IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NANCY KINNEY, CHARLES TOWNSLEY, MICHAEL SAURO, WALTER NOFFSINGER, ROSA DAVIDSON, MICHAEL KELLY, TOM KIERL, CONSTANCE LEWIS, SHERI PARR, PAUL PHAM, ALVARO PAIZ, TITON HOQUE, CHRIS MANCUSO, WILBERT TALMADGE, JANET GELPHMAN, THANH DO | § § § § § § § § § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | Civil Action No.: 1:20-cv-00969 |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § § § | JURY TRIAL DEMANDED |
| Defendant. | § | |

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT

---

## I.   STATEMENT OF THE CASE

### A. Introduction

1.      This action arises under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 *et seq.* ("ADEA"), pursuant to 29 U.S.C. §629(b), and the applicable state law of each Plaintiff's respective state. Plaintiffs Nancy Kinney ("Kinney"), Charles Townsley ("Townsley"), Michael Sauro ("Sauro"), Walter Noffsinger ("Noffsinger"), Rosa Davidson ("Davidson"), Michael Kelly ("Kelly"), Tom Kierl ("Kierl"), Constance Lewis ("Lewis"), Sheri Parr ("Parr"), Paul Pham ("Pham"), Alvaro Paiz ("Paiz"), Titon Hoque ("Hoque"), Chris Mancuso ("Mancuso"), Wilbert Talmadge ("Talmadge"), Janet Gelphman ("Gelphman"), and Thanh Do ("Do") (hereinafter "Plaintiffs") file this action against Defendant

International Business Machines Corporation ("IBM") collectively complaining of violations of the ADEA and of each applicable state laws protecting citizens from discrimination on the basis of age. More specifically, Plaintiffs allege that IBM's highest executives created and attempted to conceal a multi-faceted "fire-and-hire" scheme with the ultimate goal of making IBM's workforce younger. As part of the scheme, IBM's executives designed rolling layoffs that disproportionately targeted and terminated older workers. The scheme also involved giving older workers baseless negative performance reviews to justify their subsequent terminations. IBM simultaneously hired young college-aged employees *en masse* to replace the laid off older employees—often creating different job titles and shifting divisional structures to provide cover for the discriminatory acts. To ensure the success of its efforts, IBM explicitly excluded younger employees, or "Early Professional Hires," from the rolling layoffs. The scheme—which prematurely ended the careers of *thousands* of veteran IBM employees—was designed to function in a shrouded, compartmentalized manner to evade detection.

2.      This plot was exposed by documents and testimony produced in a virtually identical prior action against IBM. In that case, the undersigned law firm of Wright & Greenhill PC, served as lead counsel to plaintiff Jonathan Langley. Langley was a highly successful long-time IBM employee terminated as part of this illegal enterprise. In that lawsuit, this Court ordered IBM to produce high-level planning documents and correspondence from its most senior executives, including: Chief Executive Officer Ginni Rometty, Chief Financial Officer James Kavanaugh, Chief Human Resources Officer ("CHRO") Diane Gherson, and numerous other senior

executives.[1] Ethical rules bar IBM from attempting to restrict the undersigned counsel's use of this information in furtherance of Plaintiffs' case herein.

3.      There is no question that the very same discriminatory scheme is to blame for Plaintiffs' abrupt terminations. Plaintiffs respectfully implore this Court to afford them the opportunity to discover and jointly litigate IBM's plan at a national level. The joinder of all Plaintiffs and their claims herein is necessary to expose the full extent of the illegal scheme and the severity of its destructive impact.

**B.  The EEOC recently issued formal findings of cause documenting IBM's illegal age discrimination scheme dating back to 2013.**

4.      In a rare move, the U.S. Equal Employment Opportunity Commission ("EEOC") consolidated formal charges of age discrimination by numerous ex-IBM employees from across the nation into one multi-year investigation. Last month, the results of that investigation were revealed. The allegations were true. The EEOC determined that there is reasonable cause to believe that IBM discriminated against employees on the basis of age.[2] The breadth, scope, and inner workings of the discrimination uncovered by the investigation can be summarized as follows:

5.      The discriminatory scheme that IBM unleashed upon its own workforce dates back as far as 2013.[3] A massive proportion—85.85%—of the IBM employees who made up the pool of

---

[1] In *Langley v. Int'l Bus. Machines Corp.*, 1-18-CV-00443 (W.D.Tex.), this Court granted Langley's Motion to Compel Requests for Production related to the executives named herein, and others. In its Order, the Court squarely rejected IBM's "***argument that discovery should be cabined based on an arbitrary boundary***," noting that the company's resistance to an expanded discovery universe was "***highly suspect***." [*Langley*, Dkt. No. 185 at 5]. IBM eventually produced over 100,000 pages of responsive documents. [*Langley*, Dkt. No. 211 at 11]. Plaintiffs incorporate by reference all public filings in *Langley*.
[2] Exhibit 1, EEOC Determination Letter.
[3] *Id.*

persons considered for the company's rolling layoffs were older workers.[4] IBM's "highest ranks" communicated "top-down messaging" that directed managers to "engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires."[5] Dozens of witnesses confirmed IBM's ageist motives.[6] IBM's attempt to explain away the age discrimination "[did] not withstand [the] scrutiny" of the Commission.[7]

6.      Several of the individuals the EEOC identified as victims of discrimination are Plaintiffs in this lawsuit.

## II.      PARTIES

7.      Plaintiffs in this lawsuit are Nancy Kinney, Charles Townsley, Michael Sauro, Walter Noffsinger, Rosa Davidson, Michael Kelly, Alvaro Paiz, Titon Hoque, Tom Kierl, Constance Lewis, Chris Mancuso, Sheri Parr, Paul Pham, Wilbert Talmadge, Janet Gelphman, and Thanh Do. Each Plaintiff is a natural person who belongs to the protected class pursuant to the Age Discrimination in Employment Act, because each Plaintiff herein is over the age of forty.

8.      Defendant International Business Machines Corporation is a corporation with its principal offices at 1 New Orchard Road, Armonk, New York 10504-1722.  IBM does business in the Western District of Texas and maintains local offices at 11501 Burnet Road, Austin, Texas, 78758.

## III.      JURISDICTION & VENUE

9.      Plaintiffs Nancy Kinney, Charles Townsley, Michael Sauro, Rosa Davidson, Thanh Do, Michael Kelly, Alvaro Paiz, and Titon Hoque are natural persons who resided and were domiciled within the Western District of Texas at all relevant times. Walter Noffsinger and Janet

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

Gelphman, natural persons, worked for IBM within the Western District of Texas during the relevant time period. This Court has subject matter jurisdiction because Plaintiffs are asserting claims arising under federal law. Specifically, Plaintiffs all assert claims arising under the Federal Age Discrimination in Employment Act of 1967, codified at 29 U.S.C. § 626(b)-(c). This Court, therefore, has jurisdiction pursuant to 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' related state law claims. Each Texas Plaintiff fell victim to a scheme nefariously designed to target and terminate older employees within IBM. Each Texas Plaintiff worked within, and received notification of his or her termination, in the Western District of Texas. Therefore, a substantial part of the events or omissions giving rise to the claims occurred in the Western District of Texas. The scheme that resulted in the Texas Plaintiffs' respective terminations, however, was not confined to IBM's Texas workforce. IBM's discriminatory scheme was a nationwide affair.

