IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NANCY KINNEY, CHARLES TOWNSLEY, MICHAEL SAURO, WALTER NOFFSINGER, ROSA DAVIDSON, MICHAEL KELLY, TOM KIERL, CONSTANCE LEWIS, SHERI PARR, PAUL PHAM, ALVARO PAIZ, TITON HOQUE, CHRIS MANCUSO, WILBERT TALMADGE, JANET GELPHMAN, THANH DO | § § § § § § § § § § § § | |
|      Plaintiffs, | § § | |
| vs. | § § | Civil Action No.: 1:20-cv-00969-LY |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § § § | |
|     Defendant. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S MOTION TO COMPEL ARBITRATION OF ADEA CLAIMS AND PARTIAL MOTION TO DISMISS**

## I.     INTRODUCTION

1.     Defendant International Business Machines Corporation's ("IBM") Motion to Compel Arbitration of ADEA Claims and Partial Motion to Dismiss ("Motion to Dismiss") should be denied. IBM's Motion to Dismiss is predicated on a distortion of the facts, the law, and Plaintiffs' arguments. Defendant argues this Court lacks authority to determine the enforceability of the arbitration provision because Plaintiffs have challenged the entire contract. This is patently false. In support of its argument, IBM presents three-pages, of a twenty-eight-page contract, and claims it is the entire contract. The reason for Defendant's sophistry is clear—it makes Plaintiffs' case easier to dismiss. Case law dictates challenges to the validity of a contract must be decided

by an arbitrator, whereas challenges to an arbitration provision be decided by a court. Plaintiffs' Amended Complaint clearly seeks to invalidate only the arbitration provision. It is squarely within this Court's authority to decide the enforceability of the arbitration provision.

2.      Next, IBM claims (1) Plaintiffs failed to plead fraud in the inducement with sufficient particularity; and (2) Plaintiffs disguise their discrimination claims as fraudulent inducement claims. IBM's attempt to recast and reduce Plaintiffs' fraud allegations to an unrecognizable form fails. IBM's national counsel recycles the exact same arguments they made in *McCormack v. IBM*—a case omitted from IBM's Motion to Dismiss. Those arguments failed to persuade the *McCormack* district court judge and should similarly fail to persuade this Court.

3.      Plaintiffs have pled fraudulent inducement with sufficient particularity. Plaintiffs have proffered detailed specifics of IBM's fraud. Plaintiffs' pleadings are more than sufficient to put IBM on notice and allow it to prepare a defense. Additionally, this lawsuit is not an attempt to uncover unknown wrongs—quite the contrary. Wright & Greenhill PC, served as counsel for Jonathan Langley in an identical prior case in this very court.[1] In that case, counsel was privy to high-level planning documents and internal emails exchanged between IBM's executives.[2] It is with *this* knowledge Plaintiffs have alleged fraud. IBM's argument that it needs more information regarding its *own* fraud is insincere and constitutes a feeble attempt to plead ignorance. This Court should summarily disregard IBM's arguments and deny its Motion to Dismiss.

---

[1] *Langley v. Int'l Bus. Machines Corp.,* No. 1-18-CV-00443 (W.D. Tex.)
[2] *Langley* at Dkt. 185.

## II.   ARGUMENTS AND AUTHORITIES

**A. This Court has the authority to determine the enforceability of the arbitration provision.**

4.      IBM's attempt to convince this Court it lacks the authority to determine the validity of IBM's arbitration provision is misleading and contrary to controlling case law. Defendant purposefully produced only *three* pages—of a larger, twenty-eight-page contract[3]—in an attempt to make this Court believe Plaintiffs seek to invalidate an entire contract.[4]

5.      It is clear on the face of Plaintiffs' First Amended Complaint that Plaintiffs intend to invalidate the arbitration provision, not the entire contract, because those were the portions of the contract procured through IBM's fraud. IBM attached three pages to its Motion in an attempt to pass them off as an entire "contract." IBM did not produce, or even acknowledge, the remaining twenty-five pages of the contract.  The reason for Defendant's duplicity is obvious. Plaintiffs' case would be easier to dismiss and compel to IBM's secret arbitration if Plaintiffs sought to invalidate an entire contract.

6.      The law regarding challenging the validity of an arbitration provision is clear—if Plaintiffs seek to invalidate an arbitration provision within a contract, the issue is decided by the Court.[5] Conversely, if Plaintiffs attempt to invalidate an entire contract, the issue is decided by the arbitrator.[6] IBM's misrepresentation of Plaintiffs' argument is an attempt to convince this Court it lacks the authority to decide whether Plaintiffs are bound to arbitration. This walks a not-so-fine line between creative lawyering and outright deception. It is squarely within this Court's authority to determine whether to strike the arbitration provision and any argument otherwise rings hollow.

