**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| CHARLES TOWNSLEY, MICHAEL SAURO, WALTER NOFFSINGER, ROSA DAVIDSON, MICHAEL KELLY, TITON HOQUE, JANET GELPHMAN, THANH DO, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-00969-LY |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

### DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY

This is an eight-plaintiff action in which Plaintiffs are bringing eight individual disparate treatment claims against Defendant International Business Machines Corporation ("IBM").  To prevail on their claims, which are not brought as collective or class claims, Plaintiffs must establish that they were each discriminatorily selected for termination based on their age.  IBM has provided all the discovery Plaintiffs need to litigate this issue.  IBM produced thousands of pages of documents about the individual Plaintiffs and the seven headcount reduction programs – known as resource actions – that impacted them; age data for all of the employees in Plaintiffs' business units who were considered for the seven resource actions that impacted Plaintiffs; and additional data files showing that the average age of employees in the groups in which Plaintiffs worked had not changed from 2016 (before the Plaintiffs were separated) to 2020 (after they were separated).  At Plaintiffs' request, IBM also agreed to produce tens of thousands of emails from its Chief Executive Officer, Chief Human Resources Officer, Chief Financial Officer, and other C-Suite executives.  In sum, IBM has produced over 40,000 documents spanning over 200,000 pages.

Despite the expansive amount of information IBM has produced in this case, and despite Plaintiffs' earlier boast that IBM's production to date included documents "that establish Plaintiffs' claims," (Dkt. No. 62-2 at 3) they now seek the production of even more data on individuals who were considered for and selected in over 130 different and unrelated resource actions over a three-year period.  (*See* Dkt. No. 75 ("Mot.").)  This extensive discovery that Plaintiffs now seek is well beyond what the law permits.  In fact, the law is clear: data productions should be limited to the level of the "supervisor or supervisors who are primarily responsible for the employment decision regarding the plaintiff."  *Kleppinger v. Tex. Dep't of Transportation*, No. 10-cv-00124, 2012 WL 12893651, at *5–6 (S.D. Tex. Mar. 4, 2012) *order amended on other grounds on reconsideration*, 2012 WL 12893655 (S.D. Tex. Sept. 30, 2012) (quoting *Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649, 654 (D. Kan. 2004)).  Here, the decisions to conduct

the resource actions that resulted in each Plaintiff's separation, and the decisions regarding the target number of employees to be separated in such resource actions, were made within each Plaintiff's business unit—the very level at which IBM has already produced age data—and Plaintiffs' immediate managers were responsible for selecting them for separation. Thus, IBM has already produced data at the level of the decisionmakers who were responsible for the relevant employment decisions concerning the Plaintiffs, and any requests for additional data should be denied.

## I.   BACKGROUND

### A.   IBM's Organizational Structure

IBM is a global technology company comprised of numerous separate lines of business known as "groups."  Each group offers distinct products and services and operates in different competitive markets.  (Declaration of Kristin Mailen ("Mailen Decl."), attached hereto as Ex. 1, ¶ 3.)  For example, during the relevant timeframe, the Global Technology Services ("GTS") group provided IT infrastructure and technology support services, while the Cloud & Cognitive Software ("C&CS") group (and its predecessors Cloud and Hybrid Cloud) developed and supported cloud and artificial intelligence-related software.  (*Id.* at ¶ 4; Declaration of Neal Marx ("Marx Decl."), attached hereto as Ex. 2, ¶¶ 4–7.)  On the other hand, the Systems group manufactures and services hardware like servers and mainframes, and the Global Markets group is IBM's sales organization. (Mailen Decl. ¶¶ 4–5.)

Groups at IBM operate independently of one another.  (*Id.* at ¶ 7.)  As a result, they are structured and function, in many ways, as separate companies.  For instance, each group is led by a Senior Vice President, who is essentially the "CEO" of that business.  (*Id.* at ¶ 6.)  The Senior Vice President is responsible for the group's strategy and financial performance, including its revenue, expenses, and profits.  (*Id.* at ¶ 7; *see, e.g.*, Declaration of Lou Singer ("Singer Decl."),

attached hereto as Ex. 3, ¶¶ 11–12.)  Each Senior Vice President is supported and advised by his or her senior management team, which includes General Managers who are responsible for the various sub-units, a Vice President of Finance who functions as the group's "CFO," and a Vice President of Human Resources.  (Mailen Decl. ¶ 6; Marx Decl. ¶ 3; *see also* Singer Decl. at ¶ 3.)

Furthermore, each group is responsible for identifying its overall revenue and profit targets for the year.  (Mailen Decl. ¶ 7.)  The groups are afforded autonomy to determine the best way to achieve those targets, including the discretion to set their annual budgets and develop a business strategy.  (*See, e.g.*, Marx Decl. ¶ 8; Singer Decl. ¶ 3.)

