# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| CHARLES TOWNSLEY, *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 1:20-cv-00969-DAE |
| | ) |
| INTERNATIONAL BUSINESS | ) |
| MACHINES CORPORATION, | ) |
| | ) |
|     Defendant. | ) |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

Defendant International Business Machines Corporation ("Defendant" or "IBM"), pursuant to this Court's scheduling order and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), files this motion to exclude, in their entirety, the Report and testimony of Plaintiffs' economic damages expert, Mark Rambin ("Rambin").[1]

## **INTRODUCTION**

The eight Plaintiffs in this lawsuit have filed individual claims against IBM for purported age discrimination. In conjunction with their claims, each Plaintiff is seeking alleged damages in the form of past wages and fringe benefits (back pay) and future wages and fringe benefits (front pay).

Plaintiffs designated Mark Rambin, a certified public accountant who has never previously provided expert testimony or expert opinions in any matter involving employment discrimination of any kind, to testify as an expert witness and opine on the alleged economic damages that each Plaintiff is claiming to have sustained as a result of IBM's purported actions. Unsurprisingly, given his lack of experience, Rambin's opinions regarding Plaintiffs' alleged economic damages are premised upon unreliable methodology, are factually unsupported, and are based on incorrect assumptions, as follows:

1.  Rambin's front pay analysis is flawed in multiple ways. For starters, he uses inconsistent and unreliable methodologies for determining each Plaintiff's retirement age. For several Plaintiffs, he uses an "estimated work-life expectancy" methodology that is inapplicable in an employment discrimination lawsuit. Worse yet, for select Plaintiffs, he relies solely on

---

[1] All exhibits have been attached to the Declaration of Edward M. "Ted" Smith. Relevant excerpts from Mark Rambin's Deposition Transcript and excerpts of the associated exhibits, taken May 12, 2022, is attached as **Exhibit A** ("Rambin Dep.") to the Declaration of Edward M. "Ted" Smith. The Report of Mark Rambin (the "Rambin Rep."), which was Exhibit 1 to his Deposition Transcript, is attached as **Exhibit B** to the Declaration of Edward M. "Ted" Smith.

unrecorded statements from the Plaintiffs themselves in self-serving interviews in which they each claimed they planned to work until age 70. These assumptions are unreliable and must be rejected. His front pay analysis also fails to properly consider each Plaintiffs' mitigation efforts, and instead, simply accepts the unverified and unrecorded statements of each Plaintiff as to their subsequent efforts to find employment.

2. Rambin's opinions fail to account for an updated discount rate which would reduce his total damages calculation for all Plaintiffs.

3. Perhaps the most blatantly flawed component, Rambin's analysis of fringe benefits in both his back pay and front pay analyses is similarly unreliable and unsupportable. Rambin admits that those Plaintiffs who obtained subsequent employment received fringe benefits that were comparable to the fringe benefits they received at IBM, and therefore his assessment of "lost fringe benefits" for those Plaintiffs following their subsequent employment is improper. Rambin also fails to conduct an individualized assessment of the actual fringe benefits that each Plaintiff received at IBM and instead, applies a fabricated percentage multiplier to all Plaintiffs in his purported "lost fringe benefits" valuations that is both factually and scientifically unsupported.

4. Finally, Rambin's report is rife with errors and inaccuracies as to each of the individual Plaintiffs such that his calculations are unreliable and will not assist the trier of fact.

In sum, Rambin's opinions are based on inaccurate and incomplete information thereby rendering his opinions unreliable and not based on sufficient facts.[2] Accordingly, Rambin's Report and testimony should be excluded pursuant to Federal Rule of Evidence 702.

---

[2] Rambin confirmed during his deposition that multiple adjustments are needed to his expert report, and that Defendant's rebuttal report (which he reviewed) highlighted those factual errors, yet he has failed to provide any amended calculations or an amended report. [Rambin Dep. at 10:3-12].