10.     The discriminatory scheme that snared the Texas Plaintiffs was created by top executives at IBM, and it targeted and terminated the employment of older employees both within and far beyond the borders of Texas. To hide the centralized nature of the scheme, IBM utilized slice and dice techniques to make the terminations appear to be the independent decisions of local managers.

11.     Along with thousands of other victims across the United States, out-of-state Plaintiffs Tom Kierl, Constance Lewis, Chris Mancuso, Sheri Parr, Paul Pham, and Wilbert Talmadge were each members of the ADEA-protected class harmed by the same nationwide IBM scheme that harmed the Texas Plaintiffs.  Thus, all Plaintiffs' claims arise out of the same series of transactions or occurrences, and all Plaintiffs' claims concern common questions of law and fact. The Plaintiffs residing outside of the Western District of Texas are properly included in this

action and accordingly assert the right to relief jointly and severally pursuant to Rule 20 of the Federal Rules of Civil Procedure.

12.      Venue is proper in the Western District of Texas pursuant to 28 U.S.C § 1391(b) and (c).

## IV.   **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

13.      All Plaintiffs timely filed a Charge of Discrimination with the EEOC and equivalent state agencies alleging age discrimination within the requisite statutory period. Such filings occurred within 180 days of the unlawful employment practices alleged in this Complaint.  More than 60 days have passed since the filing of these charges.

## V.   **FACTUAL BACKGROUNDS**

### A.  **Nancy Kinney**

14.      Nancy Kinney is an especially tragic example of IBM tossing aside an objectively high-achieving veteran employee as part of its clandestine efforts to become younger. IBM selected Kinney to be laid off *only six months* after she earned a major promotion at IBM, and *only two months* after she returned from a short leave to deal with a personal tragedy.

15.      As an exemplar of the extent and breadth of her contributions to the company—shortly before being cast aside—IBM formally recognized Kinney in 2015 by awarding her the IBM Outstanding Technical Achievement Award, which is the "***highest technical award***" bestowed by IBM worldwide. The award was endorsed by IBM CEO Ginni Rometty herself. IBM chose Kinney for the award based on her huge breakthrough that solved an ongoing, international problem plaguing IBM. The problem revolved around the company's inability to fully integrate IBM North America's cloud network to IBM Europe's cloud network—a technological quagmire that had proven previously impossible to solve. Kinney's award-winning solution served as a blueprint to integrate IBM's Australian cloud network.

16.     For background, Kinney started her IBM career in 2000 as a Software Engineer. After a hiatus to obtain her Masters degree at the University of Texas, Kinney returned to IBM in 2010 as a contract employee. In 2012, IBM converted her to a full time employee. From there, Kinney's career at IBM quickly skyrocketed.

17.     Kinney's exemplary job performance was consistently recognized by IBM through a series of job promotions. By 2015, she had been promoted to the position of IT Cloud Architect—a lucrative Band 9 position within the company.[8] Kinney's rise to Band 9 in the span of only three years is no small feat and is reflective of IBM's awareness of both her talents and her achievements on the company's behalf.

18.     During that time, Kinney authored numerous "Redbooks" for IBM. Redbooks are highly technical internal IBM documents—usually spanning approximately 200 pages each—that describe in meticulous detail IBM's technical procedures and processes for a given product or initiative. To this day, IBM employees reference and use Redbooks that were authored by Kinney.

19.     IBM gave Kinney a momentous, potentially career-making promotion that was set to begin near the end of 2017. IBM announced Kinney's new role via email to her entire division. IBM's announcement specifically acknowledged Kinney's 20 years of experience in her field, the many Redbooks she created, her certifications that were "***too many to list***," and her successful efforts driving technical migrations into the Cloud. The new promotion expanded Kinney's job duties to include handling massive and important global accounts.

---

[8] IBM maintains a non-executive band structure (1-10), which creates the parameters of pay for non-executive employees and is correlative of experience and skill. Band 9 positions typically include department heads and upper level management.

20.     Nancy Kinney's life was upended just before her promotion and new role was set to begin. In addition to her duties at work, Kinney had been serving as a primary caretaker for her ailing brother and mother. On August 29, 2017, Kinney's brother died of brain cancer. Just three days later, Kinney's mother also passed away. To process and recover from losing her mother and brother mere days apart, Kinney took a short, company-sanctioned leave.

21.     Upon her return, IBM stripped Kinney of her newly appointed high-level responsibilities without explanation. Two months later, Kinney was informed she was going to be included in a Resource Action—IBM code for its rolling layoffs—because her skills were "***too technical***." Her managers refused to elaborate beyond this cited reason.

22.     In a matter of months, Kinney went from being one of the most celebrated employees at IBM to being laid off. The curt, "***too technical***" explanation for her firing was completely divorced from her accomplishments recognized and touted by IBM.

### B.  Charles "Chuck" Townsley

23.     Charles "Chuck" Townsley gave almost thirty years of his life to IBM. He was regularly promoted, received high performance reviews, and generated roughly $100,000,000 in sales revenue for IBM in his final years at the company. IBM rewarded him by papering his personnel file with blatantly manufactured reasons to terminate him for cause. IBM fired him one month before he turned 57.

24.     Townsley started his career at IBM in 1985 as an Electronics Technician. After a short hiatus, he rejoined IBM in 2003. His accomplishments while at IBM were numerous. In addition to generating more than $100,000,000 in company sales revenue, he was regularly promoted. IBM increased his job duties, and gave him positive performance reviews, including high marks for his sales. By 2018 Townsley reached Band 10.

25.     Over the course of his career, it was not uncommon for Townsley to exceed his IBM sales quotas by 200-300%. In performance reviews, he typically received "exceeds expectations" ratings in all five categories. In 2017, due to his tremendous sales record, Townsley qualified for IBM's celebrated "Hundred Percent Club."  The Hundred Percent Club was established in 1925 by IBM's founder, Thomas Watson Sr., to celebrate IBM's top performers. Throughout the years the Hundred Percent Club has remained an internal benchmark of excellence.  Despite both his recent and long-term history of success—and without explanation—IBM gave Townsley negative performance ratings for his 2017 evaluation.

26.     Townsley's superiors had no explanation as to why he received less than stellar reviews for his objectively successful 2017 fiscal year. The reason for the undeserved performance review became apparent. IBM needed to manufacture a justification for his termination.

27.     One month later, IBM notified Townsley he was being terminated. The purported reason given was IBM needed employees with "***better adjusted skillset to new technologies.***" IBM's suggestion that Townsley had failed to adjust his skillsets to new technologies was preposterous. Townsley had averaged 100 hours per year of continuing education courses to ensure he maintained command of IBM's latest technologies. Townsley's astronomically high sales revenue would have been impossible without mastery of IBM's new technologies.

28.     To date, IBM has failed to provide further explanation to support or clarify how exactly Mr. Townsley lacked the "***adjusted skillset to new technologies,***" nor what specific technologies he did not understand. He, and other suddenly-former IBM employees, would learn that "***lacking an adjusted skillset***" was a boilerplate excuse for otherwise inexplicable terminations.