---

[3] *See generally* Ex. A, 28-Page *Resource Action Information Package* ("RAIP").
[4] Dkt. 10-2 – 10-7, Ex. A – F of Def.'s Mot. to Dismiss.
[5] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006).
[6] *Id.*

**a. The three-page "contract" produced by IBM is not a stand-alone contract because it lacks the essential elements necessary for a contract.**

7.     The portion of the contract produced by IBM is missing the very elements required for a valid contract.[7] IBM offered terminated employees a severance payment, equal to one month's salary, plus limited extended benefits coverage and job replacement services ("severance payment and benefits") in exchange for completing a laundry list of requirements.[8] Terminated employees had to complete *all* requirements to receive their severance payment and benefits.[9]  Failure to complete any one of the requirements resulted in total forfeiture of the severance payment and benefits. The severance offer and requirements are set forth in this twenty-eight page contract titled **"*Resource Action Information Package*"** ("RAIP").[10]

8.     The 28-page RAIP is comprised of four parts. **Part 1**: Quick Reference Summaries; **Part 2**: Detailed Information about Program and Services; **Part 3**: Resource Action Summary Plan Description (SPD); and **Part 4**: Attachments to the Summary Plan Description (SPD), Attachment 1: Resource Action Retirement Bridge, Attachment 2: Resource Action Separation Agreement, and Attachment 3: Arbitration Procedure and Collective Action Waiver (Attachment to Separation Agreement).[11] Each part of the RAIP is essential to determining the terms, conditions, and obligations of the agreement between IBM and each terminated employee. Below is the equivalent of a Table of Contents for the entire contract. The highlighted section is the only portion IBM produced.

---

[7] *See* Dkt 10 at 6, Def.'s Mot. to Dismiss ("To form a valid contract under New York law . . . 'there must be an offer, acceptance, consideration, mutual assent and intent to be bound'") (quoting *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys.*, Inc. 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006)).
[8] *See generally* Ex. A, "RAIP"
[9] *Id.*
[10] *Id.*
[11] *Id.*

**Excerpt of IBM's RAIP [12]**

# Resource Action Information Package for Employees

Part 1: Quick Reference Summaries ............................................................................................... 2
  Highlights of Payments and Benefits ........................................................................................ 2
    Separation Payment ............................................................................................................. 2
    Transitional Medical Plan ("TMP") – Eligibility for Continued IBM Subsidy for Medical Coverage ......... 2
    Transitional Group Life Insurance – Eligibility for Continued Coverage by IBM .................. 2
    Additional benefits that are fully paid by IBM ....................................................................... 3
      IBM Career Transition Services ...................................................................................... 3
      IBM Financial Planning Services .................................................................................... 3
      IBM Retraining Assistance Program .............................................................................. 3
      Retirement Bridge associated with this resource action .................................................. 3
    Checklist of actions to take now ......................................................................................... 4
    Contact Information ............................................................................................................. 5
Part 2: Detailed Information about Programs and Services ........................................................ 6
  Internal Movement for Employees Identified in a Resource Action ........................................... 6
    IBM Career Transition Service Options ............................................................................... 6
    Access to Logistics & Support Team .................................................................................... 8
  IBM Financial Planning Services ............................................................................................. 8
  Government Resources ............................................................................................................ 8
  IBM Employee Assistance Program (EAP) ............................................................................... 8
  IBM Retraining Assistance Program (RAP) .............................................................................. 8
  Employee Questions and Answers ......................................................................................... 10
Part 3: Resource Action Summary Plan Description (SPD) ........................................................ 14
  Eligibility for the Resource Action .......................................................................................... 14
  Amount of the Payment ......................................................................................................... 15
  Medical Program (Transitional Medical Plan (TMP)/COBRA) .................................................. 15
  Transitional Group Life Insurance (GLI) ................................................................................. 17
  Retraining Assistance Program (RAP) .................................................................................... 17
  Retirement Bridge Associated with the Resource Action ......................................................... 18
  Process ................................................................................................................................. 18
  Future Actions ....................................................................................................................... 19
  Plan Administrator ................................................................................................................. 19
  Amendments or Termination of the Resource Action Plan ....................................................... 19
  Employee Retirement Income Security Act (ERISA) ............................................................... 20
    Claim Review Procedure ................................................................................................... 20
    Assistance with Your Questions ........................................................................................ 20
Part 4: Attachments to the Summary Plan Description (SPD) ................................................... 21
  Attachment 1: Resource Action Retirement Bridge ................................................................ 21
  Attachment 2:  Resource Action Separation Agreement ........................................................ 23
  Attachment 3:  Arbitration Procedure and Collective Action Waiver (Attachment to Separation Agreement) ......... 26
    Pre-Arbitration Dispute Resolution .................................................................................... 26
    Arbitration Procedures ...................................................................................................... 27
    Reconsideration and Review ............................................................................................. 27
    Remedies ......................................................................................................................... 27
    Time Limits and Procedure for Initiating Arbitration ............................................................ 27
    Representation .................................................................................................................. 28
    Discovery ......................................................................................................................... 28
    Privacy and Confidentiality ................................................................................................ 28
    Designation of Witnesses .................................................................................................. 28
    Subpoenas ....................................................................................................................... 28