This means that each group is also responsible for forecasting and managing its headcount (i.e., employee population).  (Mailen Decl. ¶ 8.)  Decisions about how many employees are needed in each sub-unit, where those employees should be located, what skills they need to possess, and what level of experience they should have are all made within the groups.  (*Id.*)

## B.    Reductions-in-Force at IBM

Likewise, each group decided for itself whether it needed to reduce headcount through a reduction-in-force (called a "resource action" at IBM).  (Mailen Decl. ¶¶ 9, 16; *see also* Marx Decl. ¶¶ 13–16, 22; Singer Decl. ¶¶ 8–12, 14.)  However, because the costs associated with a resource action are subject to special accounting rules for restructuring expenses, they had to be tracked through a centralized process.  (Mailen Decl. ¶ 10; *see also* Marx Decl. ¶ 18.)  IBM's corporate-level finance and accounting organization ("Corporate Finance") was responsible for coordinating this process.  (Mailen Decl. ¶¶ 11–13; *see also* Marx Decl. ¶ 18; Singer Decl. ¶ 13.)  At the time, Corporate Finance earmarked a certain amount of money for restructuring expenses and assigned a name to the fund: for example, "Concord" referred to the pool of restructuring funding in 2018, "Maple" referred to the pool of restructuring funding in 2019, and "Palm" referred to the pool restructuring funding in 2020.  (Mailen Decl. ¶¶ 11, 14; Declaration of Diane Kennedy ("Kennedy

Decl."), attached hereto as Ex. 4, ¶¶ 6–7; *see also* Marx Decl. ¶ 21; Singer Decl. ¶ 13.)

Each group then assessed whether, to meet its objectives, it needed to utilize the restructuring funding.  (Mailen Decl. ¶¶ 9, 16; *see also* Marx Decl. ¶¶ 13–16; Singer Decl. ¶¶ 8–13.)  If so, senior leaders within each group worked with their direct reports to estimate how many employees the group would need to separate, as well as which parts of the group would be impacted by the resource action.  (*See, e.g.*, Marx Decl. ¶¶ 15–17; Singer Decl. ¶¶ 9–15.)  Group management then consolidated the estimates at the group level and submitted a request for a certain amount of restructuring funding to Corporate Finance.  (Mailen Decl. ¶ 11; *see, e.g.*, Marx Decl. ¶ 19; Singer Decl. ¶ 13.)

After Corporate Finance had approved the group's request for funding, the group executed the resource action.  (Kennedy Decl. ¶ 8; *see also* Marx Decl. ¶¶ 19–20.)  Managers within the group distributed headcount reduction targets across their organizations.  (Mailen Decl. ¶ 17; Marx Decl. ¶ 17; Singer Decl. ¶ 15.)  Based on their headcount reduction targets, lower-level managers identified which of their employees would be impacted by the resource action.  (*See, e.g.*, Marx Decl. ¶ 17; Singer Decl. ¶ 16.)

A specialized team of HR professionals known as the Workforce Restructuring Project Office assisted the group in executing the resource action.  (Mailen Decl. ¶ 18; Kennedy Decl. ¶¶ 1, 4, 8.)  Specifically, the Project Office coordinated the administrative tasks associated with the resource action, such as distributing the forms that managers must complete to document their selection decisions and collecting the names of selected employees.  (Kennedy Decl. ¶ 4.)  The Project Office assigned a unique four-letter code to each reduction-in-force for tracking and recordkeeping purposes.  (*Id.* at ¶ 8.)  Plaintiff Charles Townsley, for example, separated as part of the GMST resource action, which was a 2018 reduction-in-force within the Global Markets group.  (*Id.* at ¶ 10.)

Ultimately, in 2018, the Concord restructuring fund was utilized by several different groups to cover the costs of over 60 separate resource actions, both inside and outside of the United States. (*Id.* at ¶ 17.)  In 2019, approximately 30 resource actions across multiple groups were financed by the Maple pool of restructuring funds.  (*Id.* at ¶ 18.)  And in 2020, various groups used money from the Palm fund to pay separation benefits in over 40 separate resource actions.  (*Id.* at ¶ 19.)

The resource action process was confidential and occurred separately within each group. (*See* Mailen Decl. ¶¶ 7–9.)  This meant that managers in GTS were unaware of C&CS's plans for a reduction-in-force and vice versa.  Managers within each group often used the funding name to refer to the resource action in their group (i.e., referring to "GMST" as "Concord") because, as far as they were concerned, there was no need to distinguish between multiple resource actions.  (Marx Decl. ¶ 21; Singer Decl. ¶ 13.)  Nevertheless, each resource action was a distinct event that was planned and executed within a single group.  (Mailen Decl. ¶¶ 9, 16–17; Kennedy Decl. ¶ 6; *see also* Marx Decl. ¶ 22; Singer Decl. ¶¶ 14, 16, 18.)

### C.    The Plaintiffs

Sixteen plaintiffs filed a complaint in this lawsuit alleging that IBM violated the Age Discrimination in Employment Act ("ADEA") and various state discrimination laws in terminating their employment.  (Dkt. No. 5.)  Half of the original plaintiffs have since been dismissed from this case.  (Dkt. Nos. 57–58.)  The eight remaining plaintiffs are pursuing individual claims of disparate treatment.  (Dkt. No. 5.)  With the exception of one plaintiff who was terminated after failing a performance improvement plan, each was identified by his or her immediate managers for separation in a different resource action between 2018 and 2020:

- **Charles Townsley** worked as a salesman in the Distribution market within the Global Markets group. His **first-line manager** selected him for the GMST resource action in 2018 based on his relatively weak sales performance and skills.  (Def.'s Resp. to Pl. Townsley's Interrog., Ex. A to Declaration of Edward M. "Ted" Smith ("Smith Decl."), attached hereto as Ex. 5, Nos. 1–2; Kennedy Decl. ¶ 10.)

- **Titon Hoque** served as a Middleware and Database Manager in the GTS group. He was identified for the CGTZ resource action in 2018 by his **first-line manager** based on his performance issues. (Def.'s Resp. to Pl. Hoque's Interrog., Ex. B to Smith Decl., Nos. 1–2; Kennedy Decl. ¶ 14.)