# I. AUTHORITIES

## A. The Standard for Admissibility of Expert Testimony

Federal Rule of Evidence 702 ("Rule 702") provides the standard governing the admission of scientific or other expert testimony:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 incorporates the principles elucidated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, specifically that the trial court act as a gatekeeper to ensure that proposed expert testimony is "not only relevant, but reliable" before admitting it. 509 U.S. 579, 589 (1993); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002); *Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999). The Supreme Court elaborated on *Daubert*, applying it to technical and other specialized knowledge, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). In *Kumho Tire*, the Court stated that the ultimate objective of *Daubert* is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Following the Supreme Court's decision in *Daubert*, the Fifth Circuit has reviewed expert testimony with intense scrutiny. *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 196 (5th Cir. 1996) ("a trial court has a duty to screen expert testimony for both its relevance and reliability" and must determine whether the reasoning and methodology underlying the testimony is scientifically valid and can properly be applied to the facts in issue); *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567-68 (5th Cir. 1994) (the trial judge has the duty to ensure that an expert's testimony

3

is based on a proper foundation and is relevant). Indeed, "application of the *Daubert* factors is germane to evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." *Watkins v. Telsmith, Inc.*,121 F.3d 984, 991 (5th Cir. 1997). Moreover, as the Fifth Circuit explained in *Guillory v. Domar Industries, Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996):

> Certainly nothing in Rule 703 requires a court to admit an opinion based on facts that are indisputably wrong. Even if Rule 703 will not require the exclusion of such an unfounded opinion, general principles of relevance will. In other words, an opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant. In any event, such an opinion will not advance the express goal of "assisting the trier of fact" under Rule 702.

*Id.* (quoting *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991).

As outlined below, Rambin's overstated calculations of the alleged economic damages claimed by each Plaintiff are based on unfounded assumptions, incorrect information, and speculation and, therefore, should be excluded.

## II. ARGUMENT

**A. Rambin's Opinions are Premised Upon Incorrect Methodology, Unreliable, and Factually Unsupported.[3]**

1. *Rambin's Flawed Front-Pay Analysis Should be Excluded.*

   a. **Rambin's determination of "retirement age" is based on an incorrect work-life expectancy analysis and certain Plaintiff's self-serving statements.**

In calculating the number of years to which each Plaintiff would purport to be entitled to lost front-pay damages, Rambin utilizes either (1) an inapplicable work-life expectancy analysis

---

[3] The plethora of issues associated with Rambin's Report and proffered expert testimony all presumably stem from his complete lack of experience in evaluating economic damages in the employment context. Rambin testified that not only is this case the first lawsuit or proceeding involving age discrimination in which he is providing expert testimony; Rambin has, in fact, never provided expert testimony in any matter involving employment discrimination of any kind. [Rambin Dep. 7:24-9:8].

4

to calculate certain Plaintiffs' projected retirement age, or (2) simply the self-serving, unverifiable statements of certain Plaintiffs that they intended to work until age 70. Rambin's retirement age projections based on work-life expectancy should be excluded because this is not the correct methodology to assess economic damages in employment cases. [Excerpts from 05/13/22 Deposition Transcript of Dwight Steward, Ph.D. ("Steward Dep."), attached as **Exhibit C** to the Declaration of Edward M. "Ted" Smith, 41:20-42:22]. In assessing economic damages in employment cases, total work-life expectancy is simply not relevant. Rather, the relevant inquiry is how long the plaintiff would have worked at the particular employer. [*Id.* at 42:8-22]. Thus, Rambin's methodology in calculating the time frame for which Plaintiffs could be entitled to front-pay damages is completely unsupported and unreliable.

In addition to the fact that work-life expectancy is not the correct methodology in employment discrimination cases, Rambin's application of the work-life expectancy is also flawed. With respect to Plaintiffs Thanh Do, Janet Gelphman, Michael Kelly, and Charles Townsley, Rambin utilizes an outdated work-life expectancy table in forming his opinion. Although an updated work-life expectancy table was published in 2019 from the same source that Rambin cites (and such updated data is based on workforce data from 2012-2017), Rambin utilized a work-life expectancy table from a 2011 report based on data gathered from the prior decade. [Rambin Rep., p.4, n.3; *see also* Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger, *The Markov Model of Labor Force Activity 2012-2017: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors*, 28 J. Forensic Econ. 15 (2019), *available at* https://doi.org/10.5085/JFE-457]. Indeed, Rambin failed to familiarize himself with a 2015 article indicating that the average retirement age in the United States was around 64 for men and 62 for women—which represents more recent and readily available data. [Rambin Dep. at 31:12-33:11]. Moreover, Rambin has no basis to tie this table to the specifics of these four Plaintiffs. Rambin

admitted that he does not know what the average retirement age at IBM, or the broader technology industry, has been and, thus, did not and could not consider such information in forming his opinions on expected retirement ages of Plaintiffs Do, Gelphman, Kelly, and Townsley. [Rambin Dep. at 30:21-31:6]. Notably, Rambin offers no correlation or other inference as to how his projected retirement date assumptions consider the actual age, health, lifestyle, or other individual factors specific to each individual Plaintiff or the voluntary attrition at IBM. Consequently, Rambin's opinions on expected retirement age based on outdated work-life expectancy tables (which in all events, are untethered to the IBM workplace) are unreliable. [Rambin Rep., Ex. C].