29.     IBM's only other provided rational for firing Townsley was "***the need to cut costs***." The notion that cutting the salary of an employee who generated $100,000,000 could be a *net cost*

*cutting measure* is so mathematically outrageous that no editorializing is needed to demonstrate the insincerity of the explanation.

30.     IBM replaced Townsley—both in terms of his specific job title as well as his job duties— with substantially younger employees, fresh out of college, who lacked skills and experience. Townsley knew some of those employees who replaced him, because he had mentored them during the infancies of their IBM careers. IBM was not concerned with Townsley or his replacements' respective skillsets. It was concerned with age.

### C.  Michael Sauro

31.     Michael Sauro dedicated almost forty years of his life to IBM. During his lengthy career, Sauro received numerous promotions, pay raises, excellent performance evaluations, and consistently exceeded both IBM's customer-facing and billable utilization targets. IBM rewarded him by pushing him out the door. He was 63.

32.     At the time of his termination, Sauro held two different job roles as Worldwide Analytics Project Manager and Delivery Excellence Analytics Services Leader. Sauro and his team were so successful IBM merged the two roles with another team and gave Sauro additional responsibilities over the merged unit.

33.     Sauro and his team met key objectives set by IBM, and when assigned troubled analytics projects, Sauro's team successfully transformed them into profitable businesses. Sauro's second-line manager praised his work, telling him he wanted to expand his team's roles even further.

34.     Mere months after being so lauded, the same manager told Sauro he was being laid off. Sauro was shocked. He asked his manager what had changed. The manager was unable to provide a specific reason for Sauro's termination other than IBM was ***"changing its direction."***

35.     Over the past few years, Sauro had observed numerous instances of qualified older employees being replaced by younger, less qualified employees. The cited "***new direction***" was youth.

### D.  Walter Noffsinger

36.     Walter ("Walt") Noffsinger's career with IBM spanned almost 20 years. In 2017, he was promoted to a coveted Band D "Director" position. As a Program Director and then Director, Noffsinger grew IBM's WebSphere businesses from unprofitable to wildly lucrative—generating over *$1,000,000,000 per year* in revenue*, and netting *$500,000,000 annually in profits*. Noffsinger consistently received positive performance evaluations and annual raises for his accomplishments. Despite these objective metrics of success, IBM laid him off. Noffsinger was 60 years old.

37.     During the last several years of his employment, IBM repeatedly reassigned Noffsinger to revenue goals that bordered on impossible. He accepted each of these challenges. Through his hard work, relentless determination, and sophisticated business acumen, Noffsinger exceeded each goal—netting huge sums for his employer along the way.

38.     When it became apparent Noffsinger would not fail, IBM tried a new tactic—transferring him to a newly created role in a troubled business. Noffsinger innocently believed IBM wanted to leverage his talent and experience to salvage the struggling business. He was wrong. Approximately a week and half after assuming fulltime responsibilities in his new role, Noffsinger was told that the job had been eliminated as part of a Resource Action. The timing is telling. His new role was not created to serve any legitimate business need, and IBM had no intention of keeping the position filled. It was nothing but a sacrificial vessel used to mask the real reason for terminating an exemplary employee—he was 60-years old.

### E.  Rosa Davidson

39.     Rosa Davidson's career at IBM included decades of positive performance reviews, raises, promotions, merit-based bonuses, company awards, and—without warning—an abrupt termination via layoff.

40.     Rosa Davidson began her IBM career with IBM France in 1990 where she worked for almost two decades. After a short hiatus, Davidson was hired by IBM U.S. in 2010 as a Secure Design Engineering Leader. By that time, she was based out of IBM's Austin office.

41.     During her career, IBM recognized Davidson's excellent job performance record with a competitive initial salary, annual raises, and yearly merit-based bonuses. In 2018—just one year before she was terminated—Davidson received a 17.5% raise to reward her for the fantastic work product she continued to produce as an IBM employee.

42.     Davidson consistently received positive performance reviews from her managers, as well as numerous "Blue Thanks" awards for her exemplary performance. During her last performance review, she received either "achieves" or "exceeds" on all areas of evaluation. In all her years as an IBM employee, Davidson never received any indication that her skills needed improvement, or that her ability to understand and learn new technologies was in any way deficient.

43.     In 2017, IBM HR informed Davidson she was eligible for a "*voluntary*" retirement plan. Davidson did not want to retire, because—among other reasons—she was not yet eligible for her retirement benefits. Davidson's plan was to continue working for IBM for several more years and requested that her "voluntary" retirement be postponed *at least* until her benefits could vest.

44.     On June 6, 2019, Davidson's manager informed her that IBM was terminating her employment as part of a Resource Action. The explanation IBM's low level management gave

Davidson for her layoff was that IBM was undergoing a "***reduction of resources***" within her business unit, Watson IoT. Upon closer examination, IBM's explanation began to look suspect.

45.     Davidson reviewed IBM's online job postings soon after she learned she would be laid off. She noticed that IBM was recruiting new hires for positions suspiciously similar to her own position that had just supposedly been eliminated—despite IBM's ostensible explanation that it needed fewer employees to handle those duties.

46.     Davidson's last day of work at IBM was September 4, 2019.  She was 57 years old. Just as she feared, IBM terminated her employment before her retirement benefits vested. Davidson has suffered significantly due to being laid off by the company she spent *twenty eight years* of her life working for, with nothing but a hollow explanation for her termination as a parting gift.

**F.  Michael Kelly**

47.     Michael Kelly's IBM career spanned almost two decades. IBM regularly promoted him, gave him raises, paid him yearly bonuses, and showered him with formal IBM company awards. Kelly's IBM tenure was abruptly cut short when he was baselessly placed on a performance improvement plan, terminated, and given a nonsensical explanation for why his successful job performance history at IBM was suddenly deficient.

48.     Kelly began his 18-year career with the company as a Regional Software Sales Manager. He was regularly promoted to higher positions where he excelled in generating revenue for IBM and developing new business strategies in U.S. and international markets. Kelly's promotions were regularly accompanied by salary increases and substantial annual bonuses. During his final three years at IBM before he was abruptly terminated, Kelly's bonuses reflected the considerable amount of money he generated for his employer. IBM also recognized Kelly's exceptional job

performance through various accolades and leadership awards, including IBM's highly touted "Hundred Percent Club" award.

49.     Kelly spent most of his career in IBM's Software Group. In October of 2017, he was asked by IBM management to take over the role of Partner Management Sales Leader within IBM's World Wide Resiliency Services Alliance. Kelly's transition to the Services Group occurred over two months and required the acquisition of new skills, which he quickly learned.

50.     Up to that point, Kelly's annual performance reviews were consistently rated as "meets" or "exceeds" expectations. Despite his past success at IBM, a newly assigned manager placed Kelly on a performance improvement plan—mere months after IBM awarded him a generous bonus for his recent job performance.

51.     Kelly attempted to engage his new manager for an explanation. His manager refused to talk to him. Kelly finally addressed this in a written email—which was never acknowledged.