---

[12] *Id.* at 1

9.      The offer itself—the severance payment and benefits—is contained in Parts 1 and 2 of the RAIP.[13] The conditions required to receive the severance payment and benefits are contained throughout Parts 3 and 4—Resource Action Summary Plan Description and Attachments to the Summary Plan Description.[14] The contract explicitly states, "employees…will receive the payments and benefits [described in Parts 1 and 2] … provided they **fulfill all requirements as set forth in this Summary Plan Description [Parts 3 and 4]."[15]** These requirements include:

- The employee departs his/her employment from IBM on a designated date selected by IBM's Project Office;[16]

- The employee accepts temporary work assignments at a different geographic location in order to assist with transition of work;[17]

- The employee abides by all terms and conditions of employment through his/her scheduled departure date;[18]

- The employee works 60 days past the date of notification of the resource action;[19]

- The employee does not depart prior to his/her assigned departure date;[20] and

---

[13] *Id.* at 2 – 13
[14] *Id.* at 14 – 28
[15] Id. at 14
[16] *Id.* at 18 ("Receipt of the resource action payment and benefits is contingent upon retiring, beginning a Retirement Bridge from IBM, or otherwise leaving IBM under the resource action, on a specific departure dates which has been designated by the Project Office, and accepting all applicable agreements and releases included in the Resource Action Employee Information Package.")
[17] *Id.* at 14 ("Identified employees may be required to accept a temporary assignment to another location to assist with the transition of work until their scheduled departure date in order to receive the resource action payment and benefits.")
[18] *Id.* ("An employee who is discharged (e.g., for violating terms and conditions or employment) before his or her scheduled departure date will receive neither the benefits nor the payment of the resource action.")
[19] *Id.* at 18 ("You will remain eligible to receive the payment and benefits associated with the resource action, provided you work at least 60 days beyond your notification date, or earlier if approved by your management, and otherwise comply with all requirements of the resource action.")
[20] *Id.* at 18 ("Employees may not depart prior to the departure date approved by the Project Office and receive the payment and benefits of the resource action unless management has recommended and the Project Office has assigned a new departure date.")

- The employee "accept[s] all applicable agreements and releases included in the *Resource Action Employee Information Package*."[21]

10.    Plaintiffs' position is simple: IBM's terminated employees were required to comply with numerous terms and conditions of the RAIP to receive their severance payment and benefits. Of the numerous contractual requirements imposed on terminated employees— relocating, training replacements, working until departure, following IBM guidelines—the only requirement Plaintiffs assert IBM obtained through fraud relates specifically to age discrimination. IBM's fraud was perpetuated with the intent to bind Plaintiffs to arbitration for their ADEA claims and waive their state law age claims. IBM carried out the fraud by providing false, neutral reasons for employees' terminations while simultaneously withholding federally mandated age disclosure information. IBM knew providing Older Workers Benefit Protection Act ("OWBPA") disclosures would dismantle its scheme and guarantee no employee would agree to an arbitration provision.

### b. Plaintiffs are permitted to bring their cases jointly because there is no contractual prohibition on joinder.

11.    Plaintiffs do not seek to invalidate the entire RAIP. Plaintiffs explicitly seek to invalidate the "arbitration provision contained in the Resource Action Separation Agreement ("RA Agreement") … because it was obtained through fraud."[22] The RA Agreement contains the arbitration provision. Contained within the arbitration provision is a prohibition on "class action, collective actions, or multi-party basis."[23] "Multi-party basis" is undefined.[24]

---

[21] *Id.* ("Receipt of the resource action payment and benefits is contingent upon retiring, beginning a Retirement Bridge from IBM, or otherwise leaving IBM under the resource action, on a specific departure dates which has been designated by the Project Office, and accepting all applicable agreements and releases included in the Resource Action Employee Information Package") (emphasis added)
[22] Dkt. 5, Pls.' First Amend. Compl. at ¶127
[23] Ex. A, RAIP at 25.
[24] *See generally id.*

12.     The term "multi-party basis" only appears *once* in the entire twenty-eight-page contract. The term is undefined in the RAIP. Additionally, "multi-party basis" is not a recognized legal term. There is no definition for "multi-party basis" in Black's Law Dictionary. Case law research only yields a handful of cases containing this term (5), none of which discuss the definition of the term.[25] If a term is ambiguous, the ambiguity should be resolved against the drafter—IBM.[26]

13.     To the extent IBM claims "multi-party basis" prohibits joinder—that fails too. IBM argues Plaintiffs are barred from being part of this lawsuit because of this prohibition on "multi-party basis." Plaintiffs disagree. In this case, Plaintiffs have utilized the liberal joinder rules to bring their cases with other similarly affected former IBM employees. Doing so reduces costs, streamlines discovery, and improves judicial economy. However, each Plaintiff's case remains unique and each Plaintiff has his or her own damage model. The RAIP is silent with respect to joinder. Well-established contract principles bar IBM from claiming joinder is prohibited under the RAIP—"[t]he inescapable conclusion is that the parties intended the omission."[27] If IBM sought to prohibit joinder, it was required to explicitly include the prohibition in the RAIP. IBM cannot retroactively add terms to the contract.