- **Michael Sauro** was a Project Executive in the Hybrid Cloud group. He separated in 2018 after his **first-line manager** selected him for the HYCD resource action because, compared to his peers, he had a narrower skill set. (Def.'s Resp. to Pl. Sauro's Interrog., Ex. C to Smith Decl., Nos. 1–2; Kennedy Decl. ¶ 11.)

- **Michael Kelly** worked as the WW Resiliency Services Alliance and Partner Manager in GTS. He did not leave IBM in connection with a resource action; rather, he was fired after failing a performance improvement plan in 2018. (Def.'s Resp. to Pl. Kelly's Interrog., Ex. D to Smith Decl., Nos. 1–2.)

- **Janet Gelphman** was a Software Designer in the Cloud group at the time of her separation in 2018. Her **first-line manager** identified her for the CDWP resource action based on her relatively poor performance. (Def.'s Resp. to Pl. Gelphman's Interrog., Ex. E to Smith Decl., Nos. 1–2; Kennedy Decl. ¶ 15.)

- **Rosa Davidson** served as a software developer in the C&CS group who focused on security issues. Her **immediate managers** selected her for separation in the CGMP resource action in 2019 because of her performance issues, including her inability to communicate effectively and work collaboratively with her colleagues. (Def.'s Resp. to Pl. Davidson's Interrog., Ex. F to Smith Decl., Nos. 1–2; Kennedy Decl. ¶ 13.)

- **Thanh Do** was a Software Performance Analyst in the Systems group. Her **immediate managers** identified her for the SYMP resource action in 2019 based on the financial performance of the product to which she was dedicated and her inability to work with her peers. (Def.'s Resp. to Pl. Do's Interrog., Ex. G to Smith Decl., Nos. 1–2; Kennedy Decl. ¶ 16.)

- **Walter Noffsinger** worked as an executive in the Cloud & Data Platforms business unit within C&CS. He left IBM in 2020 as part of the DCPL resource action because his **immediate managers** determined that he was a relatively weaker performer than his peers. (Def.'s Resp. to Pl. Noffsinger's Interrog., Ex. H to Smith Decl., Nos. 1–2; Kennedy Decl. ¶ 12.)

### D.    The Status of Discovery

IBM has already provided extensive discovery to Plaintiffs. As part of its production, and in response to Plaintiffs' request for demographic data, IBM provided data related to the resource

actions that impacted Plaintiffs, up to the level of the General Manager of each Plaintiff's business unit:

- Data containing the names and ages of the 482 employees in the United States who reported up to the General Manager of Hybrid Cloud Integration **(Noffsinger's third-line manager)** and who were considered and/or selected for the DCPL resource action that impacted Plaintiff Walt Noffsinger;

- Data containing the names and ages of the 251 employees in the United States who reported up to the General Manager of Cloud Technical Engagement **(Sauro's third-line manager)** and who were considered and selected for the HYCD resource action that impacted Plaintiff Michael Sauro;

- Data containing the names and ages of the 143 employees in the United States who reported up to the General Manager of the U.S. Distribution Market **(Townsley's fourth-line manager)** and who were considered and selected for the GMST resource action that impacted Plaintiff Charles Townsley;

- Data containing the names and ages of the 88 employees in the United States who reported up to the General Manager of Watson IoT **(Davidson's fourth-line manager)** and who were considered and/or selected for the CGMP resource action that impacted Plaintiff Rosa Davidson;

- Data containing the names and ages of the 83 employees in the United States who reported up to the General Manager of Cognitive Systems **(Do's fifth-line manager)** and who were considered and/or selected for the SYMP resource action that impacted Plaintiff Thanh Do;

- Data containing the names and ages of the 78 employees in the United States who reported up to the General Manager of IBM Cloud **(Gelphman's fourth-line manager)** and who were considered and/or selected for the CDWP resource action that impacted Plaintiff Janet Gelphman; and

- Data containing the names and ages of the 29 employees in the United States who reported up to the General Manager of Solutions, Delivery and Transformation **(Hoque's fifth-line manager)** and who were considered and/or selected for the CGTZ resource action that impacted Plaintiff Titon Hoque.

In sum, IBM has produced demographic data on 1,154 U.S.-based members of its workforce who were considered for separation in these resource actions.

Although IBM appropriately limited its production of <u>demographic data</u> to the specific resource actions that impacted Plaintiffs, it is important to note that IBM did not similarly limit its

document production and has produced tens of thousands of documents in response to Plaintiffs' requests. All told, IBM has already produced 40,193 documents totaling 202,361 pages. In addition to the typical documents produced in individual disparate treatment cases, such as performance reviews and communications regarding the plaintiff's termination, IBM also produced documents from senior group and corporate leaders. In fact, IBM has turned over, with limited exceptions, all documents hitting on one of twenty-six search terms specified by Plaintiffs from the following custodians: Virginia Rometty, former Chief Executive Officer of IBM; James Kavanaugh, current Chief Financial Officer; Martin Schroeter, former Chief Financial Officer; Diane Gherson, former Chief Human Resources Officer; and Ken Keverian, former Senior Vice President, Corporate Strategy. IBM also agreed to search the files of numerous other custodians, including high-level Finance and HR leaders in the groups in which Plaintiffs worked, for both references to the funding source names (i.e., Concord, Maple, Palm) as well as the specific resource action names (i.e., GMST, SYMP, DCPL). As a result, IBM has produced thousands of pages of documents related to the resource actions at issue.

Beyond that, IBM produced data showing that the median age in Plaintiffs' groups on December 31, 2020, was substantially the same as it was on December 31, 2016.