Likewise, Rambin's opinions that Plaintiffs Rosa Davidson, Titon Hoque, Walter Noffsinger, and Michael Sauro would each work until age 70 should be excluded, as there is no evidence that any of these Plaintiffs would have a reasonable expectation to work to that age. [Rambin Rep., Ex. C]. In the Fifth Circuit, even when an individual's work-life expectancy average is used to calculate damages for future lost wages (such as in personal injury lawsuits), that statistical age is to be used "unless evidence supports a variation from that average." *Mays v. Chevron Pipe Line Co.*, No. 14-03098-BAJ-CBW, 2019 U.S. Dist. LEXIS 8049, at *4 (W.D. La. 2019). Thus, even if Rambin were allowed to use a work-life expectancy methodology in this instance, Ms. Davidson, Mr. Hoque, Mr. Noffsinger, and Mr. Sauro would be required to show that they "by virtue of [their] health or occupation or other factors, [are] likely to live and work a longer . . . period than the average." *See id.* (citing *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984)). Importantly, statements or testimony that a plaintiff intends to work until age 70 will not suffice. *See id.* (citing *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 475 (5th Cir. 2015)).

Here, Rambin's opinions that these Plaintiffs would work until the age of 70 are based on self-serving, admittedly unrecorded interviews with each Plaintiff. [Rambin Dep. at 25:18-27:7].

Indeed, Rambin was unable to recall or produce any notes regarding his interviews with the Plaintiffs. [*Id.* at 27:4-7]. Despite this, Rambin uses the stated intention of retirement age for these Plaintiffs (which Rambin himself suggested to each Plaintiff) even though he admittedly had no scientific basis for it, made no inquiry into their individual circumstances, and is not aware of any research publication indicating that using such a statement is a proper method to calculate lost future wages. [*Id.* at 35:1-36:11]. As a result, Rambin's calculations—based on the assumption that Ms. Davidson, Mr. Hoque, Mr. Noffsinger, and Mr. Sauro would work until age 70—should be excluded. *See Crompton v. Graphic Packaging Int'l*, No. 5:20-CV-00095-RWS, 2021 U.S. Dist. LEXIS 254735, at *8 (E.D. Tex. 2021) (stating that work-life expectancy can be shown by evidence regarding the particular person and only using national averages when such evidence is absent and excluding an expert's opinions regarding the plaintiff's lost earning capacity that were based on the assumption that the plaintiff would work until 67 based on the lack of evidence for the variance); *Mays*, 2019 U.S. Dist. LEXIS 8049 at *4 (same).

> b. **Rambin's calculation of front-pay damages is further flawed because he simply accepts Plaintiffs' unverified statements as true, without considering proper mitigation efforts into his opinion.[4]**

In addition to blindly accepting certain Plaintiffs' statements regarding their work-life

---

[4] Nor does Rambin consider the fact that multiple Plaintiffs testified that they are not seeking reinstatement from IBM, which negates any recovery for front pay for those Plaintiffs. *See, e.g.*, *EEOC v. Molle Chevrolet, Inc.*, No. 91-0030-CV-W-BB, 1992 WL 443562, at *7 (W.D. Mo. Dec. 22, 1992) (declining to award front pay damages when the plaintiff testified that he did not want to be reinstated); *Gaskill-Clayborn v. Might Oaks Child Dev. Ctr., LLC*, No 1:20-CV-128-DMB-RP, 2021 U.S. Dist. LEXIS 181021, at *7-8 (N.D. Miss. Sept. 22, 2021) (awarding only one year of front pay where the plaintiff's testimony indicated that she did not intend to work at the employer for more than one year). Mr. Hoque has stated unequivocally that he does not wish to be reinstated at IBM. [Excerpts from 01/27/22 Deposition Transcript of Titon Hoque ("Hoque Dep."), attached as **Exhibit D** to the Declaration of Edward M. "Ted" Smith, 270:10-13]. Likewise, Ms. Gelphman testified that her current position is her "dream job." [Excerpts from 01/21/22 Deposition Transcript of Janet Gelphman ("Gelphman Dep."), attached as **Exhibit E** to the Declaration of Edward M. "Ted" Smith, 85:16-21].