52.     On June 30, 2018, his manager informed Kelly he was being terminated because his team was not generating the necessary income. Given his success and the revenue he generated for IBM, the explanation amounted to nonsense.  Kelly was 59 years old when he was fired.

**G. Tom Kierl**

53.     During Tom Kierl's tenure with the company, he rose through the ranks and reached IBM's highest non-executive job level, Band 10. IBM awarded him a significant yearly salary and annual bonuses commensurate with his outstanding performance. After a thirty-four year successful career, however, Kierl was likewise shown the door in a way that quite explicitly let him know it was because of his age. He was 58 years old.

54.     In May of 2017, IBM transferred a new sales director, Pedro Parra, to Kierl's business unit. Kierl had no interactions with Parra for several months until Parra asked him to work on a

new project. While also caring for his ailing mother on hospice, Kierl offered to apply his skills and knowledge to further Parra's project.

55.      Despite Kierl's efforts to collaborate on Parra's project as requested, Kierl was ignored.  Months later, Parra told Kierl—point blank—that Kierl was "***an expensive resource***," and that he was part of IBM's "***old guard***." Parra also expressed his desire to recruit "***young***" and "***30ish***" employees in an effort to change the culture of Kierl's business unit. While his discriminatory motive was deplorable and illegal, his honesty was refreshing.

56.      Only three months after Parra's explicit ageist remarks, Parra called Kierl to inform him he was being laid off. IBM replaced him with a much younger employee.

### H.  Constance Lewis

57.      Constance Lewis had a 36-year career in the industry, including working for an AT&T division that merged with IBM. After the merger, IBM gave her a job position with a high band level, long term job assurances, great performance reviews, and—at the age of 61—an unexpected pink slip.

58.      Prior to working at IBM, Lewis had worked in a managerial role for 15 years. In May of 2017, as part of the merger, IBM retained Lewis as an Area Manager and assured her long-term employment.

59.      IBM classified Lewis as Band 9 because of her impressive track record and experience. Lewis's supervisors at IBM obviously believed she performed exceptionally *after the acquisition,* because Lewis was given both a bonus and excellent ratings on her IBM December 2017 job performance evaluation.

60.      IBM's subsequent employment discussions with Lewis proved to be just as disingenuous as IBM's previous job assurances. An IBM manager verbally offered her another position within

IBM.  The offered job required Lewis to move to another state and was only a four-month contract position. It paid a mere *half* of her current salary, offered no benefits, and was categorized as an entry-level Band 3 position. The offer obviously was designed to be declined.

61.     Ultimately, IBM employed her for a little over a year. At the age of 61, she was laid off. Lewis was advised by management her job was being offshored. The truth is IBM replaced her with someone significantly younger.

**I.   Sheri Parr**

62.     Sheri Parr spent almost two decades working for AT&T. The company lauded her with numerous awards and substantial pay increases based on her consistent high-level work performance. In 2017, Parr's workgroup was acquired by IBM. IBM promised Parr that she would be given an equivalent job within the company after the acquisition, and that she would remain employed at least as long as needed for her retirement benefits to vest. Approximately one year after the merger, despite her excellent job performance, IBM laid her off. She was 62 years old. Her retirement benefits had not yet vested.

63.     Prior to IBM's acquisition, Sheri Parr worked as a high-level manager in a career that spanned over 30 years. Parr earned impressive accolades during her tenure, including placement on the High Performance list—a designation reserved only for the highest promotable individuals. She was the only employee within her business unit of over 500 to receive the "Leader's Council Award" for professional excellence. For consecutive years leading up to the acquisition, Parr earned the highest performance ratings possible and consistently earned annual bonuses.

64.     Parr's job title at IBM was an Area Manager of Global Ordering Sales Support, a prestigious Band 9 position. In her new role, Parr managed a team of eleven, which collectively accounted for a significant amount of annualized revenue for IBM.

65.     IBM soon notified Parr it planned to offshore her group, but IBM executives reassured her they would help her find a comparable role within the company. Parr asked for help for weeks. She was ignored. Eminently qualified for numerous open positions, Parr set out to secure a position on her own. She applied for at least *twelve open positions* within IBM that matched her skillset, education, and experience. IBM did not grant her a *single interview* for any of those twelve jobs.

66.     Parr and her colleagues, who found themselves in a similar position, began to suspect IBM was not merely ignoring them but was *actively blocking* their efforts. They started tracking various employees' efforts to secure continued employment with IBM. A pattern emerged that revealed the defining characteristic of the employees IBM kept. They were young. The only individuals able to obtain other roles were under the age of forty. The age discrepancy was no accident. It was by design.

67.     Parr was notified on May 8, 2018 that she would be laid off. She was offered a job that— by almost any metric—was designed to be rejected. After over 30 years in the industry, IBM offered her an entry-level Band 3 job at a call center in North Carolina, halfway across the country. Her pay would be reduced by *half*. Parr later discovered the sham job was only designed to last 4 months. As IBM designed it, Parr rejected the offer, and her exit from IBM was a *fait accompli*.

### J.  Paul Pham

68.     Paul Pham was considered one of the most accomplished employees within his division at IBM. He also happened to be the oldest. His story ends the same—IBM laid him off for a reason completely divorced from reality.

69.     Pham came to IBM through an acquisition involving AECOM. At IBM, Pham took on a role where he soon became instrumental to his new division's success. Pham developed a reputation as the "go-to" employee for all software performance tuning and troubleshooting issues.

70.     To provide context to Pham's impressive performance in the industry, he had singlehandedly written critical programs necessary for AECOM's operations still used today. After the acquisition, he was made a Senior Oracle Application Database Administrator in IBM's Global Technology Services unit.

71.     Pham received positive performance reviews in what would be his final year at IBM. In 2018, Pham's manager Titon Hoque—another Plaintiff in this case—blindsided Pham when he told him he was being laid off. Hoque was unable to provide an explanation for the layoff. He could only offer up that IBM was undergoing a *"reorganization,"* and Pham's selection was due to the "*business needs"* of the company.

72.     Inexplicably, IBM's official reason for Pham's termination was that he needed *"deeper technical skills."* Given his extensive technical background, the explanation was preposterous. His confusion turned to suspicion when he learned that the only other individual laid off in his group was the *second* oldest employee after him.

73.     Hoque, Pham's manager, complained in correspondence to a supervisor that he was uncomfortable IBM was pre-selecting employees for layoff. Hoque also told Pham that any

person pre-selected for layoff was barred from internal transfer. After making his complaints, Hoque himself was selected for layoff. IBM made Pham and his coworker spend the following month training their replacements—both were in their twenties.

### K.  Alvaro Paiz[9]

74.     Despite his exemplary career at IBM, Alvaro "Al" Paiz was laid off. Paiz was employed by IBM as a Band 8 IT Specialist. Paiz enjoyed a successful career at the company and received an excellent performance review right before he was terminated.

75.     On March 30, 2018, Paiz received a generic notice from his manager, Titon Hoque, informing him he had been selected for layoff, citing *"the need to position [the] company for the future"* and *"the need for increasingly deeper technical skills"* as the reason for his termination. Hoque gave Paiz the illusory "choice" of an alternative job that would require relocating himself and his family to Columbia, Missouri.