14.     Binding terminated employees to arbitration and prohibiting class/collective actions are integral components of IBM's high-level scheme to lay off tens of thousands of older workers without detection. IBM understood if the vast majority of its terminated employees were ushered into secret arbitration, its mass layoff scheme would be shielded from public exposure. If

---

[25] Counsel for Plaintiffs performed a general WestLaw search for all federal and state cases containing the term "multi-party basis" and/or "multiparty basis." This search yielded only five cases, none of which define the term.
[26] "[W]hen, confronted with an ambiguous provision, [the Court is] to construe the provision against its drafter." *See, e.g., McCarthy v. Am. Int'l Group, Inc.,* 283 F.3d 121, 127 (2d Cir. 2002).
[27] *Quadrant Structured Products Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (2014); s*ee also In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2d Cir. 1976) (where sophisticated drafter omits a term, *expressio unius* precludes the court from implying it from the general language of the agreement).

terminated employees were barred from joining together, IBM could gaslight the employee and an arbitrator into believing claims of wide-spread layoffs were fictional machinations created by disgruntled employees.

      **c.  The three-page "contracts" IBM produced in support of its claims contain unexplained inconsistencies and irregularities that discredit their validity.**

      15.    The three-page "contracts" Defendant produced for each Plaintiff are riddled with irregularities that call into question the authenticity of the documents themselves. Some of the "contracts" lack signatures,[28] others contain incongruous paginations,[29] and still others appear to be two versions of a document cobbled together to pass as one.[30] *See* excerpts of Defendant's exhibits below. The most egregious, however, is the three-page "contract" IBM produced for Nancy Kinney, numbered: Page 1, Page 2, Page 25, which—*at the very least*—confirms IBM did not produce any semblance of a complete contract.[31] The inconsistencies do not stop there. The first two pages (Pages 1 and 2) of Kinney's contract are from a January 2018 version while the third page (Page 25) is from a March 2018 version.[32] Finally, the pages contain different fonts. One would expect a sophisticated tech company to produce clear, concise, signed agreements—especially when seeking to deprive its life-long employees of their Seventh Amendment right to a jury trial. IBM's failure or inability to make even this basic preliminary showing undercuts its entire Motion to Dismiss.[33]

---

[28] Dkt. 10-4, Ex. C of Def.'s Mot. to Dismiss (purporting to be the electronic signature verifications of Constance Lewis on a Resource Action Separation Agreement and Statement of Understanding).

[29] Dkt. 10-6, Ex. E of Def.'s Mot. to Dismiss (purported contract of Alvaro Paiz); Dkt. 10-3, Ex. B of Def.'s Mot. to Dismiss (purported contract of Nancy Kinney).

[30] Dkt. 10-3, Ex. B of Def.'s Mot. to Dismiss (purported contract of Nancy Kinney).

[31] *Id.*

[32] *Id.*

[33] *Id.*

**Excerpts of Dkt. 10-3, Exhibit B of IBM's Motion to Dismiss** [34]

*Nancy Kinney's Purported "Contract"*

---

Page 1 of 3, Ver. 1/2018

January 2018                                                    Page 1

---

[Defendant's Ex. B, Dkt. 10-4, page 2 of 4]

---

Page 2 of 3, Ver. 1/2018

January 2018                                                    Page 2

---

[Defendant's Ex. B, Dkt. 10-4, page 3 of 4]

---

Employee Name (print): ____ Nancy Kinney _____

Serial #: ____ 2A6619 _____

Signature: ____ _____

Date: ____ 07/25/18 _____

*Separation Agreement Page 3 of 3, 1/2018*

March 2018                                                    Page 25

---

[Defendant's Ex. B, Dkt. 10-4, page 4 of 4]

---

[34] *See generally id.*

**B. In *McCormack*, a federal district court rejected IBM's same arguments.**

16.     Plaintiffs and IBM both agree fraud must be pled with particularity and simple age discrimination does not amount to fraud. In its Motion to Dismiss, IBM recasts and reduces Plaintiffs' fraud allegations to a gross oversimplification—and then argues against them. While not acknowledged by IBM in its Motion to Dismiss, *McCormack v. IBM* is directly on point.[35] In *McCormack*, IBM was the defendant, it had the same national counsel, and it made the *exact* same arguments against plaintiffs as it does in this case—(1) plaintiffs failed to plead fraud in the inducement with sufficient particularity, and (2) plaintiffs were recasting discrimination claims as fraudulent inducement claims.[36] Like the *McCormack* court, this Court should reject Defendant's arguments.