This, however, was apparently not enough for Plaintiffs. On October 26, 2021, Plaintiffs' counsel wrote to IBM's counsel to demand, among other things, that IBM produce demographic data for all resource actions funded by the Concord, Maple, and Palm funds. As in their Motion to Compel, Plaintiffs' counsel claimed that the GMST, HYCD, CGTZ, CDWP, CGMP, SYMP, and DCPL resource actions in which Plaintiffs were included were merely "fictitious, gerrymandered populations" created by IBM's "legal department." IBM promptly responded on November 1, 2021, explaining that the terms "Concord," "Maple," and "Palm" refer not to resource actions but to pools of restructuring funds and that, instead, resource actions are denominated by

the four-letter acronyms listed in its discovery responses.  On December 15, 2021, Plaintiffs' counsel sent another letter refusing to compromise on any of Plaintiffs' requests and reiterating the prior complaints, to which IBM responded on January 17, 2021.  Then, on February 8, 2022, Plaintiffs' counsel abruptly informed IBM's counsel that Plaintiffs were unilaterally terminating the parties' discovery negotiations and would be filing a Motion to Compel.

Plaintiffs filed the instant Motion to Compel on February 25, 2022.  (Dkt. No. 72-1.)  IBM reads Plaintiffs' Motion as containing three separate requests: (1) a request for an undefined "global ruling," (2) a request that the Court order IBM to produce "documents…related to [] Concord, Maple, and Palm," and (3) a request that the Court order IBM to produce "data related to [] Concord, Maple, and Palm."  (Mot. at 5–6.)  As explained below, Plaintiffs' Motion is both procedurally defective and substantively meritless, and therefore must be denied in full.

## II.   ARGUMENT

### A.   Any Request for a "Global Ruling" Should Be Denied

To the extent Plaintiffs request an undefined "global ruling" and the production of unspecified "documents," such requests must be denied as procedurally defective.  (Mot. at 5–6.)  Motions to compel under Federal Rule of Civil Procedure 37 "must specifically identify each disputed discovery request, explain how or why the answer is deficient, request specific relief as to each discovery item, and include a brief description of the supporting facts and authority for each request in dispute." *Arellanez v. Morales*, No. EP-19-CV-00187-KC-MAT, 2022 U.S. Dist. LEXIS 20285, at *4–5 (W.D. Tex. Feb. 4, 2022); *see also Heaney v. Time Warner Cable, Inc.*, A-No. 09-CA-701-LY, 2010 U.S. Dist. LEXIS 512, at *3–4 (W.D. Tex. Jan. 5, 2010) (rejecting the plaintiff's request that the "Court order Defendant to fully respond to all of the Requests for Production" as improper for a motion to compel).

Here, Plaintiffs' demand for "a global ruling" that undefined "documents and data" are discoverable falls far short of this standard and is plainly improper.  (Mot. at 5.)  And Plaintiffs' vague request for "documents" does not fulfill their duty to "specifically identify each disputed discovery request" in a motion to compel.  *Arellanez,* 2022 U.S. Dist. LEXIS 20285, at * 4. Plaintiffs refer to two Requests for Production in their Motion, but those Requests only concern the production of demographic data.  (Mot. at 5; Ex. 4 to Mot.)  To the extent Plaintiffs' Motion seeks the production of any "documents" beyond additional demographic data, IBM reserves the right to advance additional arguments, if and when, Plaintiffs clarify their request.

**B.     Plaintiffs' Request for Data Related to 130+ Resource Actions Is Contrary to Law**

Plaintiffs ask the Court to order IBM to produce demographic data for 130+ resource actions conducted over three years—notwithstanding the fact that (i) each of those resource actions was independently planned and executed by different groups, and (ii) only seven of those resource actions actually impacted Plaintiffs.  (*Supra* at Sections I.B, I.C.)  This request must be denied, as it seeks discovery far outside the limits set by the Federal Rules of Civil Procedure and binding Fifth Circuit law.

### 1.     Discovery Must Be Limited to Plaintiffs' "Employing Units"

Federal Rule of Civil Procedure 26(b)(1) mandates that discovery must be both "relevant to any party's claim or defense and proportional to the needs of the case."  For individual employment discrimination claims, this means that discovery should be limited to "the source of the complained of discrimination—the employing unit or work unit" unless the plaintiffs show "a more particularized need and relevance."  *Marshall v. Westinghouse Elec. Corp.*, 576 F.2d 588, 592 (5th Cir. 1978); *see also Browning v. Southwest Research Inst.*, No. SA-05-CA-0245-FB, 2006 U.S. Dist. LEXIS 108614, at *6 (W.D. Tex. Apr. 26, 2006) (following authority and

10

determining that "discovery in employment discrimination actions may appropriately be limited to employment units, departments, and sections in which there are employees who are similarly-situated to the plaintiff"). In defining a plaintiff's work unit,

> courts look to the level of the supervisor or supervisors who are primarily responsible for the employment decision regarding the plaintiff and other similarly-situated employees. The rationale is that the motive and intent of the supervisors who made the employment decisions relating to the plaintiff and other employees is relevant to determining whether the employment decision was discriminatory. Thus, when the decision is made locally, discovery is properly limited to the plaintiff's local work unit.

*Kleppinger*, 2012 WL 12893651, at *5–6 (citations omitted); *see also Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 398 (5th Cir. 2000) (affirming district court's decision to limit discovery of data to the mechanical engineering department in which the plaintiff was employed because this was "the relevant unit of decision-making with respect to these issues"); *Smith v. DeTar Hosp. LLC*, No. V-10-83, 2011 U.S. Dist. LEXIS 144003, at *14–15 (S.D. Tex. Dec. 14, 2011) (limiting discovery to the plaintiff's department: "[n]umerous federal courts have held that in employment discrimination cases, the scope of discovery should be limited to the same department or office where the plaintiff worked, and to the individuals alleged to have discriminated against the plaintiff").