expectancy, Rambin also does the same thing regarding their post-IBM mitigation efforts. For example, Rambin assumes that Plaintiff Thanh Do would not have any income or get another job through December 31, 2027. [Rambin Rep., Ex. C]. Rambin's assumption is based exclusively on his unrecorded interview with Ms. Do and the fact that since her termination, the only income she has received consists of unemployment benefits. [Rambin Dep. at 91:17-92:16]. Notably, Rambin admits that he has no evidence that Ms. Do would not receive any income or get another job through 2027. [*Id.* at 92:6-16]. Instead, Rambin disclaimed the expertise to offer an opinion on when Plaintiffs could have been reasonably expected to find comparable employment after a diligent job search. [*Id.* at 87:5-88:20]. In doing so, Rambin does not consider any facts (other than those offered by Plaintiffs) that might bear upon his estimation of front pay for each Plaintiff, including each Plaintiff's proper mitigation efforts. [*Id.* at 37:6-38:11]. Here, Rambin's calculations are based on speculative extrapolation that, because a Plaintiff does not have income today, it follows that he or she was unable to find employment, regardless of whether each Plaintiff actually searched, and that their unemployment will continue until the Plaintiff said he or she would have retired. Such an opinion is unreliable and should be excluded. *JRL Enterprises, Inc. v. Procorp Associates, Inc.*, No. 01-2893, 2003 WL 21284020, at *8 (E.D. La., June 3, 2003) (holding that merely accepting the facts conveyed by the plaintiff as true renders expert opinions inherently unreliable); *see also Donatelli v. Unumprovident Corp.*, 350 F. Supp. 2d 288, 291-92 (D. Maine 2004) (expert testimony concerning lost earnings inadmissible because it incorporates assumptions not established by the evidence).

    2.    <u>*Rambin uses an outdated discount rate that inflates his calculations.*</u>

Compounding his errors, Rambin states that his calculations "reflect the application of interest factors for both past and future lost earnings damages" to "give effect to the time value of money." [Rambin Rep., p.5]. Rambin states that for past damages he uses a discount rate of 2%

8

and for future damages he uses a discount rate of 2.5% based on the Federal Open Market Committee and their interest rate projections as of December 15, 2021. [Rambin Rep., Ex. C; Rambin Dep. at 114:22-115:20]. However, Rambin admits that the interest rate environment has changed and that it has gone up about a point. [*Id.*]. Based on this, Rambin admits that his calculations would change, and the updated discount rate would have an effect of reducing his calculation of economic damages suffered by Plaintiffs. [*See id.*]

      3.    *Rambin's methodology in calculating Plaintiffs' fringe benefits is unreliable and has no factual basis.*

Critically, in his Report, Rambin estimates that each Plaintiff would have received fringe benefits worth an additional **44.38%** of their gross income based on his own unsupported and untested methodology, which he calculates solely by manipulating national statistics released by the Bureau of Labor Statistics. [Rambin Rep., p.4, Ex. C; Rambin Dep., Ex. 2]. As explained below, Rambin's methodology is unsupported and flawed for multiple reasons. *First*, it is inappropriate to include fringe benefits in damages calculations *at all* where plaintiffs have obtained subsequent employment with benefits that are comparable to the benefits they received at IBM; yet Rambin includes fringe benefits damages for all Plaintiffs in his calculations. [Rambin Rep., Ex. C]. *Second*, to the extent calculations of fringe benefits damages may be warranted, Rambin relies solely upon national statistics instead of data specific to each Plaintiff's individual circumstances. And even if usage of national statistics were proper (which IBM does not concede), Rambin's manipulation of the national statistical data—which is unsupported and based on nothing other than Rambin's own "logic"—is not. *Finally*, Rambin's blind reliance upon each Plaintiff's own self-serving statements about the nature of the benefits provided at their subsequent employers renders his fringe benefits analysis similarly unreliable.

9

### a. There should be no valuation at all regarding fringe benefits once Plaintiffs received subsequent employment including comparable fringe benefits.