76.     Paiz was understandably confused. He approached his manager to try and better understand the decision. The response he received from Hoque shocked him. Hoque was powerless in the matter. Hoque admitted he was never aware that Paiz was going to be selected for layoff, and Hoque did not select him. Quite the opposite, he actively opposed Paiz's termination because of the value he brought to the team. Rather than the boilerplate reasons advanced by IBM to justify the layoffs, Hoque told his own supervisor, *"[i]t seems we are finding an identification methodology for people that have already been selected."*[10]

77.     Hoque's support of Paiz's retention accomplished nothing. The decision had already been made. The layoff was pre-ordained.

---

[9] Counsel has recently learned Alvaro Paiz has passed away and will substitute this filing with his Executrix.
[10] *See* Ex. 2, Correspondence from Titon Hoque to Supervisor.

### L. **Titon Hoque**

78.     Titon Hoque is yet another employee whose career was prematurely ended by IBM as part of its ageist, discriminatory scheme to create a younger workforce. Hoque is in the unique position of being both a victim of the scheme and one of the managers who was indirectly tasked with carrying it out.

79.     Hoque was a successful IBM manager based out of Austin. He consistently received positive performance reviews and was well regarded by his peers and the employees he managed.

80.     In 2017, many of Hoque's job responsibilities and those of his team were moved to the IBM Argentina office. Hoque found that the managers and employees in Argentina were much younger than him and compensated less. As a manager, Hoque was responsible for selecting employees for layoffs based on criteria given to him from IBM HR. He was also responsible for transitioning laid off employees' skills and job responsibilities to the employees in IBM's Argentina office. Hoque began to notice the subjective way in which IBM asked him to select employees for layoffs. He noted IBM employees were not evaluated by skillset or any other discernable metric. Instead, IBM chose employees to be laid off based on vague subjective criteria.

81.     Hoque expressed his concerns regarding IBM's layoff criteria and procedures to his own manager. Soon after, Hoque was laid off. His last day of work was July 19, 2018. The timing between his complaints about the layoff selection process and his own selection for layoff is no coincidence.

### M. Chris Mansuco

82.     Chris Mancuso was employed with IBM for 20 years. During that time, he was a top sales performer, received numerous awards, salary increases, and high performance ratings. To reward him, IBM laid him off.

83.     At one point in his career, Mancuso left IBM to pursue another opportunity. Soon after, IBM actively recruited him to return. To lure him back, IBM offered him a salary raise and new job responsibilities. He relented, ultimately rejoining IBM in 2016.

84.     Mancuso spoke with his manager, Pedro Parra, during his 2017 performance evaluation. Mancuso inquired about transferring into certain specific roles under Parra. Parra denied his request outright. Parra explained that "***these roles are for the young at heart. I need young blood. I need to change the old guard***."

85.     In January of 2018, Mancuso was further tipped off that he would need to find a new position.  He applied for an open position under IBM team manager Jay Leary, who wanted to hire him. HR actively blocked Mancuso's hiring. Leary told Mancuso, ***"[w]e have hit a road-block. HR won't share any detail with me, but I have been told that you are not eligible to move into my role."***[11] Leary added, ***"I am very disappointed – I really wanted to have you here on my team."***[12] Mancuso also discovered a discrepancy regarding target incentives for him and his subordinates. Mancuso suspected foul play and filed a formal complaint with HR.

86.     Despite his stellar performance ratings—and shortly after filing his formal complaint—Mancuso's manager told him he was being laid off. IBM now had room to hire the "***young blood***" that it truly desired.

---

[11] *See* Ex. 3, Correspondence from Jay Leary to Chris Mancuso.
[12] *Id.*

### N.  Wilbert Talmadge

87.    Wilbert Talmadge's career at IBM spanned almost three decades. He considered himself an IBM "lifer" who planned to carry out the remainder of his career with the company. IBM shattered those plans by laying him off.  He was 62.

88.    Talmadge had been a successful Inventory Capture & Logistics Project Manager and was responsible for overseeing data centers and employees handling various escalation matters. Throughout Talmadge's IBM tenure, he received numerous raises and high performance reviews, including his very last performance review before IBM fired him.

89.    In 2019, Talmadge's manager recognized him as "Innovator of the Year" within his organization for leading the effort to build a system, which was projected to save the company millions of dollars.

90.    Without warning, that same manager subsequently informed Talmadge he was being laid off. Talmadge's manager explained that the decision was based on the ***"business needs"*** of the company. Talmadge discovered IBM's reason for his termination was manufactured when twelve other coworkers that worked alongside him were terminated. They were all over the age of forty.

91.    Talmadge's last day of work at IBM was September 4, 2019. At 62 years old, he was suddenly out of work and uncertain of his next paycheck. He was forced to accept a low paying manual labor job to make ends meet.

### O.  Janet Gelphman

92.    Janet Gelphman joined IBM in 2015 as a Senior User Experience (UX) Designer and Information Architect.  Despite coming to IBM through an acquisition, within in her first year,

IBM was incorporating Gelphman's own designs in its software products and she was leading an "Innovation Team" of architects and developers in research and development initiatives.

93. Following a reorganization, Gelphman was transferred to the Austin UX Design Team. Not long after taking on this role, she was promoted to a Storage UX Lead where she continued to thrive, both managing employees, and creating innovative new designs and features, which consistently impressed her managers.

94. In October of 2016, Gelphman's manager, Darin Duval (53), who had previously overseen her success, was replaced by Ty Tyner—17-years his junior. Gelphman had never met Tyner. However, within a week of assuming the position, and despite the consistent praise she had received from colleagues and superiors for her design work, Tyner demoted Gelphman and dismissed her accomplishments. Gelphman's colleagues continued to integrate her designs in various new IBM platforms thereafter.

95. A subsequent discussion with Tyner revealed the real reason she was demoted. Gelphman allowed two millenials to leave the design group under her watch. Gelphman began to fear Tyner had a bigger agenda and that no amount of talent could overcome IBM's obsession with millenials. Her fears were confirmed upon learning IBM's strict policy of retaining millennial employees "***at all costs***."

96. Despite her objective success at IBM, Gelphman received a negative rating in her last performance review, and in January of 2018 Tyner placed Gelphman on a "Performance Improvement Plan" (PIP). The PIP documents were riddled with inaccuracies, and did not match the reasons previously provided by Tyner. As a result of the PIP, Gelphman was demoted and replaced with a 26 year-old.

97.     The hammer finally dropped in March of 2018 when her manager informed her she had been selected for lay off because she lacked the "skillset" needed for her role. It became apparent from her conversation with Tyner that the purpose of the PIP was not "performance improvement," but to block her from eligibility for internal transfer. Numerous other older workers in Gelphman's group met the same fate and were invariably replaced by younger counterparts. IBM terminated Gelphman in June of 2018 at the age of 63.

**P.  Thanh Do**

98.     Thanh Do is originally from Vietnam. After several failed attempts, she successfully escaped and fled from the communist regime in her home country. Do was 18-years-old when she reached the United States as a refugee.