**a. Plaintiffs plead fraud in the inducement with sufficient particularity.**

17.     In *McCormack*, IBM argued that a plaintiff's fraudulent inducement claim failed to satisfy 9(b) because plaintiff's supervisor offered no explanation for his termination, plaintiff did not identify the speaker, and plaintiff failed to state when and where the statements were made.[37] The court rejected IBM's arguments, reasoning that "the gist of [plaintiff's] claims … [were] that he was mislead by IBM's public representations" and that "it was clear …the speaker [was] IBM."[38] The district court found that "[a]lthough these allegations [were] somewhat general…[i]t [was] clear … that Plaintiffs contend Defendant's [public] representations that it was terminating employees as part of a major corporate downsizing and its statement that it was

---

[35] *McCormack v. IBM*, 145 F. Supp. 3d 258, 275 - 277 (S.D.N.Y. 2015)
[36] *Id.*; *see also* Ex. B, Side-By-Side Summary of Arguments Made by IBM's National Counsel in *McCormack* and *Kinney*
[37] *McCormack*, 145 F.Supp. 3d at 275.
[38] *Id.* at 276 - 277

'streamlining' its workforce and 'engaging in a nationwide 'resource action' were fraudulent, thus meeting the first requirement of 9(b)."[39]

18.     Although FRCP 8 only requires "a short and plain statement" of the plaintiff's claim, Rule 9(b) requires that "[i]n alleging fraud ..., a party must state with particularity the circumstances constituting fraud."[40] To satisfy Rule 9(b), "the plaintiff must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"[41] "Rule 9(b) does not displace Rule 8(a); rather, the Court must balance the requirements of Rule 9(b) and their overall purposes with the requirements of notice pleading under Rule 8(a)."[42]

19.     However, "what constitutes particularity will necessarily differ with the facts of each case and hence the Fifth Circuit has never articulated the requirements of Rule 9(b) in great detail."[43] The sufficiency of a fraud allegation depends in large part on "the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties[,] and the determination of how much circumstantial detail is necessary to give notice to the [Defendant] and enable [it] to prepare a responsive pleading."[44] Courts have found it appropriate to relax the particularity requirements when the relevant facts are peculiarly within the opposing party's knowledge or when the fraud is part of a complex scheme occurring over a long period of time.[45]

20.     Plaintiffs have sufficiently pled IBM's fraudulent statements and omissions—i.e. its fraudulent justifications for their layoffs—including who promulgated them, when they

---

[39] *Id.*
[40] *Id.* at 268
[41] *Id.*
[42] *Id.* at 269
[43] *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993)
[44] *McCormack*, 145 F.Supp 3d at 276.
[45] *U.S. ex rel. Ellis v. Sheikh*, 583 F. Supp. 2d 434, 438 - 439 (W.D.N.Y. 2008).

occurred, and why they were fraudulent.[46] For example, in 2017, Nancy Kinney received a momentous, career-making promotion.[47] However, months later, her IBM managers informed her that her skills were "too technical" and she was laid off.[48] The curt, "too technical" explanation for her firing was fraudulent and completely divorced from her accomplishments recognized and touted by IBM. Other fraudulent justifications proffered by IBM managers for Plaintiffs' 2017 and 2018 layoffs include: "the need for increasingly deeper technical skills"[49] and the need to "offshore" jobs.[50] For IBM to claim more specificity is required is insincere. IBM possesses the verbatim, neutral reasons it provided and the capability to retrieve that data with ease.

21.     The purpose of FRCP 9(b) is to prevent: 1) baseless claims, 2) damage to defendant's reputation, and 3) veiled attempts to uncover unknown wrongs—none of which apply to this case.[51] First, this is not a baseless claim. This very Court has already found evidence, during the relevant time period, that IBM engaged in a high-level plan to layoff its older workers to make room for younger employees.[52] That evidence was sufficient to deny IBM's Motion for Summary Judgment in *Langley*.[53] Second, this lawsuit does not cause any

---

[46] *See* McLeod *McLeod-McKinsey v. Tefec Corp.*, No. SA-05-CA-0183-RF, 2005 WL 2137897 (W.D. Tex. Aug. 25, 2005) (to articulate the elements of fraud with particularity, a plaintiff must "specify the statements contended to be fraudulent, identify the speaker, and state when and where the statements were made, and explain why the statements were fraudulent.")