Courts frequently apply this standard to deny wide-ranging requests for demographic data untethered to a plaintiff's circumstances. *See, e.g.*, *Marshall*, 576 F.2d at 592 (affirming district court decision denying the plaintiff's request for demographic data for 7,500 employees in thirty-two districts and three manufacturing plants); *Greshowak v. Target Corp.*, No. 1:06-cv-00379-SS, 2007 WL 9710039, at *2 (W.D. Tex. Oct. 26, 2007) (denying the plaintiff's requests for data across 400 stores and data for employees who held different roles); *Browning*, 2006 U.S. Dist. LEXIS 108614, at *6–9 (limiting discovery to the division in which the plaintiff worked because employment decisions were made by the managers of each individual division, even though they

received assistance from a central Human Resources department).

Furthermore, this limitation applies with equal force to multi-plaintiff suits where the plaintiffs are pursuing individual disparate treatment claims. *See, e.g., Price v. Lockheed Martin Corp.*, No. 4:04-cv-00123-TSL-LRA, 2006 WL 8445219, at *2 (S.D. Miss. June 20, 2006) (limiting discovery in multi-plaintiff suit to the facility where the plaintiffs worked); *Smith v. Just For Feet, Inc.*, No. Civ.A. 98-2445, 1999 WL 447454, at *2–3 (E.D. La. June 24, 1999) (similar); *Marchese v. Sec'y, Dep't of the Interior*, No. 03-3082, 2004 WL 2297465, at *1–3 (E.D. La. Oct. 12, 2004) (rejecting the plaintiffs' citations supporting broad discovery because "they apply to class actions" and limiting discovery to the plaintiffs' employing units).

     2.   <u>IBM's Production to Date Exceeds Its Obligations Under the Governing Law</u>

IBM has already produced data beyond Plaintiffs' "employing units." Each Plaintiff (except for Kelly[1]) was selected for separation by his or her immediate managers in their respective business units. (*Supra* at Section I.C.) Based on Fifth Circuit precedent, IBM would be well within its rights to insist that discovery of demographic data end there. *See, e.g., Kleppinger*, 2012 WL 12893651, at *5–6; *Rubinstein,* 218 F.3d at 398; *Smith*, 2011 U.S. Dist. LEXIS 144003, at *14–17. However, in the spirit of compromise, IBM agreed to produce data up to the level of the General Manager of each Plaintiff's sub-unit, which, depending on the Plaintiff, is between the Plaintiff's third-line and fifth-line manager. (*Supra* at Section I.D.) The General Managers of those sub-units were the individuals who decided whether to conduct resource actions and how

---

[1]   Contrary to Plaintiffs' suggestion (Mot. at 12), Kelly did not separate from IBM in a resource action; rather, he was fired after failing a performance improvement plan. (*Supra* at Section I.C; *see also* Ex. 3 to Mot. at IBMK-KEL-0000048 ("Mike, as discussed, following the assessment of your performance on the Performance Improvement Plan put in place March 27th, we have reached a decision to initiate Separation from IBM…").)

much headcount to reduce.  For example, the General Manager of Delivery within GTS decided to reduce headcount within the Delivery unit in 2018, which led to the CGTZ action.  (*See, e.g.*, Marx Decl. ¶¶ 16–17.)  Likewise, the Senior Vice President of Cognitive Systems decided to reduce headcount in Cognitive Systems in 2019, which led to the CGMP action.  (Singer Decl. ¶ 14.)  Overall, IBM's production includes age data for approximately 1,154 employees who worked in the same sub-units as Plaintiffs and were considered for the relevant resource actions. (*Supra* at Section I.D.)  This more than satisfies IBM's discovery obligations.

### 3.    Plaintiffs' Arguments to the Contrary Miss the Mark

First, Plaintiffs misleadingly suggest that they are entitled to wide-ranging data to show a "pattern" or "atmosphere" of discrimination.  (Mot. at 6–8.)  As previously stated, Plaintiffs are pursuing individual disparate treatment claims against IBM.  And it is beyond dispute that, in the Fifth Circuit, "the pattern-or-practice method of proving discrimination is unavailable in a private, non-class action."  *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016); *Roy v. U.S. Dep't of Agric.*, 115 F. App'x 198, 201 (5th Cir. 2004).

Furthermore, allegations of a "pattern" of discriminatory actions do not give Plaintiffs *carte blanche* to demand company-wide discovery.[2]  Instead, courts have repeatedly emphasized that

---

[2]    None of the cases cited by Plaintiffs (Mot. at 6–7, no. 10–15) support their request for discovery of company-wide demographic data.  Four of the opinions were not decided in the context of a motion to compel and do not address the appropriate scope of discovery.  *See McCorstin v. U.S. Steel Corp.*, 621 F.2d 749 (5th Cir. 1980) (appeal of a directed verdict); *Hodgson v. First Fed. Sav. & Loan Ass'n of Broward Cnty., Fla.*, 455 F.2d 818 (5th Cir. 1972) (appeal of injunction issued after decision on the merits); *Ratliff v. Governor's Highway Safety Program*, 791 F.2d 394 (5th Cir. 1986) (appeal of a final judgment post-bench trial); *Kelly v. Boeing Petroleum Servs. Inc.*, 61 F.3d 350 (5th Cir. 1995) (appeal of jury instruction and evidentiary rulings at trial).  The remaining decision is distinguishable, as that plaintiff's request for demographic data was limited to two departments within the facility at which he worked.  *Thompson v. UOP, LLC*, No. 20-454-BAJ-SDJ, 2021 WL 1669595, at *2 (M.D. La. Apr. 28, 2021).