Rambin admits that those Plaintiffs who obtained subsequent employment received fringe benefits that were comparable to the fringe benefits they received at IBM, and therefore it is improper to assess any valuation of "lost fringe benefits" for those Plaintiffs following their subsequent employment. [*See, e.g.*, Rambin Dep. at 23:13-24:4, 73:2-6, 101:6-13; Steward Dep. at 43:9-20, 84:18-87:24]. At most, the only possible valuation difference for fringe benefits that could reasonably be assessed would be regarding retirement benefits. [Steward Dep. at 86:11-19].

### b. Rambin's 44.38% Multiplier Figure is Unreliable and Unsupported.

In his Report, Rambin calculated the alleged percentage of fringe benefits for all Plaintiffs (regardless of their previous job position at IBM) by dividing the cost of benefits (22.50) by the cost of wages and salaries (50.70) for "Management, business, and financial" roles as set forth in Table 5 of BLS's Employer Costs for Employee Compensation. [Rambin Dep. 14:17-15:14]. This methodology is flawed both because there is no basis for blindly using the source data itself, and because the calculation that Rambin performs is based only on his own "logic" and is entirely untested and unsupported. [*Id.* at 18:3-14].

*First*, it is improper for Rambin to rely on national averages across all sectors in "Management, business, and financial" roles instead of ascertaining the actual fringe benefits that each Plaintiff received at IBM and comparing such benefits to the actual fringe benefits that each Plaintiff received (or did not receive) following their separation of employment from IBM. [Steward Dep. at 17:21-20:10]. Indeed, a similar fringe benefits opinion that relied on the same source upon which Rambin relies was previously excluded by a court because the expert witness in that case did not "explain why this nationwide figure is an appropriate estimate for fringe benefits" for a plaintiff's occupation and geography. *See Joffe v. King & Spalding*, No. 17-CV-

3392 (VEC), 2019 WL 4673554, at *8 (S.D.N.Y. Sept. 24, 2019) (rejecting 4.8% national average for retirement and saving contributions as unreliable). Here, as in *Joffee*, Rambin likewise calculated Plaintiffs' fringe benefits based on an estimated national average of employer contributions to benefit plans for "Management, professional and related" employees across all professions, instead of assessing the contributions actually made by IBM. During his deposition, Rambin admitted that he does not know what the percentage of costs of IBM's benefits were for any of the Plaintiffs, and therefore has no way of knowing if 44.38% is a representative percentage to use when calculating the value of estimated fringe benefits as a percentage of income. [Rambin Dep. at 23:3-8]. Accordingly, Rambin has no basis to assume that the national averages for employer contributions to benefit plans for "Management, business, and financial" employees across all professions are a reliable source in calculating the value of fringe benefits at either IBM or the Plaintiffs' subsequent employers.

Moreover, Rambin's presumption is even more inappropriate in this matter because Rambin improperly assumes that each Plaintiff was in a "Management, business, and financial" role, despite readily available information showing that multiple Plaintiffs were actually in non-management roles, such as sales and other technology related positions. [*Id.* at 15:12-24, 21:6-22]. Rambin admits that his calculations would change if he utilized the section in the chart for "Sales and related." [*Id.* at 16:8-21, 20:21-23]. Not surprisingly, when using Rambin's flawed methodology to calculate the percentage of fringe benefits for "Sales and related" roles, the percentage of gross income for fringe benefits drops to 35.3%. [*Id.*, Ex. 2].[5] Rambin offers no explanation as to why he did not utilize the classification tied to sales roles. Indeed, Rambin

---

[5] This is calculated by using Table 5 in the BLS source used by Rambin and the figures for "Sales, related." The cost of benefits ($9.63) is divided by the cost of wages and salaries ($27.28) to arrive at 35.3%. [Rambin Dep., Ex. 2].

11

testified that the reason for this failure is based solely on his own conclusion that the salespeople employed by IBM somehow fall into "Management, business, and financial" classification due to the hourly rate identified in the chart. [*Id.* at 15:19-16:5]. Accordingly, Rambin's opinion that all Plaintiffs, even though many are not in management roles, would receive the same percentage of fringe benefits is a faulty and unsupported assumption.