99.     Despite knowing very little English, Do graduated with high honors from college and went on to obtain a Masters Degree in Computer Science. Her educational track record made her a sought-after candidate for employment by several different companies. Upon careful consideration, Do ultimately accepted a position at IBM because she believed in IBM's mission and culture.

100.    Showing the same grit and talent she had previously displayed, Do's career at IBM included decades of hard work, promotions, raises, positive performance reviews, IBM awards, and—unexpectedly—a notice that her thirty-six year employment with IBM was about to abruptly end. Do had been selected to be laid off.

101.    During her IBM career, Do had been consistently promoted. Her managers gave her merit-based bonuses and raises on a yearly basis. In 2017, Do was promoted to the role of Senior Software Engineer, a Band 9 position, which made her one of the more experienced senior employees within IBM's corporate hierarchy. Do regularly received positive annual performance

reviews. During her final IBM performance evaluation in January 2019, Do's manager rated her as "exceeds" in business results, client success, and skills. IBM management never communicated to Do that her skills required improvement.

102.    IBM recognized Do's exceptional job performance through formal and informal awards. Among others, IBM awarded Do with an "Ovation Award," which was signed personally by the IBM CEO. IBM also awarded Do the "Manager's Choice Award" on May 14, 2019 for her commitment to IBM's practice of "***restless reinvention***." One month later, IBM fired her.

103.    In May of 2019, Do took ten days off of work to care for her single, 63-year-old brother while he underwent lung cancer surgery. She returned to work on June 6, 2019. Brazenly, on the very *same day she returned*, Do's manager informed her that she was being laid off. Do's manager explained her position had been "***eliminated***." Do's last day of work at IBM was September 4, 2019. She was 58 years old.

104.    After she was informed of her selection for layoff, Do applied for open positions within her department. IBM manager Rene Neumann admitted that Do was "***more than qualified for***" for a position she sought. Her stellar career and qualifications notwithstanding, Neumann informed Do that IBM HR would prefer to fill the position with an "***Early Professional Hire***."

105.    IBM management struggled to find an adequate replacement who could handle Do's prior job responsibilities. Ultimately, IBM had to employ *two younger* employees—who in turn required supervision by *four other employees*—to perform Do's job duties. IBM's representation that Do's job was "eliminated" rings hollow. Do's manager even admitted that one of the employees who replaced her lacked crucial skills and was "***absolutely lost***." IBM did not eliminate Do's position.  IBM merely filled it with younger employees.

## VI.    IBM'S DISCRIMINATORY SCHEME

106.    During Ginni Rometty's tenure as CEO of IBM, the company embarked on a *massive* "*reinvention*" and rebranding campaign aimed at attracting "*digitally native*" young workers, which IBM internally referred to as Millennials, Summit Hires, and Early Professional Hires ("EPH").[13]

107.    At a 2014 conference titled "*Reinvention In The Age of The Millennial*," IBM expressly linked its success to Millennials, asserting that advancement in new technologies "*are driven by Millennial Traits*."[14] IBM intended to become "*exponentially relevant with the Millennial demographic*" by "*showcas[ing] IBM's capabilities … driven by the digitally native millennials.*"[15]

108.    IBM published, "Millennials: How IBM can effectively attract, engage and retain this emerging generation."[16] Because Millennials meant big money for IBM and because IBM "face[d] major competition with [other] companies acquiring Millennials, both within the tech sector (i.e., Microsoft, Amazon) and beyond," IBM developed a "strategy to attract top Millennial talent."[17]

109.    It was not only IBM's rosy assessment of young people's potential that drove its "*transformation,*" but a growing corporate culture that not only questioned the relative value of older workers, but increasingly perceived with contempt their ability to contribute. In a 2015 publication, "**Myths, exaggerations and uncomfortable truths – The real story behind Millennials in the workplace,**" IBM flattered the Millennial generation it sought to recruit while

---

[13] *See Langley*, Dkt. No. 1 at 2, Plaintiff's Original Complaint,
[14] *See id.* at 3; Ex. 4, *Reinvention in the Age of the Millennial*, IBM Center for Applied Insights Blog published December 16, 2014
[15] *Id.*
[16] *Id.* at 4.
[17] *Id.*

disparaging older Gen X and Baby Boomer employees.[18] In that piece, IBM referred to older workers as "*gray hairs*" and "*old heads*," and represented that "*age is catching up with Baby Boomers*," and those still working often needed accommodations for "'*wear and tear' disabilities like hearing and vision impairment [sic] that older people routinely develop*."[19]

110.    In 2016, IBM's Marketing Manager, Erika Riehle, doubled down on these stereotypes, characterizing older employees as suffering from workplace "*dysfunctions.*"[20] Older employees were allegedly less trusting of their co-workers, less collaborative, less committed, less accountable, and less attentive to results.[21]  Compared to younger employees, IBM found that Boomers were the least likely to understand IBM's business strategy, least likely to understand their manager's expectations of them, least likely to understand what customers wanted, and the least likely to understand IBM's brand.[22]

111.    IBM executives simply bought in to the stereotype that younger people are better at learning, understanding, and selling technology than its current seasoned workforce.[23] These beliefs about the relative value of older employees versus younger workers dictated what happened next.

112.    Under CEO Rometty's tenure, IBM went to great lengths to hire droves of younger workers as part of its deliberate strategy to "*Transform[] to Next Generation Digital*

---

[18] *See id.* at 16; Ex. 5, *Myths, exaggerations and uncomfortable truths – The real story behind Millennials in the workplace.*

[19] *Id.*

[20] *See id. at 18;* Ex. 6, Erika Riehle*, Managing Millennials: 5 Common Issues Leaders Face, published April 24, 2016.*

[21] *Id.*

[22] *Id.*

[23] This stereotype about older workers, that Congress exposed as unfounded, unsupported by scientific research, and harmful—not only to the individual impacted by the early termination of employment—but to the US economy as a whole—resulting in the passage of the ADEA. *See* Ex. 7, Victoria A. Lipnic, *The State of Age Discrimination and Older Workers in the US 50 Years After the ADEA,* published June 2018.

*Talent.*[24]  During a 2017 television interview, Rometty touted, "*50% of IBM is Millenials*,"[25] and in 2018 IBM bragged to investors that over 50% of its workforce had been hired in the last five years.[26]

### A. IBM'S scheme was created and carried out by its top executives, not rogue local managers.

113.    The scheme came from the highest levels of IBM. Ginni Rometty, CHRO, Diane Gherson, and a cadre of top executives developed and implemented the scheme. The Human Resource and Finance divisions weaponized artificial intelligence against IBM's older workers by using biased predictive analytics to assess individuals in the workforce and their future value to the company.[27]

114.    Finance made the math work, providing the business case for mass exits of older employees. Cognizant that its efforts to "*refresh*" its workforce violated anti age-discrimination laws, IBM Legal devoted significant time and resources devising tactics and procedures to avoid detection.