[47] Dkt. 5, Pls.' First Amend. Compl. at ¶19

[48] *Id.* at ¶21

[49] *Id.* at ¶ 75 (Alvaro Paiz)

[50] *Id.* at ¶61 & 65 (Constance Lewis & Sheri Parr)

[51] *Shushany*, 992 F.2d at 521.

[52] *Langley v. Int'l Bus. Machines Corp.*, No. 1-18-CV-00443 (W.D.Tex.), Dkt. 201 at 7-8, 10 ("[T]he IBM Human Resources department's 'Fall Plans' suggest that high level IBM executives were encouraging managers to lay off workers like Langley to make room for younger employees"; "at a minimum, there are fact questions regarding whether IBM's executives and Human Resources viewed age negatively and whether HR, with direction from the executives, served as the real decision makers behind the employees who were chosen in the RIF"; "Further, the numerous public and internal statements of IBM's CEO and CFO expressing the need for the company to "refresh" its workforce creates a fact question regarding whether LeBlanc and Cowley were simply following those directives when they directed their subordinates where to make cuts during the RIF.").

[53] *Id.*

damage to Defendant's reputation. IBM is in the process of defending identical lawsuits all over the country. In September 2020 the U.S. Equal Employment Opportunity Commission released findings that implicate IBM and conclude there is reasonable cause to believe IBM discriminated against employees on the basis of age.[54] Third, this lawsuit is not an attempt to uncover unknown wrongs—quite the contrary. Undersigned counsel, Wright & Greenhill PC, served as counsel for Jonathan Langley in an identical prior case.[55] In that case, counsel was privy to high-level planning documents and internal emails exchanged between IBM's executives.[56] It is with *this* knowledge counsel filed Plaintiffs' case. Counsel need not engage in a fishing expedition—they already know the fraud is there.

22.    IBM does not claim ignorance as to the fraudulent statements. It just claims a lack of specificity. IBM—the data company—possesses the very statements, emails, memos, and letters distributed to its terminated employees that contain the fraudulent reasons for their terminations and the internal documents revealing the true reasons for such terminations. Simply put, if IBM insists on a public revelation of the coordinated plan, learned about in *Langley*, Plaintiffs' counsel is willing to accommodate in a hearing. *Assuming arguendo*, however, this Court finds Plaintiffs' pleading insufficient, case precedent permits Plaintiffs to replead.[57]

---

[54] Dkt. 5-1, Ex. 1 of Pls.' First Amend. Compl. (EEOC Determination Letter)
[55] *Langley v. Int'l Bus. Machines Corp.,* No. 1-18-CV-00443 (W.D.Tex.)
[56] *Langley*, Dkt. 185
[57] *See Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987) (finding trial court abused its discretion by not granting plaintiffs leave to replead their fraud claims, where plaintiff had not been granted prior opportunity to replead fraud with greater specificity and where plaintiffs had not had discovery of defendant); *Gourdine v. Cabrini Med. Ctr.,* 128 Fed. Appx. 780, 781 (2d Cir. 2005)(finding that courts generally permit plaintiffs to replead a fraud claim when the dismissal is based on the failure to meet the particularity requirements of Fed. R. Civ. P. 9(b)); *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." (citation omitted)).

**b. Plaintiffs assert they were fraudulently induced to agree to the arbitration provision—not just that their termination was the result of discrimination.**

23.     In *McCormack,* IBM argued plaintiffs could not "recast their discrimination claims as claims of fraudulent inducement, and that … allegations of fraudulent inducement do not meet the heightened pleading standard of Rule 9(b)."[58] The district court rejected those arguments. It held that, alleging that a termination was the result of discrimination was *completely different* than alleging plaintiff was fraudulently induced to sign a separation agreement by misrepresentations.[59] The court reasoned, "[i]f Plaintiffs were only to allege that they believed that their termination was a result of discrimination, Defendant's argument may have had merit. However, Plaintiffs complain that they were fraudulently induced to sign the Separation Agreements based on IBM's misrepresentations about the streamlining of its work force."[60]

24.     *McCormack* found the cases cited by IBM in support of its argument—*Sheridan, Frumkin,* and *Pampillonia, the exact same cases cited here*—were markedly different because the plaintiffs in those cases *had the opportunity* to conduct discovery and still could not produce *any* evidence supporting their claims.[61] In denying IBM's motion to dismiss, the district court held that "the Court cannot determine from the pleadings alone whether [plaintiffs] signed the Separation Agreements knowingly and voluntarily, and thus cannot resolve the factual issue of whether the waivers are enforceable."[62]