"given the extraordinarily limited relevance of pattern or practice information [to individual claims]…discovery requests must be very carefully and narrowly crafted," and may only proceed when "relevant and reasonably calculated" to lead to evidence proving plaintiff's individual claim. *Stancu v. Hyatt Corps./Hyatt Regency, Dallas*, No. 3:17-cv-675-L-BN, 2018 WL 888909, at *5 (N.D. Tex. Feb. 14, 2018) (denying request for company-wide discovery); *Piatt v. City of Austin*, No. 1:07-CV-520 LY, 2008 U.S. Dist. LEXIS 128998, at *8 (W.D. Tex. Sept. 29, 2008) (refusing to grant broad discovery on pattern or practice information and admonishing the plaintiff that his discovery requests must be "very carefully and narrowly crafted" "given the extraordinarily limited relevance of pattern or practice information"); *Marchese*, 2004 WL 2297465, at *2 (plaintiffs "do not have an unlimited ability to delve into their employers' policy and personnel records, even when they have alleged a pattern of discrimination"); *Smith*, 1999 WL 447454, at *1 (limiting discovery to the stores where the plaintiffs and their supervisor worked even though the plaintiffs alleged that the company committed "systematic and repeated discriminatory practices"). Plaintiffs do not even begin to argue that their request for demographic data for 130+ resource actions over a three-year period and multiple groups is "narrowly crafted" and "reasonably calculated" because they could not—indeed, their request is the very opposite of "narrowly crafted." *Stancu*, 2018 WL 888909, at *5.

Plaintiffs also boldly assert that the "data [they seek] will almost undeniably contain the manner of 'evidence of a pattern of terminating older workers when a reduction in force [occurred].'" (Mot. at 7.) As an initial matter, Plaintiffs' unsupported speculation[3] about what the

---

[3]   Plaintiffs' reference to a determination issued by the Equal Employment Opportunity Commission ("EEOC") does not support their assertion.  (Mot. at 7, 13.)  The EEOC did not provide any details about the data that it analyzed other than that the data related to unspecified resource actions "between 2013 and 2018."  (Ex. 2 to Mot.)  In other words, the EEOC did not

additional discovery may or may not show is not a legally cognizable basis for compelling discovery.  If that were true, then plaintiffs could obtain virtually limitless discovery merely by claiming that it will "almost undeniably" contain "smoking gun" evidence.  (*Id.*)  Moreover, the data that IBM has already produced contradicts Plaintiffs' theory: IBM has shown that the median age of Plaintiffs' sub-units did not meaningfully change between 2016 and 2020.  (*Supra* at Section I.D.)

Second, Plaintiffs misrepresent the scope of discovery ordered in two other previous discrimination cases against IBM.  (Mot. at 8–11.)

Far from supporting Plaintiffs here, the decision in *Iacono v. International Business Machines Corp.*, No. CV 17-8083-FMO (PLAx), 2018 WL 6112608 (C.D. Cal. April 16, 2018) underscores IBM's position: discovery of demographic data should be limited to the specific resource actions and sub-units in which Plaintiffs worked.  In that case, Iacono worked in the Enterprise Services Business Unit ("EBU"), which was a sub-unit within IBM's Sales & Distribution group. [4]  The EBU itself was sub-divided into multiple geographic regions; specifically, Iacono worked in the Southwest & Rockies region.  *Id.* at *2.  The court denied Iacono's request for company-wide demographic data, concluding it was overly broad and disproportionate.  *Id.* at *4, 9.  Instead, the court ordered IBM to produce only data regarding the individuals separated "in the EBU (nationwide) pursuant to the 2016 resource action that affected plaintiff."  *Id.* at *7 (emphasis added).  In other words, the court limited production to only those employees in Iacono's sub-unit, regardless of United States geographic region, who were impacted

---

conclude that data from the 130+ resource actions that occurred between 2018 and 2020 established a "pattern of terminating older workers."  (Mot. at 7.)

[4]   The Sales & Distribution group later became Global Markets.  (*See supra* at Section I.A (describing how Global Markets fits into IBM's organizational structure).)

in his specific resource action—notably, the same level of data IBM has already produced here. (*Supra* at Section I.D.)

Likewise, neither of the decisions in *Langley v. International Business Machines Corp.* referenced by Plaintiffs help them.  Langley separated from IBM as part of the CLDR resource action, which was funded by the Baccarat restructuring funding pool.  (Def.'s Mot. Summ. J., 4– 6, ECF No. 126, in *Langley v. Int'l Bus. Machs. Corp.*, 1:18-cv-00443-DAE.)  Critically, former Magistrate Judge Austin never considered and decided the appropriate scope of demographic data in that case.  *See generally Langley v. Int'l Bus. Machs. Corp.*, No. A-18-CV-443-LY, 2019 WL 369146 (W.D. Tex. Jan. 30, 2019) and 2019 WL 4577115 (W.D. Tex. Sept. 20, 2019).  Although Magistrate Judge Austin ultimately ordered IBM to produce documents from the files of its corporate executives (documents that IBM has <u>already</u> re-produced in this case), he <u>never</u> ordered IBM to provide demographic data for all of the resource actions funded by the Baccarat pool. *Langley*, 2019 WL 4577115 at *1, *5.  Nor did he ever conclude that the CLDR resource action was a "fictional" "gerrymandered layoff sub-unit."  (*Contra* Mot. at 10.)  Thus, notwithstanding Plaintiffs' counsel's efforts to cherry-pick and distort quotes from the *Langley* opinions, they do not dictate that IBM be ordered to produce data for every resource action funded out of the Concord, Maple, and Palm financing pools.