*Second*, even assuming the source upon which Rambin relies is sound (which IBM disputes), Rambin's opinions are based on methodology that is unsound and factually unsupported. In determining reliability, a court focuses on the expert's methodology, not the conclusions generated by it. *Orthoflex Inc. v. ThermoTek, Inc.*, 986 F.Supp.2d 776, 783 (N.D. Tex. 2013). The testimony must be "more than a subjective belief or unsupported speculation." *Id.* (internal citation omitted). A court may exclude such testimony if "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)). Here, the methodology that Rambin utilizes in arriving at his calculation that Plaintiffs would have received fringe benefits in the amount of 44.38% of their gross income (i.e., dividing the national average cost of benefits (22.50) by the national average cost of wages and salaries (50.70) for "Management, business, and financial" roles) is not based on a legitimate source, but his own subjective belief—his own "logic." [Rambin Dep. at 18:3-14]. Notably, 44.38% as a percentage of benefits value is not found anywhere in the source that Rambin cites for "Management, business, and financial" roles. [*Id.* at 14:7-16, 21:23-22:5; Rambin Rep., p.4, Ex. C]. Moreover, Rambin does not (and is not able to) point to a single research publication that uses 44.38% as a basis for calculating benefits in any employment law case. [Rambin Dep. at 18:3-14, 21:23-22:5].

Rambin's own "logic"—based on no expertise or experience in employment discrimination cases—cannot support his flawed methodology. Accordingly, because Rambin does not provide

any support for his calculation other than his own belief that it is proper, there is simply too large of an analytical gap for such an opinion to be reliable. *Thomas v. PFG Transco, Inc.*, 501 F. Supp. 3d 437, 444 (E.D. Tex. 2020) (excluding an expert opinion as unreliable because the court found that the witness did not point to any documentation supporting his conclusion). Consequently, the methodology employed by Rambin in calculating the lost fringe benefits owed to Plaintiffs is completely unsupported and unreliable.

        **c.**        **Rambin's Blind Reliance on Plaintiffs' Statements Regarding Their Benefits at Subsequent Employers is Improper.**

Finally, Rambin's fringe benefits analysis is also flawed because he relies solely on Plaintiffs' own statements about the benefits they received at their subsequent employers, and not on reliable methodology or meaningful data. When a witness proposed as an economic expert "fail[s] to demonstrate any impartiality in formulating his opinions" and "merely accept[s] as true the facts given to him by" the plaintiff, which is the equivalent of "the plaintiff . . . presenting its own estimation of damages in the guise of an expert opinion," the opinions expressed are inherently unreliable. *JRL Enterprises, Inc.*, 2003 WL 21284020 at *8; *see also Donatelli*, 350 F. Supp. 2d 288 (expert testimony concerning lost earnings inadmissible because not based on application of reliable assumptions not in the record). Here, Rambin admits that his calculation of Plaintiffs' fringe benefits at their subsequent employment as a percentage of salary is based only on conversations he had with each Plaintiff that they were receiving subsequent benefits and such benefits were "comparable" to those offered by IBM. [Rambin Dep. at 23:13-22, 39:24-40:4]. As a result, Rambin's decision to rely on information provided by Plaintiffs without conducting his own independent investigation is improper and renders his opinions unreliable.

In summary, Rambin's opinions on Plaintiffs' purported lost fringe benefits are factually unsupported and lack reliable methodology.

**B.    Rambin's Report is Littered with Inaccuracies as to each Plaintiff.**

"An expert report may be excluded solely because it is unsupported by the facts of the case. Incorrect facts underlying an expert report renders the testimony unreliable." *Wilbourn v. Brg Sports*, No. 4:19-cv-00263-P, 2021 U.S. Dist. LEXIS 231311, at *21-22 (N.D. Tex. Oct. 7, 2021) (citing *Hathaway v. Bazany*, 507 F.3d 312, 318-19 (5th Cir. 2007)). In addition to the global reasons set forth above that apply to each Plaintiff as to why Rambin's Report and testimony are unreliable and should be excluded, Rambin's calculations include the following inaccuracies as to each Plaintiff and are thus, factually unsupported for these reasons as well.

1.    *Charles Townsley*

Rambin makes the following oversights and errors with respect to Plaintiff Charles Townsley:

- Rambin fails to include $50,328 in income that Mr. Townsley received in 2018. Rambin admits that this would reduce his opinion of the amount of damages he estimates for Mr. Townsley. [Rambin Dep. at 60:16-61:5 and Ex. 5].

- Rambin fails to account for the fact that Mr. Townsley received an increase in base salary to $157,000 in 2021. [*Id.* at 61:10-18; Excerpts from 12/09/21 Deposition Transcript of Charles Townsley ("Townsley Dep."), attached as **Exhibit F** to the Declaration of Edward M. "Ted" Smith 149:14-23].