115.    Throughout the undertaking, Rometty remained profoundly involved and invested in the outcome.[28]

### B. IBM used code words for different aged employees, and then targeted its older employees for termination.

116.    High-level executive planning documents are riddled with terms such as "Early Professional Hire," "seniority mix," "skills remix," "next generation," "refresh," "revitalization

---

[24] *See Langley*, Dkt No. 1 at 19.
[25] *See Langley*, Dkt. No. 188 at 3 (citing https://www.youtube.com/watch?v=fgc4aJ-JMJg&app=desktop at 4:22).
[26] *Id.*; Plaintiff's Motion to Compel Requests for Production and Depositions, Dkt. No. 86 at 6.
[27] *See* Ex. 8*,* Jena McGregor*, The New Way Your Boss Can Tell if You're About to Quit Your Job,* The Washington Post, 2019, published April 11, 2019.
[28] *See Langley*, Dkt. No. 188 at 3.

hiring," "reinvention of the workforce," and "transformation"—catchy corporate bywords that ring of white-shoe management consulting and Ivy League MBA's.[29] Executives created this coded language to permit them to speak about illegal discrimination in a way that avoided detection, gave cover, and provided plausible deniability.

117.    IBM's scheme relied upon "Resource Actions"—company lingo for layoffs—to eliminate older workers. Resource Actions provided a ready-built mechanism for the removal of employees to free up salary and space for younger workers—thus "*revitalizing*" their workforce.

118.    The design of the layoff scheme was deliberately complex in an attempt to cover tracks and shield the company from liability. For example, the *Langley* case established that his managers were not the ones who selected him for layoff, but rather his selection had been pre-ordained by HR. One manager complained that IBM was reverse engineering "*an identification methodology for people that ha[d] already been selected.*"[30]

119.    However, IBM refused to acknowledge publicly these company-wide and continuous layoffs were taking place. When confronted with the fact that 50,000 to 100,000[31] employees had been terminated and replaced, IBM crowed that these cuts were justified by a legitimate need for cost-saving measures. Interestingly, over the same period of time, IBM was handsomely compensating the executives. Public records indicate Rometty was paid $137 million in compensation during her first seven years as CEO.[32]

---

[29] *See Langley*, Dkt. No. 1.
[30] *See* Ex. 2*, Correspondence from Titon Hoque to Supervisor.*
[31] *See Langley*, Dkt. No. 188 at 3.
[32] *See* Ex. 9, Michael Hiltzik, *Ginni Rometty's lousy record—but excellent pay—at IBM*, Los Angeles Times 2020.

**C. IBM deliberately exempted its younger hires from the rolling layoffs it sued to axe thousands of its veteran employees.**

120.    In the same year Rometty was appointed CEO, IBM instituted its "*Early Professional*" ("EP") program. While publicly, the purpose of the EP program was to "***bring in as much young talent into the workforce***" as possible,[33] in reality, IBM used "*Early Professional Hires*" to fill the thousands of vacant positions created by its layoffs of older workers. "*Early Professional Hires*" were significantly younger than their cohorts. To achieve rapid "*rejuvenation,*" IBM not only loudly trumpeted the Early Professional Program in media and recruiting campaigns, it also established aggressive Early Professional hiring targets.

121.    IBM was also careful to ensure that Early Professional Hires were not swept up in the rolling layoffs. EPHs were almost exclusively classified within lower job bands—which meant that lower bands held a high proportion of IBM's young workforce. Conversely, IBM HR knew that as band level increased, so too did the mean age of the workers within it.[34] Thus, "***rebalancing the age profile***" and "***remixing seniority***" dictated that layoffs should focus on higher-bands, avoid methodologies adverse to lower-band workers, and expressly exempt EPHs from layoffs. Targeting higher job bands—rather than age—also provided a façade of legitimacy to the layoff selection.[35]

**D. IBM pre-selected older employees for layoff, directed subordinates to alter employee evaluations as cover, and made intracompany transfers impossible.**

122.    Prior employee performance evaluation models were discarded and replaced with subjective methodologies to provide the company cover for large-scale discriminatory terminations. For example, IBM retired its long-time performance management system,

---

[33] *See* Ex. 10, Shivani Shinde Nadhe, *IBM New Team to Focus on Millennials, Business Standard, 2016, published May 31, 2016.*
[34] *See Langley*, Dkt. No. 188 at 5-6.
[35] *Id.*

"Personal Business Commitments" ("PBC"), which assigned a numerical score to every employee. This system was objective, rigid, and quantifiable and resisted manipulation. To protect itself, IBM replaced PBC with Checkpoint, a malleable, subjective rating system.

123.    The new system discarded the objectivity of PBC ratings and permitted direct manipulation. Public pleadings in *Langley* show that the plaintiff had been pre-selected for layoff by HR. To conform the layoff selection to the pre-ordained HR list, an HR partner downgraded Langley's Checkpoint evaluation.[36] Despite meeting goals and making valuable contributions to their teams, older employees found that objective indicia of good performance no longer ensured job security in the "Age of the Millennial" at IBM.

124.    To ensure that an employee selected for termination actually exited the company, IBM applied draconian requirements to make internal transfer or rehire nigh impossible. Transfers required approval from the senior vice presidents and chief financial officers of the respective business units, a level of involvement highly atypical for senior executives. The actual mechanics of the transfer process were kept secret, and HR was forbidden from discussing the process or meeting with the requesting employee.

125.    IBM refused to provide terminated employees the ages of other workers being laid off, which is a requirement of federal law under the Older Workers Benefit Protection Act. The only logical conclusion is that IBM denied its employees access to this data because it would have revealed systemic, sweeping violations of federal law.

126.    The foregoing shows a pattern and practice of deliberate age discrimination at IBM. The illegal conduct was devised by high-level executives, who went to great lengths to ensure that the illicit plot was concealed through a variety of moving parts and byzantine processes. IBM

---

[36] See *Langley*, Report and Recommendation of the United States Magistrate Judge, Dkt. No. 201 at 6-7.

counted on the fact that the sheer breadth and complexity of its "***transformation***" would make it virtually impossible to prove that the company violated the law. In doing so, IBM lost sight of what matters—the person's performance, ability, and experience. Age is irrelevant. IBM cast aside both its older workers and the law—and now it must right the wrongs inflicted.

**E.  To deceive its employees into signing an arbitration agreement, IBM lied about who was being laid off and why.**

127.    Plaintiffs expect IBM will claim some of the Plaintiffs named herein are contractually bound to bring their federal age discrimination claims in secret, individualized arbitrations. Plaintiffs are well aware the law favors arbitration but asserts the arbitration provision contained in the Resource Action Separation Agreement ("RA Agreement") is legally unenforceable because it was obtained through fraud.

128.    IBM provided fraudulent justifications for layoffs and simultaneously withheld federally mandated age information—that would have revealed the number of older workers being impacted—to fraudulently induce employees into signing an arbitration provision. Absent IBM's fraudulent conduct, these cunningly crafted agreements, which ushered laid off employees into secret arbitration, would have effectively skirted the law.

129.    The rationales provided by IBM to justify the layoffs have no basis in truth. The proffered "legitimate business need" justifications—insufficient skills, need to offshore, changing direction, job elimination, business needs, reduction of resources, reorganization, failure to meet business targets, etc.—were fabricated as part of IBM's larger scheme to quietly lay off thousands while simultaneously hiring their younger replacements.