---

[58] *McCormack*, 145 F.Supp 3d at 269.
[59] *Id.* at 275
[60] *Id.*
[61] *Id.* at 274 – 275 (emphasis added); IBM also cites to *Yassan v. J.P. Morgan Chase & Co.,* 708 F.3d 963 (7th Cir. 2013) in the present case, which is not applicable. In *Yassan,* the appellate court denied an employee's fraudulent inducement claim because it found he explicitly waived his right to bring such claim. Plaintiffs did not waive their right to bring a fraudulent inducement claim in this case nor is IBM contending as much.
[62] *McCormack,* 145 F.Supp 3d at 275; *see also Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 41 (2d Cir. 1991) (finding that the waiver employees signed in exchange for retirement benefits was induced by fraud because employer misrepresented the amount of retirement payments employee would receive and employee signed the

###### c. Fraudulent inducement is an essential part of IBM's scheme to covertly slough off older workers.

25.     In the instant case, Plaintiffs are not attempting to recast a discrimination case as fraud. Rather, Plaintiffs' Amended Complaint specifically sets forth IBM's complex scheme to shield IBM from liability related to age claims. This scheme required providing fraudulent reasons for terminating older employees to induce them into an agreement to arbitrate, then stripping those employees of their state law claims through a release.[63] Because IBM could not legally obtain an ADEA release without revealing damning age information, IBM concocted a clever contractual workaround to effectively strip terminated employees of their ADEA claims. This workaround was the arbitration provision in the RAIP contract. As the court well knows, OWBPA disclosures are required when an employer terminates an employee and seeks a release of ADEA claims. IBM maintains relegating Plaintiffs' age discrimination cases to secret arbitration is not a waiver of those claims or of substantive rights. While the courts generally do not consider arbitration a deprivation of employees' substantive rights—the draconian hurdles contained in IBM's arbitration provision constitute a substantive taking by guaranteeing employees' failure.

---

release based on this material misrepresentation.); *Lamberti v. Motorola Sols., Inc.*, 2013 WL 166367, at *1 (S.D.N.Y. Jan. 16, 2013) (finding it premature to conclude plaintiff's waiver of ADEA claims was knowing and voluntary when "the record necessary to make a determination that [employee's] waiver 'knowing and voluntary' has not been fully developed.); *Pesserillo v. Nat'l Grid*, 78 F. Supp. 3d 551, 555 (E.D.N.Y. 2015) (denying defendant's motion to dismiss where "[a]t this point in the litigation, it is not possible for the [c]ourt to determine whether [p]laintiff's waiver of his discrimination claims was done knowingly and willfully" and finding "such a determination is better made on a motion for summary judgment after the completion of discovery.").

[63] *See De Pace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 555 (E.D.N.Y. 2003)(noting "[a]s with any other contractual release, circumstances evincing fraudulent inducement, misrepresentation, mutual mistake, or duress would justify setting aside the release."); *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40 (2d Cir.1991) (release will be denied effect when based on misrepresentation of a material fact); *Fournier v. Canadian Pacific Railroad,* 512 F.2d 317 (2d Cir.1975) (In a suit under the Federal Employers' Liability Act, a release may be set aside if employer's representative deceived plaintiff); *Ott v. Midland–Ross Corp.,* 600 F.2d 24 (6th Cir.1979) (If employer made misrepresentation of material fact for purpose of inducing employee to release it from liability under Title VII, it would be estopped to interpose release as bar to suit, provided employee acted in justifiable reliance upon misrepresentation); *Fonseca v. Columbia Gas Systems, Inc.,* 37 F.Supp.2d 214, 229 (W.D.N.Y.1998)("In general, a release which has been procured through fraud, misrepresentation, or deceit is not a bar to subsequent actions by the party executing the release.").

26.     The arbitration provision is stacked so heavily in IBM's favor, it predetermines the outcome—IBM always wins. The arbitration provision requires terminated employees bring their cases singularly.[64] They are not permitted to have spouses present during the proceedings.[65] They are only entitled to *three* witnesses.[66] In order to initiate the arbitration, terminated employees are required to send a written demand and payment to the "IBM Arbitration Coordinator."[67] The IBM representative then coordinates the "IBM Arbitration Program."[68] Most egregiously, the statute of limitations is so significantly reduced, terminated employees lose the benefit of any meaningful EEOC findings. According to IBM's interpretation of its arbitration provision, Plaintiffs' "[d]eadline requires claimants to initiate arbitration within the same time as they would otherwise be required to file a pre-suit charge with the EEOC, that is within 180 or 300 days (depending on the state) of the alleged unlawful conduct."[69]

27.     Here is an illustrative example from this case. IBM has alleged Plaintiff Constance Lewis should be sent to arbitration. There, IBM will assert the affirmative defense of statute of limitations.[70] At arbitration, IBM will claim Lewis is bound by IBM's reduced statute of limitations and her deadline to file was January 18, 2018.[71] As of that date, the EEOC had not