<u>Third</u>, Plaintiffs' counsel insists that IBM conducted coordinated, company-wide resource actions under the code names "Concord," "Maple," and "Palm" and that the GMST, HYCD, CGTZ, CDWP, CGMP, SYMP, and DCPL resource actions are just "fictional" "gerrymandered" "subunits" created by IBM's legal department.  (Mot. at 11–18.)  This argument fails for two reasons.  To start, it simply is not true.  (*Supra* at Section I.B.)  And regardless, this argument does not move the needle, since courts routinely deny requests for company-wide discovery even when reductions-in-force are initiated at a national level.

As detailed above, each year, Corporate Finance earmarked a pool of funds that could be used for restructuring expenses, which receive special treatment under accounting rules. (*Supra* at Section I.B.)  That pool of funding was assigned a unique name, such as "Concord," "Maple," or "Palm." (*Id.*)  Each group and/or sub-unit at IBM then independently decided whether it would like to take advantage of those funds. (*Id.*)  If a group elected to use some of the funding for a resource action, it submitted a request for a certain amount of money to Corporate Finance. (*Id.*)  After Corporate Finance authorized the expenditure, the group executed the resource action by distributing headcount reduction targets among managers and identifying individuals to be separated. (*Id.*)  Each resource action received a unique four-letter acronym for tracking purposes. (*Id.*)  Plaintiffs in this case were separated as part of the GMST, HYCD, CGTZ, CDWP, CGMP, SYMP, and DCPL resource actions. (*Supra* at Section I.C; Kennedy Decl. ¶¶ 10–16.)  Moreover, because the resource action planning process occurred separately within each group, and because the process was confidential, managers within one group were unaware of resource actions in other groups. (*Supra* at Section I.B.)  As a result, they often (incorrectly) used the name of the funding source to refer to the resource action within their group because, for their purposes, there was no need to distinguish between different resource actions occurring across multiple groups. (*Id.*)

IBM's counsel has explained this to Plaintiffs' counsel on multiple occasions. (*Supra* at Section I.D.)  Additionally, numerous IBM witnesses have offered sworn testimony outlining the same. (Mailen Decl. ¶¶ 3–17; Kennedy Decl. ¶¶ 6–9; Marx Decl. ¶¶ 13–22; Singer Decl. ¶¶ 8–16).  Nevertheless, Plaintiffs' counsel refuses to acknowledge this reality and now invites the Court to do the same.  But in order to accept Plaintiffs' counsel's narrative, the Court must implicitly conclude that IBM's counsel and numerous witnesses are lying under oath.  That is a very serious decision, and none of the alleged "evidence" that Plaintiffs point to justifies it.

Plaintiffs begin by reviewing certain communications related to their terminations that purportedly demonstrate that they were separated as part of centralized headcount reductions labelled "Concord," "Maple," and "Palm." (Mot. at 11–13.) But none of those documents suggest that Plaintiffs were being selected as part of a company-wide resource action called "Concord," "Maple," or "Palm." Instead, each of those communications occurred between professionals in Plaintiffs' groups and related to planning for the resource action within that group:

- IBMK-TOW-0000138 (cited at Mot. at 11, n.34) is an email from the HR professional who supported managers in the U.S. Distribution Market in which Plaintiff Townsley worked. She shares a list of employees in the U.S. Distribution Market who have been selected for the resource action with managers in the U.S. Distribution Market and the Project Office.

- IBMK-GEL-0001201 (Mot. at 12, n.35) is an email between HR leaders who supported the Cloud Platform business unit in which Plaintiff Gelphman worked.

- IBMK-SAU-0000395 (Mot. at 12, n.36) is an email conversation between the HR leader who supported the Cloud Technical Engagement business unit in which Plaintiff Sauro worked and managers in that business unit.

- IBMK-HOQ-0000113 (Mot. at 12, n.37) is an email from an executive in the Solutions Delivery and Transformation business unit in which Plaintiff Hoque worked and his direct reports.

- IBMK-DAV-0000259 (Mot. at 12, n.40) is an email from an operations manager in the Watson IoT business unit in which Plaintiff Davidson worked and four other managers in that unit.

- IBMK-DO-0000560 (Mot. at 13, n.41) is an email between Plaintiff Do's managers.

- IBMK-0000844 (Mot. at 13, n.43) is an email chain between HR leaders who supported the Hybrid Cloud Integration business unit in which Plaintiff Noffsinger worked.

And, as noted earlier, individuals within the groups often mistakenly referred to the resource action in their group by the name of the funding pool. (*Supra* at Section I.B.) Thus, none of these documents are any proof that IBM conducts coordinated company-wide headcount reductions.

Similarly, none of the so-called "high-level corporate documents" cited by Plaintiffs establish that corporate executives orchestrated company-wide separations.  (Mot. at 13–15.)

- Exhibit 10 (cited at Mot. at 14, n.46) is a collection of random documents related to Plaintiff Sauro's termination and resource action planning within the Cloud Technical Engagement business unit in which he worked.

- Exhibit 18 (Mot. at 14, n.46) is an email chain discussing the Global Business Services group's plans to reduce headcount in a resource action.

- Exhibit 19 (Mot. at 14, n.46) is a presentation summarizing GBS's resource action plans and decisions regarding particular segments within GBS.

- Exhibit 21 (Mot. at 14, n.49) is an email chain in which the senior HR leader for GTS outlines the group's plans for its upcoming resource action.