- Rambin incorrectly assumes that Mr. Townsley's salary at IBM was $350,000. Rambin states that he arrived at this number by taking the average of the last five years of Mr. Townlsey's employment compensation at IBM. Yet Rambin provides no explanation for why an average of five years is appropriate, particularly when Mr. Townsley testified that his job role changed in 2016. [Townsley Dep. at 71:16-25]. Indeed, when considering Townsley's compensation from 2016, 2017, and 2018, his average compensation at IBM totals less than $300,000. [Rambin Dep. at 55:4-58:4].

- Rambin admits that Mr. Townsley was in a sales role with IBM, yet in calculating his benefits Rambin did not utilize the table for "Sales, related." [Rambin Dep. at 58:14-19].

2.    *Titon Hoque*

Rambin makes the following oversights and errors with respect to Plaintiff Titon Hoque:

- Rambin fails to include any income for Mr. Hoque in 2019, despite the fact that Mr. Hoque was working for a staffing company and making $90/hour. [Rambin Dep. 65:9-66:11; Hoque Dep. at 79:12-80:8, 81:3-11].

- Rambin incorrectly states that Mr. Hoque's annual salary at his subsequent employment with Austin Community College was $154,324 in 2021, despite admitting that Mr. Hoque's annual salary was $170,000. [Rambin Dep. at 67:15-68:4 and Ex. 6; Rambin Rep., Ex. C]. Moreover, even if this annual salary was adjusted to reflect a start date of February 1, 2021, Rambin fails to revise the subsequent years to show the full salary that Mr. Hoque received from ACC. [Rambin Rep., Ex. C]. Rambin also fails to account for the fact that Mr. Hoque received a raise from ACC in 2022 to $178,000. [Rambin Dep. at 68:5-12].

- Rambin assumes that Mr. Hoque would not have retired until the age of 70 based solely on Mr. Hoque's representations to him. [Rambin Dep. at 62:13-18].

3. *Michael Sauro*

Rambin makes the following oversights and errors with respect to Plaintiff Michael Sauro:

- Rambin fails to include distributions that Mr. Sauro was receiving from IBM's pension fund in the subsequent income that Mr. Sauro received after he left IBM. [Rambin Dep. at 75:14-22]. Rambin fails to include these distributions despite admitting that the IRS considers such distributions as "taxable income." [Rambin Dep. at 77:11-78:14].

- Rambin also ignores the fact that Mr. Sauro indicated that he was retired on his tax forms in 2019 and continues to opine that he should receive front pay through December 31, 2024. [Rambin Dep. at 81:5-82:14 and Ex. 7].

- Rambin assumes that Mr. Sauro would not have retired until the age of 70 based solely on Mr. Sauro's representations to him. [Rambin Dep. at 25:18-24].

4. *Thanh Do*

Rambin makes the following oversights and errors with respect to Plaintiff Thanh Do:

- Rambin states that he used the benefits for a manager position for Ms. Do, yet he failed to determine that she was in a management-level position. [Rambin Dep. at 91:2-11]. Ms. Do has never been a manager at IBM. [Excerpts from 01/11/22 Deposition Transcript of Thanh Do ("Do Dep."), attached as **Exhibit G** to the Declaration of Edward M. "Ted" Smith, 50:9-10].

- Rambin fails to account for the fact that it would have been reasonable to expect Ms. Do to get a comparable employment position within 24 weeks of beginning a reasonable job search and instead projects that it is reasonable for Ms. Do to receive front pay through December 31, 2027. [Rambin Dep. at 88:21-90:22, 92:6-24].

5. *Rosa Davidson*

Rambin makes the following oversights and errors with respect to Plaintiff Rosa Davidson:

15

- Rambin states that he used the benefits for a manager position for Ms. Davidson, yet there was nothing in her job title description that led him to believe she was in a management-level position. [Rambin Dep. at 94:9-14]. Ms. Davidson was a software developer, not a manager. [*Id.*]

- Rambin fails to account for the fact that Ms. Davidson was entitled to a $15,000 bonus in her subsequent employment with Cognizant Technology. [Rambin Dep. at 94:25-95:5 and Ex. 8]. Rambin admits that if including the bonus into Ms. Davidson's subsequent compensation, her salary at Cognizant would be higher than her salary at IBM and any front-pay damages would be cut off beginning in January 2021. [Rambin Dep. at 99:10-101:13].