130.    IBM realized that providing employees accurate data would reveal its scheme. In order to prevent enforcement of age discrimination claims in open court, IBM offered healthcare benefits and paltry severance pay as an inducement to employees who signed the RA Agreement—non-

signers received nothing. This agreement required employees to release virtually all causes of actions against IBM. Cleverly, it did not require employees to give up their age discrimination claims under the ADEA. To do so would have triggered the disclosure requirements of the Older Workers Benefit Protection Act ("OWBPA").[37] Under the OWBPA, employers who ask laid-off employees to sign away their rights must disclose the ages of persons in their unit who are being laid off—as well as the ages of persons retained. The purpose of this requirement is to provide employees with the factual circumstances of their layoff so that they can determine whether they were discriminated against before giving up their rights. The ADEA carve out contained in the RA Agreement is evidence of IBM willful intent to avoid OWBPA. IBM knew if it disclosed the age information, no person in their right mind would sign the waiver.

131.    IBM's arbitration agreement requires Plaintiffs bring their cases individually and limits discovery to three fact witness depositions. This makes revealing a high-level, complex, multi-layered plan impossible. IBM knew this. IBM's scheme hinges on employees' inability to see the forest through the trees and relies on the further guarantee that if an employee were successful in proving IBM's discrimination in arbitration, the case would never see the light of day. Law and equity mandate this case be tried in open court.

## VII.    CAUSES OF ACTION

### A.  Count I – Age Discrimination in Violation of the ADEA

132.    Plaintiffs incorporate by reference the allegations as though set forth in full herein.

133.    IBM terminated Plaintiffs because of their age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §623(a)(1).

134.    IBM's violation of the ADEA was willful.

---

[37] 29 U.S.C. §626; §626(f)(1)(F)(ii).

135.    As the direct result of IBM's age discrimination, Plaintiffs have sustained and will continue to sustain wage and benefit losses, and have incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

136.    As the direct result of Defendant's pretextual reasons proffered for termination, Plaintiffs have lost earnings capacity.

**B. Count II – Chapter 21 Texas Labor Code – Disparate Treatment Involving Termination (On Behalf of Plaintiffs Nancy Kinney, Charles Townsley, Michael Sauro, Walter Noffsinger, Rosa Davidson, Thanh Do, Titon Hoque, Michael Kelly, Alvaro Paiz, and Janet Gelphman)**

137.    Plaintiffs Kinney, Townsley, Sauro, Noffsinger, Davidson, Do, Hoque, Kelly, Paiz, and Gelphman incorporate all paragraphs herein as though set forth in full.

138.    IBM's practices as set forth herein violate Chapter 21 of the Texas Labor Code prohibiting discrimination on the basis of age.

139.    IBM acted with reckless indifference to the Texas Plaintiffs' rights under state law to be free from age discrimination in employment

**C. Count III – California Fair Employment and Housing Act, Cal. Gov't Code § 12900, *et seq.* and Violation of Public Policy (On Behalf of Plaintiff Paul Pham and Constance Lewis)**

140.    Plaintiffs Pham and Lewis incorporate all paragraphs herein as though set forth in full.

141.    IBM's practices as set forth herein violate the California Fair Employment and Housing Act, Gov't Code § 12900, *et seq*. This cause of action is brought pursuant to California Government Code §12940(a), which prohibits discrimination against a person in terms and conditions or privileges of employment on the basis of age, and the corresponding regulations of the California Fair Employment and Housing Commission, or its successor. At all times relevant herein, there existed fundamental and established California Public Policies, as codified by case

law and statute, including but not limited to California Government Code §12940(a). IBM violated California Public Policies by wrongfully terminating Plaintiffs on the basis of their age.

142.    IBM's practices as set forth in Count III were knowing and willful.

**D.  Count IV – New York State Human Rights Law, N.Y. Exec. Law §296 *et seq.* (On Behalf of Plaintiff Chris Mancuso).**

143.    Plaintiff Chris Mancuso incorporates all paragraphs herein as though set forth in full.

144.    IBM's practices as set forth in Count IV violate New York State Human Rights Law prohibiting discrimination on the basis of age.

**E.  Count V – Colorado's Anti-Discrimination Act ("CADA"), C.R.S. §24-34-402 *et seq.* (On Behalf of Plaintiff Wilbert Talmadge).**

145.    Plaintiff Wilbert Talmadge incorporates all paragraphs herein as though set forth in full.

146.    IBM's practices as set forth in Count V violate provisions of Colorado's CADA, C.R.S. §24-34-402, which prohibit discrimination on the basis of age.

**F.  Count VI – Fraud**

147.    Plaintiffs incorporate all paragraphs herein as though set forth in full.

148.    IBM knowingly engaged in fraud, including fraudulent inducement, by making misrepresentations of material facts in relation to Plaintiffs' terminations, that Plaintiffs relied upon to their detriment, in violation of applicable federal and state statutory and common law.

149.    IBM's violation of the ADEA was willful.

150.    As a result of IBM's fraudulent acts or omissions, Plaintiffs' agreements to arbitrate ADEA claims and waive certain state law claims are rendered void and unenforceable as a matter of law.

## VIII.   DAMAGES & PRAYER FOR RELIEF

151.   WHEREFORE, Plaintiffs request that the Court enter judgment and relief as follows:

1.   That IBM be ordered to pay Plaintiffs back pay and benefits with interest;

2.   That a final judgment in favor of Plaintiffs against IBM be entered for liquidated damages in an amount equal to the amount of back pay and benefits due to Plaintiffs;

3.   That IBM be ordered to reinstate Plaintiffs to their respective former positions with all lost pay and benefits, seniority and promotions;

4.   That in the alternative, IBM be required to pay Plaintiffs front pay and benefits in the event reinstatement is not feasible;

5.   That Plaintiffs be awarded compensatory and punitive damages, including damages for grief, inconvenience, loss of enjoyment of life, anxiety, worry, distress, emotional distress, damage to their professional reputations, and loss of earning capacity as permitted by applicable state law;

6.   That Plaintiffs be awarded compensation for the adverse tax consequences of their recovery of wages and benefits in a lump sum;

7.   That Plaintiffs be awarded the costs and expenses of this litigation and their reasonable attorney fees;

8.   That Plaintiffs be awarded pre- and post-trial interest;

9.   That IBM be enjoined from discriminating against employees in any manner that violates the ADEA or related state laws raised herein;

10.  That IBM be enjoined from enforcing any agreements found void, invalid, or unenforceable;

11. That Plaintiffs be granted such further legal and equitable relief as the Court may deem

just and proper.

Respectfully submitted,

WRIGHT & GREENHILL, P.C.
900 Congress Avenue, Suite 500
Austin, Texas  78701
512/476-4600
512/476-5382 (Fax)

By:_____
　　　Heidi A. Coughlin
　　　State Bar No. 24059615
　　　hcoughlin@w-g.com
　　　Archie Carl Pierce
　　　State Bar No. 15991500
　　　cpierce@w-g.com
　　　Blair Leake
　　　State Bar No. 24081630
　　　bleake@w-g.com

　　　and

By:_____
　　　Kaplan Law Firm
　　　Austin Kaplan
　　　State Bar No. 24072176
　　　akaplan@kaplanlawatx.com

**Counsel for the Plaintiffs**