---

[64] Ex. A, RAIP at 26 – 28. Further, IBM's plan to insulate workers in the individualized arbitration is eerily similar to IBM's defense strategy—breaking the company up through "artificial borders" (CLDR, etc.) to limit the scope of inquiry. *See Langley*, Dkt. 185 at 4.
[65] *Id.*
[66] *Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F. Supp. 2d 985, 995–96 (S.D. Ind. 2001) (noting that any application for additional depositions "is dependent upon the good graces of an arbitration panel stacked against the employee in the first place. So long as the discovery provisions are controlled by the arbitration panel, this court cannot confidently believe that this discovery procedure constitutes a fair trade-off for the 'simplicity, informality, and expedition' noted by the Court in *Gilmer*.").
[67] Ex. A, RAIP at 26 – 28.
[68] *Id.*
[69] *Rusis, et al. v. IBM.*, No. 1-18-CV-08434 (S.D.N.Y.), Dkt. 121, Matt Lampe, IBM's Memo of Law in Support of Mot. for Partial Judg. on the Pleadings as to Arbitration Opt-Ins and to Compel Arbitration at 8; *see also OConner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 602 (S.D.N.Y. 2020 (declining to enforce an arbitration agreement when, in light of all facts and circumstances, the arbitration agreement was unconscionable and procured through fraud).
[70] *Rusis,* Dkt. 121, Matt Lampe, IBM's Memo of Law in Support of Mot. for Partial Judg. on the Pleadings as to Arbitration Opt-Ins and to Compel Arbitration at 8.
[71] Lewis's EEOC filing deadline was 11/04/2018

made a determination about her claim. However, on August 31, 2020—one year, nine months, and twenty-seven days after IBM's self-imposed statute of limitations—the EEOC issued a letter of determination with respect to her charge and found:

> The investigation uncovered top down messaging from [IBM]'s highest ranks, directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires. Analysis shows it was primarily older workers (85.85%) in the total potential pool of those considered for layoff. **Evidence uncovered older workers who were laid off and told their skills were out of date** only to be brought back as contract workers at a lower rate of pay with fewer benefits. EEOC received **corroborating testimony from dozens of witnesses nationwide**, supporting a discriminatory animus based on age. . . [T]here is reasonable cause to believe that [IBM] has discriminated against [Lewis] and others on account of their age. [72]

Despite these damning EEOC findings substantiating Lewis's claims—and confirmation by the EEOC that terminated employees were provided reasons that could be described as fraudulent—if Lewis is ordered to arbitration, IBM will claim victory on a technicality it created: statute of limitations. [73] Ordering these Plaintiffs to arbitration would be a gross miscarriage of justice and would allow IBM to get away with fraud.[74]

## III.   CONCLUSION

28.    Defendant's attempt to recast and misrepresent Plaintiffs' arguments are without merit. Plaintiffs' pleadings regarding fraud are particular and supported by substantial corroborating evidence. IBM's Motion Dismiss should be accordingly denied in its entirety.

---

[72] Ex. C, Constance Lewis's 8/31/20 EEOC Letter of Determination (emphasis added).

[73] Pursuant to New York law, parties may not contractually agree to a limitations period shorter than that prescribed by law where the shortened limitations period is against public policy or obtained through fraud, duress, or other wrongdoing. *Vega v. Fed. Exp. Corp.*, 09 Civ. 07637 RJH GW, 2011 WL 4494751, at *6 (S.D.N.Y. Sept. 29, 2011)

[74] IBM cites to *Epic Systems* in support of the contention that the FAA requires a court to rigorously enforce an arbitration clause according to its terms. Dkt. 10 at 6. "However, *Epic Systems* does not stand for the proposition that arbitration agreements must be enforced in all circumstances, even if they have been procured in an unconscionable manner. *Epic Systems* held that, as a general matter, arbitration agreements between employers and employees must be enforced. However, the Supreme Court expressly noted that the employees in *Epic Systems* did not suggest that their arbitration agreements were extracted, say, by an act of fraud" *OConner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 603 (S.D.N.Y. 2020) (internal citations omitted).

Respectfully submitted,

WRIGHT & GREENHILL, P.C.
900 Congress Avenue, Suite 500
Austin, Texas  78701
512/476-4600
512/476-5382 (Fax)


By:_____
    Heidi A. Coughlin
    State Bar No. 24059615
    hcoughlin@w-g.com
    Archie Carl Pierce
    State Bar No. 15991500
    cpierce@w-g.com
    Blair Leake
    State Bar No. 24081630
    bleake@w-g.com

    and


By:_____
    Kaplan Law Firm
    Austin Kaplan
    State Bar No. 24072176
    akaplan@kaplanlawatx.com

**Counsel for the Plaintiffs**

CERTIFICATE OF SERVICE

I hereby certify that on November 20th, 2020, I electronically filed the foregoing

Response to Defendant's Motion to Compel Arbitration of ADEA Claims and Partial Motion to

Dismiss with the Clerk of the Court using the CM/ECF system, which sent notification of such

filing to the Court and Defendant's counsel of record.


_____

Heidi A. Coughlin