- Exhibit 22 (Mot. at 14, n.46) is an email discussing headcount reduction targets for a resource action affecting IBM's HR organization.

- Exhibit 23 (Mot. at 14, n.46) is a Corporate Finance presentation consolidating each group's requests for restructuring funding and each group's overall headcount reduction target.

- Exhibit 24 (Mot. at 14, n.46) is an email discussing the standardized training that the Project Office provides to managers who have identified employees for separation.

Nowhere in these documents do corporate executives direct group leaders to conduct a resource action, set headcount reduction targets for the groups, or instruct groups to reduce headcount in a particular division or business unit.[5]  (*See also* Marx Decl. ¶ 22 ("No one from corporate headquarters decided that a resource action was needed in GTS or told me how many employees should be selected."); Singer Decl. ¶ 14 ("No one from IBM corporate either directed or required

---

[5]   Plaintiffs' references (Mot. at 14–15) to news articles and stray comments made by corporate executives (*compare* Malien Decl. ¶¶ 19–22; Kennedy Decl. ¶¶ 20–23; Marx Decl. ¶¶ 23–26; Singer Decl. ¶¶ 19–22) have nothing to do with the appropriate scope of discovery.  Setting aside the fact that Plaintiffs mischaracterize both the content and import of these statements, they do not change the reality that resource actions were planned and implemented at the group—not corporate—level.  (*Supra* at Section I.B.)

Cognitive Systems to participate in a resource action."), ¶ 16 ("No one from corporate headquarters gave us any instruction or guidance as to how to distribute the targets or which employees to select.").)

Lastly, Plaintiffs misrepresent the deposition testimony of Sam Ladah and Laura Pimentel who, during the relevant time period, were HR leaders supporting the GTS and C&CS groups, respectively.  (Mot. at 16.)  Ladah and Pimentel did <u>not</u> testify that IBM conducted company-wide resource actions.  Rather, each provided information that decisions about whether and where to reduce headcount are made by managers within each group, not by corporate executives.  (*See, e.g.*, Ladah Dep. 249:5-18, 250:23-251:3, attached as Ex. J to Smith Decl. (stating that selections are made by the first-line manager); Pimentel Dep. 116:14-117:1, 124:4-9, attached as Ex. I to Smith Decl. (stating that her knowledge about a resource action was limited to the Cloud business group only and that HR partners assist lower-level managers through resource actions).)

In any event, Plaintiffs' arguments are beside the point.  Even if IBM <u>did</u> conduct company-wide resource actions (it did not, and does not), Plaintiffs <u>still</u> would not be entitled to company-wide demographic data.  *See, e.g.*, *Greshowak*, 2007 WL 9710039, at *2 (limiting discovery to local level even though plaintiff alleged he was terminated as part of company-wide policy); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1084 (11th Cir. 1990) (affirming decision to limit discovery to plaintiffs' work unit: "While Champion's RIF was initiated at the national level, each plant was given considerable autonomy in drawing up its own RIF master plan. The decision to terminate Earley and Noe in the RIF—as opposed to other employees—was made at the local level.  Where, as here, the employment decisions were made locally, discovery on intent may be limited to the employing unit."); *Jones v. RS & H, Inc.*, 775 F. App'x 978, 984 (11th Cir. 2019) (same).

Where, as here, the decisions to identify Plaintiffs for separation in a resource action were made by their immediate managers and the decisions to conduct resource actions were made by their business units, discovery should be limited to those units.  *See, e.g.*, *Browning*, 2006 U.S. Dist. LEXIS 108614, at *6–9 (limiting discovery to the division in which plaintiff worked because employment decisions were made by managers of the individual divisions and, thus, plaintiff was not similarly situated to employees in other divisions); *Rubinstein*, 218 F.3d at 398 (affirming decision to limit discovery to the department in which plaintiff worked because it was "the relevant unit of decision-making with respect to [salary and promotion] issues"); *Kleppinger*, 2012 WL 12893651, at *5–6 (limiting discovery to the division level when employment decisions were made together by a local supervisor and the division director); *Diloreto v. Towers Perrin Forster & Crosby, Inc.*, No. 3:09-CV-1280-B, 2010 WL 11619087, at *2 (N.D. Tex. Aug. 20, 2010) (limiting discovery for ADEA plaintiff terminated in an RIF because "[t]he Fifth Circuit has held discovery should be limited to the 'employing unit' or 'work unit' in discrimination cases" and that even when RIF decisions are "made at a district, local, or departmental level, and approved higher up, discovery is properly limited to the district, local, or departmental level.").  IBM has already produced demographic data for Plaintiffs' business units, as well as additional data showing that the average age of the business groups in which Plaintiffs worked has not changed.  That is more than the law requires.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, IBM respectfully requests that the Court deny Plaintiffs' Motion to Compel Discovery in its entirety.

Dated:  March 14, 2022

Respectfully submitted,

*/s/ Edward M. "Ted" Smith*

**CORNELL SMITH MIERL**
**BRUTOCAO BURTON, LLP**
1607 West Avenue
Austin, Texas 78701
Telephone:   (512) 328-1540
Telecopy:    (512) 328-1541

Edward M. "Ted" Smith
State Bar No. 00791682
tsmith@cornellsmith.com
Andrew Broadaway
State Bar No. 24082332
abroadaway@cornellsmith.com
Alan Lin
State Bar No. 24085435
alin@cornellsmith.com

*Attorneys for Defendant*
*International Business Machines Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the Court and Plaintiffs' counsel.

*/s/ Edward M. "Ted" Smith*
Edward M. "Ted" Smith