- Rambin assumes that Ms. Davidson would not have retired until the age of 70 based solely on Ms. Davidson's representations to him. [Rambin Dep. at 93:11-24].

6. *Walter Noffsinger*

Rambin makes the following oversights and errors with respect to Plaintiff Walter Noffsinger:

- Rambin assumes that Mr. Noffsinger's salary at IBM was $347,987 based on Mr. Noffsinger's W-2 from 2019 (instead of 2020), which includes Mr. Noffsinger's Restricted Stock Units as purported income. [Rambin Dep. at 103:22-104:22]. However, Mr. Rambin provides no basis for the assumption that Mr. Noffsinger would have continued to receive Restricted Stock Units and what they would have been valued at in subsequent years. [Rambin Rep., Ex. C].

- Rambin assumes that Mr. Noffsinger would not have retired until the age of 70 based solely on Mr. Noffsinger's representations to him. [Rambin Dep. at 101:22-102:11].

7. *Janet Gelphman*

Rambin makes the following oversights and errors with respect to Plaintiff Janet Gelphman:

- Although Ms. Gelphman's initial salary at Blue Yonder, her subsequent employer, was $150,000/year in 2020, Rambin incorrectly states that Ms. Gelphman's income in 2021 and subsequent years was $120,410/year. [Rambin Dep. at 110:6-23 and Ex. 10].

- Rambin fails to account for the fact that Ms. Gelphman received a $19,000 bonus from Blue Yonder in 2020. [Gelphman Dep. at 91:16-25]. Moreover, Rambin fails to account for the fact that Ms. Gelphman received a raise in 2022 to $153,000. [Rambin Dep. at 110:24-111:12; Gelphman Dep. at 92:1-13].

- Rambin states that he used the benefits for a manager position for Ms. Gelphman even though there was nothing in her job title description that led him to believe she was in a management-level position. [Rambin Dep. at 112:3-12]. Ms. Gelphman was a UX designer, not a manager. [*Id.*]

8. *<u>Michael Kelly</u>*

Rambin makes the following oversights and errors with respect to Plaintiff Michael Kelly:

- Rambin notes that Mr. Kelly was in a sales role with IBM, yet in calculating Mr. Kelly's benefits Rambin did not utilize the table for "Sales, related." [Rambin Rep., Ex. C (listing Mr. Kelly as a "Sales Specialist"; Rambin Dep. at 15:12-24].

Rambin's global methodology flaws are compounded by the factual inaccuracies underpinning his calculations. As such, Rambin's opinions are unreliable and should be excluded.

## CONCLUSION

For the reasons stated above, IBM respectfully requests that this Court grant its Motion and wholly exclude the testimony and Report of Mark Rambin. IBM also requests such other and further relief, whether legal or equitable, to which it is justly entitled.

Respectfully submitted,

By: */s/ Edward M. ("Ted") Smith*
Edward M. "Ted" Smith
State Bar No. 00791682
tsmith@cornellsmith.com
Andrew Broadaway
State Bar No. 24082332
abroadaway@cornellsmith.com
Alan Lin
State Bar No. 24085435
alin@cornellsmith.com

**CORNELL SMITH MIERL BRUTOCAO BURTON, LLP**
1607 West Avenue
Austin, Texas 78701
Telephone: (512) 328-1540
Telecopy: (512) 328-1541

**ATTORNEYS FOR DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION**

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule CV-7(i), counsel for Defendant has complied with the Court's conference requirement and conferred with Plaintiffs' counsel on May 26, 2022, via email and conference call. Plaintiffs' counsel stated that they intend to submit a supplemental expert report from Mark Rambin, as well as corrections to his deposition transcript. The undersigned stated that Defendant would review any additional report as well as corrections to his deposition transcript. In addition, Plaintiffs' counsel confirmed that Plaintiffs are opposed to the relief sought in the foregoing motion. Although the undersigned believes that a supplemental report—properly limited according to the Federal Rules and this Circuit's law—will be unable to cure the objections that form the gravamen of Defendant's motion, to the extent such supplemental report removes specific objections from controversy, Defendant will notify the Court and withdraw the resolved objections.

*/s/ Edward M. "Ted" Smith*
Edward M. "Ted" Smith

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2022, I electronically filed the foregoing Motion with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the Court and Plaintiffs' counsel of record.

/s/ *Edward M. "Ted" Smith*
Edward M. "Ted" Smith
