**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| CHARLES TOWNSLEY, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-00969-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
<u>MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN</u>**

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| CHARLES TOWNSLEY, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-00969-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S**
**MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

**DECLARATION OF EDWARD M. "TED" SMITH**

1.    I am a Partner at Cornell Smith Mierl Brutocao Burton, LLP.  I am serving as lead counsel of record for Defendant International Business Machines Corporation ("IBM") in the above-captioned matter.  I make this statement based on my personal knowledge and familiarity with the discovery documents in this matter.  I am over 18 years old and am otherwise competent to make this declaration.

2.    Attached as Exhibit A to this declaration is a true and correct copy of excerpts of the deposition transcript and associated exhibits excerpts of Mark Rambin, which was taken on May 12, 2022.

3.    Attached as Exhibit B to this declaration is a true and correct copy of Mark Rambin's Expert Report in this matter, which is dated February 15, 2022.

4.    Attached as Exhibit C to this declaration is a true and correct copy of excerpts of the deposition transcript of Dwight Steward, Ph.D., which was taken on May 13, 2022.

5.    Attached as Exhibit D to this declaration is a true and correct copy of excerpts of

Declaration of Ted Smith                                                                                                        1

the deposition transcript of Plaintiff Titon Hoque, which was taken on January 27, 2022.

6.      Attached as Exhibit E to this declaration is a true and correct copy of excerpts of the deposition transcript of Plaintiff Janet Gelphman, which was taken on January 21, 2022.

7.      Attached as Exhibit F to this declaration is a true and correct copy of excerpts of the deposition transcript of Plaintiff Charles Townsley, which was taken on December 9, 2021.

8.      Attached as Exhibit G to this declaration is a true and correct copy of excerpts of the deposition transcript of Plaintiff Thanh Do, which was taken on January 11, 2022.


My full name is Edward M. "Ted" Smith, my date of birth is December 19, 1968, and my work address is Cornell Smith Mierl Brutocao Burton, LLP, 1607 West Avenue, Austin, Texas 78701.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Travis County, State of Texas, on the 26th day of May, 2022.


Signed: _____*/s/Edward M. "Ted" Smith*_____
                        Edward M. "Ted" Smith

Declaration of Ted Smith                                                                                    2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| CHARLES TOWNSLEY, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-00969-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S**
**MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

# EXHIBIT A to Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CHARLES TOWNSLEY, MICHAEL      §
SAURO, WALTER NOFFSINGER,       §
ROSA DAVIDSON, MICHAEL          §
KELLY, TITON HOQUE, JANET       §
GELPHMAN, THANH DO,             §
                                §
        Plaintiffs,             §    CASE NUMBER
                                §    1:20-CV-00969-LY
v.                              §
                                §
INTERNATIONAL BUSINESS          §
MACHINES CORPORATION,           §
                                §
        Defendants.             §

* * * * * * * * * * * * * * * * *

THE VIDEOTAPED ORAL DEPOSITION OF
MARK RAMBIN
May 12, 2022
(Reported Remotely)

* * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF MARK RAMBIN produced at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on the 12th day of May 2022, from 9:32 a.m. to 12:58 p.m., before Sandra S. Givens, CSR, in and for the State of Texas, reported by machine shorthand method pursuant to the Federal Rules of Civil Procedure, with all parties participating via Zoom.

Page 1

---

A P P E A R A N C E S

FOR THE PLAINTIFFS:

        Mr. Ross Pringle
        WRIGHT & GREENHILL, PC
        900 Congress Avenue
        Suite, 500
        Austin, Texas 78701
        (512) 476-4600
        rpringle@w-g.com

FOR THE DEFENDANT:

        Mr. Edward M. "Ted" Smith
        CORNELL SMITH MIERL BRUTOCAO BURTON, LLP
        1607 West Avenue
        Austin, Texas 78701
        (512) 328-1540
        tsmith@cornellsmith.com

VIDEOGRAPHER:

        Mr. Rick Rienstra
        rwrienstra@clsvideo.com

Page 2

---

I N D E X

Appearances - - - - - - - - - - - - - - - - - - - - - - - 3

Exhibits - - - - - - - - - - - - - - - - - - - - - - - 4

MARK RAMBIN

    Examination by Mr. Smith - - - - - - - - - - - - - 5

Changes and Signature - - - - - - - - - - - - - - - 117

Reporter's Certification - - - - - - - - - - - - - 119

E X H I B I T S

NO.  DESCRIPTION                                     PAGE
Exhibit 1 - - - - - - - - - - - - - - - - - - - - - 9
    Expert Report of Mark Rambin, CPA, CFF
    February 15, 2022
Exhibit 2 - - - - - - - - - - - - - - - - - - - - - 12
    U.S. Bureau of Labor Statistics, Employer Costs
    for Employee Compensation - December 2020
Exhibit 3 - - - - - - - - - - - - - - - - - - - - - 31
    Center for Retirement Research at Boston
    College: The Average Retirement Age - An Update
Exhibit 4 - - - - - - - - - - - - - - - - - - - - - 54
    Document from Dr. Steward Report Utilized to
    Determine Townsley's Salary. 2016 - 2019
Exhibit 5 - - - - - - - - - - - - - - - - - - - - - 60
    2018 W-2 from Workforce Logic for Charles
    Townsley
Exhibit 6 - - - - - - - - - - - - - - - - - - - - - 67
    1/25/21 Offer Letter from Austin Community
    College to Titon Hoque
Exhibit 7 - - - - - - - - - - - - - - - - - - - - - 78
    2019 1040-SR U.S. Tax Return for Seniors for
    Michael Sauro

Page 3

---

Exhibit 8 - - - - - - - - - - - - - - - - - - - - - 97
    11/3/20 Cognizant Offer Letter to Rosa
    Davidson
Exhibit 9 - - - - - - - - - - - - - - - - - - - - - 103
    IBM Compensation to Walt Noffsinger for
    2020
Exhibit 10 - - - - - - - - - - - - - - - - - - - - 110
    2/26/20 BlueYonder Offer Letter to Janet
    Gelphman

Page 4

---

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1    VIDEOGRAPHER:  We are on the record
2  May 12th, 2022.  The time is approximately 9:32 a.m.
3  Would counsel like to identify yourselves for the
4  record?  And we can start with Mr. Pringle.
5    MR. PRINGLE:  My name is Ross
6  Pringle.  We represent the plaintiffs in this lawsuit.
7    MR. SMITH:  And my name is Ted
8  Smith, and I represent the defendant IBM.
9    VIDEOGRAPHER:  All right.  The
10  court reporter today is Sandy Givens, and she will now
11  swear in the witness.
12    MARK RAMBIN,
13  having been first duly sworn, testified as follows:
14    EXAMINATION
15  BY MR. SMITH:
16    Q   Good morning, Mr. Rambin.  As I mentioned
17  earlier, my name is Ted Smith, and I represent the
18  defendant in this case, IBM.  Do you understand that
19  you have been presented as an expert witness in this
20  case on behalf of the plaintiffs?
21    A   Yes.
22    Q   Have you had your deposition taken before?
23    A   Yes.
24    Q   How many times?
25    A   I have no way of knowing, but I've been doing

1    A   Yes, sir.
2    Q   Great.  Mr. Rambin, you have a degree in
3  business administration; is that correct?
4    A   Yes.  Accounting.
5    Q   And is that a bachelor's degree?
6    A   Yes, it is.
7    Q   And did you receive that degree in 1983?
8    A   No.  I received it in 1980.
9    Q   '80.  Okay.  1980.
10    A   Yes.  I became a CPA in 1983, so that may be
11  where that question came from.
12    Q   Okay.  So you received your bachelor's in
13  business administration accounting in 1980, and you
14  became a CPA in 1983; is that right?
15    A   That's, that is correct.
16    Q   Do you have any master's degrees?
17    A   No.
18    Q   Do you have any doctorate degrees?
19    A   No.
20    Q   Do you have any degrees in economics?
21    A   No.
22    Q   Do you have any degrees in statistics?
23    A   No.
24    Q   Have you ever provided expert testimony or an
25  expert opinion in an employment-related, in an

1  this kind of work for the last 35 years.  So it's got
2  to be somewhere over a hundred times.
3    Q   Okay.  So you're obviously cognizant of and
4  aware of, of how these depositions work, but just to
5  make sure we're on the same page, obviously you
6  understand that you're under oath today, correct?
7    A   Yes.
8    Q   And you understand that although we're
9  conducting this deposition by Zoom remotely that your
10  testimony carries the same weight as if we're in a
11  court of law, correct?
12    A   Yes, sir.
13    Q   And this is not a -- I don't think this is
14  going to be a particularly long deposition today, and
15  you're welcome to take as many breaks as you like.  The
16  only thing that I would ask is if there's a question on
17  the table, if you would answer that question before we
18  take the break.  Is that fair?
19    A   That is fair.
20    Q   And again, you know, we're doing this by
21  Zoom, so I think it's particularly important to make
22  sure that we're not talking over each other so that
23  Ms. Givens can make sure that she gets a clean record.
24  I'll certainly try to do that on my part and would ask
25  if you would do the same.

1  employment-law-related lawsuit or proceeding?
2    A   I'm having a hard time distinguishing that.
3  I believe so, but it's, it's possible that it related
4  to these matters related more to, more to personal
5  injury or, or medical malpractice, but I believe that
6  there was employment-related.
7    Q   Okay.  Well, let me see if I can be a little
8  more pointed.  Have you, have you ever provided expert
9  testimony or an expert opinion in a lawsuit or
10  proceeding that involved claims of discrimination?
11    A   I, I can't precisely recall that.
12    Q   So sitting here today you can't recall a
13  single lawsuit or proceeding in which you provided
14  expert testimony or an expert opinion that involved
15  claims of employment discrimination?
16    A   Not as I'm sitting here.
17    Q   Is it possible that this is the first lawsuit
18  or proceeding in which you are providing expert
19  testimony or expert opinion that involves employment
20  discrimination?
21    MR. PRINGLE:  Objection, form.
22    A   I, I can't, I can't rule that out.
23    Q   (By Mr. Smith)  So it's possible?
24    A   It is possible.
25    Q   And have you ever provided expert testimony

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

Page 9

```
 1   or an expert opinion in a lawsuit or proceeding that
 2   involved age discrimination claims?
 3        A   Not that I recall.
 4        Q   So is it possible that this is the first
 5   lawsuit or proceeding involving age discrimination
 6   claims in which you are providing expert testimony or
 7   an expert opinion?
 8        A   I believe that's right.
 9            MR. SMITH:  If you could go ahead
10   and have marked as the first exhibit, this is going to
11   be, Richard, Tab 3 of the general exhibits.  It's the
12   expert report of Mark Rambin.
13            (Exhibit No. 1 marked off the
14   record.)
15        Q   Mr. Rambin, did you, did you provide an
16   expert report in this lawsuit?
17        A   Yes.
18        Q   And is this the expert report that you
19   provided in this lawsuit as Exhibit 1?
20        A   It appears to be.
21            MR. SMITH:  If we could go to --
22        Q   Well, let me, let me ask you this first.
23   Mr. Rambin, what, what did you do to prepare for this
24   deposition today?
25        A   I, I read my, read my report, I read
```

Page 10

```
 1   Dr. Steward's information, I went -- I had a meeting
 2   with Mr. Pringle yesterday.
 3        Q   And when you say that you reviewed
 4   Mr. Steward's information, are you referring to the
 5   expert reports that Mr. Steward provided in this
 6   lawsuit?
 7        A   Yes.
 8        Q   So, so you're familiar with those reports
 9   that Mr. Steward provided?
10        A   Yes.  I, I can't say that I, that I've
11   studied them in, in great detail, but I've read through
12   them.
13        Q   Okay.  And how long did you meet with
14   Mr. Pringle?
15        A   Probably two hours.
16        Q   Was there anyone else present in that meeting
17   other than Mr. Pringle?
18        A   No.
19        Q   Mr. Rambin, if we could look --
20            MR. SMITH:  If we could go to page
21   4, I believe, of this exhibit.
22        Q   Do you see paragraph 18?  It refers to
23   "Employment Fringe Benefits"?
24        A   Yes.
25        Q   And in it it says, "In addition to direct
```

Page 11

```
 1   compensation, the Plaintiffs received fringe benefits
 2   from IBM in the form of paid leave, insurance, other
 3   legally required benefits such as social security
 4   contribution among" -- "contributions, among others."
 5   Did I read that correctly?
 6        A   Yes.
 7        Q   And then the report goes on to state, "These
 8   fringe benefits have been calculated as a percentage of
 9   compensation based upon statistics compiled by the
10   Bureau of Labor Statistics."  Did I read that
11   correctly?
12        A   Yes.
13        Q   And is that how you calculated the percentage
14   of fringe benefits, based it on the Bureau of Labor
15   Statistics?
16        A   Yes, I did.
17        Q   And as you can see, there is a footnote 4
18   there; is that right?
19        A   I, I can't really read it, but I, I see
20   there's a footnote 4.
21        Q   Okay.  So if we go to footnote 4, the
22   citation is to "U.S. Department of Labor.  Bureau of
23   Labor Statistics.  Employer Costs for Employee
24   Compensation - December 2020"; is that right?
25        A   That's correct.
```

Page 12

```
 1        Q   Okay.  And is that the publication that you
 2   utilized in order to provide an opinion on fringe
 3   benefits with regards to these plaintiffs?
 4        A   Yes, it is.
 5            MR. SMITH:  If we could go to Tab 2
 6   of the universal documents, Richard, and we may need to
 7   make that a little bit bigger if we can.  And I'd like
 8   to have this marked as Exhibit No. 2, please.
 9            (Exhibit No. 2 marked off the
10   record.)
11        Q   Mr. Rambin, is this the publication that you
12   were referencing in footnote number 4 of the report,
13   "Employer Costs for Employee Compensation - December
14   2020" from BLS?
15        A   I believe so.  I can't see the tables that I
16   utilized yet, but I believe that is the, that is the
17   document.
18        Q   Okay.  And Mr. Rambin, would you agree with
19   me that for all of the plaintiffs in your expert report
20   you utilized a percentage of 44.38 percent to calculate
21   lost benefits?  Is that right?
22        A   I, I used 44.38 for positions that had, that
23   had benefits.  I used -- utilized zero for those that
24   did not.
25        Q   Okay.  But you, but you utilized 44.38
```

3  (Pages 9 to 12)

**Page 13**

1  percent for all of the plaintiffs in this case; isn't
2  that right?
3      A    With respect to their IBM compensation,
4  that's correct.
5      Q    Well, and you also used that percentage
6  to -- when you were calculating pre-trial lost income
7  and post-trial lawsuit income as well, right?
8      A    That's only if, if individuals had received
9  benefits.  Again, with -- there was, there were
10 situations where people were either un- either
11 unemployed or on unemployment where they had -- where
12 zero benefits were being calculated.
13     Q    Okay.  So other than when they were
14 unemployed or receiving unemployment benefits, you
15 utilized 44 -- 44.38 percent to calculate what you
16 determined to be lost benefit income and lost bene-
17 both pre-trial and post-trial, right?
18     A    That's correct.  Those, you know, those,
19 those often offset, but that is the number that I used.
20     Q    And you -- okay.  If we could go to -- and
21 you say that you utilized tables within Exhibit 2 in
22 order to determine that 44.38 percent; is that right?
23     A    Yeah.  I believe it's Table 5.
24     Q    Table 5?
25              MR. SMITH:  Okay.  Well, let's go

**Page 14**

1  to Table 5.
2      Q    Table 5 is entitled "Employer Costs for
3  Employee Compensation for private industry workers by
4  bargaining and work status"; is that correct?
5      A    That's correct.  And you need to go to the
6  next page of Table 5.
7      Q    Okay.  So we're looking at Table -- the
8  second page of Table 5.  Can you show me on here where
9  44.38 percent shows up?
10     A    You have to understand how
11 fractions work to get to 44.38.  The, the amount -- and
12 I, I utilized "Management, business, and financial,"
13 that second line there, and you, you can see in this
14 table that they're expressing benefits as a percentage
15 of total compensation, but as a factor of the wages
16 it's going to be that 44.38.
17     Q    Where -- how do you get 44.38?  How did you
18 calculate that?
19     A    You divide, you divide 30 -- 22.5 by 50.70,
20 the cost numbers.
21     Q    Where is 20 -- okay.  22.5 the cost, and you
22 do, you -- what do you --
23     A    Divide that by, you divide that by the
24 actual wages that are paid, the 50.70, and that's how
25 you get 44.38.  Again, it's just fractions.  The, the

**Page 15**

1  30.7 is, is how much it is as, as the total, as, as
2  the total hundred percent compensation, but it's
3  not -- it's -- as a, as a factor of the wages that are
4  actually paid it's at 44.38.
5      Q    Why is -- doesn't this say total benefits
6  percentage 30.7?
7      A    True, but it's total -- it's, it's, it's a,
8  it's a total benefits of the total compensation.  It's
9  a percentage of the total compensation.  We're
10 calculating it based on the wages.  So as, as to what
11 wages are being paid, 22.50 over 50.70 is 44.38.
12     Q    And you're using "Management, business, and
13 financial" for all of the plaintiffs?
14     A    Yes.
15     Q    Are you aware that several of the plaintiffs
16 were not in management?
17     A    I, I think that's, I think that's probably
18 correct.
19     Q    Are you aware that some of the plaintiffs are
20 actually sales, in sales?
21     A    Yeah.  I'm, I'm aware of that.  I think that,
22 that the type of sales we're talking about is, is still
23 going to be in "Management, business, and financial"
24 classification.
25     Q    Do you see that there's a classification here

**Page 16**

1  for "Sales and related"?
2      A    Yeah.  But you see that the sales and related
3  people are making 36 -- or, I'm sorry, getting paid $27
4  an hour.  That's not, that's not the kind of people
5  we're dealing with here.
6              MR. SMITH:  Objection,
7  nonresponsive.
8      Q    Mr. Rambin, you, you, you just testified that
9  you chose "Management, business, and financial" for all
10 of the plaintiffs, correct?
11     A    That's correct.
12     Q    And you utilized this table for that?
13     A    Yes.
14     Q    And yet this table has a section for
15 sales-related employees, but you chose not to use that
16 number, correct?
17     A    Yes.
18     Q    And that number shows a percentage that is
19 less than that for "Management, business, and
20 financial," right?
21     A    Yes.
22     Q    And is this first time that you've ever
23 utilized this type of percentage to calculate benefits
24 in any litigation or proceeding that you've provided an
25 opinion in?

4 (Pages 13 to 16)

1      A    No.

2      Q    What other proceedings have you utilized this

3  benefits percentage calculation methodology in other

4  proceedings?

5      A    Many times when I was -- when I'm working as

6  a consultant, not, and not in an expert position.  And

7  I've done a number of lost, lost earnings due to

8  personal injur- injuries, lost earnings due to

9  allegations of medical malpractice.  Those are some --

10     Q    So as --

11     A    -- that come to mind.

12     Q    So as far as expert reports, have you -- is

13  this the first time that you are utilizing this

14  benefits percentage calculation methodology?

15     A    No.

16     Q    But it's the first time you're ever doing it

17  in an employment discrimination case, right?

18     A    That's, that's my best recollection.  The

19  methodology is, is the same, but it's, it's my, it's my

20  current recollection that I've not seen -- I've not

21  applied, applied it in, in that fact situation.

22     Q    Okay.  So I just want to make sure that the

23  jury's clear on this.  This is the first time in which

24  you are providing expert testimony or an opinion in an

25  employment discrimination case where you are utilizing

Page 17

1  this benefits methodology calculation; is that right?

2      A    That's my current recollection.

3      Q    Okay.  And what source are you relying on to

4  come up with that calculation rather than just using

5  the percentages that are on this table?

6      A    I'm using I'd call it logic.

7      Q    So it's just your own logic?

8      A    No.  I think it's, it's pretty -- it's, it's

9  obvious that if you're trying to, if you're trying to

10  look at benefits as a function of wages, you -- that,

11  that, that percentage, that 30 percent on there is not

12  a percentage -- it's not a percentage as of the wage.

13  It's a percentage of the total compensation.  So it's

14  just, yeah, it's logic.

15     Q    Can you point to any source that has used

16  that same calculation methodology that you're using to

17  determine benefits?

18     A    I, I've seen, I've seen it written before.

19     Q    Can you identify that?

20     A    I've seen it in the supporting documentation

21  for calculations, the calculation software that I use

22  for this type of work.

23     Q    What, what type of calculation software do

24  you use?

25     A    It's called, it's called Damages Advocate.

Page 18

1      Q    And is that the software you utilized to come

2  up with this benefits percentage analysis?

3      A    Well, the soft- yeah.  The -- I, I think

4  that's, that's accurate.  It is, it is, it is in, in

5  that, and there's some of the, the user explanations of

6  how you get to that number is, is in, in that

7  documentation.

8      Q    In utilizing this Damages Advocate software

9  do you manually put in the percentage of benefits that

10  you think is applicable, or does the software package

11  do that automatically?

12     A    Well, it depends on the selections that I

13  make.  I, I selected this, this category, and it, and

14  it, and it populates, populates it automatically, and I

15  checked it against this publication to make sure it,

16  make sure it was accurate.

17     Q    Okay.  My question, Mr. Rambin, is, in

18  inputting the data into the Damages Advocate software

19  program do you manually have to put in the percentage

20  of benefits that you believe is applicable in order to

21  make the calculation, or does the software package do

22  that automatically?

23     A    Well, I think you're asking two different

24  questions.  I had to make the selection, and once I

25  made the selection then it populates.

Page 19

1      Q    So you had to put in the number of 44.38

2  percent for the software to calculate -- to populate;

3  is that right?

4      A    No.  I had to select this, this category,

5  this "Management, business, financial," and then it

6  populated the 44.38.

7      Q    Are you saying that this -- that your

8  software package has this table, has the data within

9  this table in the software?

10     A    Yeah.  It's a, it's a web-based application

11  that, that keeps all these current statistics and

12  things like that.

13     Q    So what, what information do you have to

14  input into the program for benefits in order for it to

15  populate?

16     A    Like I said, that, that classification of

17  "Management, business, and financial."

18     Q    And what else do you have to put in there?

19     A    Well, as far as, as, as far, as far as

20  benefits that's it.

21     Q    So would you agree that if you put in "Sales

22  and related," it would come up with a different number?

23     A    Yes.

24     Q    And if you put in "Information" employees, it

25  would come up with a different number?

Page 20

5  (Pages 17 to 20)

**Page 21**

```
 1      A    Sure.
 2      Q    And given the choice between management and
 3  sales, you put in the higher number, right?
 4      A    Sure.  That's, that's, that's what happened.
 5  That's not why I did it.
 6      Q    And when you were going through each
 7  individual plaintiff you didn't individualize their
 8  benefits category, did you?  You used "Management,
 9  business, and financial" for all of them?
10      A    Yes.
11      Q    So you didn't make any determination as to
12  whether someone was a software programmer versus
13  management?
14      A    I did not.
15      Q    You did not make any determination as to
16  whether someone was in sales rather than management,
17  business, and financial?
18      A    I, I did not.
19      Q    You did not determine whether someone was in
20  services rather than management, business and
21  financial; is that right?
22      A    That's correct.
23      Q    And again, other than this software program,
24  can you, can you point the jury to any research
25  publication that uses 44.38 percent as a basis for
```

**Page 22**

```
 1  calculating benefits in an employment law case?
 2      A    Not as I'm sitting here.
 3      Q    And you didn't cite to any of those in your,
 4  in your report, did you?
 5      A    No, I didn't.
 6      Q    Do you know what the costs, percentage costs
 7  for IBM were?
 8      A    No.  I don't have any independent information
 9  on IBM's benefits cost.
10      Q    Well, you don't have any information on it at
11  all, right?  Isn't that correct, Mr. Rambin?
12      A    I -- give me a second.  I, I think I do have
13  some information.  I haven't quantified it, but when
14  you see the W-2s from the -- some of the IBM employees,
15  the, the W-2s now disclose insur- the cost of health
16  insurance, things like that, but I've not, I've not
17  quantified it, but I have seen it.
18      Q    Okay.  So although you had some information
19  on the individual benefits that these plaintiffs had,
20  you didn't quantify that information; is that correct?
21      A    Well, I had -- the, the important part of it
22  is it was some of the information and so that the some
23  information that I had I did not quantify.
24      Q    You did not do any individualized analysis on
25  what benefits these plaintiffs had at IBM, correct?
```

**Page 23**

```
 1      A    That's correct.
 2           MR. PRINGLE:  Objection, form.
 3      Q    (By Mr. Smith)  And you don't know the
 4  percentage of IBM -- the percentage costs of IBM
 5  benefits were for any of these plaintiffs, correct,
 6  these plaintiffs?
 7      A    Their individual costs I do not have that
 8  information.
 9      Q    And did you do -- do you have information on
10  what benefits any of these plaintiffs received after
11  they left IBM?
12      A    Could you clarify that question?
13      Q    Sure.  Do you have -- did you have any
14  information about the benefits that any of these
15  plaintiffs received through their employment after they
16  left IBM when you were preparing this report?
17      A    Yes.  When, when I, when I interviewed
18  these -- the folks that had subsequent employment and
19  had, had benefits I made inquiries as to what, what
20  type of benefits they had, and, and, you know, I, I
21  assumed they were comparable to IBM just to be
22  conservative about that.
23      Q    And did you do any individualized assessment
24  of the benefits that any of the plaintiffs received
25  after they left IBM as a part of your expert report?
```

**Page 24**

```
 1      A    Not, not in a quantifiable matter -- manner.
 2  As I've said, to be conservative I assumed that the
 3  cost would be the same, so it would be a wash between
 4  the two positions.
 5      Q    You said that you interviewed the plaintiffs.
 6  Did you interview all of the plaintiffs?
 7      A    Yes, sir.
 8      Q    When did you do that?
 9      A    Prior to the completion of my report.  It
10  would have been sometime in, I'm assuming, beginning in
11  early February.
12      Q    How did you interview them?
13      A    Telephone.
14      Q    Did you record any of these conversations?
15      A    No.
16      Q    Other than you and the plaintiffs, was anyone
17  else involved in these telephone conversations?
18      A    No.
19      Q    No attorneys were involved?
20      A    No.
21      Q    Did you take notes of these interviews?
22      A    I may have.  I, I don't -- I'm not sure about
23  that.
24      Q    You're not sure if you took any notes
25  regarding your interviews with these plaintiffs?
```

GIVENS COURT REPORTING

6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1    A   I just, I don't, I don't recall if I did or
2    didn't.  I was, I was mostly working with, with
3    the -- on the, on the computer working, working on
4    their, on their, their aspect of the report.
5        Q   Well, did you -- while you were talking with
6    them were you taking notes on your computer?
7            MR. PRINGLE:  Objection, form.
8        A   I don't, I don't recall.  It wouldn't have
9    been like that.  I would have been actually working on
10   the, on the, the act- the draft of the report and
11   verifying -- you know, I was doing things like
12   verifying their date of birth, verifying how -- their
13   ethnicity, dis- discussing with them their, their
14   intentions for retirement, to the extent they had
15   subsequent employment did they have benefits, those
16   sort of things.  And so I was working, working on the
17   report itself.
18       Q   (By Mr. Smith)  In your report, and we'll go
19   through this in more detail later, but on some of the
20   plaintiffs you state that they have an intended
21   retirement date of 70 years old; is that correct?
22       A   That's correct.
23       Q   Is that based on your interviews of them?
24       A   That's correct.
25       Q   And then on other plaintiffs you don't --

Page 25

1    you, you utilize an actuarial number for their intended
2    retirement date; is that right?
3        A   That's correct.
4        Q   So it's fair to say when you use the
5    actuarial number that those plaintiffs did not provide
6    you with any information on their anticipated
7    retirement date?
8        A   No.  Just the, the opposite.  I, I spoke with
9    each of them about that, and there was some of them
10   that said, No, I'd be, I'd be ready to retire, you
11   know, at a normal time, I wouldn't have any plans to
12   work past an expe- a future life.
13       Q   And what's a normal time?
14       A   Well, the, the calculated worklife
15   expectancy.  I would tell them, you know, The, the
16   calculation says that you would be retired by X date.
17   Does that sound right?  Or, you know, and some would
18   say, No, I, I would have worked, I would have worked
19   till at least age 70.
20       Q   Okay.  So that, that's my question.  So with
21   regard to the plaintiffs who had the actuarial number,
22   they would have told you that their anticipated date of
23   retirement would not have been past that number; is
24   that right?
25       A   That's correct.

Page 26

1        Q   And the others they just said they were
2    planning to work until 70 years old?
3        A   Yes.
4        Q   And again, I want to make sure we're clear.
5    Do you or do you not have any notes regarding your
6    interviews with any of these plaintiffs?
7        A   I don't think so.
8        Q   Did you go back to review your papers and
9    notes to see what you had before you had this
10   deposition?
11       A   I, I looked at some, some documents that I'd
12   printed out, some documents that were in production,
13   but I don't recall looking at any notes.
14       Q   What were the documents that you printed out
15   that you reviewed in preparation for this deposition?
16       A   Well, it'd be the exhibit we just talked
17   about with the, the employee benefit; that document is
18   one.  You know, some, some W-2s, some of the tax
19   returns just to refresh my memory on, on things.
20       Q   Okay.  I'm sorry.  You looked at reports and
21   what other documents?
22           MR. PRINGLE:  Objection, form.
23       A   Well, as, as an example, I, I would have -- I
24   had some of these W-2s that I'd used -- I'd, I had,
25   had printed them out -- some of the tax returns,

Page 27

1    different, different documents like that.  And, you
2    know, I looked at them both on paper and on, on a, on a
3    computer.
4        Q   (By Mr. Smith)  And after reviewing the
5    documents, W-2s, etc., in preparation for this
6    deposition, you didn't, you didn't submit a revised
7    report, did you?
8        A   No.  I have not.
9        Q   You did not make any changes to your original
10   report even after re-reviewing the documents?
11       A   Yeah.  I've not been requested to, to do
12   that.
13       Q   And after reviewing the documents you didn't
14   feel any need to submit a revised report?
15       A   Well, I think, I think that if I was asked
16   to, I would.  I mean, I know there was, there was one,
17   one document that, that Dr. Steward alerted me to that,
18   that had been inadvertently overlooked.
19       Q   What's that document?
20       A   Oh, it's on Mr. Townsley's, some of his -- he
21   had a contract job, I believe in 2018, that he had, he
22   had omitted from his tax return, and I didn't, I didn't
23   pick up on that until, until I read Dr. Steward's
24   report.
25       Q   Am I understanding you correctly that

Page 28

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

1  Mr. Townsley omitted income from his tax return?
2      A   Yeah.  He, he did.  He, he, he did, and then
3  the IRS figured it out and he, he, he paid the tax.
4  And, you know, it actually wasn't that much of a
5  difference, because there'd already been withholding
6  taken from, from the employment that he had with that
7  contract job.  But so I just, I didn't pick up on, on
8  that in preparing, in preparing my report.
9      Q   What was the income that he omitted?  What
10  was the income that Mr. Townsley omitted from his tax
11  returns?
12      A   It was, it was a contract job.  People were
13  referring his -- it was a contractor for ARM, and I
14  think the amount, the W-2 amount was, like, $58,000.
15      Q   So Mr. Townsley omitted $58,000 in income
16  from his IRS return?
17          MR. PRINGLE:  Objection, form.
18      A   Well, he he, he did not include it on his
19  tax return, and, and then it got rectified.
20      Q   (By Mr. Smith)  Other than Mr. Townsley --
21  well, let me ask you, did you review all of Mister --
22  of Dr. Steward's expert reports in this lawsuit?
23      A   Like I said, I read through them.
24      Q   After reading through them, other than
25  Mr. Townsley was there anything else that you felt

Page 29

1  needed to be changed from your expert report?
2      A   Not that I recall.
3      Q   Nothing with regard to Titon Hoque?  Is that
4  right, Mr. Rambin?
5      A   I'm -- I don't know that, that anything I
6  would do differently on, on that, you know, based on
7  the information that was available at the time.  It
8  does -- his, his income seems to have gone up.  His
9  deposition was taken after, after my report, but seems
10  like there's also some uncertainty about whether he's
11  going to keep that ACC job.  I don't know how that's
12  going.
13          You know, all of these -- all of this is
14  a moving target.  These people are living their lives
15  and either doing something to, to earn, earn a living,
16  and so these, these numbers are going to keep -- you
17  know, they change every day.
18      Q   There's nothing you felt you needed to change
19  in your report about Walter Noffsinger; is that right?
20      A   Not that I'm aware of.
21      Q   Do you know what the current average
22  retirement age is at IBM?
23      A   No.
24      Q   Do you know what the current average age of
25  retirement is in the technology industry?

Page 30

1      A   I haven't, I haven't looked at it that way.
2  I, I -- so no, I do not.
3      Q   So you didn't calculate average age of
4  retirement based on the industry that they were in,
5  these plaintiffs were in?
6      A   That's correct.
7      Q   Would you agree that they were all in the
8  technology industry?
9      A   In one form or another.
10          MR. SMITH:  If we could go to Tab 5
11  in the universal packet, Richard.  It should say
12  "Average Retirement Age - an Update."  If I could have
13  this marked as Exhibit No. 3.
14          (Exhibit No. 3 marked off the
15  record.)
16      Q   Mr. Rambin, in, in conducting your research
17  to prepare this expert report did you review this
18  publication, "The Average Retirement Age - an Update,"
19  dated March 2015?
20      A   I don't believe so.
21      Q   And this is from the Center for Retirement
22  Research at Boston College; is that right?
23      A   That's what it says.
24      Q   Would you agree that the retirement -- the
25  Center for Retirement Research at Boston College is a

Page 31

1  reputable institution?
2      A   I'm not familiar with it.
3      Q   Are you familiar with Boston College
4  University?
5      A   I've heard of it.
6      Q   Would you agree that that's a reputable
7  university?
8      A   I don't have any basis for that either way.
9      Q   You don't have any basis to deter- to opine
10  one way or the other whether Boston College is a
11  reputable university?
12      A   I've heard of it before, but I don't know, I
13  don't know what else to say.
14      Q   Okay.
15          MR. SMITH:  Let's go to, should be
16  page 3 of this document.
17      Q   If we look at the bottom right-hand corner,
18  do you see where it says "Average Retirement Age"?  It
19  says, "The data on labor force participation can be
20  used to construct an average retirement age, defined as
21  the age at which the labor force participation rate
22  drops below 50 percent."  Did I read that correctly?
23      A   I see that.
24      Q   It goes on to say, "Based on this definition,
25  in 2013 the average retirement age was about 64 for men

Page 32

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

Page 33:

```
 1   and about 62 for women."  Did I read that correctly?
 2       A   I see that.
 3       Q   Were you aware of this research at the time
 4   that you made your expert report?
 5       Not that particular research.
 6       Q   So in, in conducting your research on the
 7   retirement age for these plaintiffs you, you never came
 8   across this publication?
 9       A   That's correct.
10       Q   You never came across this research?
11       A   Correct.
12       Q   You never came across the information that
13   the average age of retirement for men was 64 and women
14   was 62?
15               MR. PRINGLE:  Objection, form.
16       A   Yeah.  I, I don't know.  I don't know that.
17   I haven't read it.  I haven't read the report.
18       Q   (By Mr. Smith)  Okay.  Do you have any reason
19   to dispute this data?
20       A   I just don't -- I don't have any, I don't
21   have any opinion either way on this research.
22               MR. SMITH:  Objection,
23   nonresponsive.
24       Q   Do you have any reason to dispute this data
25   in Exhibit No. 3?
```

Page 33

Page 34:

```
 1       A   Since I haven't read it, I, I would have to
 2   say I don't have any basis either way.
 3       Q   Okay.  And you certainly didn't take this
 4   information into account in preparing your expert
 5   report, right?
 6       A   Two things:  Yes, I didn't, but I, I think
 7   you're misunderstanding this, this -- the intention of,
 8   of these individuals.  I'm not, I'm not making that
 9   determination.  They're going to have to demonstrate
10   it.  I'm just using that assumption.
11       Q   What do you mean they are going to have to
12   demonstrate?
13       A   They, they will, they will need to be able to
14   explain to the, to the finder of facts their
15   intentions.  I'm just using what they told me.
16       Q   And some of the plaintiffs told you that they
17   intended to work until they were 70; is that right?
18       A   Correct.
19       Q   And some of them told you they didn't know
20   how long they were going to work; is that right?
21       A   Well, I don't think they said it that way.  I
22   would -- I told them what the life expectance- or the
23   worklife expectancy that I see in calculations, and
24   they, they didn't object to that being a, a retirement
25   time.
```

Page 34

Page 35:

```
 1       Q   So you suggested the, the retirement age to
 2   the plaintiffs --
 3       A   I told them --
 4       Q   -- is that right?
 5       A   Well, I, I told them what was calc- what was
 6   calculated on the, on the data that I was using.
 7       Q   Okay.  So you told them the date that was
 8   showing up on your software program and asked them if
 9   that was the date that they intended to work until?
10       A   That's, that's, that's kind of maybe
11   mischaracterizing it a little bit, but the point was
12   they didn't, they didn't disagree with that as, as a
13   time to retire.
14       Q   Okay.  So I just want to make sure the jury's
15   clear.  You stated an age that the software program
16   stated would be their average age of retirement, and
17   you asked them if that was accurate in their mind; is
18   that correct?
19       A   That's a fair way to say it.
20       Q   So you were giving them the, the age, and
21   then they either agreed with it or didn't agree with
22   it; is that right?
23       A   That's correct.
24       Q   Do you have any scientific basis for using
25   somebody's stated age of retirement as a basis for
```

Page 35

Page 36:

```
 1   calculating lost wages in a discrimination lawsuit?
 2               MR. PRINGLE:  Objection --
 3       A   No.
 4               MR. PRINGLE:  -- form.
 5       Q   (By Mr. Smith)  I'm sorry?
 6       A   I said no.
 7       Q   Can you point to any research publication
 8   that states that utilizing a plaintiff's estimated date
 9   of retirement is proper in assessing lost wages in a,
10   in an employment discrimination case?
11       A   No.
12       Q   Did you just come up with that yourself?
13       A   No.
14       Q   Where did you come up with it from?
15       A   I've, I've seen it.  I've seen it done in
16   other, in other matters.  And again, I --
17       Q   In employment discrimination matters?  Have
18   you seen it --
19       A   No.
20       Q   -- done in any employment discrimination
21   matters?
22       A   No.  Again, I, I believe you're
23   mischaracterizing what I'm doing.  I'm just --
24               MR. SMITH:  Objection to the
25   sidebar, nonresponsive.
```

Page 36

9  (Pages 33 to 36)

**Page 37**

1    MR. PRINGLE:  You need to let him
2 finish his answer, then you can object.
3    MR. SMITH:  Yes, sir.
4    Q   Are you done with your answer?
5    A   Yes.
6    Q   Thank you.  Mr. Rambin, in preparing your
7 report you, you don't provide any opinion as to how
8 long it should have taken any of these plaintiffs to
9 find work, correct?
10   A   That's correct.
11   Q   And in your expert report you don't
12 find -- you, you don't incorporate any opinion as to
13 how long it should have taken any of these plaintiffs
14 to find comparable employment, correct?
15   A   That's correct.
16   Q   You don't provide any opinion in your expert
17 report as to whether any of these plaintiffs' job
18 searches were reasonable, correct?
19   A   Correct.
20   Q   You don't analyze any of that with regard to
21 your expert report?
22   A   That is correct.
23   Q   In your expert report you didn't take into
24 account what the job market in Austin, Texas was during
25 the time that these plaintiffs were conducting their

**Page 38**

1 job searches?
2    A   I did not.
3    Q   In fact, you didn't take into account what
4 the job market was like in the entire United States at
5 the time that -- well, following the time that any of
6 these plaintiff was separated from IBM, right?
7    A   That's correct.
8    Q   So you didn't take into account or analyze
9 how long it would take someone in their positions in
10 the Austin job market to find a comparable position?
11   A   Correct.
12   Q   So in other words, you just, you just did an
13 accounting analysis; isn't that right?
14       MR. PRINGLE:  Objection, form.
15   A   I, I only analyzed what actually happened.  I
16 didn't try to create something.
17   Q   (By Mr. Smith)  You, you took data from what
18 they were earning, what these plaintiffs were earning
19 at IBM and what income they earned after they left IBM,
20 and you made an accounting determination, correct?
21   A   You know, I, I don't know what you mean by
22 accounting, but I did, I, I did my analysis based on
23 what they reported and then applied other, other
24 factors to it.  So it's not really an accounting.  I
25 wouldn't refer to it as an accounting analysis, but I

**Page 39**

1 did -- I didn't create any, any, any of those things
2 that you've been asking about as far as the
3 reasonableness of their job search or whatever else.
4    Q   Okay.  Well, you, you didn't determine -- you
5 testified earlier you didn't determine what their
6 actual benefits were at any of their subsequent
7 employment positions after leaving IBM, right?
8    A   Oh, I think I, I described that as trying to
9 be conservative and assumed that they were -- if they
10 had benefits that they were equivalent to the IBM.  So
11 that wouldn't be a factor.
12   Q   Okay.  So you just determined whether they
13 had benefits or didn't have benefits, right?
14   A   That's correct.
15   Q   You didn't determine what type of benefits
16 they had?
17   A   Well, anecdotally I did when I was talking to
18 these folks.  Like, I, I can recall talking to, to the
19 folks that had it, and they would say, yeah, you know,
20 they were, they were comparable or maybe not as good as
21 IBM.  But they, they did talk -- they did say, you
22 know, things like vacation and, and sick leave and
23 whatever else is, is in it, is in that full package.
24   Q   Okay.  So setting aside the percentage, your,
25 your determination was, based on your interviews with

**Page 40**

1 them, that if they had benefits at any of these other
2 positions that those benefits were comparable to the
3 benefits that the plaintiffs had at IBM; is that right?
4    A   That's correct.
5    Q   Okay.  And so then other than determining
6 whether or not they had benefits, you also looked at
7 what their income was after they left IBM, correct?
8    A   That's correct.
9    Q   So other than their income and whether or not
10 they had benefits, what other factors did you take into
11 account in preparing your report?
12   A   Well, what, what was cited in the report is
13 things like the, the historical inflation rates in the,
14 in the, in the pre-trial parts and then discounting the
15 future post-trial.  Also using inflation to project
16 salary increases both at the IBM position and future
17 positions.
18   Q   Okay.  But --
19   A   Those are some that come to mind as I'm
20 sitting here.
21   Q   Okay.  But those, those are, those are just
22 discount percentages, correct, or interest percentages?
23   A   Well, the, the expected future salary
24 increases at, at both, at both IBM and their subsequent
25 employment is, is, you know, it is, it is an interest,

10 (Pages 37 to 40)

1     Q   Okay.  So you made an assessment that you
2  felt that he was a manager for purposes of your
3  analysis, right?
4     A   I certainly -- I think that's an accurate
5  description, and again, I can't foreclose the
6  possibility that I saw that on a -- on some of his, his
7  personnel documents.
8     Q   Okay.  Can you point us to any of those
9  personnel documents that show he's a manager in your
10 view?
11    A   Not as I'm sitting here.
12    Q   Okay.  You show his initial salary as
13 $350,000; is that right?
14    A   That's correct.
15    Q   And that's a round number, correct?
16    A   Yes, it is.
17    Q   Where did you get that number from?
18    A   It's an average of his, his employment over,
19 I think, I think it was, the preceding four years,
20 something along those lines.
21    Q   Where, where did you, where did you get
22 information as to four years of employment for
23 Mr. Townsley?
24    A   From the documents that were produced in
25 this, in this lawsuit.

Page 53

1          MR. SMITH:  Let me -- let's go to
2  Exhibit No. 5, and this is going to be to -- I'm sorry.
3  This is going to be in the Townsley report for
4  Dr. Steward, Richard.  It's going be Exhibit 5 to the
5  Townsley portion of Dr. Steward's report.  Perfect.
6  And let's have this marked as the next exhibit.  Is
7  that Exhibit 4 or 5?
8          THE REPORTER:  I have 4.
9          MR. SMITH:  4.  Okay.  Thank you.
10         (Exhibit No. 4 marked off the
11 record.)
12    Q   So have you ever seen this document before,
13 Mr. Rambin?
14    A   Yes.
15    Q   Is this the document that you utilized to
16 determine his salary, Mr. Townsley's salary?
17    A   It certainly was part of it.
18    Q   And this goes back four years, right, to
19 2016?
20    A   Yeah.  But it was -- I used the, the four
21 years preceding his termination in addition to his
22 termination year.  So I guess it was actually five
23 years that I, that I utilized.
24    Q   What is the document that you utilized to, to
25 get that?

Page 54

1     A   It would have been his, his, his tax returns
2  for 2014, 2015 and, and this document we're looking at
3  here.
4     Q   Okay.  So I want to make sure that we're
5  clear, that your testimony is clear.  Your testimony is
6  that when you took into account his last five years of
7  employment compensation at IBM it averaged out to
8  $350,000?
9     A   Yes.  Slightly over that, but I rounded down
10 to 350.
11    Q   Because if we look at this document, if we
12 can just do the math real quick, 167 -- he made
13 $167,228.88 in 2016, correct?
14    A   I can't read that.
15    Q   Did I read that correctly, 167,228.82 in
16 2016?
17    A   No.  You're reading that incorrectly.
18    Q   $167,228.88.
19    A   The, the numbers that, that are -- that
20 represent his compensation would be the first two line
21 items.
22    Q   Okay.  Fair enough.  Let's do that.  So if we
23 add 138,264 plus 44,693, that equals $182,957, right?
24    A   That's correct.
25    Q   Okay.  And then if we go to the next line and

Page 55

1  we add 138,271.56 plus 156,628.71, that equals
2  $294,900.27, right?
3     A   Correct.
4     Q   And then if we go down to 2018, $67,983 plus
5  68,400 -- well, let me try to get it exactly.
6  67,983.52 plus 68,455.51 equals $136,493, right?
7     A   Yes, it does.
8     Q   Okay.
9     A   You know, you, you should note that that's
10 only for work through June 15th --
11    Q   Okay.
12    A   -- of that year.  So it's --
13    Q   We don't really know what -- unless we
14 prorate that, so but if we go back for his first two
15 years, the two last full years, it would have been
16 294,900.27 plus 182,957 divided by 2 would give us an
17 average of $283,928.64; is that right?
18    A   I'll trust your math.
19    Q   Okay.  Significantly less than the $350,000
20 that you cite in your report.
21    A   That's correct.
22    Q   But your testimony is, if we were to look at
23 the previous two years beyond that?
24    A   Yes.
25    Q   So if we go back to 2014 --

Page 56

14  (Pages 53 to 56)

**Page 57**

1    A    Yeah.  Go back to 2014, 2015.

2    Q    And your testimony --

3    A    And, and --

4    Q    -- is if we, if we look at those years and we

5    do an average, it's going to come out to $350,000?

6    A    Correct.  If, and if, if you annualize -- I

7    annualized that 2018 salary and commissions as well.

8    Q    How did you annualize?  Did you just double

9    it?

10   A    No.  Well, I div- I divided it by 11 and, and

11   multiplied it by 24.

12   Q    Divided it by 11 -- and say that again?

13   A    Divided it, divided those amounts by 11, that

14   would be the -- in two-week periods, because he, he was

15   terminated as of I believe right around June 15th, and

16   then multiply that by 24 would get you an annualized

17   number.

18   Q    Okay.  Well, let's see what that comes out

19   to.  So we take the 136,439.03, you said multiply by

20   11?

21   A    Divide it by 11.

22   Q    Divide it by 11.

23   A    And then multiply it by 24.

24   Q    That gives you 297,685.

25   A    Correct.

**Page 58**

1    Q    Okay.  So for the three years that we

2    actually have documentation on here, he never made even

3    $300,000.

4    A    For those three years that's correct.

5    Q    So again, your testimony is that those

6    additional, those additional two years, which would be

7    2015 and 2014, when you include those it's going to

8    average out to $350,000?

9    A    Correct.

10   Q    Okay.  And would you agree that

11   Mr. Townsley's compensation fluctuated over the years,

12   correct?

13   A    Yes, it did.

14   Q    Because he had a set salary plus commissions,

15   right?

16   A    Correct.

17   Q    And again, wouldn't commissions indicate that

18   he had a sales role?

19   A    Certainly does.

20   Q    As opposed to a manager role?

21            MR. PRINGLE:  Objection, form.

22   Q    (By Mr. Smith)  Isn't that right?

23   A    Well, again, I think that's a -- sales, sales

24   is a pretty broad term.  He's, he's not out hitting the

25   streets selling stuff.

**Page 59**

1            MR. SMITH:  And let's, let's go

2    back to Exhibit 1, back to Mr. Townsley's portion, and

3    if we could go to page -- go three -- two pages

4    further.  If we could highlight the "Pre-Trial Lost

5    Income and "Post-Trial Lost Income," the bottom half

6    there.

7    Q    So Mr. Rambin, despite your testimony just

8    now that Mr. Townsley's income fluctuated up and down

9    throughout the years, you used $350,000 as the amount

10   all the way through 2028 in your calculations with

11   regard to Mr. Townsley; is that right?

12   A    That's correct.

13   Q    Would you agree with me that Mr. Townsley,

14   even when he was at IBM his bonuses or his commissions

15   fluctuated pretty significantly?

16   A    Yes.

17   Q    So why did you use a set number when you knew

18   that his salary, his compensation fluctuated

19   significantly over the years at IBM?

20   A    It's simply using an average, and some, some

21   years it would have been higher, some years it would

22   have been lower, likely, based on his prior experience.

23   Q    Are you aware that Mr. Townsley's starting

24   base salary at Oracle is actually higher than his base

25   salary at IBM?

**Page 60**

1    A    Yes.  I included that in the calculation.

2            MR. SMITH:  And if we could go to

3    Tab 8 of Mister -- of Dr. Steward's report with regard

4    to Mr. Townsley.

5            (Exhibit No. 5 marked off the

6    record)

7            MR. PRINGLE:  I'm sorry.  You are

8    which one, are you in the general?

9            MR. SMITH:  No.  Sorry.  This would

10   be -- I know we're going back and forth.  So this is

11   Doctor -- this is with the plaintiff specific, so this

12   will be for Townsley Tab 8.

13           MR. PRINGLE:  Okay.

14           MR. SMITH:  We may need to blow

15   that up a little bit.

16   Q    Mr. Rambin, is this the 50,328 in income that

17   Mr. Townsley had in 2018 that you were referencing

18   previously that was not included in your report?

19   A    Yes, sir.

20   Q    And again, you haven't revised your report

21   since learning of this, right?

22   A    I have not.

23           MR. PRINGLE:  Object to form.

24   Q    (By Mr. Smith)  And, and that would decrease

25   the amount of damages that you're claiming that

1   Mr. Townsley would be entitled to, correct?
2        A   Yes, it would.  Yeah.  Just to clarify, that
3   is my opinion that that should be deducted from the
4   calculation.  I have not been requested to revise my
5   report, but that would be my opinion.
6        Q   Okay.  And even though you weren't asked to
7   revise it, you didn't feel the need to before this
8   deposition?
9        A   No.
10       Q   Are you aware that Mr. Townsley received an
11  increase in his base salary in 2021 to $157,000?
12       A   I don't, I don't have it off the top of my
13  head.  If it's in the calculation -- if I had the
14  document, it would be in the calculation.
15       Q   Did you include that in the calculations?
16       A   Well, if I could, if I could look at the
17  report, I could tell you.  I, I don't know that
18  extemporaneously.
19            MR. SMITH:  Let's go next to the
20  section of Exhibit 1 that deals with Titon Hoque.  And
21  if we could go to the next page.  And actually, I'm
22  sorry, if we could, if we could -- oh, wait.  So, I'm
23  sorry.  What we need to do, Richard, is go to Exhibit
24  No. 1 and the section in Exhibit No. 1 that deals with
25  Titon Hoque.  It should be about midway through.

1            THE REPORTER:  It's page 33 of the
2   expert report.
3            VIDEOGRAPHER:  Can ya'll see it?
4        Q   Can you see it, Mr. Rambin?
5        A   Yes.
6        Q   Is this the portion of your expert report
7   that you submitted in this lawsuit with regard to
8   plaintiff Titon Hoque?
9        A   Yes, sir.
10       Q   And in this case at the time of Mr. Hoque's
11  termination he was 44.48 years old; is that right?
12       A   That's correct.
13       Q   And you have a projected retirement age of 70
14  years old; is that right?
15       A   Yes.  That's what he represented to me.
16       Q   And you based that projected retirement age
17  based on what he told you?
18       A   Correct.
19       Q   Did you rely on anything else other than what
20  he told you as far as determining his retirement age?
21       A   No.  Well, I guess the fact that he's -- that
22  he was -- he's projected to still be alive at 70.
23  That's, that's a factor, but that's it.
24       Q   And what do you mean by that?
25       A   Well, you know, it's, it's -- he's, he's not

1   working past his, his life expectancy.  You know,
2   there's a difference between worklife expectancy and
3   life expectancy.  That's all.
4            MR. SMITH:  If we could go to the
5   next page, and if we could look at the top first.
6        Q   Do you see his occupation listed as technical
7   services professional?
8        A   Yes.
9        Q   And did you consider that to be a manager?
10       A   I don't, I don't know specifically.
11       Q   But you utilized the manager benefits
12  percentage that you calculated for him as well,
13  correct?
14       A   That's correct.
15       Q   If we could go down to the second half of the
16  page, "Pre-Trial Lost Income" and "Post-Trial Lost
17  Income," Mr. Rambin, are you familiar with the term
18  "back pay" and "front pay" as far as damages in
19  employment discrimination cases?
20       A   I've heard the term before.
21       Q   What's your understanding of back pay?
22       A   Well, be for time that's, that's actually,
23  it's actually past.  You're, you're being, you know,
24  restored to what you would have earned at, at that
25  point.  That's, that's my understanding of it.

1        Q   And what's your understanding of what front
2   pay means in employment discrimination cases?
3        A   I believe that would be what you, what you'd
4   be expecting had you been there, that, you know, you
5   wouldn't have -- it wouldn't have been earned yet, but
6   you would expect to, to get it.
7        Q   So would you agree with me that what you
8   refer to as pre-trial lost income would be back pay?
9        A   I think it's equivalent.  I, I, I can't say
10  I've studied it, studied that, but that's my general
11  understanding.
12       Q   And post-trial lost income would be front
13  pay?
14       A   That's my understanding.
15       Q   Okay.  And in determining back pay you need
16  to also determine what income that particular
17  individual has had during that time period, correct?
18       A   That's correct.
19       Q   And that would be vital to your calculation?
20       A   It's an important component.
21       Q   Do you see in Section 2 there in the
22  "Post-Trial Lost Income"?  Let's focus on -- or in the
23  "Pre-Trial Lost Income"?  Let's focus on that first.
24  Do you see you show no income for Mr. Hoque from
25  January 2019 to December 2019?

16 (Pages 61 to 64)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

1      A   Yes.  I see that.

2      Q   Were you not aware that Mr. Hoque had income

3  during that time period?

4      A   I, I was not.

5      Q   Did you review Mr. Hoque's deposition at the

6  time that you took this -- that you made this report?

7      A   No.  I did not.  I did not have the

8  (crosstalk) --

9      Q   Did you interview Mr. Hoque?

10     A   I did talk to him.

11     Q   Did you ask him about what income he may have

12  had in 2019?

13     A   I don't specifically recall that.  What I,

14  what I recall is he had, all he had was the 2020 tax

15  return and the unemployment benefit.

16     Q   So you're not aware that beginning, beginning

17  in December 2018 Mr. Hoque was actually doing contract

18  work where he received $90 per hour?

19     A   No.  I was not aware that that was happening

20  in, in that timeframe.

21     Q   And were you not aware that he continued in

22  that contract position until February of 2020?  I'm

23  sorry.  Until, until February of 2021?

24     A   I, I was aware of that.  I think it was when

25  he was doing business as H&H or something along those

                                        Page 65

1  lines.  And that's that 155,3184 from his personal tax

2  return.

3      Q   But you don't show anything for 2019.

4      A   I did not have any information on that.

5      Q   If in fact, if in fact Mr. Hoque was working

6  in that $90-per-hour position in 2019 for that entire

7  year, wouldn't that change your numbers?

8      A   Yes, it would.

9      Q   It would decrease the amount of front -- or

10  back pay that you claim he may be entitled to, correct?

11     A   That's correct.

12     Q   And isn't it true that -- well, let's look

13  at -- you, you have him listed as making an income,

14  income of $154,324 in 2021; is that right?

15     A   That's what I see there.

16     Q   What is that based on?

17     A   I'd have to dig into the, into the documents

18  to, to do that.  Again, extemporaneously I don't know.

19  I know, I know that he had a -- I believe he had a tax

20  return in, in 2020 that was, was what was utilized.  He

21  was operating that H&H.  I think it's a, it's like a

22  sole proprietorship.

23     Q   Well, backing up a little bit, would you

24  agree with me if he was making $90 per hour and worked

25  40 hours per week 50 weeks out of the year, that would

                                        Page 66

1  equal $187,200?

2      A   I'll, I'll have to trust your math, but if

3  your math is correct, that, that would make sense.

4      Q   And $187,200 would be more than the 158,952

5  you show for his income at IBM, correct?

6      A   That, that's, that is more.

7          MR. SMITH:  Could we go to -- this

8  is going to be Exhibit 5 to Titon Hoque's section of

9  Dr. Steward's report.

10         (Exhibit No. 6 marked off the

11  record.)

12     Q   Have you ever seen this document before,

13  Mr. Rambin?

14     A   I don't believe so.

15     Q   Do you see that it's an offer letter from

16  Austin Community College dated January 25th, 2021?

17     A   Yes.  I see it.

18     Q   And do you see what the annual rate of his

19  salary's going to be?

20         MR. SMITH:  Sorry.  We need to go

21  down a little further.

22     A   Yeah.  It's hard for me to read that small.

23     Q   Do you see that's $170,000?

24     A   Yes, I do.

25     Q   That's different than the 155,324 that you

                                        Page 67

1  put in -- 154,324 that you put in your report, isn't

2  it?

3      A   Of course.  That's because he didn't start

4  until February 1st apparently.

5      Q   And did, did Mr. Hoque tell you that he

6  actually got a raise to $178,000?

7      A   I saw that in his deposition testimony.

8      Q   Did you include that in your report?

9      A   That -- I did not.

10     Q   And that change would also lower your

11  estimation for back wages; isn't that right?

12     A   Yes.

13     Q   And $170,000 is more than the 158,952 that he

14  was making at IBM; isn't that right?

15     A   Yes.

16     Q   So if -- and the 183,000 that we just talked

17  about is higher than he was making at IBM, right?

18     A   That's true.

19     Q   So if Mr. Hoque had income of higher than he

20  had at IBM beginning in 2018 going forward and his

21  benefits are the same, what damages does he have?

22     A   Well, there, there's --

23     Q   Economically speaking.

24     A   There is a, there's a premise that's, that's

25  not correct in your, in your question.  His benefits

                                        Page 68

17  (Pages 65 to 68)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

**Page 73**

```
 1  period.
 2      Q     And if his benefits during the time that he's
 3  employed at ACC are comparable to those at IBM, as
 4  you've testified previously, then he would have no
 5  damages with regard to his benefits either, correct?
 6      A     For that period.
 7      Q     And when you go to front pay, you're just
 8  making an assumption that he will no longer be employed
 9  at Austin Community College during that time, correct?
10      A     I don't understand your question.
11      Q     Isn't it possible that Mr. Hoque could be
12  employed at ACC for the next 20 years?
13      A     Certainly.
14      Q     And if he did, then there would be no damages
15  at all for him going forward; isn't that right?
16            MR. PRINGLE:  Objection to form.
17      Q     (By Mr. Smith)  And let me make sure I'm
18  clear on that.  There would be no economic damages for
19  him going forward if he stayed at ACC under these
20  similar circumstances, correct?
21            MR. PRINGLE:  Objection, form.
22      Q     That see- that seems correct to me.  If, if
23  that's -- if, if indeed his, his salary and benefits
24  outpaced where, where he would have been at IBM, it
25  would, it would, it would certainly -- you wouldn't add
```

**Page 74**

```
 1  additional damages.
 2      Q     (By Mr. Smith)  Okay.  And you didn't have
 3  that information, apparently, when you created this
 4  report, correct?
 5      A     That is correct.
 6            MR. SMITH:  Let's go to Michael
 7  Sauro.  So if we can go to Mr. Sauro's portion in
 8  Mr. Rambin's report.
 9      Q     Mr. Rambin, is this the portion of your
10  report involving Michael Sauro?
11      A     Yes, sir.
12      Q     And the information at, at the time that
13  Mr. Sauro was separated from IBM he was 63.64 years
14  old, correct?
15      A     Correct.
16      Q     So he was less than six months, five months
17  shy of being 64 years old?
18      A     That's correct.
19      Q     And if we go to the second page, you list
20  Mr. Sauro as a director.  Where did you get that
21  information?
22      A     I, I believe it came from one of the, one of
23  the IBM documents, and it may be -- it may have been
24  shortened just because I didn't want a bunch of words.
25      Q     You're saying it just came from some IBM
```

**Page 75**

```
 1  document?
 2      A     That's my, that's my best recollection.
 3      Q     And if we could go down -- if we can -- if
 4  you can see, the only income that you show Mr. Sauro
 5  making from the time he was separated in June of 2018
 6  is $5,850; is that right?
 7      A     Doing math in my head I believe that's
 8  correct.  The, the income from Sedera [SED-ruh], or
 9  seh-DARE-uh, however that's said.
10      Q     So during the three-plus years that you
11  looked at, Mr. Sauro only had $5,850 in income that
12  you're showing on here, correct?
13      A     Yes.  That's all I was aware of.
14      Q     Are you aware that Mr. Sauro was also getting
15  distributions during that time from IBM's pension fund?
16      A     Yes.  I was aware of that.
17      Q     Wouldn't that be income that should have been
18  included in this calculation?
19      A     No.  That's, that's --
20      Q     Why not?
21      A     That's a collateral source type thing.  He
22  would have been entitled to it regardless.
23      Q     Well, you included unemployment benefits that
24  other plaintiffs received, right?
25      A     Yes.
```

**Page 76**

```
 1      Q     Then why wouldn't you, why wouldn't you
 2  include retirement benefits?
 3      A     Again, those are -- those were event --
 4  that's wholly unrelated to their claims, whereas the
 5  employment benefits are related to the claims.
 6      Q     Why -- okay.  Why would unemployment benefits
 7  received by a plaintiff be included in your, in your
 8  assessment but not retirement benefits received?
 9      A     Because the retirement benefits are unrelated
10  to his separation from IBM, and the unemployment
11  benefits are actually triggered by that.  So I felt
12  like it was appropriate to treat that as an offset.
13      Q     Is it your understanding that an employee at
14  IBM can receive benefit from the pension plan while
15  still being employed at IBM?
16      A     I, I don't know that specifically, but what I
17  do know is, it's -- it was already -- it was earned.
18  You know, they wouldn't be giving it to him if he
19  hadn't earned it.
20      Q     Well, weren't the unemployment benefits also
21  earned through the tax payments that were made?
22      A     Certainly, but, but again, they were
23  triggered by the unemployment.
24      Q     Right.
25      A     By the separation.
```

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

Page 77

```
1      Q    Right.  And my question is, isn't it true
2  that IBM retirement distributions through their pension
3  plan would also be triggered by a separation of
4  employment from IBM?
5      A    The actual payment of it would be, but the
6  fact that he, that he'd earned it already was not.
7      Q    Okay.  And --
8      A    So from an economic standpoint that's, that
9  is, that is, that is something he was already entitled
10 to.
11     Q    Okay.  And so despite the fact that he
12 received $30,000-plus in retirement benefits through
13 the pension plan during these years, you didn't feel
14 that that was appropriate to include in your report?
15     A    That's correct.
16     Q    And you also did not include in your report
17 IRA or 401(k) distributions that Mr. Sauro took during
18 that time period?
19     A    That's correct.
20     Q    You didn't include that as income?
21     A    Certainly not.
22     Q    As a CPA, Mr. Rambin, are, are retirement
23 distributions from a pension plan or from 401(k) or
24 IRAs, is that taxable income as far as the IRS is
25 concerned?
```

Page 78

```
1      A    Certain of it is.  A 401(k) is taxable
2  income.  The -- you know, a Roth IRA wouldn't be, but I
3  don't know the specifics of, of his.  But in either
4  case I don't think it's appropriate as an offset,
5  because those are assets they owned -- that he owned
6  out -- completely without regard to his separation.
7      Q    How about distributions or -- that an
8  individual receives as part of a defined retirement
9  plan like a pension plan?  Are those distributions that
10 an individual receives in the year taxable income as
11 far as the IRS is concerned?
12     A    That's, that's my understanding.
13     Q    Okay.  But again, you didn't include it?
14     A    Nope.
15     Q    Are you aware that Mr. Sauro has indicated to
16 the IRS that he is retired?
17     A    I, I saw that, that designation on, on one of
18 his tax forms.
19              MR. SMITH:  Let's go ahead and pull
20 up that tax form.  If we could go to Exhibit -- this is
21 going to be Exhibit 6 of Dr. Steward's report.
22              (Exhibit No. 7 marked off the
23 record.)
24              VIDEOGRAPHER:  So 6 in Sauro?
25              MR. SMITH:  Yes.  6 in Sauro.
```

Page 79

```
1  Sorry.  Thank you.  Perfect.
2      Q    Mr. Rambin, what is, what is an IRS Form
3  1040-SR?
4      A    It's a kind of a simplified Form 1040 that
5  can be used by folks that are eligible for it, and I
6  can't remember the exact, the exact date that you
7  become eligible for it.
8      Q    It says "U.S. Tax Return for Seniors."
9      A    Mm-hm.
10     Q    Do you know why there's a designated form,
11 IRS form for seniors as opposed to others?
12     A    I, I really, I don't know.  It looks like
13 the -- it looks less -- it simplified to me, but
14 I, I really don't know the, the nuts and bolts of why
15 the IRS devised this separate form for those folks.
16     Q    As a CPA you haven't come across this form
17 before?
18     A    No.  I've come across it before.  I, I -- it,
19 it prints out on, on my TurboTax when I do, do the tax
20 return for my, my 86-year-old dad, but I don't --
21     Q    And is your 86-year-old dad retired?
22     A    Yes.
23     Q    Okay.  Can we go to the -- and is this, is
24 this a tax return for Michael Sauro?
25     A    It looks to be.
```

Page 80

```
1              MR. SMITH:  If we could go to the
2  next page.
3      Q    And if we could focus on the bottom half
4  there, do you see at the bottom where it says "Paid
5  Preparer Use Only"?
6      A    Yes.
7      Q    And it says "Self-Prepared"?
8      A    Yes.
9      Q    Does that indicate that Mr. Sauro prepared
10 this document himself?
11     A    Not necessarily.
12     Q    Why do you say that?
13     A    Well, go back to my, my analogy with -- or
14 my example with my dad.  His, his returns say
15 "Self-Prepared," and I actually do it.  It's just the
16 way TurboTax does it unless you check a box that you're
17 a, that you are a paid provider.  Or --
18     Q    Okay.
19     A    -- a paid preparer.  So it's, it's simply
20 a -- that's a self -- that's one of those things that
21 populates itself if you don't check, if you don't check
22 that preparer.
23     Q    So this shows that it wasn't prepared by a
24 paid person, correct?
25     A    That would be the implication.
```

20 (Pages 77 to 80)

Page 81

```
 1      Q    So it would either have had to have been
 2 prepared by Mr. Sauro himself or somebody acting on his
 3 behalf who's not paid?
 4      A    Yeah.
 5      Q    Okay.  And do you see on there where it says
 6 occupation "Retired"?
 7      A    Yes, sir.
 8      Q    Did you take that into account when you were,
 9 when you were preparing the report on Mr. Sauro?
10      A    No.  I did not.
11      Q    If in fact Mr. Sauro is retired and has been
12 since 2019, wouldn't that mean -- actually, this 2019
13 form would be for two thou- the year 2018, correct?
14      A    I -- let me see the form again.  I need to
15 see what, what it says.
16      Q    Sure.
17           MR. SMITH:  So if we go back to the
18 front page, first page.
19      A    Yeah.  I need to see what it says there.  No.
20 This is, this is 2019.  This is for 2,000- this is for
21 income that's received in 2019.
22      Q    Okay.  So this would have been --
23      A    This would have been filed --
24      Q    -- income in --
25      A    I'm sorry.
```

Page 83

```
 1 question here.
 2      Q    Would you --
 3      A    (Crosstalk)
 4      Q    -- agree that with -- would you agree that
 5 when someone is retired they've taken themselves out of
 6 the workforce?
 7      A    Again you're going to a legal question.
 8      Q    No.  I'm asking you, Mr. Rambin, as a CPA and
 9 as an expert witness in this case on damages.  Would
10 you agree with me that somebody who is retired has
11 taken themselves out of the workforce?
12           MR. PRINGLE:  Objection, form.
13      A    I, I can, I can say I can agree with that,
14 that they are out of the workforce, but you don't know
15 why they're out of the workforce, and that's where I'm
16 getting to the legal question.
17      Q    (By Mr. Smith)  And in fact, Mr. Rambin, the
18 fact that Mr. Sauro shows zero -- well, shows only
19 $5,850 in income over the last three years, isn't that
20 also an indication that he has taken himself out of the
21 workforce?
22           MR. PRINGLE:  Objection, form.
23      A    I don't think that that's an indication.  He
24 obviously did something to earn that money.
25      Q    (By Mr. Smith)  And in your "Post-Trial Lost
```

Page 82

```
 1      Q    Right.  So, okay, so this was actually for
 2 the year 2019.
 3      A    Correct.
 4      Q    And this form should be showing everything
 5 from January 1st, all income from January 1st, 2019
 6 through December 31st, 2019, right?
 7      A    That would be your expectation.
 8      Q    And his -- the status -- his occupation that
 9 is listed would have been the occupation that he had in
10 2019, correct?
11      A    The form speaks for itself.
12      Q    Okay.  And the form states that he's retired
13 in 2019; isn't that right?
14      A    That's what it says.
15      Q    If Mr. Sauro retired in 2019, as far as
16 economic damages, he wouldn't be entitled to any
17 further economic damages from IBM; isn't that right?
18      A    I --
19           MR. PRINGLE:  Objection, form.
20      A    I, I think that's ultimately a legal
21 question.
22      Q    (By Mr. Smith)  Well, what lost wages would
23 Mister -- what lost income would Mr. Sauro be entitled
24 to if he was retired as of 2019 from IBM?
25      A    Now, you're, you're getting into a legal
```

Page 84

```
 1 Income" you're continuing to show that he had zero
 2 income; isn't that right?
 3      A    That's correct.
 4      Q    Why are you continuing to show him having
 5 zero income through the year July '37?
 6      A    Mr., Mr. Sauro indicated he didn't see that
 7 those -- consulting arrangement continuing with that
 8 and wasn't aware of any other prospects that he had for
 9 earnings.
10      Q    Why, why did he say he wasn't aware of any
11 prospects for earnings?
12      A    I don't know why, but that's, that's what he
13 indicated to me, that that was, that was something
14 that -- that that was a unique consulting opportunity
15 that he had but he didn't see that continuing and
16 wasn't aware of anything else.
17      Q    Okay.  So was it your understanding from
18 Mr. Sauro that he didn't intend to work any further for
19 the rest of his career?
20      A    I don't think he gave me that impression.  He
21 just said he didn't have any -- he didn't see any more
22 opportunities with that company and wasn't aware of
23 anything else that was out there.
24      Q    Did he tell you he was looking?
25      A    I don't know that that con- that conversation
```

GIVENS COURT REPORTING

6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1 happened.
2    Q    Did he tell you about any kind of steps he
3 was taking or has been taking to find a job?
4    A    I don't recall that kind of conversation with
5 him.
6    Q    And in fact your report has nothing to do
7 with -- you did no analysis on, on what their job
8 search was, correct?
9    A    That's correct.
10    Q    So if Mr. Sauro said, I don't think I can get
11 another job and I'm not going to get another job, you
12 just used that information in your assessment?
13    A    Yes.
14    Q    And even though his IRS form says that he's
15 retired, you just disregarded that in your assessment?
16              MR. PRINGLE:  Objection, form.
17    A    Yes.  I, and I think I've been pretty clear
18 on, on why.  I think that's ultimately a legal issue
19 and not something I, I'm involved in.
20    Q    (By Mr. Smith)  And based on that
21 information, you're claiming that Mr. Sauro should be
22 entitled to almost $2 million from IBM; is that right?
23    A    That's what the calculation says.
24    Q    So the fact that Mr. Sauro has said he
25 doesn't think he can work or find another job, he's

Page 85

1    A    No.  She thought -- she, she expressed that
2 that, that seemed like a good time --
3    Q    Is this another --
4    A    -- to retire.
5    Q    Is this another situation where you gave her
6 the number of a projected retirement age of 66.85 and
7 asked her whether she agreed with that or not?
8    A    Yes.
9    Q    Mr. Rambin, in your, in your report you, you
10 state that Ms. Do is expected to be totally injured for
11 the next six years.  What do you mean by that?
12    A    That, that she has, that she has not
13 demonstrated an ability to, to be employed.
14    Q    What is her injury, what is her total injury
15 that is prevent- preventing, in your opinion is
16 preventing her from finding any job whatsoever?
17    A    I have no idea.
18    Q    So what did you base your opinion that she's
19 totally injured on?
20    A    That she has not had any earnings other than
21 em- than unemployment since her termination from IBM,
22 and I, you know, I don't have any other information.
23    Q    So couldn't that also be due to the fact that
24 she's not looking for a job?
25    A    I --

Page 87

1 entitled to $2 million, but these other plaintiffs who
2 have found jobs, they're entitled to less.  Is that
3 your expert opinion?
4    A    That's the way that --
5              MS. COUGHLIN:  Objection, form.
6    A    That's the way the economics work.
7    Q    (By Mr. Smith)  Based on your calculations,
8 correct?
9    A    That's correct.
10    Q    Let's go to Thanh Do.  So if we could go
11 to -- first let's go to Thanh Do's portion of
12 Mr. Rambin's report.
13          Is this your portion of the report that
14 deals with Thanh Do?
15    A    Yes, sir.
16    Q    Did you speak with Ms. Do?
17    A    Yes, I did.
18    Q    And you show her age at termination being
19 58.54 years old?
20    A    Correct.
21    Q    And you have a projected retirement age of
22 66.84; is that right?
23    A    Or 85.  Yes.
24    Q    85?  And is that because Ms. Do didn't give
25 you an anticipated retirement date?

Page 86

1              MR. PRINGLE:  Objection, form.
2    Q    (By Mr. Smith)  Go ahead.
3    A    That's, that's, that's beyond the scope of,
4 of what I've, what I've, what I've -- where my
5 expertise is.
6    Q    Because you didn't take that into account at
7 all?
8    A    I, I reported on what, what has actually
9 happened.
10    Q    And if somebody -- if one of these plaintiffs
11 like Ms. Do just comes to you and says, I've had --
12 unable to find any job, I haven't taken a job and I've
13 had no income, you then utilize that information to say
14 she's totally injured; is that right?
15    A    That's, that's all the information I have.
16 I, I have no earnings information for her.
17    Q    You just take that at face value?
18              MR. PRINGLE:  Objection, form.
19    A    Again, that's, that is, that is my -- that is
20 not my job to, to do the vocational stuff.
21    Q    (By Mr. Smith)  So Mister -- Dr. Steward
22 states that based on his analysis and the statistics
23 he's looked at, she should be employ- it was expected
24 that she should be able to obtain employment within 24
25 weeks of beginning a sufficiently diligent job search.

Page 88

22 (Pages 85 to 88)

**Page 89**

```
1   Do you disagree with that?
2        A   I, I, I -- that's, that's outside the, the
3   realm of, of my report.  I, I do kind of question how,
4   how, how that -- what supports that conclusion, but
5   that's, that's not, not my job.
6        Q   So sitting here today you don't have any
7   information to dispute that, correct?
8        A   I, I, I guess I do have some.  I mean, I've
9   seen some in the, in the files that have been
10  produced the, the, the evidence that she had applied
11  for lots of jobs in the reports that she was giving to
12  the TWC.
13            So I, again, I don't -- it's out of my
14  lane, that I can't, I can't, I can't, I can't, I can't
15  accept that I don't have any reason to disagree with
16  that, because I do see a fair amount of activity that,
17  that you'd have to report to the TWC.
18       Q   And do you know what jobs she applied to?
19       A   I can't recall as I'm sitting here.
20       Q   Right.  Because you haven't done any analysis
21  with regard to Ms. Do as to what her job search was,
22  whether it was reasonable or not, right?
23       A   I didn't, I didn't try to make that
24  assessment, but I did, I did read through that
25  information and saw that it was for -- with different
```

**Page 90**

```
1   technology companies and things like that, but again,
2   I, I don't have an overall opinion on that.
3        Q   Right.  You're not able to provide an expert
4   opinion one way or another on that issue of her job
5   search and how long it should have taken her to do a
6   reasonable search, correct?
7        A   Well, you're, you're changing question here.
8   The question that I was responding to was, do I have
9   any basis to disagree with, with Dr. Steward's
10  assessment or conclusion, and I, I just had -- I
11  couldn't -- I can't just accept that without citing
12  I've seen evidence to the contrary.  I --
13       Q   Okay.  Let me make sure my question is clear.
14  You haven't done any analysis whatsoever with regard to
15  whether Dr. Steward's opinion that it would have been
16  reasonable to expect for her to get a job within 24
17  weeks of beginning a sufficient job search, you, you
18  haven't done any analysis on that, correct?
19       A   That's correct.
20       Q   Okay.  And because of that you're not in a
21  position to give an expert opinion on that, correct?
22       A   Yes.
23       Q   Okay.
24            MR. SMITH:  And if we go to the
25  next page.  And the page after that, I'm sorry.  So if
```

**Page 91**

```
1   we could go ahead and look at that whole page there.
2        Q   And she's showing as a senior software
3   engineer; is that correct?
4        A   Correct.
5        Q   Did you determine that that was a
6   management-level position?
7        A   I don't, I don't know that I made that, that
8   determination.
9        Q   But you used the benefits percentage
10  calculation for a manager for her as well, correct?
11       A   That's correct.
12            MR. SMITH:  If we could go down
13  further.
14       Q   We're showing --
15            MR. SMITH:  If we could just go up
16  a little bit, I'm sorry.
17       Q   So does this show that the only income that
18  Ms. Do has received since the time she was terminated
19  from IBM is unemployment benefits?
20       A   Yes.
21       Q   And that she has not had any other income
22  other than unemployment benefits?
23       A   That's, that's my understanding.
24            MR. SMITH:  And if we could go down
25  further.
```

**Page 92**

```
1        Q   And you're showing that she's not going to
2   have any income whatsoever through December 30- well,
3   through August of 2045; is that right?
4        A   No.  That's, that's, that is a typo.  It
5   actually runs through 12/31/27.
6        Q   Okay.  So your expert opinion that you're
7   providing to the jury is that she is not going to
8   receive any income and not get any job through December
9   31st, 2027; is that right?
10       A   Yeah.  I have, I have no evidence on that.
11       Q   And you're basing that on your interview with
12  her?
13       A   And the -- my interview with her and the fact
14  that all we've seen since her termination was, was
15  unemployment benefits.  So I have no evidence to the
16  contrary.
17       Q   And so because it's your assessment that
18  she's not going to get any job whatsoever between now
19  and December 31st, 2027, she's entitled to over a
20  million dollars from IBM; is that right?
21       A   That's what the calculation shows.  It's, you
22  know, it's not my, it's not my determination to say
23  what she's owed; that's the fact-finder.  But that is
24  the calculation.
25       Q   And because she didn't get any job between
```

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

**Page 93**

1  the time that she left IBM and September 30th of 2022,
2  IBM should pay her $539,651; is that right?
3      A    That's what the calculation shows.
4            MR. SMITH:  Let's go to Rosa
5  Davidson.  If we could go to that in Mr. Rambin's
6  report.
7      Q    Is this the portion of your report,
8  Mr. Rambin, that you prepared regarding plaintiff Rosa
9  Davidson?
10     A    Yes, it is.
11     Q    And again you're showing her projected age of
12  retirement as 70?
13     A    Yes.
14     Q    And is this also based on her just telling
15  you that?
16     A    It's that.  I believe it was also, it was
17  supplemented by her -- her deposition was taken after
18  my report, but I believe she stated that as well in her
19  deposition.
20     Q    And I'm going to object as assuming facts not
21  in evidence unless you can point to something in her
22  deposition that says she intended to work until 70
23  years old.
24     A    Okay.
25     Q    So at the time that you created this -- is it

**Page 94**

1  your testimony that you relied on something other than
2  her -- your interview with her to come up with this
3  70-year-old projected retirement age?
4      A    No.  At the time of the report that, that's
5  what I relied on as her stated intention.
6      Q    Okay.
7            MR. SMITH:  And if we could go to
8  the next page.
9      Q    So you show her -- well, first off, she's a,
10  a -- occupation is a software developer?
11     A    Yes.  I see that.
12     Q    Is there anything in there that leads you to
13  believe she's a manager?
14     A    No.
15     Q    You list her salary as $147,372; is that
16  right?
17     A    Correct.
18     Q    And in your --
19            MR. SMITH:  Well, let's, let's go a
20  little bit further down.
21     Q    In the -- in your projections here you show
22  Ms. Davidson as earning $145,000 a year with Cognizant
23  Technology; is that right?
24     A    That's correct.
25     Q    Were you aware that she's also entitled to a

**Page 95**

1  $15,000 bonus?
2      A    I don't have a recollection of that.
3      Q    You didn't include that in your assessment,
4  correct?
5      A    That's correct.
6      Q    And as of the time even that she started
7  with her initial salary of $145,000, that's two thou-
8  approximately, yeah, around --
9            MR. SMITH:  Let's go back to the
10  top.
11     Q    That's $2,372 less than her initial salary
12  at -- her last salary at IBM; is that right?
13     A    That's correct.
14     Q    And if she gets the $15,000 bonus, then
15  that's more than she was making at IBM; isn't that
16  right?
17     A    Yes.
18     Q    And if she received a bonus in 2020 on top
19  that's more than $2,372, then she would have no lost
20  salary during that time, correct?
21     A    Let's be clear here that she didn't start
22  until November of '20.  So that, that initial salary of
23  145 is just for a month.  It seems pretty unlikely
24  there would have been a bonus in that, in that
25  one-month period.

**Page 96**

1      Q    Okay.  Well, if she received it in 2021.
2      A    Then, then it, then it starts exceeding the,
3  the IBM salary.
4      Q    And when it starts exceeding the IBM salary
5  she's not entitled to any lost wages on that, correct?
6      A    Well, except that I'm not, I'm not seeing how
7  the projection -- her projected earnings from IBM at
8  the 3 percent increase is -- yeah.  I, I can't see --
9      Q    Well, let's --
10     A    -- that part of the report.
11     Q    Let's look down.
12     A    Okay.
13            MR. SMITH:  Right there.
14     Q    So she would have to -- if we add 15,000 to
15  147, she would have to make more than $162,372 at IBM,
16  correct?
17            MR. PRINGLE:  Objection, form.
18     A    I, I'm sorry.  I don't see that number you're
19  referring to.
20     Q    (By Mr. Smith)  Sure.  So if she's making
21  145,000 plus 15, that's $160,000, right?
22     A    145 plus 15 is 160.  Okay.
23     Q    So that would be what, what her target
24  compensation is for working at Cognizant.  Would you
25  agree with me?

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

1              MR. PRINGLE:  Objection --
2       A    Okay.
3       Q    (By Mr. Smith)  Do you agree with me?
4       A    I agree that those two numbers equal 160.
5       Q    Well, let's just make sure we're on the
6  same --
7              MR. SMITH:  So let's, let's go to
8  Exhibit 5 of Dr. Steward's report regarding Davidson.
9  I don't want you to just take my word for it.
10 Does this appear to be an offer letter to Ms. Davidson
11 dated November 3rd, 2020?
12      A    Yes.
13      Q    From Cognizant?
14      A    Yes.
15             MR. SMITH:  And if we go to the
16 next page -- actually I want to go ahead and have this
17 marked as the next exhibit, please.
18             (Exhibit No. 8 marked off the
19 record.)
20             THE REPORTER:  That'll be 6.
21             MR. SMITH:  And I've been bad,
22 Sandy.  Have I not been putting these other things in
23 as exhibits?
24             THE REPORTER:  You have not.
25 Uh-oh.

1              MR. SMITH:  Okay.
2              THE REPORTER:  Would you like me to
3  go back and --
4              MR. SMITH:  You know, why don't --
5  I want to make sure that I've done that.  Just let's do
6  some housekeeping.  Each document that I've pulled up
7  and questioned him about I want to have as an, an
8  exhibit consecutively.  Ross, are you okay with that?
9  I mean, we can go back and redo, but I just -- each
10 document that I've questioned him about I need those to
11 be marked as an exhibit.
12             MR. PRINGLE:  Well, we don't we do
13 that so we'll know what to call this one.
14             MR. SMITH:  Okay.  Do we -- we
15 probably need to take a quick break then, let, let
16 Sandy do that.  And I apologize.  I should have been
17 doing that all along.  That's -- this is the problem
18 with Zoom depositions.
19             VIDEOGRAPHER:  And we're off the
20 record.  The time is 11:57 a.m.
21             (At 11:57 a.m. the proceedings
22 recessed, continuing at 12:27 p.m.)
23             VIDEOGRAPHER:  We're back on the
24 record at 12:27 p.m., beginning of media 3.
25      Q    (By Mr. Smith)  Mr. Rambin, have you had an

1  opportunity to take a break?
2       A    Yes.
3       Q    And I apologize, it was a little longer than
4  anticipated.  That's my fault.  Are you ready to
5  proceed?
6       A    Yes, sir.
7       Q    And I'd just remind you that you're still
8  under oath.
9       A    Understood.
10      Q    So before we went on a break we were looking
11 at this latest exhibit, which is an offer letter from
12 Cognizant to Ms. Davidson, do you see that, dated
13 November 3rd, 2020?
14      A    Yes.
15      Q    And if we go to the next page, do you see at
16 the top it talks about her base salary and target
17 bonus?
18      A    Yes, I do.
19      Q    And does it show that her base salary is
20 $145,000?
21      A    Yes, sir.
22      Q    And does it also show that her target bonus
23 is 15,000?
24      A    Yes.
25      Q    So if we added those two together, that would

1  be $160,000, correct?
2       A    That's true.
3       Q    And $160,000 is more than the $147,372 that
4  she was earning at IBM at the time of her termination,
5  correct?
6       A    Yes.
7              MR. SMITH:  And if we could now go
8  back to Exhibit 1, the section involving Ms. Davidson,
9  which is Mr. Rambin's report involving Ms. Davidson,
10 and if we can look at the pre- highlight the bottom
11 half, "Pre-Trial Lost Income" and "Post-Trial Lost
12 Income."
13      Q    Would you agree with me, Mr. Rambin, that if,
14 if her compensation at Cognizant is $160,000 salary
15 plus bonus beginning in 2021, that is higher than the
16 income that you're showing for her for IBM?  Is that
17 right?
18      A    Well, again, keep in mind that what's in '21
19 is really -- okay.  Yeah.  That's, that's the first
20 full year.  Sorry.  Yeah.  That -- if that's the case,
21 that would -- that's a larger number.  You know, we'd
22 be comparing 156 to 160.  So, yeah, it's a larger
23 number.
24      Q    And because that's a larger number and you
25 keep -- and you continue to add 3 percent going

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1   forward, that number at Cognizant would always be
2   higher than the number at IBM; isn't that right?
3       A   You know, assuming everything kept, kept
4   increasing at a, at a similar pace, that, that seems
5   like that would be the conclusion.
6       Q   So if all that is correct, her economic
7   dam- and, and you've already testified that her
8   benefits are comparable, correct?
9       A   That's correct.
10      Q   So if, if all of that is correct, then her
11  damages would cut off from lost income beginning in
12  January of 2021; isn't that right?
13      A   Yeah.  They would, they would not increase.
14      Q   So that would mean her total damages, even
15  according to your calculations, would be approximately
16  $158,000, 48,556 plus 110,291; is that right?
17      A   That, that would appear to be correct.
18      Q   Okay.  Thank you.
19              MR. SMITH:  If we could then go to
20  the portion of Exhibit No. 1 that deals with Walter
21  Noffsinger.
22      Q   Mr. Rambin, is this the portion of your
23  expert report that references Walter Noffsinger?
24      A   Yes, sir.
25      Q   Who's one of the plaintiffs in this case?

1               MR. SMITH:  Okay.  Could we mark as
2   the next -- go to Tab 8 of Dr. Steward's report
3   regarding Mr. Noffsinger, and that's going to be the
4   next exhibit.
5               (Exhibit No. 9 marked off the
6   record.)
7       Q   Have you seen this document before,
8   Mr. Rambin?
9       A   I believe so.  It looks similar to other
10  documents that we've talked about today.
11      Q   And is this showing -- does this appear to be
12  an IBM document showing Mr. Noffsinger's compensation
13  for 2018, 2019, and 2020?
14      A   Yes.
15      Q   And you said you utilized 2019, correct?
16      A   I utilized 2019 W-2.
17      Q   Well, would you agree with me, would you
18  agree with me that Mr. Noffsinger's -- that the number
19  that you show in your report should only be IBM income
20  for 2019?  It shouldn't be any other income?
21      A   I'm not sure what you mean by that.
22      Q   Should the $347,987 number that you used in
23  your report only refer to IBM income for Mr. Noffsinger
24  in 2019?
25      A   Yes.

1   And in here again this is where you have as projected
2   retirement age at 70 years old; is that correct?
3       A   That's, that's -- was his intention.  That's
4   what he stated.
5       Q   And you -- that, that was my question.  So
6   you base that 70-year-old projected retirement age
7   based on his statements to you?
8       A   Yes.
9       Q   Did you base it on anything else other than
10  his statements to you?
11      A   No.
12              MR. SMITH:  If we could go to the
13  next page of that document.
14      Q   Do you see that you show Mister --
15              MR. SMITH:  If we could highlight
16  that upper page.  Thank you.
17      Q   Do you see that you show Mr. Noffsinger's
18  salary -- or his, his last, his last salary at IBM
19  being $347,987?
20      A   Yes, I do.
21      Q   What did you base that off of?
22      A   His W-2 form for 2019.
23      Q   So you only used one year, the 2019 number?
24  You didn't do an average with him?
25      A   No.  I did not.

1       Q   So it wouldn't matter what other income might
2   show up on his W-2 -- or his, or his tax information.
3   It's, it's what he earned from IBM that's important in
4   2019, correct?
5       A   Right.  That's, that's the number that comes
6   directly from his W-2, the 347.
7       Q   Okay.  So let's look at these numbers here.
8   220,098.60 plus $62,400.
9       A   Yep.
10      Q   That should be the, that should be the
11  amount, right?
12      A   No.  His compensation also is the restricted
13  stock that he was able to, that he was able to cash in.
14      Q   So you're including that restricted stock
15  release as income for him?
16      A   Yeah.  That's, that's taxable, you know, it's
17  taxable when it's actually exercised, and that's part
18  of his compensation package.
19      Q   Okay.  Well, if I add that in, that comes to
20  $355,545.92.  So that's not --
21      A   Yeah.  I mean -- well, I think there's --
22      Q   That's not 347,987.
23      A   Well, I, I don't disagree with you, but
24  that's the number that's on, that is on his W-2, I'm
25  quite sure of that, and so it has to do with, with some

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

1      A    Correct.
2      Q    And yet despite that you're projecting her
3  retirement to go to 69?
4      A    Well, she's, she's working right now.
5           MR. SMITH:  If we could go to the
6  next page.  Now, if you'll go to the page after that.
7      Q    You show her last salary at IBM as being
8  $99,996; is that right?
9      A    Yes.
10     Q    And beginning in --
11          MR. SMITH:  If we go down further
12  in the page.
13     Q    Do you show her salary in beginning January
14  1st, 2020 as $120,000?
15     A    Yes, I do.
16     Q    What are you basing that off of?
17     A    As I'm sitting here I don't have a, I don't
18  know I don't have a clear recollection of that,
19  that specific document.  If you'd -- I can refer to my
20  report and see if I can pick it up from the, the -- my
21  Exhibit B.
22     Q    Well, let's go to Exhibit 3 of the
23  Dr. Steward report --
24     A    Okay.
25     Q    -- regarding Ms. Gelphman.

                                        Page 109

1      A    Okay.
2           MR. SMITH:  And this is going to be
3  marked as the next exhibit.
4           (Exhibit No. 10 marked off the
5  record.)
6      Q    Do you see is this an offer letter to
7  Ms. Gelphman from Blue Yonder dated February 26, 2020?
8      A    Yes.  I see that.
9      Q    Do you see that the salary for her position
10  will be $150,000?
11     A    Yes.
12     Q    So the $120,410 amount that you had in your
13  report would be incorrect, right?
14     A    No.  She, she's not starting until, you know,
15  two months into the year.
16     Q    Okay.  Well, let's --
17     A    Her start date is March 9th, 2020.
18     Q    Okay.  Well, let's look at the next period in
19  your report, January 1st, 2021 to December 31st, '21.
20  It also shows $120,410, right?
21     A    Yeah.  I see that.
22     Q    So that'd be incorrect, wouldn't it?
23     A    Possibly.
24     Q    And are you aware that Ms. Gelphman testified
25  that she actually got a raise to $157,000 while she was

                                        Page 110

1  at Blue Yonder?
2      A    I was not aware of that.
3      Q    So that would also make these numbers
4  incorrect, wouldn't it?
5      A    Yeah.  That would, that would change, that
6  would change the math for sure.
7      Q    And in any event, your calculations are
8  showing that her damages, her, her lost income damages
9  cut off as of December 31st, 2019, right?
10     A    Yeah.  Yeah.  And, and yeah, that, that, that
11  would probably happen earlier if we had those larger
12  numbers.
13     Q    It would probably happen earlier than that,
14  correct?
15     A    If, if, if that number needs to be larger --
16     Q    Okay.
17     A    -- future income number.
18     Q    And that would also affect the benefits that
19  you calculated on here as well, right?
20     A    Yes, it would.
21     Q    Okay.  And you're using --
22          MR. SMITH:  Let me go, let's go
23  back to the first page of -- or actually if we could
24  just zoom out of that zoom.
25     Q    You're using the 44.38 percent for benefits

                                        Page 111

1  calculations; is that correct?
2      A    Yes, I am.
3      Q    And do you see her occupation is UX designer?
4      A    Yes.
5      Q    Is there anything about her job title as UX
6  designer that leads you to believe she was in
7  management?
8      A    No.
9      Q    And yet you were using a management, you were
10  using management data from BLS to calculate this
11  benefits percentage; is that right?
12     A    Yes.
13     Q    Do you still believe that to be correct?
14     A    Yes.
15     Q    Why?
16     A    Because the compensation levels that, that
17  we're talking about with all these people is more
18  comparable to that that was in that table than those
19  other, those other lower numbers.  If you look what
20  those people are being paid in that data, these, these
21  people are more comparable with that, that level.
22     Q    And you don't think that -- you believe that
23  was the best data source to utilize for this benefits
24  percentage calculation?
25     A    Yes.

                                        Page 112

28  (Pages 109 to 112)

1    Q    You don't believe there was a better table to
2    use or data number to use for a UX designer than
3    management?
4    A    No.
5    Q    Okay.
6         MR. SMITH:  If we can go to the
7    portion of Mr. Rambin's report regarding Michael Kelly.
8    Q    You show on here projected retirement age as
9    66.73.  Again is this because Mr. Kelly did not provide
10   you with an estimation himself of what his retirement
11   age would be?
12   A    He, yeah, he didn't, he didn't -- he, he
13   accepted that as, as what is in line with his
14   expectations.
15   Q    And again, 66.73 is the number that you
16   provided to him?
17   A    Correct.
18        MR. SMITH:  If we could go to the
19   next page, and if we could go down, further down on
20   that page.
21   Q    If we could look at the "Pre-Trial Lost
22   Income," do you see that you show zero income or
23   benefits for him from June 30th to, 2018, to December
24   31st, 2018?
25   A    Yes, I do.

Page 113

1    A    Let me look, make sure I, I'm answering
2    accurately here.  Yes.  So, so for past damages I'm
3    using 2 percent, and for future damages I'm using 2 and
4    a half percent.
5    Q    And those were your -- that was based on a
6    discount rate back in February of 2022, right, when you
7    did this?
8    A    Right.  And it was based on Federal Open
9    Market Committee, their, their interest rate
10   projections as of December 15th, 2021, and I, I think
11   the, the interest rate environment has, has, has
12   changed since then.
13   Q    It's actually gone up about a point, hasn't
14   it?
15   A    Yeah.  I absolutely -- yeah.  And so I
16   anticipate that, that that, that that would be
17   something that if, if I was asked to update a report, I
18   would think that would, that would change.  And so that
19   would, that would have an effect of reducing the
20   calculation.
21   Q    Okay.  Mr. Rambin, at this point I don't
22   think I have any further questions.
23        MR. SMITH:  And I'll pass the
24   witness.
25        MR. PRINGLE:  We will reserve.

Page 115

1    Q    Do you have any opinion as to whether that
2    was reasonable for him to be without any income or
3    benefits during that time?
4    A    I have no opinion on that.
5         MR. SMITH:  If we could go back for
6    a moment to the exhibit with the tables, which is U.S.
7    Bureau of Labor Statistics -- I believe it's probably
8    Exhibit 2 or 3 -- and if we can go to Table 5.  And if
9    we could go to the second to next page, and if we could
10   zero in at the top on the "Management, business,
11   financial" up there.
12   Q    Mr. Rambin, I just want you to explain to me,
13   so I'm clear, the math that you used to determine the
14   44.38 percent that you, that you used for the benefits
15   percentage for each of these plaintiffs.
16   A    Sure.  So if you'd look at "Management,
17   business, and financial," and in the "Cost" column
18   you'll see that the actual wages and salaries are $50.7
19   per hour and that the benefits are $22.5 per hour.  And
20   if you divide -- do division with the enumerator of
21   22.5, the denominator of 50.7, that will get you 44.38.
22   Q    Okay.  That's what I needed to know.
23   Throughout your report, Mr. Rambin, you use a discount
24   rate of 2 and a half percent per year versus 3 and a
25   half percent per year for 10 years; is that right?

Page 114

1         MR. SMITH:  Thank you for your
2    time.
3         THE WITNESS:  Do you need any
4    spellings from me, Ms. Givens?
5         THE REPORTER:  I've got everything.
6    Thank you.
7         VIDEOGRAPHER:  Okay.  We're off the
8    record at 12:58 p.m.  This concludes media 3.
9         (At 12:58 p.m. the proceedings
10   adjourned.)

Page 116

29  (Pages 113 to 116)

```
 1          CHANGES AND INSERTIONS
 2              MARK RAMBIN
 3              May 12, 2022
 4
 5  PAGE   LINE   CHANGE                    REASON
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

                                                    Page 117

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF TEXAS
 2                   AUSTIN DIVISION
 3
    CHARLES TOWNSLEY, MICHAEL      $
 4  SAURO, WALTER NOFFSINGER,      $
    ROSA DAVIDSON, MICHAEL         $
 5  KELLY, TITON HOQUE, JANET      $
    GELPHMAN, THANH DO,            $
 6                                 $
         Plaintiffs,               $     CASE NUMBER
 7                                 $  1:20-CV-00969-LY
    v.                             $
 8                                 $
    INTERNATIONAL BUSINESS         $
 9  MACHINES CORPORATION,          $
                                   $
10      Defendants.                $
11      REPORTER'S CERTIFICATION OF THE
12      ORAL DEPOSITION OF MARK RAMBIN
13              May 12, 2022
14            (Reported Remotely)
15
16      I, Sandra S. Givens, Certified Shorthand Reporter
17  in and for the State of Texas, hereby certify to the
18  following:
19      That the witness, MARK RAMBIN, was duly sworn by
20  the officer and that the transcript of the oral
21  deposition is a true record of the testimony given by
22  the witness;
23      That the original deposition transcript was
24  submitted to: MARK RAMBIN in care of his attorney,
25  Heidi A. Coughlin;
```

                                                    Page 119

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3      I, MARK RAMBIN, do hereby certify that I have read
 4  the foregoing pages and that the same is a correct
 5  transcription of the answers given by me to the
 6  questions therein propounded, except for the
 7  corrections or changes in form or substance, if any,
 8  noted in the attached Changes and Insertions page
 9  (Errata).
10
11
12
13              MARK RAMBIN
14
15              DATE
16
17
18
19
20
21
22
23
24
25
```

                                                    Page 118

```
 1      That a copy of this certificate was served on all
 2  parties and/or the witness shown herein on May 17,
 3  2022.
 4      I further certify that pursuant to FRCP Rule
 5  30(f)(1) that the signature of the deponent was
 6  requested by the deponent's attorney before the
 7  completion of the deposition and that the transcript be
 8  returned within 30 days from the date of receipt.  If
 9  returned, the attached Changes and Signature page
10  contains any changes and the reasons therefor:
11      That $994.05 is the deposition officer's charges
12  to the Defendant for preparing the original deposition
13  transcript and any copies of exhibits;
14      That the amount of time used by each party at the
15  deposition is as follows:
16      Edward M. (Ted) Smith - 2 hours, 45 minutes
            Ross Pringle - 0 minutes
17
18      That pursuant to information given to the
19  deposition officer at the time said testimony was
20  taken, the following includes counsel for all parties
21  of record:
22      Edward M. (Ted) Smith - Attorney for Defendant
            Ross Pringle - Attorney for Plaintiffs
23
24      I further certify that I am neither counsel for,
25  related to, nor employed by any of the parties or
```

                                                    Page 120

30  (Pages 117 to 120)

```
1    attorneys in the action in which this proceeding was
2    taken, and further, that I am not financially or
3    otherwise interested in the outcome of the action.
4
5        Certified to by me this 17th day of May 2022.
6
7                        GIVENS COURT REPORTING
                         6549 Fair Valley Trail
                         Austin, Texas 78749
8                        (512) 301-7088
9
10
11
                         SANDRA S. GIVENS, CSR
12                       Certification No. 5000
  # sg-1928             Certificate Expires 1/31/24
13
14
15
16
17
18
19
20
21
22
23
24
25
                                Page 121
```

**U.S. BUREAU OF LABOR STATISTICS**

# Economic News Release

ECT 🔊 PRINT: 🖨

## Employer Costs for Employee Compensation News Release

For release 10:00 a.m. (ET) Thursday, March 18, 2021                    USDL-21-0437

Technical information:   (202) 691-6199  *  ncsinfo@bls.gov  *  www.bls.gov/ect
Media contact:           (202) 691-5902  *  pressoffice@bls.gov

EMPLOYER COSTS FOR EMPLOYEE COMPENSATION – DECEMBER 2020

Employer costs for employee compensation for civilian workers averaged $38.60 per hour worked in December 2020, the U.S. Bureau of Labor Statistics reported today. Wages and salaries cost employers $26.53 and accounted for 68.7 percent of total costs, while benefits cost $12.07 and accounted for the remaining 31.3 percent. (See table 1.)

State and local government employer costs averaged $53.47 per hour worked. Wages and salaries averaged $33.08 per hour worked and represented 61.9 percent of total compensation costs, while benefit costs averaged $20.39 and accounted for the remaining 38.1 percent. (See tables 1 and 3.)

Total employer compensation costs for private industry workers averaged $36.23 per hour worked in December 2020. Wage and salary costs averaged $25.48 and accounted for 70.3 percent of employer costs, while benefit costs were $10.74 and accounted for 29.7 percent. (See tables 1 and 4.)

Within total benefits, supplemental pay costs averaged $1.15 per hour worked or 3.0 percent of total compensation for civilian workers, $1.25 per hour worked (3.5 percent) for private industry workers, and $0.54 per hour worked (1.0 percent) for workers in state and local government. (See table 1.)

Supplemental pay includes employer costs for employee shift differentials (extra payments for working a non-traditional work schedule), overtime and premium pay (pay in addition to the regular work schedules, and pay for work on weekends and holidays), and nonproduction bonuses (such as holiday bonuses or end-of-year bonuses which are given at the discretion of the employer and are not tied to a production formula).

For private industry workers, nonproduction bonuses cost employers $0.84 per employee hour worked or 2.3 percent of total compensation, overtime and premium pay cost $0.33 per hour worked (0.9 percent), and shift differentials cost $0.08 per hour worked (0.2 percent). (See table 1.)

Supplemental pay costs by occupational group ranged from $0.38 per employee hour worked or 2.1 percent of total compensation in service occupations to $2.28 (3.7 percent) in management, professional, and related occupations. (See table 4.)

Nonproduction bonus costs ranged from $0.14 per employee hour worked or 0.8 percent of total compensation in service occupations to $1.97 (3.2 percent) in management, professional, and related occupations, while overtime and premium pay costs ranged from $0.17 (1.0 percent) in service occupations to $0.94 (2.4 percent) in natural resources, construction, and maintenance occupations.

Supplemental pay costs varied by bargaining unit status. Supplemental pay costs for union workers were $1.86 per hour worked or 3.6 percent of total compensation, while costs for nonunion workers were $1.20 (3.4 percent). (See table 5.) Overtime and premium costs was the largest component of supplemental pay costs for union workers at $0.94 per hour worked, while for nonunion workers the largest component was nonproduction bonus costs at $0.86.

Estimates for supplemental pay components are available through the database query tool at www.bls.gov/ncs/ect/data.htm.

```
|    Coronavirus (COVID-19) Pandemic Impact on December 2020 ECEC Data             |
| The Employer Costs for Employee Compensation (ECEC) reference date was December 12, 2020. |
| Response rates for December were comparable with prior releases, and no changes in estimation |
| procedures were necessary. Additional information is available at www.bls.gov/covid19/effects-of- |
| covid-19-on-workplace-injuries-and-illnesses-compensation-and-occupational-requirements.htm#ECEC. |
```

Employer Costs for Employee Compensation for March 2021 is scheduled to be released on Thursday, June 17, 2021, at 10:00 a.m. (ET).

TECHNICAL NOTE

Employer Costs for Employee Compensation (ECEC), a product of the National Compensation Survey, provides the average employer cost for wages and salaries as well as benefits per employee hour worked. The ECEC covers the civilian economy, which includes data from both private industry and state and local government. Excluded from private industry are the self-employed, agricultural workers, and private household workers. Federal government workers are excluded from the public sector.

All workers are included in the benefit cost estimates including those that do not have plan access or do not participate. Costs are also affected by other factors such as cost sharing between employers and employees, plan features, and plan generosity. For the latest information on the percentage of workers with access to and participating in employer-sponsored benefit plans, including health care and retirement and savings plans, see www.bls.gov/ebs.

EXHIBIT

2

*sg*

Rzmbin      5-12-22

The "National Compensation Measures" provides additional details on the sample design, calculation methodology, and resources explaining changes over time. (See www.bls.gov/opub/hom/ncs/home.htm.)

Additional ECEC estimates, including historical data, are available in the ECEC database query tool at www.bls.gov/ncs/ect/data.htm.

Sample size:
Data for this reference period were collected from a probability sample of approximately 24,600 occupational observations selected from a sample of about 6,000 private industry establishments and approximately 7,800 occupational observations selected from a sample of about 1,400 state and local government establishments that provided data at the initial interview.

Measures of reliability:
Relative standard errors (RSEs) provide users a tool to ascertain the quality of an estimate to ensure that it is within an acceptable range for their intended purpose. RSEs are available at www.bls.gov/ncs/ect/ecec-rse.htm and database query tool at www.bls.gov/ncs/ect/data.htm.

Comparisons:
Compensation cost levels in state and local government should not be directly compared with levels in private industry. Differences between these sectors stem from factors such as variation in work activities and occupational structures.

Area definitions:
Metropolitan area definitions have been updated based on Office of Management and Budget Bulletin No. 13-01, dated February 28, 2013. (See www.census.gov/programs-surveys/metro-micro.html.)

Publication focus:
Topics of news releases for the upcoming reference periods are as follows:
* March 2021 – compensation costs by wage percentile and 15 metropolitan areas in private industry
* June 2021 – benefits costs in private industry
* September 2021 – compensation costs in state and local government

The 2021 ECEC release dates are available at www.bls.gov/schedule/news_release/ecec.htm.

**Table 1. Employer Costs for Employee Compensation by ownership**
[Dec. 2020]

| Compensation component | Civilian workers(1) | | Private industry workers | | State and local government workers | |
| --- | --- | --- | --- | --- | --- | --- |
| | Cost ($) | Percent of compensation | Cost ($) | Percent of compensation | Cost ($) | Percent of compensation |
| Total compensation(2) | 38.60 | 100.0 | 36.23 | 100.0 | 53.47 | 100.0 |
| Wages and salaries | 26.53 | 68.7 | 25.48 | 70.3 | 33.08 | 61.9 |
| Total benefits | 12.07 | 31.3 | 10.74 | 29.7 | 20.39 | 38.1 |
| Paid leave | 2.87 | 7.4 | 2.69 | 7.4 | 4.04 | 7.6 |
| Vacation | 1.40 | 3.6 | 1.38 | 3.8 | 1.52 | 2.9 |
| Holiday | 0.85 | 2.2 | 0.80 | 2.2 | 1.14 | 2.1 |
| Sick | 0.46 | 1.2 | 0.37 | 1.0 | 1.03 | 1.9 |
| Personal | 0.17 | 0.4 | 0.14 | 0.4 | 0.35 | 0.7 |
| Supplemental pay | 1.15 | 3.0 | 1.25 | 3.5 | 0.54 | 1.0 |
| Overtime and premium(3) | 0.32 | 0.8 | 0.33 | 0.9 | 0.23 | 0.4 |
| Shift differentials | 0.07 | 0.2 | 0.08 | 0.2 | 0.05 | 0.1 |
| Nonproduction bonuses | 0.76 | 2.0 | 0.84 | 2.3 | 0.25 | 0.5 |
| Insurance | 3.28 | 8.5 | 2.81 | 7.8 | 6.23 | 11.7 |
| Life | 0.05 | 0.1 | 0.04 | 0.1 | 0.07 | 0.1 |
| Health | 3.12 | 8.1 | 2.65 | 7.3 | 6.07 | 11.4 |
| Short-term disability | 0.07 | 0.2 | 0.07 | 0.2 | 0.03 | 0.1 |
| Long-term disability | 0.05 | 0.1 | 0.04 | 0.1 | 0.05 | 0.1 |
| Retirement and savings | 1.99 | 5.2 | 1.25 | 3.4 | 6.65 | 12.4 |
| Defined benefit | 1.21 | 3.1 | 0.42 | 1.2 | 6.18 | 11.6 |
| Defined contribution | 0.78 | 2.0 | 0.82 | 2.3 | 0.47 | 0.9 |
| Legally Required benefits | 2.77 | 7.2 | 2.75 | 7.6 | 2.94 | 5.5 |
| Social Security and Medicare | 2.16 | 5.6 | 2.14 | 5.9 | 2.29 | 4.3 |

**Footnotes**
(1) Includes workers in the private nonfarm economy except those in private households, and workers in the public sector, except the federal government.
(2) Includes costs for wages and salaries and benefits.
(3) Includes premium pay for work (such as overtime, weekends, and holidays) in addition to the regular work schedule.
(4) Social Security refers to the Old-Age, Survivors, and Disability Insurance (OASDI) program.
(5) Cost per hour worked is $0.01 or less.
(6) Less than .05 percent.

| Compensation component | Civilian workers(1) | | Private industry workers | | State and local government workers | |
|---|---|---|---|---|---|---|
| | Cost ($) | Percent of compensation | Cost ($) | Percent of compensation | Cost ($) | Percent of compensation |
| Social Security(4) | 1.72 | 4.5 | 1.71 | 4.7 | 1.75 | 3.3 |
| Medicare | 0.44 | 1.1 | 0.42 | 1.2 | 0.54 | 1.0 |
| Federal unemployment insurance | 0.02 | 0.1 | 0.03 | 0.1 | (5) - | (6) - |
| State unemployment insurance | 0.13 | 0.3 | 0.14 | 0.4 | 0.06 | 0.1 |
| Workers' compensation | 0.47 | 1.2 | 0.45 | 1.2 | 0.58 | 1.1 |

**Footnotes**

(1) Includes workers in the private nonfarm economy except those in private households, and workers in the public sector, except the federal government.

(2) Includes costs for wages and salaries and benefits.

(3) Includes premium pay for work (such as overtime, weekends, and holidays) in addition to the regular work schedule.

(4) Social Security refers to the Old-Age, Survivors, and Disability Insurance (OASDI) program.

(5) Cost per hour worked is $0.01 or less.

(6) Less than .05 percent.

**Table 2. Employer Costs for Employee Compensation for civilian workers by occupational and industry group**
[Dec. 2020]

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Civilian workers(2) | 38.60 | 100.0 | 26.53 | 68.7 | 12.07 | 31.3 | 2.87 | 7.4 | 1.15 | 3.0 | 3.28 | 8.5 | 1.99 | 5.2 | 2.77 | 7.2 |
| Occupational group | | | | | | | | | | | | | | | | |
| Management, professional, and related | 62.29 | 100.0 | 42.47 | 68.2 | 19.82 | 31.8 | 5.46 | 8.8 | 1.82 | 2.9 | 5.00 | 8.0 | 3.70 | 5.9 | 3.85 | 6.2 |
| Management, business and financial | 72.43 | 100.0 | 49.58 | 68.5 | 22.85 | 31.5 | 7.03 | 9.7 | 2.98 | 4.1 | 4.97 | 6.9 | 3.45 | 4.8 | 4.43 | 6.1 |
| Professional and related | 57.71 | 100.0 | 39.27 | 68.0 | 18.45 | 32.0 | 4.75 | 8.2 | 1.29 | 2.2 | 5.01 | 8.7 | 3.81 | 6.6 | 3.59 | 6.2 |
| Teachers(3) | 65.04 | 100.0 | 44.20 | 68.0 | 20.84 | 32.0 | 3.42 | 5.3 | 0.25 | 0.4 | 6.35 | 9.8 | 7.45 | 11.5 | 3.37 | 5.2 |
| Primary, secondary, and special education school teachers | 63.78 | 100.0 | 42.35 | 66.4 | 21.43 | 33.6 | 2.95 | 4.6 | 0.21 | 0.3 | 6.91 | 10.8 | 8.30 | 13.0 | 3.06 | 4.8 |
| Registered nurses | 59.30 | 100.0 | 38.58 | 65.1 | 20.72 | 34.9 | 6.07 | 10.2 | 2.20 | 3.7 | 5.47 | 9.2 | 3.02 | 5.1 | 3.96 | 6.7 |
| Sales and office | 28.33 | 100.0 | 19.98 | 70.5 | 8.35 | 29.5 | 1.91 | 6.7 | 0.76 | 2.7 | 2.63 | 9.3 | 1.00 | 3.5 | 2.06 | 7.3 |
| Sales and related | 27.34 | 100.0 | 20.78 | 76.0 | 6.56 | 24.0 | 1.55 | 5.7 | 0.80 | 2.9 | 1.54 | 5.6 | 0.59 | 2.2 | 2.08 | 7.6 |
| Office and administrative support | 28.98 | 100.0 | 19.45 | 67.1 | 9.53 | 32.9 | 2.14 | 7.4 | 0.73 | 2.5 | 3.35 | 11.5 | 1.26 | 4.4 | 2.05 | 7.1 |
| Service | 20.71 | 100.0 | 14.84 | 71.7 | 5.87 | 28.3 | 1.10 | 5.3 | 0.44 | 2.1 | 1.62 | 7.8 | 0.94 | 4.5 | 1.76 | 8.5 |
| Natural resources, construction, and maintenance | 38.97 | 100.0 | 26.12 | 67.0 | 12.85 | 33.0 | 2.22 | 5.7 | 1.38 | 3.5 | 3.38 | 8.7 | 2.33 | 6.0 | 3.55 | 9.1 |
| Construction, extraction, farming, fishing, and forestry | 39.92 | 100.0 | 26.40 | 66.1 | 13.51 | 33.9 | 1.84 | 4.6 | 1.46 | 3.6 | 3.49 | 8.8 | 2.87 | 7.2 | 3.85 | 9.6 |

**Footnotes**

(1) Includes costs for wages and salaries and benefits.

(2) Includes workers in the private nonfarm economy except those in private households, and workers in the public sector, except the federal government.

(3) Includes postsecondary teachers; primary, secondary, and special education teachers; and other teachers and instructors.

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Installation, maintenance, and repair | 37.91 | 100.0 | 25.80 | 68.1 | 12.11 | 31.9 | 2.64 | 7.0 | 1.30 | 3.4 | 3.25 | 8.6 | 1.71 | 4.5 | 3.21 | 8.5 |
| Production, transportation, and material moving | 30.70 | 100.0 | 20.43 | 66.5 | 10.27 | 33.5 | 1.90 | 6.2 | 1.30 | 4.3 | 3.10 | 10.1 | 1.29 | 4.2 | 2.68 | 8.7 |
| Production | 28.89 | 100.0 | 19.25 | 66.7 | 9.63 | 33.3 | 1.79 | 6.2 | 1.43 | 5.0 | 3.09 | 10.7 | 0.90 | 3.1 | 2.42 | 8.4 |
| Transportation and material moving | 32.27 | 100.0 | 21.45 | 66.4 | 10.83 | 33.6 | 1.99 | 6.2 | 1.20 | 3.7 | 3.11 | 9.6 | 1.63 | 5.1 | 2.90 | 9.0 |
| Industry group | | | | | | | | | | | | | | | | |
| Education and health services | 43.57 | 100.0 | 29.54 | 67.8 | 14.03 | 32.2 | 3.38 | 7.8 | 0.67 | 1.5 | 4.22 | 9.7 | 3.02 | 6.9 | 2.74 | 6.3 |
| Educational services | 55.53 | 100.0 | 36.69 | 66.1 | 18.84 | 33.9 | 3.58 | 6.4 | 0.28 | 0.5 | 5.94 | 10.7 | 6.07 | 10.9 | 2.97 | 5.3 |
| Elementary and secondary schools | 54.29 | 100.0 | 35.47 | 65.3 | 18.82 | 34.7 | 2.84 | 5.2 | 0.22 | 0.4 | 6.23 | 11.5 | 6.79 | 12.5 | 2.74 | 5.0 |
| Junior colleges, colleges, and universities | 61.42 | 100.0 | 40.60 | 66.1 | 20.82 | 33.9 | 5.36 | 8.7 | 0.39 | 0.6 | 6.05 | 9.9 | 5.58 | 9.1 | 3.44 | 5.6 |
| Health care and social assistance | 36.87 | 100.0 | 25.54 | 69.3 | 11.33 | 30.7 | 3.27 | 8.9 | 0.89 | 2.4 | 3.26 | 8.8 | 1.31 | 3.5 | 2.61 | 7.1 |
| Hospitals | 51.61 | 100.0 | 33.47 | 64.9 | 18.14 | 35.1 | 5.07 | 9.8 | 1.81 | 3.5 | 5.32 | 10.3 | 2.64 | 5.1 | 3.31 | 6.4 |

Footnotes

(1) Includes costs for wages and salaries and benefits.

(2) Includes workers in the private nonfarm economy except those in private households, and workers in the public sector, except the federal government.

(3) Includes postsecondary teachers; primary, secondary, and special education teachers; and other teachers and instructors.

**Table 3. Employer Costs for Employee Compensation for state and local government workers by occupational and industry group**
[Dec. 2020]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| State and local government workers | 53.47 | 100.0 | 33.08 | 61.9 | 20.39 | 38.1 | 4.04 | 7.6 | 0.54 | 1.0 | 6.23 | 11.7 | 6.65 | 12.4 | 2.94 | 5.5 |
| Occupational group | | | | | | | | | | | | | | | | |
| Management, professional, and related | 64.02 | 100.0 | 41.02 | 64.1 | 23.00 | 35.9 | 4.55 | 7.1 | 0.42 | 0.7 | 6.79 | 10.6 | 7.94 | 12.4 | 3.30 | 5.2 |
| Professional and related | 62.20 | 100.0 | 40.17 | 64.6 | 22.03 | 35.4 | 4.05 | 6.5 | 0.40 | 0.6 | 6.75 | 10.8 | 7.66 | 12.3 | 3.19 | 5.1 |
| Teachers(2) | 70.59 | 100.0 | 46.92 | 66.5 | 23.67 | 33.5 | 3.52 | 5.0 | 0.27 | 0.4 | 7.29 | 10.3 | 9.22 | 13.1 | 3.38 | 4.8 |
| Primary, secondary, and special education school teachers | 70.13 | 100.0 | 45.98 | 65.6 | 24.15 | 34.4 | 3.14 | 4.5 | 0.24 | 0.3 | 7.77 | 11.1 | 9.80 | 14.0 | 3.19 | 4.5 |

Footnotes

(1) Includes costs for wages and salaries and benefits.

(2) Includes postsecondary teachers; primary, secondary, and special education teachers; and other teachers and instructors.

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Sales and office | 37.14 | 100.0 | 21.25 | 57.2 | 15.89 | 42.8 | 3.26 | 8.8 | 0.34 | 0.9 | 5.88 | 15.8 | 4.22 | 11.4 | 2.20 | 5.9 |
| Office and administrative support | 37.29 | 100.0 | 21.29 | 57.1 | 16.00 | 42.9 | 3.27 | 8.8 | 0.34 | 0.9 | 5.95 | 16.0 | 4.24 | 11.4 | 2.20 | 5.9 |
| Service | 39.53 | 100.0 | 22.47 | 56.8 | 17.06 | 43.2 | 3.35 | 8.5 | 0.87 | 2.2 | 4.97 | 12.6 | 5.43 | 13.7 | 2.44 | 6.2 |
| Industry group | | | | | | | | | | | | | | | | |
| Education and health services | 55.77 | 100.0 | 35.80 | 64.2 | 19.97 | 35.8 | 3.68 | 6.6 | 0.37 | 0.7 | 6.36 | 11.4 | 6.70 | 12.0 | 2.86 | 5.1 |
| Educational services | 57.31 | 100.0 | 37.02 | 64.6 | 20.29 | 35.4 | 3.52 | 6.1 | 0.27 | 0.5 | 6.49 | 11.3 | 7.15 | 12.5 | 2.86 | 5.0 |
| Elementary and secondary schools | 55.69 | 100.0 | 36.02 | 64.7 | 19.67 | 35.3 | 2.87 | 5.2 | 0.23 | 0.4 | 6.54 | 11.7 | 7.32 | 13.1 | 2.71 | 4.9 |
| Junior colleges, colleges, and universities | 61.69 | 100.0 | 39.73 | 64.4 | 21.96 | 35.6 | 5.31 | 8.6 | 0.37 | 0.6 | 6.34 | 10.3 | 6.68 | 10.8 | 3.25 | 5.3 |
| Health care and social assistance | 47.09 | 100.0 | 28.91 | 61.4 | 18.18 | 38.6 | 4.59 | 9.7 | 0.92 | 2.0 | 5.65 | 12.0 | 4.17 | 8.8 | 2.86 | 6.1 |
| Hospitals | 49.83 | 100.0 | 31.14 | 62.5 | 18.69 | 37.5 | 4.87 | 9.8 | 1.07 | 2.2 | 5.65 | 11.3 | 4.10 | 8.2 | 3.00 | 6.0 |
| Public administration | 51.54 | 100.0 | 29.54 | 57.3 | 22.00 | 42.7 | 4.86 | 9.4 | 0.81 | 1.6 | 6.20 | 12.0 | 7.02 | 13.6 | 3.11 | 6.0 |

**Footnotes**

(1) Includes costs for wages and salaries and benefits.

(2) Includes postsecondary teachers; primary, secondary, and special education teachers; and other teachers and instructors.

**Table 4. Employer Costs for Employee Compensation for private industry workers by occupational and industry group**
[Dec. 2020]

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Private industry workers | 36.23 | 100.0 | 25.48 | 70.3 | 10.74 | 29.7 | 2.69 | 7.4 | 1.25 | 3.5 | 2.81 | 7.8 | 1.25 | 3.4 | 2.75 | 7.6 |
| Occupational group | | | | | | | | | | | | | | | | |
| Management, professional, and related | 61.72 | 100.0 | 42.95 | 69.6 | 18.77 | 30.4 | 5.76 | 9.3 | 2.28 | 3.7 | 4.41 | 7.1 | 2.30 | 3.7 | 4.03 | 6.5 |
| Management, business, and financial | 72.15 | 100.0 | 50.07 | 69.4 | 22.09 | 30.6 | 6.98 | 9.7 | 3.29 | 4.6 | 4.70 | 6.5 | 2.63 | 3.6 | 4.49 | 6.2 |
| Professional and related | 55.73 | 100.0 | 38.87 | 69.7 | 16.86 | 30.3 | 5.06 | 9.1 | 1.69 | 3.0 | 4.24 | 7.6 | 2.11 | 3.8 | 3.76 | 6.8 |
| Sales and office | 27.56 | 100.0 | 19.87 | 72.1 | 7.69 | 27.9 | 1.79 | 6.5 | 0.79 | 2.9 | 2.34 | 8.5 | 0.71 | 2.6 | 2.05 | 7.4 |
| Sales and related | 27.31 | 100.0 | 20.78 | 76.1 | 6.53 | 23.9 | 1.54 | 5.6 | 0.81 | 3.0 | 1.53 | 5.6 | 0.57 | 2.1 | 2.08 | 7.6 |
| Office and administrative support | 27.74 | 100.0 | 19.18 | 69.1 | 8.56 | 30.9 | 1.97 | 7.1 | 0.78 | 2.8 | 2.96 | 10.7 | 0.82 | 3.0 | 2.03 | 7.3 |
| Service | 17.88 | 100.0 | 13.70 | 76.6 | 4.18 | 23.4 | 0.76 | 4.3 | 0.38 | 2.1 | 1.12 | 6.2 | 0.26 | 1.5 | 1.66 | 9.3 |

**Footnotes**

(1) Includes costs for wages and salaries and benefits.

(2) Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.

(3) Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Natural resources, construction, and maintenance | 38.43 | 100.0 | 26.06 | 67.8 | 12.37 | 32.2 | 2.07 | 5.4 | 1.42 | 3.7 | 3.17 | 8.2 | 2.12 | 5.5 | 3.60 | 9.4 |
| Construction, extraction, farming, fishing, and forestry | 39.50 | 100.0 | 26.42 | 66.9 | 13.09 | 33.1 | 1.67 | 4.2 | 1.52 | 3.8 | 3.27 | 8.3 | 2.71 | 6.9 | 3.92 | 9.9 |
| Installation, maintenance, and repair | 37.24 | 100.0 | 25.66 | 68.9 | 11.58 | 31.1 | 2.52 | 6.8 | 1.32 | 3.5 | 3.05 | 8.2 | 1.46 | 3.9 | 3.23 | 8.7 |
| Production, transportation, and material moving | 30.25 | 100.0 | 20.28 | 67.1 | 9.96 | 32.9 | 1.85 | 6.1 | 1.32 | 4.4 | 2.98 | 9.8 | 1.14 | 3.8 | 2.67 | 8.8 |
| Production | 28.58 | 100.0 | 19.12 | 66.9 | 9.46 | 33.1 | 1.75 | 6.1 | 1.43 | 5.0 | 3.04 | 10.6 | 0.83 | 2.9 | 2.42 | 8.5 |
| Transportation and material moving | 31.76 | 100.0 | 21.35 | 67.2 | 10.41 | 32.8 | 1.95 | 6.1 | 1.22 | 3.8 | 2.92 | 9.2 | 1.43 | 4.5 | 2.90 | 9.1 |
| Industry group | | | | | | | | | | | | | | | | |
| Goods-producing(2) | 40.32 | 100.0 | 27.22 | 67.5 | 13.09 | 32.5 | 2.61 | 6.5 | 1.75 | 4.3 | 3.61 | 8.9 | 1.80 | 4.5 | 3.33 | 8.3 |
| Construction | 40.61 | 100.0 | 28.29 | 69.7 | 12.32 | 30.3 | 1.85 | 4.6 | 1.44 | 3.5 | 3.06 | 7.5 | 2.12 | 5.2 | 3.86 | 9.5 |
| Manufacturing | 40.02 | 100.0 | 26.56 | 66.4 | 13.46 | 33.6 | 3.03 | 7.6 | 1.89 | 4.7 | 3.91 | 9.8 | 1.61 | 4.0 | 3.01 | 7.5 |
| Aircraft manufacturing | 75.58 | 100.0 | 47.07 | 62.3 | 28.51 | 37.7 | 7.19 | 9.5 | 4.01 | 5.3 | 7.29 | 9.6 | 5.19 | 6.9 | 4.82 | 6.4 |
| Service-providing(3) | 35.39 | 100.0 | 25.13 | 71.0 | 10.27 | 29.0 | 2.70 | 7.6 | 1.15 | 3.2 | 2.65 | 7.5 | 1.13 | 3.2 | 2.63 | 7.4 |
| Trade, transportation, and utilities | 30.66 | 100.0 | 21.72 | 70.8 | 8.94 | 29.2 | 2.02 | 6.6 | 0.94 | 3.1 | 2.38 | 7.8 | 1.14 | 3.7 | 2.46 | 8.0 |
| Wholesale trade | 41.21 | 100.0 | 29.18 | 70.8 | 12.02 | 29.2 | 3.19 | 7.8 | 1.50 | 3.6 | 2.97 | 7.2 | 1.32 | 3.2 | 3.04 | 7.4 |
| Retail trade | 21.65 | 100.0 | 16.45 | 76.0 | 5.20 | 24.0 | 1.09 | 5.0 | 0.53 | 2.5 | 1.34 | 6.2 | 0.42 | 1.9 | 1.83 | 8.4 |
| Transportation and warehousing | 40.24 | 100.0 | 26.45 | 65.7 | 13.78 | 34.3 | 2.94 | 7.3 | 1.35 | 3.4 | 4.00 | 9.9 | 2.21 | 5.5 | 3.28 | 8.2 |
| Utilities | 67.62 | 100.0 | 41.64 | 61.6 | 25.98 | 38.4 | 5.99 | 8.9 | 2.27 | 3.4 | 6.31 | 9.3 | 6.64 | 9.8 | 4.77 | 7.0 |
| Information | 56.03 | 100.0 | 37.13 | 66.3 | 18.90 | 33.7 | 5.10 | 9.1 | 2.88 | 5.1 | 4.89 | 8.7 | 2.37 | 4.2 | 3.66 | 6.5 |
| Financial activities | 50.85 | 100.0 | 33.93 | 66.7 | 16.92 | 33.3 | 4.53 | 8.9 | 3.01 | 5.9 | 4.42 | 8.7 | 1.75 | 3.4 | 3.21 | 6.3 |
| Financial and insurance | 56.47 | 100.0 | 37.25 | 66.0 | 19.22 | 34.0 | 5.18 | 9.2 | 3.65 | 6.5 | 4.89 | 8.7 | 2.09 | 3.7 | 3.41 | 6.0 |
| Credit intermediation and related activities | 51.16 | 100.0 | 33.95 | 66.4 | 17.21 | 33.6 | 4.74 | 9.3 | 2.88 | 5.6 | 4.70 | 9.2 | 1.76 | 3.4 | 3.13 | 6.1 |
| Insurance carriers and related activities | 51.36 | 100.0 | 33.88 | 66.0 | 17.48 | 34.0 | 4.56 | 8.9 | 2.79 | 5.4 | 4.76 | 9.3 | 2.09 | 4.1 | 3.27 | 6.4 |
| Real estate and rental and leasing | 32.67 | 100.0 | 23.18 | 70.9 | 9.50 | 29.1 | 2.45 | 7.5 | 0.93 | 2.8 | 2.91 | 8.9 | 0.65 | 2.0 | 2.56 | 7.8 |
| Professional and business services | 44.39 | 100.0 | 31.94 | 72.0 | 12.45 | 28.0 | 3.59 | 8.1 | 1.54 | 3.5 | 2.86 | 6.4 | 1.28 | 2.9 | 3.18 | 7.2 |
| Professional and technical services | 58.74 | 100.0 | 42.06 | 71.6 | 16.68 | 28.4 | 5.21 | 8.9 | 1.95 | 3.3 | 3.79 | 6.5 | 1.80 | 3.1 | 3.93 | 6.7 |

**Footnotes**

(1) Includes costs for wages and salaries and benefits.

(2) Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.

(3) Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Administrative and waste services | 24.05 | 100.0 | 18.27 | 75.9 | 5.79 | 24.1 | 1.19 | 5.0 | 0.63 | 2.6 | 1.42 | 5.9 | 0.37 | 1.5 | 2.17 | 9.0 |
| Education and health services | 37.55 | 100.0 | 26.45 | 70.5 | 11.10 | 29.5 | 3.23 | 8.6 | 0.82 | 2.2 | 3.16 | 8.4 | 1.20 | 3.2 | 2.67 | 7.1 |
| Educational services | 49.17 | 100.0 | 35.49 | 72.2 | 13.68 | 27.8 | 3.81 | 7.7 | 0.33 | 0.7 | 3.96 | 8.1 | 2.24 | 4.6 | 3.34 | 6.8 |
| Junior colleges, colleges, universities and professional schools | 60.85 | 100.0 | 42.45 | 69.8 | 18.40 | 30.2 | 5.46 | 9.0 | 0.44 | 0.7 | 5.43 | 8.9 | 3.25 | 5.3 | 3.83 | 6.3 |
| Health care and social assistance | 36.00 | 100.0 | 25.25 | 70.1 | 10.75 | 29.9 | 3.16 | 8.8 | 0.89 | 2.5 | 3.06 | 8.5 | 1.07 | 3.0 | 2.59 | 7.2 |
| Leisure and hospitality | 15.46 | 100.0 | 12.46 | 80.6 | 3.00 | 19.4 | 0.44 | 2.8 | 0.22 | 1.4 | 0.66 | 4.2 | 0.14 | 0.9 | 1.54 | 10.0 |
| Accommodation and food services | 14.84 | 100.0 | 11.96 | 80.6 | 2.88 | 19.4 | 0.39 | 2.6 | 0.22 | 1.5 | 0.63 | 4.3 | 0.14 | 0.9 | 1.50 | 10.1 |
| Other services | 29.54 | 100.0 | 21.97 | 74.4 | 7.57 | 25.6 | 1.87 | 6.3 | 0.50 | 1.7 | 1.76 | 5.9 | 1.03 | 3.5 | 2.40 | 8.1 |

Footnotes
(1) Includes costs for wages and salaries and benefits.
(2) Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.
(3) Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

**Table 5. Employer Costs for Employee Compensation for private industry workers by bargaining and work status**
[Dec. 2020]

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| **Union** | | | | | | | | | | | | | | | | |
| All workers | 50.90 | 100.0 | 30.25 | 59.4 | 20.65 | 40.6 | 3.64 | 7.1 | 1.86 | 3.6 | 6.99 | 13.7 | 4.41 | 8.7 | 3.75 | 7.4 |
| Goods-producing(2) | 53.19 | 100.0 | 30.40 | 57.2 | 22.79 | 42.8 | 2.91 | 5.5 | 2.47 | 4.6 | 7.64 | 14.4 | 5.53 | 10.4 | 4.24 | 8.0 |
| Service-providing(3) | 49.85 | 100.0 | 30.18 | 60.5 | 19.68 | 39.5 | 3.97 | 8.0 | 1.58 | 3.2 | 6.70 | 13.4 | 3.90 | 7.8 | 3.53 | 7.1 |
| **Nonunion** | | | | | | | | | | | | | | | | |
| All workers | 34.99 | 100.0 | 25.08 | 71.7 | 9.91 | 28.3 | 2.61 | 7.5 | 1.20 | 3.4 | 2.46 | 7.0 | 0.98 | 2.8 | 2.66 | 7.6 |
| Goods-producing(2) | 38.16 | 100.0 | 26.69 | 69.9 | 11.47 | 30.1 | 2.56 | 6.7 | 1.63 | 4.3 | 2.93 | 7.7 | 1.17 | 3.1 | 3.18 | 8.3 |
| Service-providing(3) | 34.40 | 100.0 | 24.78 | 72.0 | 9.62 | 28.0 | 2.62 | 7.6 | 1.12 | 3.3 | 2.38 | 6.9 | 0.94 | 2.7 | 2.57 | 7.5 |
| **Full-time** | | | | | | | | | | | | | | | | |
| All workers | 42.02 | 100.0 | 28.99 | 69.0 | 13.03 | 31.0 | 3.36 | 8.0 | 1.56 | 3.7 | 3.50 | 8.3 | 1.56 | 3.7 | 3.05 | 7.3 |
| Occupational group | | | | | | | | | | | | | | | | |

Footnotes
(1) Includes costs for wages and salaries and benefits.
(2) Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.
(3) Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Management, professional and related | 64.20 | 100.0 | 44.36 | 69.1 | 19.84 | 30.9 | 6.11 | 9.5 | 2.44 | 3.8 | 4.73 | 7.4 | 2.45 | 3.8 | 4.12 | 6.4 |
| Management, business, and financial | 73.19 | 100.0 | 50.70 | 69.3 | 22.50 | 30.7 | 7.13 | 9.7 | 3.35 | 4.6 | 4.80 | 6.6 | 2.69 | 3.7 | 4.53 | 6.2 |
| Professional and related | 58.25 | 100.0 | 40.16 | 68.9 | 18.09 | 31.1 | 5.43 | 9.3 | 1.84 | 3.2 | 4.68 | 8.0 | 2.29 | 3.9 | 3.84 | 6.6 |
| Sales and office | 32.20 | 100.0 | 22.63 | 70.3 | 9.57 | 29.7 | 2.34 | 7.3 | 1.02 | 3.2 | 3.00 | 9.3 | 0.92 | 2.9 | 2.28 | 7.1 |
| Sales and related | 36.91 | 100.0 | 27.28 | 73.9 | 9.63 | 26.1 | 2.51 | 6.8 | 1.25 | 3.4 | 2.38 | 6.4 | 0.90 | 2.4 | 2.59 | 7.0 |
| Office and administrative support | 29.74 | 100.0 | 20.20 | 67.9 | 9.54 | 32.1 | 2.26 | 7.6 | 0.90 | 3.0 | 3.33 | 11.2 | 0.93 | 3.1 | 2.12 | 7.1 |
| Service | 21.68 | 100.0 | 15.70 | 72.4 | 5.98 | 27.6 | 1.24 | 5.7 | 0.60 | 2.7 | 1.89 | 8.7 | 0.43 | 2.0 | 1.82 | 8.4 |
| Natural resources, construction, and maintenance | 39.03 | 100.0 | 26.36 | 67.6 | 12.66 | 32.4 | 2.14 | 5.5 | 1.46 | 3.7 | 3.25 | 8.3 | 2.19 | 5.6 | 3.63 | 9.3 |
| Construction, extraction, farming, fishing, and forestry | 39.87 | 100.0 | 26.61 | 66.7 | 13.26 | 33.3 | 1.71 | 4.3 | 1.54 | 3.9 | 3.30 | 8.3 | 2.76 | 6.9 | 3.94 | 9.9 |
| Installation, maintenance, and repair | 38.08 | 100.0 | 26.09 | 68.5 | 11.99 | 31.5 | 2.62 | 6.9 | 1.37 | 3.6 | 3.20 | 8.4 | 1.53 | 4.0 | 3.27 | 8.6 |
| Production, transportation, and material moving | 32.29 | 100.0 | 21.36 | 66.2 | 10.92 | 33.8 | 2.12 | 6.6 | 1.47 | 4.6 | 3.33 | 10.3 | 1.27 | 3.9 | 2.74 | 8.5 |
| Production | 29.65 | 100.0 | 19.64 | 66.2 | 10.01 | 33.8 | 1.87 | 6.3 | 1.53 | 5.2 | 3.26 | 11.0 | 0.89 | 3.0 | 2.47 | 8.3 |
| Transportation and material moving | 35.24 | 100.0 | 23.29 | 66.1 | 11.95 | 33.9 | 2.40 | 6.8 | 1.41 | 4.0 | 3.40 | 9.7 | 1.70 | 4.8 | 3.04 | 8.6 |
| Industry group | | | | | | | | | | | | | | | | |
| Goods-producing(2) | 40.77 | 100.0 | 27.47 | 67.4 | 13.30 | 32.6 | 2.67 | 6.5 | 1.78 | 4.4 | 3.67 | 9.0 | 1.83 | 4.5 | 3.35 | 8.2 |
| Construction | 41.14 | 100.0 | 28.55 | 69.4 | 12.59 | 30.6 | 1.90 | 4.6 | 1.48 | 3.6 | 3.15 | 7.7 | 2.18 | 5.3 | 3.88 | 9.4 |
| Manufacturing | 40.43 | 100.0 | 26.80 | 66.3 | 13.63 | 33.7 | 3.09 | 7.6 | 1.91 | 4.7 | 3.96 | 9.8 | 1.63 | 4.0 | 3.03 | 7.5 |
| Service-providing(3) | 42.37 | 100.0 | 29.42 | 69.4 | 12.95 | 30.6 | 3.55 | 8.4 | 1.49 | 3.5 | 3.45 | 8.1 | 1.48 | 3.5 | 2.97 | 7.0 |
| Trade, transportation, and utilities | 37.35 | 100.0 | 25.81 | 69.1 | 11.54 | 30.9 | 2.80 | 7.5 | 1.26 | 3.4 | 3.11 | 8.3 | 1.53 | 4.1 | 2.84 | 7.6 |
| Information | 61.32 | 100.0 | 40.37 | 65.8 | 20.96 | 34.2 | 5.64 | 9.2 | 3.26 | 5.3 | 5.44 | 8.9 | 2.67 | 4.4 | 3.94 | 6.4 |
| Financial activities | 52.85 | 100.0 | 35.10 | 66.4 | 17.76 | 33.6 | 4.78 | 9.1 | 3.18 | 6.0 | 4.65 | 8.8 | 1.85 | 3.5 | 3.30 | 6.2 |
| Professional and business services | 49.02 | 100.0 | 34.93 | 71.3 | 14.09 | 28.7 | 4.15 | 8.5 | 1.75 | 3.6 | 3.30 | 6.7 | 1.50 | 3.1 | 3.39 | 6.9 |
| Education and health services | 40.42 | 100.0 | 27.88 | 69.0 | 12.54 | 31.0 | 3.71 | 9.2 | 0.88 | 2.2 | 3.79 | 9.4 | 1.39 | 3.4 | 2.76 | 6.8 |

**Footnotes**

(1) Includes costs for wages and salaries and benefits.

(2) Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.

(3) Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Leisure and hospitality | 21.15 | 100.0 | 16.09 | 76.0 | 5.07 | 24.0 | 1.04 | 4.9 | 0.47 | 2.2 | 1.40 | 6.6 | 0.32 | 1.5 | 1.84 | 8.7 |
| Other services | 34.56 | 100.0 | 24.85 | 71.9 | 9.71 | 28.1 | 2.54 | 7.3 | 0.65 | 1.9 | 2.42 | 7.0 | 1.45 | 4.2 | 2.64 | 7.7 |
| Part-time | | | | | | | | | | | | | | | | |
| All workers | 19.16 | 100.0 | 15.14 | 79.0 | 4.02 | 21.0 | 0.71 | 3.7 | 0.35 | 1.8 | 0.80 | 4.2 | 0.32 | 1.6 | 1.84 | 9.6 |
| Occupational group | | | | | | | | | | | | | | | | |
| Management, professional and related | 41.40 | 100.0 | 31.43 | 75.9 | 9.97 | 24.1 | 2.91 | 7.0 | 0.93 | 2.2 | 1.78 | 4.3 | 1.05 | 2.5 | 3.30 | 8.0 |
| Professional and related | 42.07 | 100.0 | 31.84 | 75.7 | 10.23 | 24.3 | 3.05 | 7.2 | 0.89 | 2.1 | 1.85 | 4.4 | 1.10 | 2.6 | 3.34 | 7.9 |
| Sales and office | 16.91 | 100.0 | 13.53 | 80.0 | 3.38 | 20.0 | 0.51 | 3.0 | 0.27 | 1.6 | 0.83 | 4.9 | 0.25 | 1.5 | 1.53 | 9.0 |
| Sales and related | 15.22 | 100.0 | 12.60 | 82.8 | 2.62 | 17.2 | 0.33 | 2.1 | 0.24 | 1.6 | 0.45 | 3.0 | 0.16 | 1.0 | 1.44 | 9.5 |
| Office and administrative support | 19.73 | 100.0 | 15.08 | 76.4 | 4.65 | 23.6 | 0.82 | 4.1 | 0.31 | 1.6 | 1.45 | 7.3 | 0.40 | 2.0 | 1.67 | 8.5 |
| Service | 14.36 | 100.0 | 11.84 | 82.5 | 2.52 | 17.5 | 0.31 | 2.2 | 0.18 | 1.3 | 0.40 | 2.8 | 0.11 | 0.8 | 1.51 | 10.5 |
| Production, transportation, and material moving | 20.32 | 100.0 | 15.05 | 74.0 | 5.28 | 26.0 | 0.57 | 2.8 | 0.59 | 2.9 | 1.27 | 6.2 | 0.52 | 2.5 | 2.33 | 11.5 |
| Transportation and material moving | 21.46 | 100.0 | 15.59 | 72.6 | 5.87 | 27.4 | 0.61 | 2.9 | 0.67 | 3.1 | 1.48 | 6.9 | 0.63 | 2.9 | 2.48 | 11.5 |
| Industry group | | | | | | | | | | | | | | | | |
| Service-providing(3) | 19.06 | 100.0 | 15.08 | 79.1 | 3.98 | 20.9 | 0.72 | 3.8 | 0.34 | 1.8 | 0.79 | 4.1 | 0.31 | 1.6 | 1.82 | 9.6 |
| Trade, transportation, and utilities | 17.81 | 100.0 | 13.85 | 77.8 | 3.95 | 22.2 | 0.52 | 2.9 | 0.33 | 1.9 | 0.99 | 5.5 | 0.39 | 2.2 | 1.72 | 9.7 |
| Professional and business services | 20.21 | 100.0 | 16.33 | 80.8 | 3.89 | 19.2 | 0.66 | 3.2 | 0.47 | 2.3 | 0.54 | 2.7 | 0.13 | 0.6 | 2.10 | 10.4 |
| Education and health services | 29.38 | 100.0 | 22.39 | 76.2 | 6.99 | 23.8 | 1.88 | 6.4 | 0.64 | 2.2 | 1.36 | 4.6 | 0.67 | 2.3 | 2.44 | 8.3 |
| Leisure and hospitality | 12.66 | 100.0 | 10.68 | 84.3 | 1.99 | 15.7 | 0.15 | 1.2 | 0.10 | 0.8 | 0.29 | 2.3 | 0.06 | 0.5 | 1.39 | 11.0 |

Footnotes

(1) Includes costs for wages and salaries and benefits.

(2) Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.

(3) Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

**Table 6. Employer Costs for Employee Compensation for private industry workers by establishment size and industry group**
[Dec. 2020]

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| All workers | | | | | | | | | | | | | | | | |

Footnotes

(1) Includes costs for wages and salaries and benefits.

(2) Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.

(3) Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| 1-99 workers | 29.99 | 100.0 | 22.21 | 74.0 | 7.78 | 26.0 | 1.88 | 6.3 | 0.75 | 2.5 | 1.95 | 6.5 | 0.74 | 2.5 | 2.46 | 8.2 |
| 1-49 workers | 29.05 | 100.0 | 21.75 | 74.9 | 7.31 | 25.1 | 1.77 | 6.1 | 0.71 | 2.4 | 1.77 | 6.1 | 0.64 | 2.2 | 2.42 | 8.3 |
| 50-99 workers | 33.46 | 100.0 | 23.92 | 71.5 | 9.55 | 28.5 | 2.31 | 6.9 | 0.91 | 2.7 | 2.63 | 7.9 | 1.08 | 3.2 | 2.62 | 7.8 |
| 100 workers or more | 44.23 | 100.0 | 29.68 | 67.1 | 14.55 | 32.9 | 3.72 | 8.4 | 1.89 | 4.3 | 3.92 | 8.9 | 1.90 | 4.3 | 3.11 | 7.0 |
| 100-499 workers | 37.14 | 100.0 | 25.80 | 69.5 | 11.34 | 30.5 | 2.85 | 7.7 | 1.28 | 3.4 | 3.13 | 8.4 | 1.29 | 3.5 | 2.80 | 7.5 |
| 500 workers or more | 53.83 | 100.0 | 34.94 | 64.9 | 18.88 | 35.1 | 4.91 | 9.1 | 2.73 | 5.1 | 4.99 | 9.3 | 2.72 | 5.1 | 3.54 | 6.6 |
| Goods-producing(2) | | | | | | | | | | | | | | | | |
| 1-99 workers | 34.82 | 100.0 | 24.68 | 70.9 | 10.13 | 29.1 | 1.78 | 5.1 | 1.21 | 3.5 | 2.64 | 7.6 | 1.33 | 3.8 | 3.18 | 9.1 |
| 1-49 workers | 33.00 | 100.0 | 23.74 | 71.9 | 9.26 | 28.1 | 1.62 | 4.9 | 1.07 | 3.3 | 2.28 | 6.9 | 1.14 | 3.4 | 3.15 | 9.6 |
| 50-99 workers | 39.80 | 100.0 | 27.27 | 68.5 | 12.52 | 31.5 | 2.21 | 5.6 | 1.59 | 4.0 | 3.62 | 9.1 | 1.84 | 4.6 | 3.26 | 8.2 |
| 100 workers or more | 45.51 | 100.0 | 29.62 | 65.1 | 15.89 | 34.9 | 3.40 | 7.5 | 2.26 | 5.0 | 4.52 | 9.9 | 2.24 | 4.9 | 3.47 | 7.6 |
| 100-499 workers | 42.38 | 100.0 | 28.11 | 66.3 | 14.27 | 33.7 | 2.93 | 6.9 | 1.89 | 4.5 | 4.09 | 9.6 | 1.95 | 4.6 | 3.41 | 8.0 |
| 500 workers or more | 50.61 | 100.0 | 32.07 | 63.4 | 18.53 | 36.6 | 4.16 | 8.2 | 2.86 | 5.6 | 5.24 | 10.3 | 2.71 | 5.4 | 3.57 | 7.1 |
| Service-providing(3) | | | | | | | | | | | | | | | | |
| 1-99 workers | 29.17 | 100.0 | 21.79 | 74.7 | 7.38 | 25.3 | 1.90 | 6.5 | 0.67 | 2.3 | 1.84 | 6.3 | 0.64 | 2.2 | 2.34 | 8.0 |
| 1-49 workers | 28.43 | 100.0 | 21.43 | 75.4 | 7.00 | 24.6 | 1.79 | 6.3 | 0.65 | 2.3 | 1.69 | 5.9 | 0.57 | 2.0 | 2.30 | 8.1 |
| 50-99 workers | 32.04 | 100.0 | 23.16 | 72.3 | 8.88 | 27.7 | 2.33 | 7.3 | 0.76 | 2.4 | 2.41 | 7.5 | 0.90 | 2.8 | 2.47 | 7.7 |
| 100 workers or more | 43.91 | 100.0 | 29.70 | 67.6 | 14.21 | 32.4 | 3.80 | 8.7 | 1.80 | 4.1 | 3.77 | 8.6 | 1.81 | 4.1 | 3.02 | 6.9 |
| 100-499 workers | 35.71 | 100.0 | 25.16 | 70.5 | 10.54 | 29.5 | 2.82 | 7.9 | 1.11 | 3.1 | 2.87 | 8.0 | 1.11 | 3.1 | 2.63 | 7.4 |
| 500 workers or more | 54.52 | 100.0 | 35.57 | 65.2 | 18.96 | 34.8 | 5.08 | 9.3 | 2.70 | 5.0 | 4.93 | 9.0 | 2.72 | 5.0 | 3.53 | 6.5 |

Footnotes

(1) Includes costs for wages and salaries and benefits.

(2) Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.

(3) Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

**Table 7. Employer Costs for Employee Compensation for private industry workers by census region and division**
[Dec. 2020]

| Area(1) | Total compensation(2) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |

Footnotes

(1) The census divisions are defined as follows: New England: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont; Middle Atlantic: New Jersey, New York, and Pennsylvania; South Atlantic: Delaware, District of Columbia, Florida, Georgia, Maryland, North Carolina, South Carolina, Virginia, and West Virginia; East South Central: Alabama, Kentucky, Mississippi, and Tennessee; West South Central: Arkansas, Louisiana, Oklahoma, and Texas; East North Central: Illinois, Indiana, Michigan, Ohio, and Wisconsin; West North Central: Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, and South Dakota; Mountain: Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah, and Wyoming; and Pacific: Alaska, California, Hawaii, Oregon, and Washington.

(2) Includes costs for wages and salaries and benefits.

| Area(1) | Total compensation(2) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Northeast | 40.62 | 100.0 | 27.89 | 68.7 | 12.72 | 31.3 | 3.20 | 7.9 | 1.48 | 3.6 | 3.35 | 8.3 | 1.56 | 3.8 | 3.14 | 7.7 |
| New England | 40.63 | 100.0 | 28.23 | 69.5 | 12.40 | 30.5 | 3.29 | 8.1 | 1.26 | 3.1 | 3.26 | 8.0 | 1.49 | 3.7 | 3.10 | 7.6 |
| Middle Atlantic | 40.61 | 100.0 | 27.77 | 68.4 | 12.84 | 31.6 | 3.16 | 7.8 | 1.55 | 3.8 | 3.39 | 8.3 | 1.59 | 3.9 | 3.15 | 7.8 |
| South | 32.34 | 100.0 | 23.39 | 72.3 | 8.95 | 27.7 | 2.32 | 7.2 | 1.08 | 3.3 | 2.18 | 6.7 | 0.98 | 3.0 | 2.39 | 7.4 |
| South Atlantic | 34.00 | 100.0 | 24.53 | 72.1 | 9.47 | 27.9 | 2.54 | 7.5 | 1.05 | 3.1 | 2.28 | 6.7 | 1.07 | 3.2 | 2.53 | 7.4 |
| East South Central | 29.55 | 100.0 | 21.30 | 72.1 | 8.25 | 27.9 | 2.08 | 7.0 | 0.85 | 2.9 | 2.20 | 7.5 | 0.96 | 3.3 | 2.16 | 7.3 |
| West South Central | 30.68 | 100.0 | 22.35 | 72.8 | 8.34 | 27.2 | 2.03 | 6.6 | 1.25 | 4.1 | 1.97 | 6.4 | 0.83 | 2.7 | 2.26 | 7.4 |
| Midwest | 34.76 | 100.0 | 24.01 | 69.1 | 10.75 | 30.9 | 2.50 | 7.2 | 1.30 | 3.7 | 3.05 | 8.8 | 1.31 | 3.8 | 2.59 | 7.5 |
| East North Central | 35.70 | 100.0 | 24.63 | 69.0 | 11.07 | 31.0 | 2.56 | 7.2 | 1.38 | 3.9 | 3.05 | 8.6 | 1.45 | 4.1 | 2.64 | 7.4 |
| West North Central | 32.82 | 100.0 | 22.73 | 69.3 | 10.08 | 30.7 | 2.39 | 7.3 | 1.13 | 3.5 | 3.03 | 9.2 | 1.03 | 3.2 | 2.50 | 7.6 |
| West | 40.19 | 100.0 | 28.28 | 70.4 | 11.91 | 29.6 | 3.04 | 7.6 | 1.28 | 3.2 | 3.12 | 7.8 | 1.33 | 3.3 | 3.14 | 7.8 |
| Mountain | 33.80 | 100.0 | 23.61 | 69.8 | 10.19 | 30.2 | 2.38 | 7.0 | 1.25 | 3.7 | 2.85 | 8.4 | 1.16 | 3.4 | 2.55 | 7.5 |
| Pacific | 42.81 | 100.0 | 30.19 | 70.5 | 12.62 | 29.5 | 3.31 | 7.7 | 1.29 | 3.0 | 3.24 | 7.6 | 1.40 | 3.3 | 3.38 | 7.9 |

Footnotes

(1) The census divisions are defined as follows: New England: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont; Middle Atlantic: New Jersey, New York, and Pennsylvania; South Atlantic: Delaware, District of Columbia, Florida, Georgia, Maryland, North Carolina, South Carolina, Virginia, and West Virginia; East South Central: Alabama, Kentucky, Mississippi, and Tennessee; West South Central: Arkansas, Louisiana, Oklahoma, and Texas; East North Central: Illinois, Indiana, Michigan, Ohio, and Wisconsin; West North Central: Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, and South Dakota; Mountain: Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah, and Wyoming; and Pacific: Alaska, California, Hawaii, Oregon, and Washington.

(2) Includes costs for wages and salaries and benefits.

**Last Modified Date:** March 18, 2021

U.S. BUREAU OF LABOR STATISTICS  Office of Compensation and Working Conditions  PSB Suite 4160  2 Massachusetts Avenue NE Washington, DC 20212-0001

Telephone:1-202-691-6199  www.bls.gov/ECT  Contact ECT

## 2018 W-2 and EARNINGS SUMMARY

**EXHIBIT**

5

Ranchin   5-12-22

| W-2 | Employee | Reference | Copy | |
|---|---|---|---|---|
| | Wage and Tax Statement | | **2018** | |

Copy C for employee's records.   OMB No. 1545-0008

| d  Control number | Dept. | Corp. | Employer  use only | |
|---|---|---|---|---|
| 0000042992 TJA | | RII7 | A | 10411 |

c  Employer's name, address, and ZIP code
WORKFORCE LOGIC LLC
420 SOUTH ORANGE AVE SUITE 600
ORLANDO, FL  32801

e/f  Employee's name, address, and ZIP code
CHARLES D TOWNSLEY

AUSTIN, TX  78702

| b  Employer's FED ID number | a  Employee's SSA number |
|---|---|
| | |
| 1  Wages, tips, other comp. | 2  Federal income tax withheld |
| 50328.00 | 9794.70 |
| 3  Social security wages | 4  Social security tax withheld |
| 50328.00 | 3120.34 |
| 5  Medicare wages and tips | 6  Medicare tax withheld |
| 50328.00 | 729.76 |
| 7  Social security tips | 8  Allocated tips |
| 9 | 10  Dependent care benefits |
| 11  Nonqualified plans | 12a See instructions for box 12 |
| 14  Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |
| 15 State  Employer's state ID no. | 16 State wages, tips, etc. |
| 17 State income tax | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

The wages, tips, and other compensation reflected in box 1 are the
sum of those wages shown on your last pay statement, plus any
additional compensation or adjustments received after the
payroll close.

Your gross pay may not match your box 1 totals due to adjustments
made for GTL, 401(k), cafeteria plans, or etc...

To change your employee W-4 profile information,
file a new W-4 with your payroll department.

CHARLES D TOWNSLEY

AUSTIN, TX  78702

Social Security Number:
Taxable Marital Status:
   SINGLE
Exemptions/Allowances:
   Federal: 0
   State:   0
   Local:   0

HD 2018 ADP, LLC

**PAGE 01 OF 01**

### (Lower left W-2)

| 1  Wages, tips, other comp. | 2  Federal income tax withheld |
|---|---|
| 50328.00 | 9794.70 |
| 3  Social security wages | 4  Social security tax withheld |
| 50328.00 | 3120.34 |
| 5  Medicare wages and tips | 6  Medicare tax withheld |
| 50328.00 | 729.76 |

| d  Control number | Dept. | Corp. | Employer  use only | |
|---|---|---|---|---|
| 0000042992 TJA | | RII7 | A | 10411 |

c  Employer's name, address, and ZIP code
WORKFORCE LOGIC LLC
420 SOUTH ORANGE AVE SUITE 600
ORLANDO, FL  32801

| b  Employer's FED ID number | a  Employee's SSA number |
|---|---|
| 7  Social security tips | 8  Allocated tips |
| 9 | 10  Dependent care benefits |
| 11  Nonqualified plans | 12a See instructions for box 12 |
| 14  Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f  Employee's name, address and ZIP code
CHARLES D TOWNSLEY

AUSTIN, TX  78702

| 15 State  Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|
| 17 State income tax | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2**  Federal  Filing  Copy
Wage and Tax Statement  **2018**   OMB No. 1545-0008
Copy B to be filed with employee's Federal income Tax Return.

### (Lower center W-2)

| 1  Wages, tips, other comp. | 2  Federal income tax withheld |
|---|---|
| 50328.00 | 9794.70 |
| 3  Social security wages | 4  Social security tax withheld |
| 50328.00 | 3120.34 |
| 5  Medicare wages and tips | 6  Medicare tax withheld |
| 50328.00 | 729.76 |

| d  Control number | Dept. | Corp. | Employer  use only | |
|---|---|---|---|---|
| 0000042992 TJA | | RII7 | A | 10411 |

c  Employer's name, address, and ZIP code
WORKFORCE LOGIC LLC
420 SOUTH ORANGE AVE SUITE 600
ORLANDO, FL  32801

| b  Employer's FED ID number | a  Employee's SSA number |
|---|---|
| 7  Social security tips | 8  Allocated tips |
| 9 | 10  Dependent care benefits |
| 11  Nonqualified plans | 12a |
| 14  Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f  Employee's name, address and ZIP code
CHARLES D TOWNSLEY

AUSTIN, TX  78702

| 15 State  Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|
| 17 State income tax | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2**  State  Filing  Copy
Wage and Tax Statement  **2018**   OMB No. 1545-0008
Copy 2 to be filed with employee's State income Tax Return.

### (Lower right W-2)

| 1  Wages, tips, other comp. | 2  Federal income tax withheld |
|---|---|
| 50328.00 | 9794.70 |
| 3  Social security wages | 4  Social security tax withheld |
| 50328.00 | 3120.34 |
| 5  Medicare wages and tips | 6  Medicare tax withheld |
| 50328.00 | 729.76 |

| d  Control number | Dept. | Corp. | Employer  use only | |
|---|---|---|---|---|
| 0000042992 TJA | | RII7 | A | 10411 |

c  Employer's name, address, and ZIP code
WORKFORCE LOGIC LLC
420 SOUTH ORANGE AVE SUITE 600
ORLANDO, FL  32801

| b  Employer's FED ID number | a  Employee's SSA number |
|---|---|
| 7  Social security tips | 8  Allocated tips |
| 9 | 10  Dependent care benefits |
| 11  Nonqualified plans | 12a |
| 14  Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f  Employee's name, address and ZIP code
CHARLES D TOWNSLEY

AUSTIN, TX  78702

| 15 State  Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|
| 17 State income tax | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2**  City  or  Local  Filing  Copy
Wage and Tax Statement  **2018**   OMB No. 1545-0008
Copy 2 to be filed with employee's City or Local income Tax Return.

Townsley 0406





EXHIBIT

6

sg
Rambin    5-12-22

January 25, 2021

Titon Hogue

Elgin, TX 78621

Dear Titon:

Congratulations on your position as **Associate Vice President, Solutions Delivery & Business Intelligence,** for Austin Community College District effective **February 1, 2021.** This is a temporary employment position for a period of one (1) year.  We anticipate your services will be needed through January 31, 2022.  As with all ACC staff employees, your employment is at-will. This means that while we hope your employment will be mutually satisfying and rewarding, both you and the organization are free to end your employment at any time, with or without notice or cause, prior to the end of the temporary period of employment.

This employment offer is contingent on your **ability to pass a background check, reference checks, and verify your eligibility to work in the United States. See note below about submitting your documents remotely.** Attached is a list of acceptable documents.  In addition, you have a period of six (6) months to complete the required Bachelor's degree that is required for the position.

### SALARY INFORMATION

Your salary information is based upon ACC's FY21 salary scale and is computed based upon information provided in your application and resume.

**Below you will find your salary information:**

| | |
|---|---|
| **Start Date:** | February 1,2021 |
| **Annual Rate:** | $170,000 |
| **Band/Level/Pay Range:** | ADM/999 |
| **FLSA Status:** | Exempt |
| **Job Classification:** | Administrator |

*Employees normally receive pay at the end of each month.*

### NEW EMPLOYEE ORIENTATION

You are required to attend orientation. New employee orientation is your official first day of employment. At orientation you will receive important information about hiring paperwork, policies and procedures and obtain an official welcome to the college. Arrangements will be made for new employees to present I-9 documents remotely. All employees will be required to re-present their documents in person with an HR representative when the College reopens.

01290895;1

EXHIBIT

7

Form **1040-SR**  Department of the Treasury—Internal Revenue Service (99)

**2019**  **U.S. Tax Return for Seniors**  OMB No. 1545-0074  IRS Use Only—

Ramlin  5-12-22

sd

| Filing Status | ☒ Single | ☐ Married filing jointly | ☐ Married filing separately (MFS) |
|---|---|---|---|

Check only one box.

☐ Head of household (HOH)  ☐ Qualifying widow(er) (QW)

If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| Michael | Sauro | ▓▓▓▓▓ |
| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |

| Home address (number and street). If you have a P.O. box, see instructions. | | Apt. no. | **Presidential Election Campaign** |
|---|---|---|---|
| ▓▓▓▓▓ | | ▓▓▓ | Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse |

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).

Austin TX 78704-4261

| Foreign country name | Foreign province/state/county | Foreign postal code | If more than four dependents, see inst. and ✓ here ▶ ☐ |
|---|---|---|---|

**Standard Deduction**  Someone can claim:  ☐ You as a dependent   ☐ Your spouse as a dependent

☐ Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness**  **You:** ☒ Were born before January 2, 1955   ☐ Are blind

**Spouse:** ☐ Was born before January 2, 1955   ☐ Is blind

**Dependents** (see instructions):

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see inst.): | |
|---|---|---|---|---|
| | | | Child tax credit | Credit for other dependents |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |

Attach Schedule B if required.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . | | | **1** | 3,323. |
| 2a | Tax-exempt interest . . | **2a** | 0. | b Taxable interest . . . | **2b** | 8. |
| 3a | Qualified dividends . . . | **3a** | 1,145. | b Ordinary dividends . . | **3b** | 2,354. |
| 4a | IRA distributions . . . . | **4a** | | b Taxable amount . . . | **4b** | 42,360. |
| c | Pensions and annuities . | **4c** | | d Taxable amount . . . | **4d** | 44,196. |
| 5a | Social security benefits . . | **5a** | | b Taxable amount . . . | **5b** | |
| 6 | Capital gain or (loss). Attach Schedule D if required. If not required, check here . ▶ ☐ | | | **6** | 7,004. |
| 7a | Other income from Schedule 1, line 9 . . . . . . . . . . . | | | **7a** | |
| b | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** . . . . ▶ | | | **7b** | 99,245. |
| 8a | Adjustments to income from Schedule 1, line 22 . . . . . . . | | | **8a** | 3,000. |
| b | Subtract line 8a from line 7b. This is your **adjusted gross income** . . . . ▶ | | | **8b** | 96,245. |

**Standard Deduction**
See Standard Deduction Chart below.

| | | | | | |
|---|---|---|---|---|---|
| 9 | **Standard deduction or itemized deductions** (from Schedule A) | **9** | 27,788. | | |
| 10 | Qualified business income deduction. Attach Form 8995 or Form 8995-A | **10** | 11. | | |
| 11a | Add lines 9 and 10 . . . . . . . . . . . . . . . . | | | **11a** | 27,799. |
| b | **Taxable income.** Subtract line 11a from line 8b. If zero or less, enter -0- . . . | | | **11b** | 68,446. |

**Standard Deduction Chart\***

Add the number of boxes checked in the "Age/Blindness" section of *Standard Deduction* . . . ▶

| IF your filing status is... | AND the number of boxes checked is... | THEN your standard deduction is... | IF your filing status is... | AND the number of boxes checked is... | THEN your standard deduction is... |
|---|---|---|---|---|---|
| Single | 1 | 13,850 | Head of household | 1 | 20,000 |
| | 2 | 15,500 | | 2 | 21,650 |
| Married filing jointly or Qualifying widow(er) | 1 | 25,700 | | 1 | 13,500 |
| | 2 | 27,000 | Married filing separately | 2 | 14,800 |
| | 3 | 28,300 | | 3 | 16,100 |
| | 4 | 29,600 | | 4 | 17,400 |

\*Don't use this chart if someone can claim you (or your spouse if filing jointly) as a dependent, your spouse itemizes on a separate return, or you were a dual-status alien. Instead, see instructions.

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.

Form **1040-SR** (2019)

Sauro 0055

Form 1040-SR (2019)                                                                                                    Page **2**

| | | | | |
|---|---|---|---|---|
| **12a** | **Tax** (see instructions). Check if any from: | | | |
| | 1 ☐ Form(s) 8814  2 ☐ Form 4972  3 ☐ _____ | **12a** | 10,341. | |
| **b** | Add Schedule 2, line 3, and line 12a and enter the total  . . . . . . . ▶ | **12b** | 10,341. | |
| **13a** | Child tax credit or credit for other dependents . . . . | **13a** | | |
| **b** | Add Schedule 3, line 7, and line 13a and enter the total  . . . . . . . ▶ | **13b** | | |
| **14** | Subtract line 13b from line 12b. If zero or less, enter -0-  . . . . . . . . | **14** | 10,341. | |
| **15** | Other taxes, including self-employment tax, from Schedule 2, line 10  . . . . | **15** | 226. | |
| **16** | Add lines 14 and 15. This is your **total tax**  . . . . . . . . . . . ▶ | **16** | 10,567. | |
| **17** | Federal income tax withheld from Forms W-2 and 1099  . . . . . . . . | **17** | 6,354. | |
| **18** | Other payments and refundable credits: | | | |

• If you have a qualifying child, attach Sch. EIC.
• If you have nontaxable combat pay, see instructions.

| | | | |
|---|---|---|---|
| **a** | Earned income credit (EIC) . . . . . . . . . | **18a** | |
| **b** | Additional child tax credit. Attach Schedule 8812 . . . . | **18b** | |
| **c** | American opportunity credit from Form 8863, line 8 . . . | **18c** | |
| **d** | Schedule 3, line 14 . . . . . . . . . . . . | **18d** | |
| **e** | Add lines 18a through 18d. These are your **total other payments and refundable credits** ▶ | **18e** | |
| **19** | Add lines 17 and 18e. These are your **total payments** . . . . . . . . ▶ | **19** | 6,354. |

**Refund**

| | | | |
|---|---|---|---|
| **20** | If line 19 is more than line 16, subtract line 16 from line 19. This is the amount you **overpaid** | **20** | |
| **21a** | Amount of line 20 you want **refunded to you**. If Form 8888 is attached, check here  ▶ ☐ | **21a** | |

Direct deposit? ▶ **b** Routing number [x]x]x]x]x]x]x]x]x]  ▶ **c** Type: ☐ Checking  ☐ Savings
See instructions. ▶ **d** Account number [x]x]x]x]x]x]x]x]x]x]x]x]x]x]x]x]x]

| | | | |
|---|---|---|---|
| **22** | Amount of line 20 you want **applied to your 2020 estimated tax** ▶ | **22** | |

**Amount You Owe**

| | | | |
|---|---|---|---|
| **23** | **Amount you owe**. Subtract line 19 from line 16. For details on how to pay, see instructions  ▶ | **23** | 4,313. |
| **24** | Estimated tax penalty (see instructions)  . . . . . . ▶ | **24** | 100. |

**Third Party Designee**

(Other than paid preparer)

Do you want to allow another person (other than your paid preparer) to discuss this return with the IRS? See instructions.  ☐ **Yes. Complete below.**  ☒ **No**

| Designee's name ▶ | Phone no. ▶ | Personal identification number (PIN)  ▶ | |
|---|---|---|---|

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |
|---|---|---|---|
| | | Retired | |

Joint return? See instructions. Keep a copy for your records.

| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent your spouse an Identity Protection PIN, enter it here (see inst.) |
|---|---|---|---|
| Phone no. | Email address | | |

**Paid Preparer Use Only**

| Preparer's name | Preparer's signature | Date | PTIN | Check if: ☐ 3rd Party Designee  ☐ Self-employed |
|---|---|---|---|---|
| Firm's name ▶  Self-Prepared | | | Phone no. | |
| Firm's address ▶ | | | Firm's EIN ▶ | |

Go to *www.irs.gov/Form1040SR* for instructions and the latest information.      **BAA**      REV 08/2020 Intuit.cg.cfp.sp      Form **1040-SR** (2019)

Sauro 0056



211 Quality Circle
College Station, TX USA
Tel: +1 979 691 7700
**careers.cognizant.com**

November 3, 2020

Rosa Davidson

Round Rock, Texas 78681

Re: Offer of Employment

**EXHIBIT**

*sg*
*8*
Rambin  5-12-22

Dear Rosa:

Cognizant Technology Solutions U.S. Corporation ('Cognizant') is pleased to extend an offer of employment, in the position of Security Architect, at Senior Manager Level. You will initially report to Booker Winrow. Cognizant reserves the right to make any changes or modifications in the future that it believes is in the best interest of the Company's business goals and needs. Your scheduled start date will be November 30, 2020. If for any reason, the first day of employment needs to be altered, it may be done so upon written agreement by both parties. Because time is of the essence, this offer will remain open only for fourteen (14) calendar days, inclusive of the date you receive this offer letter. If you do not accept this offer within that time frame, it will expire and will no longer be available for you to accept.

This offer is contingent on the following:

- Your signing and returning of this offer letter within the prescribed timeframe above;
- The successful and satisfactory completion of your references and background verification; which may include drug testing;
- Your signing of the Confidential Information and Invention Assignment Agreement (CIIAA);
- Completion of all new hire paperwork received electronically; and
- Satisfactory verification of employment eligibility and authorization to work in the United States. You will need to present documentation of identity and employment eligibility, and complete the I-9 Employment Eligibility Verification form within the first 3 business days of your employment. In compliance with the Immigration Reform and Control Act of 1986, your employment at Cognizant is contingent on presenting adequate documentation within the mandatory time frame.

Employment with Cognizant is 'at-will,' meaning that it is not for any specific period of time and can be terminated by either you or by the Company at any time, with or without advance notice, and for any or no particular reason or cause.

The terms and conditions of your employment with Cognizant are described below:

Davidson 0445

**CASH COMPENSATION**:

**BASE SALARY:** You will be paid USD 6,041.67 per pay period equivalent to an annual base salary of USD 145,000.00. You will be paid your salary on the 15th and last working day of each month in accordance with the Company's current payroll policies and practices.

**TARGET BONUS:** You are also eligible for a target bonus of USD 15,000.00. The bonus program is discretionary, subject to change, and based on individual and company performance. Bonuses are paid out for a calendar year and will be pro-rated if you have not spent the entire year on the Company's payroll. The bonus will be paid to you only if you are still active on the Company's payroll on the date the bonus is paid and in one single payment.

All aforementioned components of your cash compensation will be subject to customary deductions and withholdings as required by law or as authorized by you.

**VACATION:** You will be entitled to 12 days of personal leave, plus normal Company holidays, subject to the Company's applicable accrual and carry-over rules.

**BENEFITS:** As a full-time, regular employee of Cognizant, you will be eligible to receive benefits which the Company offers subject to applicable vesting periods and eligibility requirements.

**COMPLIANCE WITH COMPANY POLICIES**: As an employee of Cognizant, you will be expected to comply with the Company's personnel and other policies including, but not limited to, the Company's policy requiring your ongoing compliance with the CIIAA, and the Company's policies prohibiting discrimination and unlawful harassment, conflicts of interest and violation of any applicable laws in the course of performing your job duties and responsibilities. You also agree to adhere to all confidentiality obligations of any previous employer, that you will not bring any confidential information from your prior employer to Cognizant or provide such confidential information to Cognizant, and that you will not use any such confidential information for any purpose in the course of your employment at Cognizant.

**OFFER ACCEPTANCE:** If you accept this offer, and the conditions of this offer are satisfied, this letter and the CIIAA shall constitute the complete agreement between you and Cognizant, with respect to the terms and conditions of your employment. Any representations, promises or agreements, whether written or oral, that are not expressly written in this letter or are contrary to or conflict with this letter, which may have been made to you by any person, are expressly replaced by this letter. The terms and conditions of your employment pursuant to this letter may not be changed except as otherwise expressly specified in this letter or in the CIIAA.

We will be delighted to have you join us. If the foregoing is acceptable to you, please eSign and your electronic acceptance will be returned to the Company. Please retain a copy for your records. Please be sure to complete pre-joining documents on our Welcome Center per the instructions that will be sent to you shortly.

If you have any questions regarding the contents of this letter, employment with Cognizant or the enclosed materials, please contact your recruiter, William Ehlers at 773-814-2919 or

Sincerely,

Cognizant Technology Solutions U.S. Corp.

I HAVE READ, UNDERSTAND AND ACCEPT THE ABOVE OFFER OF EMPLOYMENT AND AGREE TO THE TERMS AND CONDITION SET FORTH ABOVE:

Rosa Davidson
_____
Name

_____
Signature

_____
Date  (Month, Day, Year) or (MM/DD/YY)





February 26, 2020

Janet Gelphman

████████████████

Dallas, Texas 75229
United States of America

It is with great pleasure that JDA Software, Inc. ("JDA"), an indirect wholly owned subsidiary of RedPrairie Holding, Inc. ("Parent", together with JDA and is affiliates, the "Company"), extends to you an offer of employment for the position of User Experience Architect (the "Position"), reporting to Joerg Beringer, Chief Design Officer. The position is located at US - Dallas.

You acknowledge and agree that you may from time to time also be assigned to similar positions as the Position within affiliated entities of the Parent and/or requested to provide services therefor and that, upon such assignment and/or request, you shall not be provided any compensation or benefits beyond that provided herein. It being acknowledged that such additional assignment(s) shall be considered duties under this offer letter. Should you accept this offer of employment, the salary for your position will be $150,000.00 base annual salary, payable on the 15th and 30th of each month, in line with other similarly situated employees of the Company, as may be changed from time to time. All amounts payable to you under this offer letter shall be subject to applicable federal, state and local withholding requirements. Your start date with the Company will be March 9, 2020.

As an Associate working at least 30 hours per week, you will be eligible to participate in the Company's annual performance incentive bonus program at 18% of your annual salary per year beginning on your date of hire. Based on your hire date, any payments will be prorated accordingly. The funding of the bonus pool is based on achievement of the company's annual financial goals, as approved by the Board of Directors. The actual payout to associates is based on individual performance and contribution to the company in the applicable year, as determined by management. The bonus distribution is, of course, not guaranteed, and the company has the right to modify the program from time to time or cancel at its sole discretion. New hires starting after January through September 30 will be eligible for the bonus plan in the current calendar year. New hires joining Oct 1 through Dec 31 will be eligible for the bonus plan starting in the following calendar year.

Although we are confident that your employment relationship will be mutually satisfactory, your employment with the Company is "at-will". This means that your employment is not guaranteed for any specific period of time. Accordingly, either you or the Company can terminate the employment relationship at any time, with or without cause or with or without advanced notice.

As part of your onboarding process, you will be provided copies of the Company's policies and terms and conditions of employment, including the Company's Whistle-Blowing Policy, Social Media Policy, Information Security Policy, Anti-Bribery Policies and Procedures, Code of Conduct and Acceptable Use Policy (all of the foregoing documents and policies are collectively referred to herein as the "Company Policy Documents"), you will be required to review and acknowledge that you have reviewed and understand the Company Policy Documents. You will also be required to complete, execute and deliver a Confidentiality, Non-Competition and Inventions Assignment Agreement (the "Assignment Agreement"). In connection with the Assignment Agreement, you will have the opportunity to disclose any innovations, inventions or improvements relevant to the subject matter of your employment by the Company that have been conceived, developed, reduced to practice, fixed in a tangible medium of expression, or made by you alone or jointly with others prior to your employment by JDA (collectively, "Prior Inventions"), which you desire to remove from the operation of the Assignment Agreement.

This offer of employment is conditioned upon the following:
- your signing this offer letter;
- your completing a Form I-9 and providing documentation establishing both identity and eligibility to work in the United States within three (3) days of hire;
- obtaining favorable results from a criminal, educational and driving record background check, as well as favorable references,
- your reviewing and acknowledgment that you have reviewed and understand the Company Policy Documents, and
- your completion, execution and delivery of the Assignment Agreement. This offer letter (along with the Company Policy Documents and Assignment Agreement) sets forth all understandings and agreements between you and JDA regarding your employment and supersedes any prior or contemporaneous agreements or negotiations regarding the subject matter contained therein. This offer letter shall be governed by and construed in accordance with the laws of the State of Arizona without giving effect to conflicts of law principles thereof.

Gelphman 0059



We believe you will greatly contribute to the Company and its future success. Congratulations on your new opportunity!

Sincerely,

Rick Miller [C]
Agency Consultant

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| CHARLES TOWNSLEY, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-00969-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

# EXHIBIT B to Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CHARLES TOWNSLEY, MICHAEL SAURO,       )
WALTER NOFFSINGER, ROSA DAVIDSON,      )
MICHAEL KELLY, TITON HOQUE, THANH DO,  )
                                       )
                                       )
Plaintiffs,                            )
                                       )
                                       )
V.                                     )        Case No. 1:20-cv-00969-LY
                                       )
INTERNATIONAL BUSINESS MACHINES        )
CORPORATION                            )
                                       )
Defendants.                            )

# Expert Report

## of

## Mark Rambin, CPA, CFF

February 15, 2022





**Expert Report of Mark Rambin**                    **Townsley, et al. v. International Business Machines Corporation**

## Table of Contents

Introduction ........................................................................................................................... 1

    Qualifications ..................................................................................................................... 1

    Scope of Retention and Compensation ........................................................................... 1

    Information Considered .................................................................................................... 1

Background ............................................................................................................................ 2

    The Parties ........................................................................................................................ 2

    The Dispute ....................................................................................................................... 2

Discussion and Analysis ......................................................................................................... 3

    Assumptions ...................................................................................................................... 3

    Summary of Opinions ....................................................................................................... 3

    Methodology Utilized ....................................................................................................... 3

    Overall Opinion ................................................................................................................ 5



## Introduction

**Qualifications**

1.      I am a Managing Director with Echelon Analytics ("Echelon"), a specialized consultancy that provides economic and financial analysis, forensic investigation, and expert testimony in commercial disputes and litigation.  I have provided consulting services to clients involved in commercial disputes in many industries.  I have prepared expert reports and have provided expert testimony in matters before state and federal courts and in arbitrations.  I have practiced in this field for over thirty-five years.

2.      I am a graduate of The University of Texas at Austin, receiving a Bachelor of Business Administration in Accounting in 1980. I became licensed as a Certified Public Accountant in 1983.  My professional biography at Exhibit A provides additional information on my education and experience, including expert testimony over the last four years.

**Scope of Retention and Compensation**

3.      Echelon has been retained by counsel for the Plaintiffs in this matter.  I have been requested to analyze financial and economic issues related to economic damages claims asserted by the Plaintiffs against International Business Machines Corporation ("IBM").

4.      Echelon's compensation for services provided is based on hourly rates ranging from $200 to $695, plus job-related expenses.  My hourly rate is $425.  The firm's compensation is not contingent on or related to the outcome of this litigation.

**Information Considered**

5.      In performing my review and analysis to arrive at the opinions expressed herein, I have relied upon my skills, knowledge, education, experience and training, which are summarized in Exhibit A. Additionally, I have considered information from a variety of sources, including information produced by parties to this dispute and information I and/or persons working under my direction obtained independently.  The information I have considered through the date of this report is listed in Exhibit B.



6.     My work is continuing, discovery is ongoing, and I reserve the opportunity to revise and/or supplement this report based on additional information received or to respond to issues raised by the parties, their witnesses, or the Court.

7.     This report is intended to be used solely in this litigation and should not be relied upon for any other purpose. If I provide deposition or trial testimony, such testimony may supplement the opinions expressed herein. I may also prepare or assist in the preparation of demonstrative exhibits related to my analysis and opinions. The exhibits and schedules accompanying this report, including all footnotes and source notations, are integral parts of this report.

## Background

**The Parties**

8.     The Plaintiffs are former employees of IBM that currently reside in the United States. Each Plaintiff is over the age of forty.

9.     IBM is a NYSE publicly traded global company with a market capitalization of more than $120 billion. Headquartered in New York, IBM is self-described as an information technology company, which provides integrated solutions that leverage information technology and knowledge of business processes.[1]

**The Dispute**

10.    The Plaintiffs allege that the termination of their employment with IBM was the result of an illegal and age-discriminatory plan to reduce the overall age of IBM's workforce. The Plaintiffs seek to recover their lost earnings and other damages.

---

[1] wsj.com – retrieved February 10, 2022



Expert Report of Mark Rambin                    Townsley, et al. v. International Business Machines Corporation

## Discussion and Analysis

### Assumptions

11.    While I am experienced in analyzing economic damages in litigation and dispute matters, I am not an attorney nor the finder of fact in this matter. I have not been requested to form, and I have not formed, any legal opinions on matters related to the alleged age discrimination and wrongful termination claims asserted by the Plaintiffs.

### Summary of Opinions

12.    I have calculated the lost earnings damages for each of the Plaintiffs as presented below. The detailed calculation for each Plaintiff is presented in Exhibit C.

| Plaintiff Name | Future Value | Present Value |
|---|---|---|
| Davidson | $ 424,188 | $ 402,617 |
| Do | 1,664,839 | 1,593,610 |
| Gelphman | 95,763 | 105,554 |
| Hoque | 1,485,711 | 1,283,106 |
| Kelly | 457,157 | 488,536 |
| Noffsinger | 2,405,784 | 2,251,449 |
| Sauro | 1,885,760 | 1,905,020 |
| Townsley | 2,500,171 | 2,455,604 |
| **Total Lost Earnings Damages** | **$ 10,919,373** | **$ 10,485,496** |

### Methodology Utilized

13.    My calculations of lost earnings damages are based upon my review of the information made available to me to date as identified in Exhibit B as well as my personal telephone interviews with each Plaintiff. These calculations are based upon the assumption that, absent the alleged wrongful terminations, the Plaintiffs would have remained employed with IBM from the time of their separation from IBM through the completion of their projected work life. This amount is then compared to their actual and future projected earnings after their separation from IBM through the completion of their projected work life. These amounts are also adjusted for interest and inflation factors.



14.    This methodology is standard and commonly utilized in the measurement of the lost earnings damages of individuals.[2] Additional information concerning the methodology utilized in these damage calculations is discussed below.

15.    **Work life expectancy** – There are widely accepted academic studies commonly utilized to calculate the expected work life of an individual based upon their age, education, and employment status.[3] This work life expectancy has been utilized in these calculations unless the individual Plaintiff stated that their work life intentions differed from these calculated work life expectancies.

16.    **Expected earnings from IBM** – These amounts have been calculated based upon the prior earnings information provided in document production in this matter for each Plaintiff beginning as of their separation from IBM.  The earning histories of Plaintiffs with significant variable compensation, particularly sales commissions, have been averaged over multiple years to provide a basis for the projection of future earnings.

17.    **Actual earnings after separation from IBM** - These amounts have been calculated based upon the actual earnings or unemployment compensation information provided in document production in this matter for each Plaintiff.  To the extent that a Plaintiff is currently employed, the compensation from current employment is assumed to continue through their expected work life.

18.    **Employment Fringe Benefits** – In addition to direct compensation, the Plaintiffs received fringe benefits from IBM in the form of paid leave, insurance, other legally required benefits such as social security contributions, among others.  These fringe benefits have been calculated as a percentage of compensation based upon statistics compiled by the Bureau of Labor Statistics.[4] To the extent that a Plaintiff received employment fringe benefits from employment after their separation from IBM, this same calculation has been applied to those earnings.

---

[2] Measurement of Damages Involving Individuals – American Institute of Certified Public Accountants, 2020
[3] Skoog, Gary R., James E. Ciecka, and Kurt V. Krueger. 2011.
[4] U.S. Department of Labor. Bureau of Labor Statistics. *Employer Costs for Employee Compensation – December 2020.*



19.     **Other economic damages** – Such damages include forfeiture of IBM restricted stock units due to the separation of a Plaintiff from IBM.  These amounts are calculated at the value of these restricted stock units at the time of separation of the Plaintiff from IBM.

20.     **Actual and Projected Growth and Discount Factors** – The lost earnings calculations reflect the application of interest factors for both past and future lost earnings damages.  This interest factor increases past lost earnings and decreases lost future earnings to give effect to the time value of money. A growth factor in expected future earnings from both IBM and from earnings after separation from IBM has also been applied to the calculations.

**Overall Opinion**

21.     Based upon the information available to me as detailed in Exhibit B, the methodology described above and detailed in the Exhibit C calculation for each Plaintiff, it is my opinion that the lost earnings damages of the Plaintiffs total not less than $10.9 million on a future value basis and $10.4 million on a present value basis.

February 15, 2022



Mark Rambin, CPA, CFF



Exhibit A



**Mark Rambin, CPA, CFF**
Managing Director

1717 Main Street, Suite 3380
Dallas, Texas 75201
214.965.8534
mrambin@ea-us.com

_____

**Certifications**
Certified Public Accountant

Certified in Financial Forensics

**Professional Affiliations**
American Institute of Certified
Public Accountants

Texas Society of Certified Public
Accountants

National Association of Forensic
Economics

**Education**
Bachelor of Business
Administration – Accounting
University of Texas at Austin

**Echelon Analytics is not
a CPA Firm.**

Mark Rambin is an experienced forensic accountant with a substantial background in financial investigation, the analysis of economic damages issues and litigation consulting. A Texas-licensed CPA for over 35 years, Mr. Rambin specializes in providing objective and fact-based analysis to his clients, allowing them to make better informed decisions about disputes, litigation, or other critical business challenges facing them.

## Financial Investigation

Mr. Rambin's experience in financial investigation includes commercial litigation matters as well as engagements on behalf of bankruptcy trustees, receivers, and numerous government authorities and regulatory agencies, including the United States Department of Justice, the Texas Office of the Attorney General, the Federal Deposit Insurance Corporation, and the Texas Department of Insurance, among others. These matters have included the investigation of complex failures of financial institutions, insurance companies, and other businesses engaged in many industries. This work has been utilized in civil litigation and criminal prosecutions of former officers and directors, insiders, outside professionals, and other parties alleged to have caused damages, received preferential transfers, or committed illegal acts.

## Economic Damages Issues

Mr. Rambin is regularly engaged by both plaintiff and defense litigation counsel to provide investigation, analysis, and expert opinions concerning economic damages related to disputes, claims, and litigation. Such matters often relate to claims of lost profits, business interruption losses, professional liability claims, complex property loss, personal injury or employment related claims, and trademark or trade secret disputes. His opinions, often presented through written reports and expert testimony, have been presented before Federal and State District courts and Bankruptcy courts in multiple jurisdictions throughout Texas and in other states.

## Litigation Consulting

Mr. Rambin also has significant experience in working with counsel and their clients in performing general litigation consulting. He often provides plaintiff or defense counsel with investigation and fact-finding related to unasserted claims. In litigation matters, he regularly works closely with counsel to develop discovery plans, to identify potential sources of information, to draft production requests and interrogatories, and to analyze and evaluate large document populations. Mr. Rambin also works to prepare for depositions of fact and expert witnesses through the identification of relevant documents or issues, outside research, and with expert witnesses, through the detailed analysis of their expert reports, including the research of their prior reports and testimony in other matters. He has substantial experience in working with counsel in asserting or responding to *Daubert*-type

Exhibit A

## Mark Rambin, CPA, CFF

challenges to the admissibility of accounting, financial, or other economic expert testimony.

Mr. Rambin's experience includes engagements in the following industries, among others:

- Agricultural and Commodities
- Banking and Financial Services
- Communications
- Construction
- Health Care
- High Technology
- Hospitality
- Insurance – Property & Casualty
- Insurance – Regulatory & Insolvency
- Manufacturing and Distribution
- Mortgage Lending and Servicing
- Oil & Gas Exploration and Production
- Professional Services
- Real Estate Development
- Real Estate Management
- Retail
- Software
- Transportation

## Professional Experience

Some examples of Mr. Rambin's case experience include:

### Accounting Malpractice

- **Audit failures.** Evaluated whether the accountant's work was conducted in accordance with Generally Accepted Auditing Standards. Reconstructed business and accounting records to determine the true financial condition of the company under audit, identified any misstatements, and developed facts to analyze interrelated liability, causation and damages issues. These audit failure accounting malpractice claims have involved audits of enterprises in several industries including financial institutions, manufacturing and distribution, commodities, retail sales, and insurance entities. The accounting firms involved have ranged from sole practitioners to regional, international, and the major Big 4 firms.

- **Tax shelters.** Served as a consulting expert to plaintiff counsel in an accounting malpractice matter involving allegedly abusive tax shelters, in which a Big 4 firm was a defendant. Assisted counsel with drafting discovery, identifying and interviewing potential expert witnesses, researching and documenting applicable professional standards, and in the review and analysis of a large volume of working papers, internal communications, and internal policy and technical standards information produced by the defendants. Provided assistance to counsel in their preparations for the depositions of client service team members including independent research of their professional backgrounds, their specific roles on the engagements in question, and in the identification of potential deposition exhibits and areas of inquiry. A significant confidential settlement was reached at the conclusion of the depositions of these individuals.

2

## Mark Rambin, CPA, CFF

- **Financial restatement and accounting malpractice claim**.  Engaged by Multi-national Corporation to investigate prior financial reporting practices of U.S. subsidiary.  Identified significant overstatements of net income due to improper use of percentage of completion accounting method.  Assisted client in the restatement process and in the successful pursuit of an accounting malpractice claim against prior outside auditor.

### Oil & Gas Industry

- **Oil Field Service Provider Fraud Claims.**  Evaluated claims that a water and wastewater hauling service provider was overbilling a mid-major exploration and production company for its services.  Performed a comprehensive analysis and identified a massive scheme to defraud the exploration and production company.  Provided expert testimony before the presiding bankruptcy judge in the Southern District of Texas resulting in a significant judgement entered against the service provider.

- **Joint Interest Audits and Investigations.**  Provided assistance to working interest owners of individual wells or prospect ventures to evaluate whether the Operator was appropriately conducting joint interest operations in accordance with the Operating Agreement or other applicable agreements.

- **Litigation matters.**  Provided expert services related to litigation between working interest owners and Operator of prospect concerning alleged breach of exploration agreement and overcharges and inappropriate expenditures billed to the joint interest.  Assisted in litigation related to disputes over a natural gas farm-out agreement and the related development rights.  This matter involved analysis of over 40 years of production and development records and coordination with a team of engineers and geologists in order to evaluate both the factual issues involved as well as the basis for damages claimed. Evaluated damage claims related to a dispute arising from the sale of a natural gas gathering system including analysis of historical and current operating and financial information in relation to the offering memorandum provided to prospective purchasers.

- **Consulting project related to closely-held oil and gas holdings.** Led a project team in the analysis of the administration of a complex family estate and multiple related trusts involving in oil and gas working interests valued in excess of one billion dollars and located throughout the United States. The objective of this project was to determine whether ownership interests and other development and royalty rights had been appropriately recognized over a time period in excess of 50 years.  The project entailed detailed tracing of legal, oil and gas production and financial records from the inception of leasing and exploration activities through farm-outs, farm-ins, production pooling and unitizations, non-participations and other events relevant to the present ownership status of each property.

3

Mark Rambin, CPA, CFF

- **Transactional assistance.**   Provided consulting services related to the transfer of diverse natural gas working interests to a publicly traded exploration and development company.   This project required detail analysis of lease and farm-out agreements, agreements related to development rights, varying royalty and overriding interests, as well as varying working and net revenue interests at each multiple of payout.

- **Financial reporting.**   Involved in numerous other financial reporting and consulting engagements relating to the oil and gas industry.   These engagements have included exploration and production companies, independent producers, natural gas processing and carbon black production plants, refining operations and related oilfield service providers.

**Bankruptcy and Insolvency**

- **Oil & Gas exploration and production Company in liquidation.**  Assisted the Chapter 7 trustee in assuming control of the offices and accounting and IT systems of the debtor (whose officers and employees abandoned the company offices upon the appointment of the trustee).  Developed financial information to enable the trustee to secure the assets of the estate and to prepare schedules and monthly reporting for the court.  Prepared all financial information required to support numerous complex adversary proceedings and other litigation related to alleged fraudulent transfers and disputed ownership of certain assets of the estate.

- **International shipping vessel operator in liquidation.**  Assumed custody of all business and accounting records and assisted the Chapter 7 trustee in evaluating the solvency of the debtor in periods preceding the bankruptcy filing.  Analyzed insider transactions that supported an adversary proceeding against the former shareholder of the company and assisted with discovery, depositions, and in evaluating the advisability of a compromise settlement of the claim.

- **Financial advisor in a telecommunications company Chapter 11.** Performed analysis on behalf of an unsecured creditors committee related to determining the solvency of the estate and an assessment of the continued viability of the business operations of a reorganized entity.  Analyzed the current and historical operating information of the company to assist the committee in assessing the reasonableness of the financial projections of the debtor. Provided analysis and testimony for adversary proceedings against its principal lender and in the investigation of potential claims against its former directors and officers and outside accountants.  Worked with committee counsel to develop a liquidation plan and supported the committee in its evaluation of alternative bids from prospective buyers of all or parts of the business.

4

## Mark Rambin, CPA, CFF

- **Regional Homebuilder.** Provided consulting and testimony services to the Chapter 7 trustee for the identification and prosecution of claims to recover preferential transfers. Several actions related to claims against lenders receiving payments on insider secured debt during the 1-year period prior to bankruptcy filing. Assisted in resolving over one hundred 90-day preference actions on behalf of the trustee, including providing deposition and trial testimony. Performed detailed analysis of a significant volume of accounting and financial records to analyze solvency issues at the 1-year and 90-day periods and to identify potential preferential transfers relative to those periods.

**Financial Investigation and Fraud**

- **Litigation claim against the executor of a complex estate.** Provided consulting services to counsel defending an executor from claims asserted by a beneficiary of an estate. The estate involved several generations of trusts and varied asset classes including ranches, oil and gas interests, and other financial assets. This engagement required the analysis of detailed historical transaction records to identify appropriate treatment of distributable income vs. principal and the appropriateness of reimbursement claims and other transactions between the trusts, the ranches, and certain beneficiaries.

- **Investigation of claims asserted by the beneficiaries of a trust.** Assisted the beneficiaries of a trust and their outside counsel in the investigation of alleged self-dealing by its trustee. This project involved investigation of public records to identify undisclosed business relationships and related party transactions. Because of these transactions, a majority of the assets of the trust were invested in failed business ventures from which the trustee and his business partners withdrew substantial sums of money. The beneficiaries instituted litigation against the trustee based upon this investigation.

- **Fraud investigation of trustee.** Worked directly with a large family enterprise to investigate alleged fraudulent transactions involving the trustee of a family trust. Performed detailed analysis of multiple years of transactions, obtained financial records from third parties and researched the identities of several businesses and individuals receiving distributions from the trust. Identified unauthorized distributions made directly to the trustee and his relatives and business associates. Prepared a detailed listing of questioned transactions that formed the basis for the resignation of the trustee and a related claim for reimbursement to the trust.

- **Borrower fraud.** Investigated alleged misapplication of loan proceeds or removal of funds from single-asset entities subject to a mortgage, often through straw buyers, abusive property flips, misrepresentation of the lien status of assets securing the transaction, or unauthorized advances to related parties. These engagements often required detailed analysis of the sources and uses of loan and project proceeds and an investigation of the

5

Exhibit A

# Mark Rambin, CPA, CFF

appropriateness of project expenditures and other transfers to determine the borrowers' potential liability for misapplication of funds.

- **Embezzlement.** Engaged by multi-state commercial property management firm to investigate alleged fraud by a departed executive. Assisted client in reconstruction of manipulated accounting records to quantify the loss. Developed Proof of Loss for insurance claim and for the subsequent criminal indictment of executive.

- **Breach of fiduciary duty.** Assisted counsel in the investigation of the actions of a company president. Identified significant misuse of company resources including ghost employees and unauthorized reimbursement for personal expenses such as personal airplane repairs and equipment upgrades, travel, and home remodeling. Documented diversion of corporate assets and opportunities to a competing business controlled by the president. When presented with findings, the president resigned and signed over ownership interests in the company and in the competing business.

- **Breach of non-compete agreement.** Assisted counsel in investigating the abrupt departure of a group of key employees subject to a non-compete agreement. Worked with computer forensics experts to analyze email and other electronic records. This information documented their plans for future competing business activities and their improper retention of confidential and proprietary information from the employer. Findings were presented in arbitration proceeding.

## Damages Analysis in Complex Commercial Litigation

- **Manufacturing operations.** Provided consulting and expert services to manufacturers of industrial equipment and their counsel and insurers. In these matters, the claimants alleged that the failure of the equipment manufactured by the defendant interrupted the operation of a plant, factory, or other business process. The industries involved included defense contractors, agricultural and food products, construction, transportation, and consumer goods.

- **Retail operations.** Performed numerous engagements related to alleged failures of landlords to perform under retail lease agreements due to construction delays, equipment failures, water incursions, and fires. These matters required the analysis or reconstruction of historical financial information of the claimants to quantify projected lost revenues, fixed and variable costs, and excluded costs or saved expenses. These projects often included analysis and independent research of external factors such as general economic or industry circumstances that would affect the operations of the claimants and the efforts of the parties to mitigate any damages resulting from

## Mark Rambin, CPA, CFF

these events. These engagements have included the evaluation and resolution of insurance claims and in matters involving litigation.

- **Major natural or man-made disasters.** Provided assistance to both claimants and insurers in preparing and evaluating business interruption claims related to catastrophic or mass claim occurrences such as fires, hurricanes, floods, and in the BP Deepwater Horizon incident. In addition to the claim considerations mentioned above, these matters often required detailed analysis of the causal relationship between the incident and the claimed damages.

- **Information technology.** Assisted counsel in responding to litigated business interruption claims related to the alleged failures of information technology systems utilized by financial services organizations. One matter involved an alleged system failure while the other involved deliberate sabotage. In each matter, evaluating the claimed damages required the analysis of the causal relationship between the facts and the alleged economic impacts and included significant analysis of the claimants' financial operations and independent economic and industry research.

- **Consumer class actions.** Assisted lenders who were defendants in consumer class action litigation. Identified populations of potential class members and analyzed specific liability issues related to the claims asserted by named plaintiffs and evaluated the potential applicability of these specific facts and claims to a broader population. Assisted in evaluating ranges of potential financial exposure under assumed liability and damages theories and various class definitions and populations.

- **Secured lending disputes.** Worked with lenders in disputes involving "floor plans" and other similar high-volume secured lending facilities. These have included lending facilities for automobiles, boats, recreational vehicles, heavy equipment, consumer paper, mortgage warehouse and premium finance involving allegations of misrepresentation as to the "in trust" status of the facility prior to default. Through reconstructing earlier financial transactions, identified the true historical financial positions of the facility and determined the methods utilized to conceal any collateral shortfalls. This work has been utilized in pursuing claims against the borrowers, outside accountants, and other parties.

- **Loan securitization disputes.** Evaluated loan underwriting and loan loss reserves regarding compliance with the written guidelines of a particular financial institution or of the terms of the mortgage participation, securitization or other pooling. This work has been used to evaluate potential damage claims of the participants or investors in these assets and in pursuit of claims against directors or officers of financial institutions or other lenders.



Exhibit A

**Mark Rambin, CPA, CFF**
Managing Director

1717 Main Street, Suite 3380
Dallas, Texas  75201
214.965.8534 (Office)
512.422.1022 (Cell)
mrambin@ea-us.com

_____

**Certifications**
Certified Public Accountant

Certified in Financial Forensics

**Professional Affiliations**
American Institute of Certified
Public Accountants

Texas Society of Certified Public
Accountants

National Association of Forensic
Economics

**Education**
Bachelor of Business
Administration – Accounting
University of Texas at Austin

## Recent Prior Testimony and Expert Reports

Confidential Investment Advisor Arbitration (Engaged by Defendant), FINRA
Arbitration, Houston, Texas, Expert Report

FDIC v. Hall, et al., United States District Court, Middle District of Florida, Expert
Report, Deposition Testimony

Gamez v. The Estate of Parrish, County Court at Law, Rockwall County, Texas, Expert
Testimony

Issa v. Issa, State District Court, Travis County, Texas, Expert Report

Ramos, et al. v. Cruz, et al. v. Lincoln Property Company Commercial, Inc., et al.,
State District Court, Dallas County, Texas, Expert Report

Dutch Bro LLC v. DutchPro, B.V., United States District Court, Western District of
Texas, Austin Division, Expert Report, Deposition Testimony

Fuller v. Bear Rental-Purchase, LTD., et al., State District Court, Williamson County,
Texas, Expert Report

Elumenus Lighting Corporation, Inc. v. Government Energy Management, LLC, et al. ,
State District Court, Collin County, Texas, Expert Report, Deposition Testimony

Midstates Petroleum Company, Inc. v. Triple F Oilfield Services, LLC, United States
Bankruptcy Court, Southern District of Texas, Houston Division, Declaration and
Expert Report, Expert Testimony

Mitchell, et al. v. R&R Trucking, Inc., et al., State District Court, Childress County,
Texas, Expert Report, Deposition and Court Hearing Testimony

Sherry A. Coffman v. O'Reilly Automotive Stores, Inc., AAA Arbitration, Dallas, Texas,
Expert Report, Arbitration Hearing Testimony

Cardenas v. Ovation Services, LLC, State District Court, Travis County, Texas, Expert
Report, Deposition and Trial Testimony

Austin Children's Dentistry, Inc., et al. v. Williams, State District Court, Travis County,
Texas, Expert Reports

Potter v. Dehan, State District Court, Travis County, Texas, Expert Reports



Exhibit A
## Mark Rambin

<u>FEDD Wireless, LLC, et al.</u> v. Flowserve US Inc., et al., State District Court, Harris County, Texas, Expert Report, Deposition and Trial Testimony

White Oak Global Advisors, LLC v. <u>Tommy W. Weder, Sr.</u>, United States District Court, Western District of Oklahoma, Expert Report

Gray v. <u>J.H. Strain & Sons, Inc.</u>, State District Court, Taylor County, Texas, Expert Report

Dynesic Technologies, Inc. v. <u>Ali Mutlu, et al.</u>, State District Court, Dallas County, Texas, Expert Reports, Deposition Testimony

Mary M. Young, et al. v. <u>Keith P. Young, Sr.</u>, et al., Probate Court, Dallas County, Texas, Expert Reports, Deposition Testimony

Halbert, et al. v. <u>Scott, et al.</u>, State District Court, Travis County, Texas, Expert Reports

England v. <u>O'Reilly Automotive Parts, et al.</u>, United States District Court, Eastern District of Texas, Tyler Division, Expert Report

Wagner v. <u>Starwood Custom Homes LLC, et al.</u>, AAA Arbitration, Dallas, Texas, Expert Report, Deposition and Arbitration Hearing Testimony

Englehart, et al. v. <u>Van Dyke, et al.</u>, United States District Court, Southern District of Texas, Houston Division, Expert Report

<u>National Rifle Association of America, et al.</u>, v. Ackerman McQueen, Inc., United States District Court, Northern District of Texas, Dallas Division, Expert Reports

<u>Van Brummen</u> v. Hess Corporation, United States District Court, Southern District of Texas, Houston Division, Expert Report

Hugh Gray v. <u>Mariam Gray</u>, Circuit Court of Maryland for Baltimore County, Expert Report, Trial Testimony

<u>Coffman</u> v. Uniti Group, et al., Circuit Court for Baldwin County, Alabama, Expert Reports

Expert Report of Mark Rambin                    Townsley, et al. v. International Business Machines Corporation

## Exhibit B. Information Considered

As of February 15, 2021

| PL's Bates Label | DESCRIPTION |
|---|---|
| Davidson _____ | |
| 0169 | Compensation Summary 2013-2014 |
| 0173 | Emince & Excellence Award 2015 – Cash Award |
| 0175 | IBM Recognition Email 2015 - $1000 |
| 0229-232 | National Payroll Service -- IBM 9/16/17-9/30/17; 10/16/17-10/31/17 |
| 0256-259 | National Payroll Service – IBM 3/16/18-4/15/18 |
| 0262-263 | Employee Salary Statement |
| 0302 | IBM Profit Share Notification – 2019 |
| 0365-377 | Worker Profile |
| 0397-398 | W-2 2019 |
| 0399-405 | W-2 2020 |
| 0406-436 | TX Workforce Commision Search Log |
| 0445-447 | Cognizant Offer Letter |
| 0536-537 | 2021 Form W-2 |

| DF Bates Label | DESCRIPTION |
|---|---|
| IBK-DAV _____ | |
| 0000154 | Portfolio Actions |
| 0000307-309 | Employee Profile Information -- Roselyn Wolfe |
| 0000310-445 | Semi- Monthly Pay and Contributions Statement 1/1/17-12/30/2019 |
| 0000446-447 | IBM Ltr 10-9-20 re 2016-2019 Salary Description |
| 0000459-461 | Employee Profile Information – Rosa Davidson |
| 0000690-692 | Employee Profile Information – Jacqueline Wilson |
| 0000599 | Simulation UTL30 |
| 0000592 | UTL30 |
| 0000590 | Simulating reductions of HC in IOT Platform and Watson Assistant for 2020 |
| 0000589 | UTL Breakdown |
| 0000580 | Maple Assumptions |
| 0000575 | Maple Assumptions |
| 0000572 | Maple Assumptions |
| 0000510 | Summary of Q1-Q4 |
| 0000629 | Q2-Q4 Savings |
| 0000628 | Q2-Q4 Savings |
| 0000627 | Q2-Q4 Savings |
| 0000626 | Q2-Q4 Savings |
| 0000625 | Q2-Q4 Savings |
| 0000624 | Q2-Q4 Savings |
| 0000623 | Q2-Q4 Savings |
| 0000622 | Q2-Q4 Savings |
| 0000621 | Portfolio Actions |
| 0000619 | Simulation at UTL30 for all actions |



## Exhibit B.  Information Considered

As of February 15, 2021

| | |
|---|---|
| 0000618 | UTL20 and UTL30 |
| 0000617 | Simulation at UTL30 for all actions |
| 0000616 | Q2-Q4 Savings |
| 0000608 | Maple Assumptions |
| 0000604 | Portfolio Actions |
| 0000603 | Platform UTL30 |
| 0000658 | UTL Breakout |
| 0000644 | Q2-Q4 Summary |
| 0000643 | Q2-Q4 Summary |
| 0000640 | Platform UTL30 |
| 0000641 | Platform UTL30 |
| 0000639 | Platform UTL30 |
| 0000638 | Portfolio Actions |
| 0000637 | Q2-Q4 Savings |
| 0000636 | Q2-Q4 Savings |
| 0000635 | Q2-Q4 Savings |
| 0000634 | Q2-Q4 Savings |
| 0000633 | Q2-Q4 Savings |
| 0000632 | Q2-Q4 Savings |
| 0000631 | Q2-Q4 Savings |
| 0000630 | Q2-Q4 Savings |

| PL's Bates Label<br>DO _____ | DESCRIPTION |
|---|---|
| 0297-2099 | Email from Rene Neumann to team re referral bonus for candidates to fill roles |
| 0300 | Growth Driver Profit-Sharing Statement - $1400.00 |
| 0339 | W-2 2018 |
| 0340 | W-2 2019 |
| 3041-0342 | IRS Tax Info 2019 |
| 0343-0344 | IRS Tax Info 2020 |
| 0346-352 | 2018 Form W-2 |
| 0353-375 | 2021 Unemployment Compensation Information |

| DF Bates Label<br>IBK-DO _____ | DESCRIPTION |
|---|---|
| 0000188-190 | Employee Profile Information – Andres Herrera |
| 0000191-193 | Employee Profile Information – Michel Dirk |
| 0000407-409 | Employee Profile Information – Gao Ounying |
| 0000508-510 | Employee Profile Information - Cai Young |
| 583-817 | Semi-Monthly Pay and Contribution Statement – Thanh Do 1/1/15- 12/30/19 |



Expert Report of Mark Rambin                    Townsley, et al. v. International Business Machines Corporation

## Exhibit B.  Information Considered

As of February 15, 2021

| PL's Bates Label Gelphman _____ | DESCRIPTION |
|---|---|
| 0052-54 | 1040 Tax Form 2018 |
| 0055-57 | 1040 Tax Form 2019 |
| 0058 | W2 Earnings Summary 2020 |
| 0061-62 | Blue Yonder Earnings Statements |
| 0118-121 | Janet Gelphman Resume |
| 0130-0151 | Timeline of Events |
| 0173-0174 | Email re Senior Deisgner Position |
| 0182-0194 | Employement Agreement – GTN Technical Staffing |
| 0224 | Email re Gelphman's preferred rate/salary |
| 1003-1006 | Zip Recruiter Job Listings with title and salary |
| 1667-1668 | 2020 Form 1040 |
| 1669 | 2018 Form 1099-G |

| DF Bates Label IBMK-GEL _____ | DESCRIPTION |
|---|---|
| 0000066-68 | Employree Profile Info – Ana Morales |
| 0000077-79 | Employee Profile Info – Janet Gelphman |
| 0000154-202 | Semi Monlthy Pay and Contribution Statements 1/1/16-12/31/16 |
| 0000203-251 | Semi Monthly Pay and Contribution Statements 1/1/17- 12/31/17 |
| 0000252-273 | Semi Monthly Pay and Contribution Statements 1/1/18-6/15/18 |
| 0000274 | Pay and Contribution Statement 6/22/18 |
| 0000276 | Pay and Contribution Statement 7/23/18 |
| 0000277 | Pay and Contribution Statement 12/27/18 |

| PL's Bates Label Hoque _____ | DESCRIPTION |
|---|---|
| 0103 | IBM 401(k) Plus Plan |
| 0104 | Client Sources of Income Verification |
| 0106-178 | 2020 Form 1040 |
| 0186-187 | 2021 Form W-2 |

| DF Bates Label IBMK-HOQ _____ | DESCRIPTION |
|---|---|
| 0000172-174 | Employee Profile Information – Natalie Vest |
| 0000176 | IBM – Salary Breakdown 10-9-20 |
| 0000177-179 | IBM ltr re payroll info 10-23-18 |
| | Checks from IBM to Hoque |
| 0000193-195 | Employee Profile Information – Titon Hoque |

| PL's Bates Label Kelly _____ | DESCRIPTION |
|---|---|



Expert Report of Mark Rambin                    Townsley, et al. v. International Business Machines Corporation

## Exhibit B.  Information Considered

As of February 15, 2021

| | |
|---|---|
| 0122-124 | Email frm Kelly to Allen Downes re revenue generated |
| 0125 | Email frm Kelly to Allen Downes re no Q1 bonus rec'd |
| 0150-152 | Email frm Kelly to Andrea Sayles re PIP and bonus rec'd |
| 0178-200 | 2020 Form 1040 |
| 0225-228 | Forms W-2 and 1099-G |

| DF Bates Label IBMK-KEL _____ | DESCRIPTION |
|---|---|
| 0000004 | Investigation Summary – Q1 bonus |
| 0000097-98 | Employee History – Mike Kelly |
| 0000101-102 | Itemized Salary Description 2016-2018 |
| 0000109-111 | Employee Profile Information – Michael Kelly |

| PL's Bates Label Noffsinger _____ | DESCRIPTION |
|---|---|
| 0001-0146 | Noffsinger document production |
| 0147-154 | 2021 Forms W-2 |
| 0155 | Morgan Stanley account statement |

| DF Bates Label IBMK-NOF _____ | DESCRIPTION |
|---|---|
| 0000001-231 | Semi-MonthlyPay and Contributions Statement |
| 0000236-238 | Employee profile info, including salary |
| 0000286-407 | Semi-MonthlyPay and Contributions Statement |
| 0000604-620 | 2018 Global Performance Assessment |
| 0000621-629 | 2019 Global Performance Assessment |
| 0000630-632 | Employee profile info, including salary |
| 0000634-635 | Employee History including awards $ |
| 0000637 | Pay stub |
| 0000640-651 | Employment offer & 401k |
| 0000957961 | Form W-4 (2019) and tax return |
| 0000970-973 | EOX Vanatge Employment offer |
| 0000977-979 | EOX pay stubs and W-2 |

| PL's Bates Label Sauro _____ | DESCRIPTION |
|---|---|
| 0025-26 | Ltr from J. Cox to Sauro re Federal Tax Return |
| 0028-0035 | Form 1040 (2018 tax yr) |
| 0036-37 | Form 8949 (2018 tax yr) |
| 0038-39 | Form 8889 (2018 tax yr) |
| 0040 | Form 8879 (2018 tax yr) |



4

## Exhibit B.  Information Considered

As of February 15, 2021

| | |
|---|---|
| 0041 | Federal Support Statements |
| 0042 | Summary of Estimates |
| 0043 | Estimated Tax Wrksht |
| 0044 | Computation of Regular Tax (2018) |
| 0045 | Qualified Dividends of form 1040 (2018) |
| 0046 | Investment Income of the Earned Income of form 1040 (2018) |
| 0047 | Carryover Wrksht (2018) |
| 0048 | Tax Return Comparison (2018) |
| 0049-50 | Payment Voucher Filing instructions (2018) |
| 0051-0054 | 2020 Form 1040-ES Payment Vouchers |
| 0055-63 | Form 1040 (2019) |
| 0064-65 | Form 8889 (2019) |
| 0066 | Form 8995 (2019) |
| 0067-70 | Form 8283 (2019) |
| 0071-76 | Form 1040/ 1040 SR (2019) |
| 0077-81 | Form 8960 (2019) |
| 0082-100 | Charitable Organization Wrksht |
| 0101 | Persional Info Wrksht  (2019) |
| 0102-0104 | W-2/W-2G Summary (2019) |
| 0105-107 | Form 1095-A (2019) |
| 0108-109 | 1099-R (2019) |
| 0110-114 | Form 1099-SA (2019) |
| 0115-117 | Form 1040 (2019) |
| 0118-119 | Form 1099-B (2019) |
| 0120-121 | IRA Contributions Wrksht (2019) |
| 0122 | Medical Expenses Wrksht (2019) |
| 0123 | Tx Payments Wrksht (2019) |
| 0124-125 | Tax and Interest Deduction Worksheet (2019) |
| 0126 | Localty for Sale Tax Deductions (2019) |
| 0127 | State and Local Tax Deduction Worksheet (2019) |
| 0128 | Home Mortgage Interest Worksheet (2019) |
| 0129 | Cash Contributions (2019) |
| 0130-138 | Noncash Contributions (2019) |
| 0139-143 | Charitable Deduction Limits Wrksht (2019) |
| 0144 | Misc. Itemized Deductions Wrksht (2019) |
| 0145 | Standard Deduction Worksheet for Dependents (2019) |
| 0146 | Earned Income Worksheet (2019) |
| 0147 | Form 4952 Investment Interest Expense Worksheet (2019) |
| 0148-150 | Form 1040 Earned Income Credit Worksheet (2019) |
| 0151 | Form 4684 Casualty and Theft Worksheet (2019) |
| 0152-159 | Form 6251 Schedule D Tax Worksheet (2019) |
| 0160-162 | IRA Info Wrksht (2019) |
| 0163 | Form 8582 Modified Adjusted Gross Income Worksheet |



## Exhibit B. Information Considered

As of February 15, 2021

| | |
|---|---|
| 0164 | Two-Year Comparisons (2019) |
| 0165 | Tax Summary (2019) |
| 0166 | Compare to U. S. Averages (2019) |
| 0167-181 | W-4 (2019) |
| 0182-193 | Smart Worksheets from your 2019 Federal Tax Return (2019) |
| 0194-197 | Form 1099-B Worksheet (AMERICAN ENTERPRISE INVESTMENT) |
| 0251-274 | 2020 Form 1040 |
| 0275-277 | 2021 Form 1099-NEC |

| DF Bates Label | DESCRIPTION |
|---|---|
| IBMK-SAU _____ | |
| 0000178-179 | Employee Personal Information – Carroll Hummer |
| 0000190-192 | Employee Personal Information – Chris Fender |
| 0000274-276 | Employee Personal Information – James Martinson |
| 0000280-282 | Employee Personal Information – John Kirian |
| 0000283-285 | Employee Personal Information – Kevin Zachary |
| 0000351-353 | Employee Personal Information – Michael Ashwell |
| 0000354-355 | IBM – Salary Itemized 2016-2018 |
| 0000367-369 | Employee Personal Information – Thaddeus Trask |
| 0000370-372 | Employee Personal Information – William Taylor |
| 0000585-594 | Application for Employment – Sauro |
| 0000600-602 | Employee Profile Information – Michael Sauro |
| 0000621-623 | IBM Salary Sheet |
| 0000624 | Internal IBM Employment Date Pairs |
| 0000625 | Payroll Confirmation 6-4-79 |
| 0000634-683 | Semi-Monthly Pay and Contribution Statement (2015) |
| 0000730 | W9 – Sauro 2020 |
| 0000731-733 | 2020 Nonemployee Compensation |
| 0000734-744 | Sedera, Inc. – Sauro (with invoices) |
| 0000745-750 | Emails between Sauro and Sedera re invoices |

| PL's Bates Label | DESCRIPTION |
|---|---|
| Townsley _____ | |
| 0026-0032 | Revenue and ACV Bookings 1/25/17 |
| 0033-0039 | Revenue and ACV Booking 7/24/17 |
| 0040-0067 | Tax Return 2020 |
| 0080-0088 | Revenue and ACV Booking 1/25/17 |
| 0089-0093 | Incentive Statements 1/1/17-6/3017 |
| 0094-0097 | Incentive Statements 1/1/17-6/3017 (dup.) |
| 0098-0104 | Revenue and ACV Booking 7/24/17 (dup.) |
| 0105-0109 | Incentive Statements 1/7/17-12/31/17 |
| 0110-0115 | Incentive Statements 1/1/18-6/30/18 |
| 0116-0122 | Incentive Statements 1/1/18-6/30/18 (dup.) |



**Expert Report of Mark Rambin**                    **Townsley, et al. v. International Business Machines Corporation**

## Exhibit B.  Information Considered

As of February 15, 2021

| | |
|---|---|
| 0123-0128 | Incentive Statements 1/1/18-6/30/18 |
| 0129-0131 | Incentive Plan Search 2015 |
| 0132-0134 | Incentive Plan Search 2016 |
| 0135-0156 | IBM Benefit Program |
| 0157-0158 | Semi Monthly Oay and Contributions Statement 6/1-6/15/18 |
| 0159-0161 | Employee History |
| 0163-0165 | Incentive Plan Search 2015 (dup.) |
| 0166-0168 | Incentive Plan Search 2016 |
| 0169-0183 | Incentive Statement 2017 |
| 0184-0200 | Incentive Statement 2018 |
| 0201-0210 | Incentive Calculation 2018 |
| 0211-0213 | Employee History (dup.) |
| 0214-0217 | Performance Assessment 2016 |
| 0218-0220 | Performance Assessment 2017 |
| 0221-0246 | 100 Percent Club 2017 |
| 0247-0251 | 100 Percent Club 2018 |
| 0265-0268 | Performance Assessment 2016 (dup.) |
| 0269-0272 | Performance Assessment 2017 (dup.) |
| 0273 | Direct Pay Confirmation 12/15/2020 |
| 0277-0278 | Eminence and Excellence Cash Award 5/18/18 |
| 0279-0280 | Eminence and Excellence Cash Award 5/18/18 (dup.) |
| 0284-0311 | 100 Percent Club 2017 (dup.) |
| 0319-0321 | Employee History (dup.) |
| 0322-0326 | SEA Honorees 2014 |
| 0327 | Bonus Log |
| 0328-0332 | SEA Honorees 2014 (dup.) |
| 0334-0369 | Tax Return 2018 |
| 0370-0403 | Tax Return 2019 |
| 0404-0407 | Unemployment Benefits |
| 0411-601 | Forms 1040 2013-2020 and 2018 Unemploment Information |
| 0602-603 | 2021 Form W-2 |

| DF Bates Label<br>IBMK-TOW _____ | DESCRIPTION |
|---|---|
| 0000096-99 | Emails re overpayment to Townsley |
| 0000100-103 | Email re payment |
| 0000111 | Employee Chart with salary codes |
| 0000168-170 | Employee Profile Information – Justin Crohn |
| 0000381-383 | Employee Profile Information – Kalman Gyimesi |
| 0000384-433 | Semi-Monthly Payroll Statements 1/1/15- |
| 0000541 | Employee Chart with salary codes |
| 0000586 | Revenue chart |
| 0000588 | Revenue chart |



## Exhibit B.  Information Considered

As of February 15, 2021

| | |
|---|---|
| 0000600 | Pipeline Indicators |
| 0000601 | Pipeline Indicators |
| 0000603 | Pipeline Progression |
| 0000604 | Revenue Chart |
| 0000723-863 | Emails between Townsley and IBM re money owed by Townsley |
| 0000881-1048 | Emails between Townsley and IBM re money owed by Townsley (2) |
| 0001069 | Pipeline Indicators |
| 0001070 | Pipeline Indicators |
| 0001074 | Pipeline Progression |
| 0001078 | Pipeline Progression |
| 0001191-1206 | Emails between Townsley and IBM re money owed by Townsley (3) |
| 0001234-1244 | Emails between Townsley and IBM re money owed by Townsley (4) |
| 0001269-1270 | IBM Salary Itemizations (2016-2018) |
| 0001271-0001277 | IBM Confidential Performance Assessment |
| 0001280-1289 | IBM Application for Employment (5/13/1985) |
| 0001339 | Fidelity – Define Benefit System |
| 0001340-1342 | Position and Salary Chart |
| 0001343 | Personal Pension Account |
| 0001344 | Date of Hire wrksht |
| 0001345-1346 | Update Misc. Hire Data |
| 0001360-1361 | Checklist of Financial Obligations/ Property |
| 0001380-1382 | Employee Profile Information – Chuck Townlsey |
| 0001408-1411 | Earning Report |
| 00001412-1417 | Oracle – Payroll Report |
| 0001418-1422 | W2 2019 |
| 0001423-1431 | State Tax Rules 2019-2021 |
| 0001432-1445 | FY21 Annual Evaluation - Oracle |
| 0001452-1458 | Health – Election History 2019-2020 |
| 0001460-1495 | Time Entry Report - Oracle |
| 0001496-1497 | Job Offer Ltr – Oracle 5/14/2019 |
| NATIVES | |
| 0000596 | Cloud Node Based Weekly Key Deals Report |
| 0000594 | Cloud Node Based Weekly Key Deals Report |
| 0000588 | Total Pipeline |
| 586 | Total Pipeline |
| 600 | SOM Excel |
| 604 | Total Pipeline |

Social Security Administration Average Wage Index 1984-2020
Social Security Administration Cost Of Living Adjustments 1975-2022
Federal Open Market Committee Summary of Economic Projections December 15, 2021



Exhibit C

# Rosa Davidson

## General Information

| | |
|---|---|
| Damages Date: | 9/30/2019 |
| Trial or Settlement Date: | 10/1/2022 |
| Interest Rate (Past Damages): | 2.00% |
| Discount Rate (Future Damages): | 2.50% |
| Periodic Compounding: | Annually |
| Present Value Interest Calculation: | Simple Interest |

## Plaintiff Information

| | |
|---|---|
| Gender: | Female |
| Race: | Hispanic |
| Birth Date: | 4/10/1962 |
| Age at Injury: | 57.47 |
| Projected Retirement Age*: | 70.00 |
| Projected Age at Death**: | 86.65 |

\*   Ms. Davidson has stated that her intention was to remain employed by IBM until age 70.

\*\*  Life expectancy calculated for Hispanic women. Study used: United States Life Tables, 2017 by Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics, National Vital Statistics Reports, Volume 68, Number 7, June 24 2019.

## Damages Summary

| | Future Values | | Present Values | |
|---|---|---|---|---|
| | Pre-Trial | Post-Trial | Pre-Trial | Post-Trial |
| Lost Income | $96,815 | $165,664 | $100,176 | $146,222 |
| Lost Fringe Benefits | $88,187 | $73,522 | $91,327 | $64,893 |
| Subtotal: Lost Earnings | $185,003 | $239,185 | $191,503 | $211,115 |
| Other Damages | $0 | $0 | $0 | $0 |
| Total Damages | $185,003 | $239,185 | $191,503 | $211,115 |
| Grand Total Damages | $424,188 | | $402,617 | |

*

Exhibit C

# Lost Income

## Projected Employment Without Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|-----------------|------------------|
| 10/01/19 | 04/10/32 | Software Developer | IBM | $147,372 | 44.38% | 3.00% | 3.00% |

## Actual and Projected Employment With Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|-----------------|------------------|
| 10/01/19 | 12/31/19 | Unemployed | Texas Workforce Commission | $7,605 | 0.00% | 0.00% | 0.00% |
| 01/01/20 | 05/31/20 | Unemployed | Texas Workforce Commission | $11,829 | 0.00% | 0.00% | 0.00% |
| 06/01/20 | 11/29/20 | Consultant | Aditi Consulting | $82,460 | 0.00% | 0.00% | 0.00% |
| 11/30/20 | 12/31/20 | Security Architect | Cognizant Technology | $145,000 | 44.38% | 0.00% | 0.00% |
| 01/01/21 | 04/10/32 | Security Architect | Cognizant Technology | $145,000 | 44.38% | 0.00% | 3.00% |

## Pre-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|----------------|--------|----------|--------------|------|--------------|
| 1 | 09/30/19 | 12/31/19 | $37,146 | $16,485 | $53,631 | $7,605 | $0 | $7,605 | $46,026 | $48,556 |
| 2 | 01/01/20 | 12/31/20 | $151,793 | $67,366 | $219,159 | $106,967 | $5,626 | $112,593 | $106,566 | $110,291 |
| 3 | 01/01/21 | 12/31/21 | $156,347 | $69,387 | $225,734 | $145,000 | $64,351 | $209,351 | $16,383 | $16,628 |
| 4 | 01/01/22 | 09/30/22 | $119,553 | $53,058 | $172,611 | $108,452 | $48,131 | $156,583 | $16,028 | $16,028 |
| Total | 09/30/19 | 09/30/22 | $464,839 | $206,296 | $671,135 | $368,024 | $118,108 | $486,132 | $185,003 | $191,503 |

## Post-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|----------------|--------|----------|--------------|------|--------------|
| 1 | 10/01/22 | 12/31/22 | $40,590 | $18,014 | $58,604 | $36,821 | $16,341 | $53,163 | $5,442 | $5,408 |
| 2 | 01/01/23 | 12/31/23 | $165,868 | $73,612 | $239,481 | $150,467 | $66,777 | $217,244 | $22,237 | $21,562 |
| 3 | 01/01/24 | 12/31/24 | $170,845 | $75,821 | $246,665 | $154,981 | $68,781 | $223,761 | $22,904 | $21,683 |
| 4 | 01/01/25 | 12/31/25 | $175,970 | $78,095 | $254,065 | $159,630 | $70,844 | $230,474 | $23,591 | $21,817 |
| 5 | 01/01/26 | 12/31/26 | $181,249 | $80,438 | $261,687 | $164,419 | $72,969 | $237,388 | $24,299 | $21,964 |
| 6 | 01/01/27 | 12/31/27 | $186,686 | $82,851 | $269,538 | $169,352 | $75,158 | $244,510 | $25,028 | $22,123 |
| 7 | 01/01/28 | 12/31/28 | $192,287 | $85,337 | $277,624 | $174,432 | $77,413 | $251,845 | $25,779 | $22,294 |
| 8 | 01/01/29 | 12/31/29 | $198,056 | $87,897 | $285,953 | $179,665 | $79,735 | $259,401 | $26,552 | $22,477 |
| 9 | 01/01/30 | 12/31/30 | $203,997 | $90,534 | $294,531 | $185,055 | $82,128 | $267,183 | $27,349 | $22,671 |
| 10 | 01/01/31 | 12/31/31 | $210,117 | $93,250 | $303,367 | $190,607 | $84,591 | $275,198 | $28,169 | $22,877 |
| 11 | 01/01/32 | 12/31/32 | $58,458 | $25,944 | $84,402 | $53,030 | $23,535 | $76,565 | $7,837 | $6,238 |
| Total | 10/01/22 | 12/02/48 | $1,784,124 | $791,794 | $2,575,918 | $1,618,460 | $718,273 | $2,336,733 | $239,185 | $211,115 |

Exhibit C

# Thanh Do

## General Information

| | |
|---|---|
| Damages Date: | 9/4/2019 |
| Trial or Settlement Date: | 10/1/2022 |
| Interest Rate (Past Damages): | 2.00% |
| Discount Rate (Future Damages): | 2.50% |
| Periodic Compounding: | Annually |
| Present Value Interest Calculation: | Simple Interest |

## Plaintiff Information

| | |
|---|---|
| Gender: | Female |
| Race: | White |
| Birth Date: | 2/20/1961 |
| Age at Injury: | 58.54 |
| Projected Retirement Age*: | 66.85 |
| Projected Age at Death**: | 84.45 |

\* Worklife expectancy calculated for all women active in the workforce with a master's degree. Study used: The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors, Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, Journal of Forensic Economics, 22(2), 2011.

\*\* Life expectancy calculated for white women. Study used: United States Life Tables, 2017 by Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics, National Vital Statistics Reports, Volume 68, Number 7, June 24, 2019.

Exhibit C

# Damages Summary

| | Future Values | | Present Values | |
|---|---|---|---|---|
| | Pre-Trial | Post-Trial | Pre-Trial | Post-Trial |
| Lost Income | $347,961 | $786,893 | $354,980 | $729,989 |
| Lost Fringe Benefits | $180,763 | $349,223 | $184,671 | $323,969 |
| Subtotal: Lost Earnings | $528,723 | $1,136,116 | $539,651 | $1,053,959 |
| Other Damages | $0 | $0 | $0 | $0 |
| Total Damages | $528,723 | $1,136,116 | $539,651 | $1,053,959 |
| Grand Total Damages | $1,664,839 | | $1,593,610 | |

Exhibit C

# Lost Income

## Projected Employment Without Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|----|-----------|----------|---------------|-----------|-----------------|------------------|
| 09/04/19 | 12/27/27 | Senior Software Engineer | IBM | $126,173 | 44.38% | 3.00% | 3.00% |

## Actual and Projected Employment With Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|----|-----------|----------|---------------|-----------|-----------------|------------------|
| 09/04/19 | 12/31/19 | Unemployed | Texas Workforce Commission | $6,591 | 0.00% | 0.00% | 0.00% |
| 01/01/20 | 12/31/20 | Unemployed | Texas Workforce Commission | $31,773 | 0.00% | 0.00% | 0.00% |
| 01/01/21 | 12/31/21 | Unemployed | Texas Workforce Commission | $20,982 | 0.00% | 0.00% | 0.00% |

## Pre-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|----|--------|----------|----------------|--------|----------|--------------|------|--------------|
| 1 | 09/04/19 | 12/31/19 | $41,136 | $18,256 | $59,392 | $6,591 | $0 | $6,591 | $52,801 | $55,703 |
| 2 | 01/01/20 | 12/31/20 | $129,958 | $57,675 | $187,634 | $31,773 | $0 | $31,773 | $155,861 | $161,309 |
| 3 | 01/01/21 | 12/31/21 | $133,857 | $59,406 | $193,263 | $20,982 | $0 | $20,982 | $172,281 | $174,858 |
| 4 | 01/01/22 | 09/30/22 | $102,356 | $45,425 | $147,781 | $0 | $0 | $0 | $147,781 | $147,781 |
| Total | 09/04/19 | 09/30/22 | $407,307 | $180,763 | $588,069 | $59,346 | $0 | $59,346 | $528,723 | $539,651 |

## Post-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|----|--------|----------|----------------|--------|----------|--------------|------|--------------|
| 1 | 10/01/22 | 12/31/22 | $34,751 | $15,423 | $50,174 | $0 | $0 | $0 | $50,174 | $49,860 |
| 2 | 01/01/23 | 12/31/23 | $142,009 | $63,024 | $205,032 | $0 | $0 | $0 | $205,032 | $198,809 |
| 3 | 01/01/24 | 12/31/24 | $146,269 | $64,914 | $211,183 | $0 | $0 | $0 | $211,183 | $199,927 |
| 4 | 01/01/25 | 12/31/25 | $150,657 | $66,862 | $217,519 | $0 | $0 | $0 | $217,519 | $201,164 |
| 5 | 01/01/26 | 12/31/26 | $155,177 | $68,867 | $224,044 | $0 | $0 | $0 | $224,044 | $202,517 |
| 6 | 01/01/27 | 12/31/27 | $158,029 | $70,133 | $228,163 | $0 | $0 | $0 | $228,163 | $201,682 |
| Total | 10/01/22 | 08/04/45 | $786,893 | $349,223 | $1,136,116 | $0 | $0 | $0 | $1,136,116 | $1,053,959 |

Exhibit C

# Janet Gelphman

## General Information

| | |
|---|---|
| Damages Date: | 6/27/2018 |
| Trial or Settlement Date: | 10/1/2022 |
| Interest Rate (Past Damages): | 2.00% |
| Discount Rate (Future Damages): | 2.50% |
| Periodic Compounding: | Annually |
| Present Value Interest Calculation: | Simple Interest |

## Plaintiff Information

| | |
|---|---|
| Gender: | Female |
| Race: | White |
| Birth Date: | 2/9/1955 |
| Age at Injury: | 63.38 |
| Projected Retirement Age*: | 69.08 |
| Projected Age at Death**: | 85.28 |

\*   Worklife expectancy calculated for all women active in the workforce with a bachelor's degree. Study used: The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors, Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, Journal of Forensic Economics, 22(2), 2011.

\*\*  Life expectancy calculated for white women. Study used: United States Life Tables, 2017 by Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics, National Vital Statistics Reports, Volume 68, Number 7, June 24, 2019.

Exhibit C

# Damages Summary

|  | Future Values | | Present Values | |
|---|---|---|---|---|
|  | Pre-Trial | Post-Trial | Pre-Trial | Post-Trial |
| Lost Income | $64,616 | ($12,947) | $70,181 | ($12,568) |
| Lost Fringe Benefits | $49,840 | ($5,746) | $53,519 | ($5,578) |
| Subtotal: Lost Earnings | $114,456 | ($18,693) | $123,700 | ($18,146) |
| Other Damages | $0 | $0 | $0 | $0 |
| Total Damages | $114,456 | ($18,693) | $123,700 | ($18,146) |
| Grand Total Damages | $95,763 | | $105,554 | |

Exhibit C

# Lost Income

## Projected Employment Without Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|-----------------|------------------|
| 06/27/18 | 03/09/24 | UX Designer | IBM | $99,996 | 44.38% | 3.00% | 3.00% |

## Actual and Projected Employment With Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|-----------------|------------------|
| 06/27/18 | 12/31/18 | Unemployment Compensation | Texas Workforce Commission | $10,374 | 0.00% | 0.00% | 0.00% |
| 01/01/19 | 07/31/19 | Unemployment Compensation | Texas Workforce Commission | $2,470 | 0.00% | 0.00% | 0.00% |
| 08/01/19 | 11/30/19 | UX Contractor | GTN | $39,872 | 0.00% | 0.00% | 0.00% |
| 12/01/19 | 03/09/24 | UX Architect | Blue Yonder Inc. | $120,410 | 44.38% | 0.00% | 3.00% |

## Pre-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|-----------------|--------|----------|---------------|------|---------------|
| 1 | 06/27/18 | 12/31/18 | $51,505 | $22,858 | $74,363 | $5,343 | $0 | $5,343 | $69,019 | $74,193 |
| 2 | 01/01/19 | 12/31/19 | $102,996 | $45,710 | $148,705 | $52,569 | $4,539 | $57,107 | $91,598 | $96,632 |
| 3 | 01/01/20 | 12/31/20 | $106,086 | $47,081 | $153,167 | $120,410 | $53,438 | $173,848 | ($20,681) | ($21,404) |
| 4 | 01/01/21 | 12/31/21 | $109,268 | $48,493 | $157,762 | $120,410 | $53,438 | $173,848 | ($16,086) | ($16,327) |
| 5 | 01/01/22 | 09/30/22 | $83,554 | $37,081 | $120,635 | $90,060 | $39,969 | $130,029 | ($9,394) | ($9,394) |
| Total | 06/27/18 | 09/30/22 | $453,408 | $201,223 | $654,631 | $388,792 | $151,383 | $540,175 | $114,456 | $123,700 |

## Post-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|-----------------|--------|----------|---------------|------|---------------|
| 1 | 10/01/22 | 12/31/22 | $28,368 | $12,590 | $40,958 | $30,577 | $13,570 | $44,147 | ($3,189) | ($3,169) |
| 2 | 01/01/23 | 12/31/23 | $115,923 | $51,447 | $167,369 | $124,950 | $55,453 | $180,402 | ($13,033) | ($12,638) |
| 3 | 01/01/24 | 12/31/24 | $21,976 | $9,753 | $31,730 | $23,688 | $10,513 | $34,200 | ($2,471) | ($2,339) |
| Total | 10/01/22 | 05/19/40 | $166,267 | $73,789 | $240,056 | $179,214 | $79,535 | $258,750 | ($18,693) | ($18,146) |

Exhibit C

# Titon Hoque

## General Information

| | |
|---|---|
| Damages Date: | 7/18/2018 |
| Trial or Settlement Date: | 10/1/2022 |
| Interest Rate (Past Damages): | 2.00% |
| Discount Rate (Future Damages): | 2.50% |
| Periodic Compounding: | Annually |
| Present Value Interest Calculation: | Simple Interest |

## Plaintiff Information

| | |
|---|---|
| Gender: | Male |
| Race: | White |
| Birth Date: | 1/24/1974 |
| Age at Injury: | 44.48 |
| Projected Retirement Age*: | 70.00 |
| Projected Age at Death**: | 79.25 |

\*    Mr. Hoque has stated that it was his intention to remain employed by IBM until age 70.

\*\*  Life expectancy calculated for white men. Study used: United States Life Tables, 2017 by Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics, National Vital Statistics Reports, Volume 68, Number 7, June 24, 2019.

## Damages Summary

| | Future Values | | Present Values | |
|---|---|---|---|---|
| | **Pre-Trial** | **Post-Trial** | **Pre-Trial** | **Post-Trial** |
| Lost Income | $278,054 | $700,631 | $292,626 | $543,867 |
| Lost Fringe Benefits | $196,087 | $310,940 | $205,244 | $241,368 |
| Subtotal: Lost Earnings | $474,140 | $1,011,571 | $497,870 | $785,236 |
| Other Damages | $0 | $0 | $0 | $0 |
| Total Damages | $474,140 | $1,011,571 | $497,870 | $785,236 |
| **Grand Total Damages** | $1,485,711 | | $1,283,106 | |

Exhibit C

# Lost Income

## Projected Employment Without Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|-----------------|------------------|
| 07/18/18 | 01/24/44 | Technical Services Professional | IBM | $158,952 | 44.38% | 3.00% | 3.00% |

## Actual and Projected Employment With Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|-----------------|------------------|
| 07/18/18 | 12/31/18 | Unemployed | Texas Workforce Commission | $8,398 | 0.00% | 0.00% | 0.00% |
| 01/01/20 | 12/31/20 | Sole Proprietor | HHH LLC | $155,384 | 0.00% | 0.00% | 0.00% |
| 01/01/21 | 01/24/44 | Technology Specialist | Austin Community College | $154,324 | 44.38% | 0.00% | 3.00% |

## Pre-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|----------------|--------|----------|--------------|------|--------------|
| 1 | 07/18/18 | 12/31/18 | $72,726 | $32,276 | $105,002 | $8,398 | $0 | $8,398 | $96,604 | $103,845 |
| 2 | 01/01/19 | 12/31/19 | $163,721 | $72,659 | $236,380 | $0 | $0 | $0 | $236,380 | $249,371 |
| 3 | 01/01/20 | 12/31/20 | $168,632 | $74,839 | $243,471 | $155,384 | $0 | $155,384 | $88,087 | $91,167 |
| 4 | 01/01/21 | 12/31/21 | $173,691 | $77,084 | $250,775 | $154,324 | $68,489 | $222,813 | $27,962 | $28,381 |
| 5 | 01/01/22 | 09/30/22 | $132,816 | $58,944 | $191,759 | $115,426 | $51,226 | $166,652 | $25,107 | $25,107 |
| Total | 07/18/18 | 09/30/22 | $711,585 | $315,802 | $1,027,387 | $433,532 | $119,715 | $553,247 | $474,140 | $497,870 |

## Post-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|----------------|--------|----------|--------------|------|--------------|
| 1 | 10/01/22 | 12/31/22 | $45,093 | $20,012 | $65,105 | $39,189 | $17,392 | $56,581 | $8,524 | $8,471 |
| 2 | 01/01/23 | 12/31/23 | $184,269 | $81,779 | $266,047 | $160,142 | $71,071 | $231,214 | $34,834 | $33,777 |
| 3 | 01/01/24 | 12/31/24 | $189,797 | $84,232 | $274,029 | $164,947 | $73,203 | $238,150 | $35,879 | $33,967 |
| 4 | 01/01/25 | 12/31/25 | $195,491 | $86,759 | $282,250 | $169,895 | $75,399 | $245,295 | $36,955 | $34,177 |
| 5 | 01/01/26 | 12/31/26 | $201,356 | $89,362 | $290,717 | $174,992 | $77,661 | $252,653 | $38,064 | $34,406 |
| 6 | 01/01/27 | 12/31/27 | $207,396 | $92,042 | $299,439 | $180,242 | $79,991 | $260,233 | $39,206 | $34,656 |
| 7 | 01/01/28 | 12/31/28 | $213,618 | $94,804 | $308,422 | $185,649 | $82,391 | $268,040 | $40,382 | $34,923 |
| 8 | 01/01/29 | 12/31/29 | $220,027 | $97,648 | $317,675 | $191,218 | $84,863 | $276,081 | $41,593 | $35,210 |
| 9 | 01/01/30 | 12/31/30 | $226,628 | $100,577 | $327,205 | $196,955 | $87,409 | $284,364 | $42,841 | $35,515 |
| 10 | 01/01/31 | 12/31/31 | $233,426 | $103,595 | $337,021 | $202,864 | $90,031 | $292,894 | $44,126 | $35,837 |
| 11 | 01/01/32 | 12/31/32 | $240,429 | $106,702 | $347,132 | $208,950 | $92,732 | $301,681 | $45,450 | $36,178 |
| 12 | 01/01/33 | 12/31/33 | $247,642 | $109,904 | $357,546 | $215,218 | $95,514 | $310,732 | $46,814 | $36,536 |
| 13 | 01/01/34 | 12/31/34 | $255,071 | $113,201 | $368,272 | $221,675 | $98,379 | $320,054 | $48,218 | $36,912 |
| 14 | 01/01/35 | 12/31/35 | $262,723 | $116,597 | $379,320 | $228,325 | $101,331 | $329,655 | $49,665 | $37,305 |
| 15 | 01/01/36 | 12/31/36 | $270,605 | $120,095 | $390,700 | $235,175 | $104,370 | $339,545 | $51,155 | $37,716 |
| 16 | 01/01/37 | 12/31/37 | $278,723 | $123,697 | $402,421 | $242,230 | $107,502 | $349,731 | $52,689 | $38,145 |
| 17 | 01/01/38 | 12/31/38 | $287,085 | $127,408 | $414,493 | $249,497 | $110,727 | $360,223 | $54,270 | $38,591 |
| 18 | 01/01/39 | 12/31/39 | $295,698 | $131,231 | $426,928 | $256,982 | $114,048 | $371,030 | $55,898 | $39,054 |

---

Exhibit C

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|----------------|--------|----------|---------------|------|---------------|
| 19 | 01/01/40 | 12/31/40 | $304,568 | $135,167 | $439,736 | $264,691 | $117,470 | $382,161 | $57,575 | $39,535 |
| 20 | 01/01/41 | 12/31/41 | $313,706 | $139,223 | $452,928 | $272,632 | $120,994 | $393,626 | $59,302 | $40,034 |
| 21 | 01/01/42 | 12/31/42 | $323,117 | $143,399 | $466,516 | $280,811 | $124,624 | $405,434 | $61,081 | $40,551 |
| 22 | 01/01/43 | 12/31/43 | $332,810 | $147,701 | $480,511 | $289,235 | $128,363 | $417,598 | $62,914 | $41,085 |
| 23 | 01/01/44 | 12/31/44 | $21,866 | $9,704 | $31,570 | $19,003 | $8,434 | $27,437 | $4,134 | $2,656 |
| Total | 10/01/22 | 04/24/53 | $5,351,144 | $2,374,838 | $7,725,982 | $4,650,514 | $2,063,898 | $6,714,412 | $1,011,571 | $785,236 |

Exhibit C

# Michael Kelly

## General Information

| | |
|---|---|
| Damages Date: | 6/30/2018 |
| Trial or Settlement Date: | 10/1/2022 |
| Interest Rate (Past Damages): | 2.00% |
| Discount Rate (Future Damages): | 2.50% |
| Periodic Compounding: | Annually |
| Present Value Interest Calculation: | Simple Interest |

## Plaintiff Information

| | |
|---|---|
| Gender: | Male |
| Race: | White |
| Birth Date: | 12/30/1958 |
| Age at Injury: | 59.50 |
| Projected Retirement Age*: | 66.73 |
| Projected Age at Death**: | 81.70 |

\* Worklife expectancy calculated for all men active in the workforce with a bachelor's degree. Study used: The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors, Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, Journal of Forensic Economics, 22(2), 2011.

\*\* Life expectancy calculated for white men. Study used: United States Life Tables, 2017 by Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics, National Vital Statistics Reports, Volume 68, Number 7, June 24, 2019.

Exhibit C

# Damages Summary

|  | Future Values | | Present Values | |
|---|---|---|---|---|
|  | Pre-Trial | Post-Trial | Pre-Trial | Post-Trial |
| Lost Income | $340,030 | ($31,210) | $359,587 | ($29,340) |
| Lost Fringe Benefits | $162,188 | ($13,851) | $171,310 | ($13,021) |
| Subtotal: Lost Earnings | $502,218 | ($45,061) | $530,897 | ($42,360) |
| Other Damages | $0 | $0 | $0 | $0 |
| Total Damages | $502,218 | ($45,061) | $530,897 | ($42,360) |
| Grand Total Damages | $457,157 | | $488,536 | |

Exhibit C

# Lost Income

## Projected Employment Without Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|-----------------|------------------|
| 06/30/18 | 09/22/25 | Sales Specialist | IBM | $254,230 | 44.38% | 0.00% | 0.00% |

## Actual and Projected Employment With Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|-----------------|------------------|
| 01/01/19 | 04/30/19 | Unemployment | Texas Workforce Commission | $5,434 | 0.00% | 0.00% | 0.00% |
| 05/01/19 | 12/31/19 | Senior Director | HID Global | $113,258 | 44.38% | 0.00% | 0.00% |
| 01/01/20 | 08/31/20 | Senior Director | HID Global | $166,000 | 44.38% | 0.00% | 0.00% |
| 09/01/20 | 12/31/20 | Unemployment | Texas Workforce Commission | $19,988 | 0.00% | 0.00% | 0.00% |
| 01/01/21 | 09/22/25 | Global Channel Director | Measurabl | $250,000 | 44.38% | 0.00% | 3.00% |

## Pre-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|----------------|--------|----------|--------------|------|--------------|
| 1 | 06/30/18 | 12/31/18 | $128,856 | $57,186 | $186,043 | $0 | $0 | $0 | $186,043 | $199,988 |
| 2 | 01/01/19 | 12/31/19 | $254,230 | $112,827 | $367,057 | $118,692 | $50,264 | $168,956 | $198,101 | $208,989 |
| 3 | 01/01/20 | 12/31/20 | $254,230 | $112,827 | $367,057 | $185,988 | $73,671 | $259,659 | $107,398 | $111,153 |
| 4 | 01/01/21 | 12/31/21 | $254,230 | $112,827 | $367,057 | $250,000 | $110,950 | $360,950 | $6,107 | $6,199 |
| 5 | 01/01/22 | 09/30/22 | $190,150 | $84,389 | $274,539 | $186,986 | $82,985 | $269,971 | $4,568 | $4,568 |
| Total | 06/30/18 | 09/30/22 | $1,081,696 | $480,057 | $1,561,753 | $741,666 | $317,869 | $1,059,536 | $502,218 | $530,897 |

## Post-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|----------------|--------|----------|--------------|------|--------------|
| 1 | 10/01/22 | 12/31/22 | $64,080 | $28,439 | $92,519 | $63,485 | $28,175 | $91,660 | $859 | $854 |
| 2 | 01/01/23 | 12/31/23 | $254,230 | $112,827 | $367,057 | $259,426 | $115,133 | $374,559 | ($7,501) | ($7,274) |
| 3 | 01/01/24 | 12/31/24 | $254,230 | $112,827 | $367,057 | $267,208 | $118,587 | $385,796 | ($18,738) | ($17,739) |
| 4 | 01/01/25 | 12/31/25 | $184,578 | $81,916 | $266,494 | $198,209 | $87,965 | $286,174 | ($19,680) | ($18,201) |
| Total | 10/01/22 | 09/10/40 | $757,118 | $336,009 | $1,093,127 | $788,328 | $349,860 | $1,138,188 | ($45,061) | ($42,360) |

Exhibit C

# Walter Noffsinger

## General Information

| | |
|---|---|
| Damages Date: | 6/22/2020 |
| Trial or Settlement Date: | 10/1/2022 |
| Interest Rate (Past Damages): | 2.00% |
| Discount Rate (Future Damages): | 2.50% |
| Periodic Compounding: | Annually |
| Present Value Interest Calculation: | Simple Interest |

## Plaintiff Information

| | |
|---|---|
| Gender: | Male |
| Race: | White |
| Birth Date: | 3/7/1960 |
| Age at Injury: | 60.29 |
| Projected Retirement Age*: | 70.00 |
| Projected Age at Death**: | 81.86 |

\*   Mr. Noffsinger has stated that it was his intention to remain employed by IBM until age 70.

\*\*  Life expectancy calculated for white men. Study used: United States Life Tables, 2017 by Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics, National Vital Statistics Reports, Volume 68, Number 7, June 24, 2019.

## Damages Summary

| | Future Values | | Present Values | |
|---|---|---|---|---|
| | Pre-Trial | Post-Trial | Pre-Trial | Post-Trial |
| Lost Income | $387,288 | $1,206,489 | $393,615 | $1,090,765 |
| Lost Fringe Benefits | $182,496 | $535,440 | $185,628 | $484,082 |
| Subtotal: Lost Earnings | $569,784 | $1,741,929 | $579,243 | $1,574,847 |
| Other Damages | $94,071 | $0 | $97,360 | $0 |
| Total Damages | $663,855 | $1,741,929 | $676,602 | $1,574,847 |
| Grand Total Damages | $2,405,784 | | $2,251,449 | |

Exhibit C

# Lost Income

## Projected Employment Without Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|----|-----------|----------|----------------|-----------|------------------|-------------------|
| 06/22/20 | 03/07/30 | Director | IBM | $347,987 | 44.38% | 3.00% | 3.00% |

## Actual and Projected Employment With Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|----|-----------|----------|----------------|-----------|------------------|-------------------|
| 06/23/20 | 09/14/20 | Unemployed | Colorado DOL | $29,252 | 0.00% | 0.00% | 0.00% |
| 09/15/20 | 12/31/20 | VP of Product Management and BD | EOX Vantage | $200,000 | 44.38% | 0.00% | 0.00% |
| 09/15/20 | 09/16/20 | VP of Product Management and BD | EOX Vantage - Signing Bonus | $12,000 | 0.00% | 0.00% | 0.00% |
| 01/01/21 | 05/15/21 | VP of Product Management and BD | EOX Vantage | $71,623 | 44.38% | 0.00% | 0.00% |
| 05/16/21 | 07/19/21 | Unemployed | Colorado DOL | $29,252 | 0.00% | 0.00% | 0.00% |
| 07/20/21 | 12/31/21 | VP of Product | Section | $105,866 | 44.38% | 0.00% | 0.00% |
| 01/01/22 | 03/07/30 | VP of Product | Section | $225,000 | 44.38% | 0.00% | 3.00% |

## Pre-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|----|--------|----------|-----------------|--------|----------|---------------|------|---------------|
| 1 | 06/22/20 | 12/31/20 | $183,501 | $81,438 | $264,939 | $77,730 | $26,191 | $103,921 | $161,018 | $166,647 |
| 2 | 01/01/21 | 12/31/21 | $358,427 | $159,070 | $517,496 | $182,698 | $78,770 | $261,468 | $256,028 | $259,858 |
| 3 | 01/01/22 | 09/30/22 | $274,076 | $121,635 | $395,711 | $168,288 | $74,686 | $242,974 | $152,738 | $152,738 |
| Total | 06/22/20 | 09/30/22 | $816,004 | $362,143 | $1,178,147 | $428,716 | $179,647 | $608,363 | $569,784 | $579,243 |

## Post-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|----|--------|----------|-----------------|--------|----------|---------------|------|---------------|
| 1 | 10/01/22 | 12/31/22 | $93,053 | $41,297 | $134,351 | $56,712 | $25,169 | $81,881 | $52,469 | $52,141 |
| 2 | 01/01/23 | 12/31/23 | $380,255 | $168,757 | $549,012 | $231,750 | $102,851 | $334,601 | $214,411 | $207,904 |
| 3 | 01/01/24 | 12/31/24 | $391,662 | $173,820 | $565,482 | $238,703 | $105,936 | $344,639 | $220,844 | $209,072 |
| 4 | 01/01/25 | 12/31/25 | $403,412 | $179,034 | $582,447 | $245,864 | $109,114 | $354,978 | $227,469 | $210,366 |
| 5 | 01/01/26 | 12/31/26 | $415,515 | $184,405 | $599,920 | $253,239 | $112,388 | $365,627 | $234,293 | $211,780 |
| 6 | 01/01/27 | 12/31/27 | $427,980 | $189,938 | $617,918 | $260,837 | $115,759 | $376,596 | $241,322 | $213,313 |
| 7 | 01/01/28 | 12/31/28 | $440,820 | $195,636 | $636,455 | $268,662 | $119,232 | $387,894 | $248,561 | $214,962 |
| 8 | 01/01/29 | 12/31/29 | $454,044 | $201,505 | $655,549 | $276,722 | $122,809 | $399,531 | $256,018 | $216,726 |
| 9 | 01/01/30 | 12/31/30 | $82,541 | $36,632 | $119,173 | $50,305 | $22,326 | $72,631 | $46,542 | $38,582 |
| Total | 10/01/22 | 01/14/42 | $3,089,283 | $1,371,024 | $4,460,306 | $1,882,793 | $835,584 | $2,718,377 | $1,741,929 | $1,574,847 |

Exhibit C

# Other Damages

## Summary of Other Damages

| Start | End | Type* | Description | Vendor | Amount | Growth | Occurs |
|---|---|---|---|---|---|---|---|
| 06/22/20 | 06/22/20 | E | Forfeit of Unvested RSU's | IBM | $94,071.00 | | Once |

* E = Expense, R = Reimbursement

## Pre-Trial Other Damages

| Period | From | To | Loss of Unvested RSU's | Present Value |
|---|---|---|---|---|
| 1 | 06/22/20 | 12/31/20 | $94,071 | $97,360 |
| Total | 06/22/20 | 09/30/22 | $94,071 | $97,360 |

Exhibit C

# Michael Sauro

## General Information

| | |
|---|---|
| Damages Date: | 6/30/2018 |
| Trial or Settlement Date: | 10/1/2022 |
| Interest Rate (Past Damages): | 2.00% |
| Discount Rate (Future Damages): | 2.50% |
| Periodic Compounding: | Annually |
| Present Value Interest Calculation: | Simple Interest |

## Plaintiff Information

| | |
|---|---|
| Gender: | Male |
| Race: | White |
| Birth Date: | 11/8/1954 |
| Age at Injury: | 63.64 |
| Projected Retirement Age*: | 70.00 |
| Projected Age at Death**: | 82.69 |

\*   Mr. Sauro has stated that it was his intention to remain employed by IBM until age 70.

\*\*  Life expectancy calculated for white men. Study used: United States Life Tables, 2017 by Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics, National Vital Statistics Reports, Volume 68, Number 7, June 24, 2019.

## Damages Summary

| | Future Values | | Present Values | |
|---|---|---|---|---|
| | Pre-Trial | Post-Trial | Pre-Trial | Post-Trial |
| Lost Income | $870,357 | $433,954 | $899,606 | $417,991 |
| Lost Fringe Benefits | $388,861 | $192,589 | $401,918 | $185,505 |
| Subtotal: Lost Earnings | $1,259,217 | $626,542 | $1,301,524 | $603,496 |
| Other Damages | $0 | $0 | $0 | $0 |
| Total Damages | $1,259,217 | $626,542 | $1,301,524 | $603,496 |
| Grand Total Damages | $1,885,760 | | $1,905,020 | |

Exhibit C

# Lost Income

## Projected Employment Without Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|------------------|-------------------|
| 06/30/18 | 11/08/24 | Director | IBM | $205,934 | 44.38% | 0.00% | 0.00% |

## Actual and Projected Employment With Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|------|-----|-----------|----------|---------------|-----------|------------------|-------------------|
| 01/01/20 | 12/31/20 | Nonemployee Compensation | Sedera, Inc. | $4,250 | 0.00% | 0.00% | 0.00% |
| 01/01/21 | 12/31/21 | Nonemployee Compensation | Sedera, Inc. | $1,600 | 0.00% | 0.00% | 0.00% |

## Pre-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|-----------------|--------|----------|---------------|------|---------------|
| 1 | 06/30/18 | 12/31/18 | $104,378 | $46,323 | $150,700 | $0 | $0 | $0 | $150,700 | $161,997 |
| 2 | 01/01/19 | 12/31/19 | $205,934 | $91,394 | $297,328 | $0 | $0 | $0 | $297,328 | $313,668 |
| 3 | 01/01/20 | 12/31/20 | $205,934 | $91,394 | $297,328 | $4,250 | $0 | $4,250 | $293,078 | $303,323 |
| 4 | 01/01/21 | 12/31/21 | $205,934 | $91,394 | $297,328 | $1,600 | $0 | $1,600 | $295,728 | $300,151 |
| 5 | 01/01/22 | 09/30/22 | $154,027 | $68,357 | $222,385 | $0 | $0 | $0 | $222,385 | $222,385 |
| Total | 06/30/18 | 09/30/22 | $876,207 | $388,861 | $1,265,067 | $5,850 | $0 | $5,850 | $1,259,217 | $1,301,524 |

## Post-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|--------|------|-----|--------|----------|-----------------|--------|----------|---------------|------|---------------|
| 1 | 10/01/22 | 12/31/22 | $51,907 | $23,036 | $74,943 | $0 | $0 | $0 | $74,943 | $74,474 |
| 2 | 01/01/23 | 12/31/23 | $205,934 | $91,394 | $297,328 | $0 | $0 | $0 | $297,328 | $288,303 |
| 3 | 01/01/24 | 12/31/24 | $176,113 | $78,159 | $254,272 | $0 | $0 | $0 | $254,272 | $240,719 |
| Total | 10/01/22 | 07/18/37 | $433,954 | $192,589 | $626,542 | $0 | $0 | $0 | $626,542 | $603,496 |

Exhibit C

# Charles Townsley

## General Information

| | |
|---|---|
| Damages Date: | 6/16/2018 |
| Trial or Settlement Date: | 10/1/2022 |
| Interest Rate (Past Damages): | 2.00% |
| Discount Rate (Future Damages): | 2.50% |
| Periodic Compounding: | Annually |
| Present Value Interest Calculation: | Simple Interest |

## Plaintiff Information

| | |
|---|---|
| Gender: | Male |
| Race: | White |
| Birth Date: | 7/15/1961 |
| Age at Injury: | 56.92 |
| Projected Retirement Age*: | 67.39 |
| Projected Age at Death**: | 81.08 |

\*   Worklife expectancy calculated for all men active in the workforce with a master's degree. Study used: The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors, Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, Journal of Forensic Economics, 22(2), 2011.

\*\*  Life expectancy calculated for white men. Study used: United States Life Tables, 2017 by Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics, National Vital Statistics Reports, Volume 68, Number 7, June 24, 2019.

Exhibit C

# Damages Summary

| | Future Values | | Present Values | |
|---|---|---|---|---|
| | Pre-Trial | Post-Trial | Pre-Trial | Post-Trial |
| Lost Income | $865,193 | $856,297 | $900,132 | $789,914 |
| Lost Fringe Benefits | $398,655 | $380,025 | $414,995 | $350,564 |
| Subtotal: Lost Earnings | $1,263,849 | $1,236,322 | $1,315,127 | $1,140,478 |
| Other Damages | $0 | $0 | $0 | $0 |
| Total Damages | $1,263,849 | $1,236,322 | $1,315,127 | $1,140,478 |
| **Grand Total Damages** | $2,500,171 | | $2,455,604 | |

Exhibit C

# Lost Income

## Projected Employment Without Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|---|---|---|---|---|---|---|---|
| 06/16/18 | 12/04/28 | Manager | IBM | $350,000 | 44.38% | 0.00% | 0.00% |

## Actual and Projected Employment With Damages

| From | To | Occupation | Employer | Initial Salary | Benefits % | Pre-Trial Growth | Post-Trial Growth |
|---|---|---|---|---|---|---|---|
| 06/16/18 | 12/31/18 | Unemployed | Texas Workforce Commission | $2,964 | 0.00% | 0.00% | |
| 01/01/19 | 12/31/19 | Contractor | APC Workforce Solutions II LLC | $24,192 | 0.00% | 0.00% | 0.00% |
| 01/01/19 | 12/31/19 | Unemployed | Texas Workforce Commission | $5,928 | 0.00% | 0.00% | 0.00% |
| 01/01/19 | 12/31/19 | Manager | Oracle | $91,741 | 44.38% | 0.00% | 0.00% |
| 01/01/20 | 12/31/20 | Manager | Oracle | $180,515 | 44.38% | 0.00% | 0.00% |
| 01/01/21 | 12/04/28 | Manager | Oracle | $189,977 | 44.38% | 0.00% | 3.00% |

## Pre-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 06/16/18 | 12/31/18 | $190,822 | $84,687 | $275,509 | $2,964 | $0 | $2,964 | $272,545 | $292,974 |
| 2 | 01/01/19 | 12/31/19 | $350,000 | $155,330 | $505,330 | $121,861 | $40,715 | $162,576 | $342,754 | $361,592 |
| 3 | 01/01/20 | 12/31/20 | $350,000 | $155,330 | $505,330 | $180,515 | $80,113 | $260,628 | $244,702 | $253,257 |
| 4 | 01/01/21 | 12/31/21 | $350,000 | $155,330 | $505,330 | $189,977 | $84,312 | $274,289 | $231,041 | $234,497 |
| 5 | 01/01/22 | 09/30/22 | $261,781 | $116,178 | $377,959 | $142,092 | $63,061 | $205,153 | $172,806 | $172,806 |
| Total | 06/16/18 | 09/30/22 | $1,502,603 | $666,855 | $2,169,458 | $637,409 | $268,200 | $905,609 | $1,263,849 | $1,315,127 |

## Post-Trial Lost Income

| Period | From | To | Income | Benefits | Total Uninjured | Income | Benefits | Total Injured | Loss | Present Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 10/01/22 | 12/31/22 | $88,219 | $39,152 | $127,371 | $48,243 | $21,410 | $69,653 | $57,718 | $57,357 |
| 2 | 01/01/23 | 12/31/23 | $350,000 | $155,330 | $505,330 | $197,140 | $87,491 | $284,630 | $220,700 | $214,001 |
| 3 | 01/01/24 | 12/31/24 | $350,000 | $155,330 | $505,330 | $203,054 | $90,115 | $293,169 | $212,161 | $200,853 |
| 4 | 01/01/25 | 12/31/25 | $350,000 | $155,330 | $505,330 | $209,145 | $92,819 | $301,964 | $203,366 | $188,075 |
| 5 | 01/01/26 | 12/31/26 | $350,000 | $155,330 | $505,330 | $215,420 | $95,603 | $311,023 | $194,307 | $175,636 |
| 6 | 01/01/27 | 12/31/27 | $350,000 | $155,330 | $505,330 | $221,882 | $98,471 | $320,354 | $184,976 | $163,507 |
| 7 | 01/01/28 | 12/31/28 | $324,180 | $143,871 | $468,052 | $211,218 | $93,739 | $304,957 | $163,094 | $141,048 |
| Total | 10/01/22 | 08/14/42 | $2,162,400 | $959,673 | $3,122,072 | $1,306,102 | $579,648 | $1,885,750 | $1,236,322 | $1,140,478 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| CHARLES TOWNSLEY, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-00969-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

# EXHIBIT C to Exhibit 1

Dwight Steward, Ph.D.  - 5/13/2022

---

**Page 1**

```
               IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
                        AUSTIN DIVISION

CHARLES TOWNSLEY,            §
MICHAEL SAURO, WALTER        §
NOFFSINGER, ROSA             §
DAVIDSON, MICHAEL KELLY,     §
TITON HOQUE, JANET           §
GELPHMAN, THANH DO,          §
                             § CASE NO.
        Plaintiffs,          § 1:20-CV-00969-LY
                             §
                             §
VS.                          §
                             §
                             §
INTERNATIONAL BUSINESS       §
MACHINES CORPORATION,        §
                             §
        Defendant.           §


* * * * * * * * * * * * * * * * * * *

         ORAL AND VIDEOTAPED DEPOSITION OF
               DWIGHT STEWARD, Ph.D.

                   May 13, 2022

* * * * * * * * * * * * * * * * * * *
```

---

**Page 3**

APPEARANCES

For the Plaintiffs:
    Mr. Ross Pringle
    WRIGHT & GREENHILL, P.C.
    900 Congress Avenue
    Suite 500
    Austin, Texas 78701-2496
    512-476-4600/512-476-5382 (fax)
    hcoughlin@w-g.com
    scooke@w-g.com
    cpierce@w-g.com
    rpringle@w-g.com
    lgobellan@w-g.com

For the Defendant:
    Mr. Edward M. "Ted" Smith
    CORNELL SMITH MIERL BRUTOCAO BURTON, LLP
    1607 West Avenue
    Austin, Texas 78701
    512-328-1540
    tsmith@cornellsmith.com
    alin@cornellsmith.com
    abroadaway@cornellsmith.com

Videographer:
    Mr. Hank Wisrodt
    3stix Productions
    512-569-0725
    hwisrodt@gmail.com

---

**Page 2**

```
     ORAL AND VIDEOTAPED DEPOSITION OF DWIGHT
STEWARD, Ph.D., produced as a witness at the instance
of the PLAINTIFFS, and duly sworn, was taken in the
above-styled and numbered cause on May 13, 2022, from
9:30 a.m. to 3:35 p.m., before Brenda J. Wright, RPR,
CSR in and for the State of Texas, reported remotely
by machine shorthand, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the
record or attached herein.
```

---

**Page 4**

```
            STIPULATIONS

     The attorneys for all parties present stipulate
and agree to the following items:

     That the deposition of DWIGHT STEWARD, Ph.D. is
being taken pursuant to Notice;

     That the deposition is being taken pursuant to
the Federal Rules of Civil Procedure;

     That the original transcript will be submitted
to the witness' attorney; EDWARD M. "TED" SMITH;

     That the witness or the witness' attorney will
return the signed transcript to the court reporter
within 30 days of the date the transcript is provided
to the witness' attorney.  If not returned, the
witness may be deemed to have waived the right to make
the changes, and an unsigned copy may be used as
though signed.
```

---

Dwight Steward, Ph.D.  - 5/13/2022

---

Page 5

INDEX

PAGE
MARKED
APPEARANCES                          3
STIPULATIONS                         4

DWIGHT STEWARD, Ph.D.

Examination by   Mr. Pringle         6

Changes and Corrections            248
Signature Page                     249
Reporter's Certificate             250

EXHIBITS

EXHIBIT DESCRIPTION                PAGE
NO.                              MARKED
1    Dr. Steward's report - Charles    45
     Townsley
2    Dr. Steward's report - Walter     98
     Noffsinger
3    Dr. Steward's report - Michael   140
     Sauro
4    Dr. Steward's report - Thanh Do  168
5    Dr. Steward's report - Michael   195
     Kelly
6    Dr. Steward's report - Rosa      215
     Davidson
7    Dr. Steward's report - Titon Hoque 222
8    Dr. Steward's report - Janet     230
     Gelphman

---

Page 6

1          THE VIDEOGRAPHER:  We're on the record
2   May 13th, 2022, and the time is 9:32.  Here begins
3   Tape 1 of the video deposition of
4   Doctor Dwight Steward.  This video deposition is being
5   held via Zoom video conferencing.
6          Will counsel please identify yourselves
7   for the record.
8          MR. PRINGLE:  Ross Pringle representing
9   the plaintiffs.
10          MR. SMITH:  Ted Smith representing
11   defendant IBM.
12          THE VIDEOGRAPHER:  Will the court
13   reporter please swear in the witness.
14          DWIGHT STEWARD, Ph.D.,
15   having been first duly sworn, testified as follows:
16          EXAMINATION
17   BY MR. PRINGLE:
18   Q.   Would you please state your name, sir?
19   A.   Dwight Steward.
20   Q.   And what is your current business address?
21   A.   It is 1920 East Riverside Drive, A-120,
22   Number 260, Austin, Texas, 78741.
23   Q.   And what is at that office?
24   A.   That's just a mailing address.
25   Q.   Okay.  And have you given depositions

---

Page 7

1   before?
2   A.   Yes, sir, I have.
3   Q.   Any idea how many depositions you've given?
4   A.   Upward of 300 depositions.
5   Q.   All right.  I'm going to go over real
6   briefly the deposition warnings that you've heard
7   upwards of 300 times, so bear with me.
8          You understand that you're under oath?
9   A.   Yes, sir, I do.
10   Q.   And so it's important that you understand
11   all of my questions.  If I ever ask you a question
12   that's unclear to you, will you ask me to rephrase it?
13   A.   Yes.
14   Q.   All right.  It's important not to talk over
15   each other, especially in a Zoom format such as what
16   we're enjoying today.  So if I ever cut you off, you
17   let me know, and I'll do the same.  Agreed?
18   A.   Yes.
19   Q.   If you answer a question, I will have
20   understood or assumed that you understood it at the
21   time it was asked.  Is that fair?
22   A.   Yes.
23   Q.   When were you hired in this case, sir?
24   A.   I don't recall the exact date.  I believe it
25   was earlier -- earlier this year -- earlier this year,

---

Page 8

1   2022.
2   Q.   2022.  And how were you contacted?
3   A.   I don't recall.  But I -- yeah, probably by
4   email, though, but I don't recall specifically how I
5   was contacted.
6   Q.   Do you remember who -- who contacted you?
7   A.   I can't remember if it was -- or recall if
8   it was Ted Smith or not, but I believe it was
9   Ted Smith.
10   Q.   Okay.  And what were you hired to do?
11   A.   I was hired to perform an analysis and to
12   review the plaintiffs' experts' reports.
13   Q.   Perform an analysis and to do what?
14   A.   And review the plaintiffs' expert reports.
15   Q.   And have you prepared a series of reports
16   concerning your work in this case?
17   A.   Yes, sir, I have.
18   Q.   And those reports, I believe, were dated in
19   the middle of March 2022.  Correct?
20   A.   Yes, sir, that's right.
21   Q.   Okay.  Are all of your opinions contained
22   and referenced in those reports?
23   A.   My general opinions and impressions up to
24   date are -- to date are contained in those reports.
25   Q.   And all of the documents and sources

Dwight Steward, Ph.D.  - 5/13/2022

17

1    Q.  All right.  All right.  Any other things
2  that you recall being discussed in that 20 to 30 --
3  20- to 30-minute conversation yesterday other than
4  discussion about fringe benefits calculations and the
5  fact that Mr. Rambin hasn't made any changes to his
6  report?
7    A.  Nothing specific, I guess, other than --
8  because you mentioned fringe benefits, but it's my
9  understanding that Mr. Rambin believes that if you --
10  you know, once they've got comparable benefits,
11  they've got comparable benefits and they should be
12  netted out.  That's kind of what I took away from
13  that.  But that's part of the fringe benefits part
14  that I -- that's part of the fringe benefits response
15  that I talked about a couple of seconds ago.
16    Q.  Okay.  Was there any other aspects of his
17  testimony that were discussed yesterday that you can
18  recall about the fringe benefits and -- well, the
19  fringe benefits?
20    A.  Nothing that I can think of right now, no.
21    Q.  What did the lawyers tell you about
22  Mr. Rambin's calculation of fringe benefits?
23    A.  They told me how he testified in terms of
24  how he made the calculation.  He -- they told me what
25  table and what lines that he got his numbers from.

18

1    Q.  What did they tell you?
2    A.  What did they tell me?  That he used a
3  document, the ECEC, from December 2020, which is what
4  he references in this report, and he went through and
5  described how he calculated his fringe benefit
6  multiplier from one of the tables.  I don't recall the
7  table number now, but I have it printed out.
8    Q.  What's your understanding of how he
9  calculated the fringe benefit number, based on your
10  conversation yesterday?
11    A.  Sure.  Well, I mean, I just have to be
12  careful in terms of, this is how he calculated his
13  fringe benefit multiplier that he uses throughout his
14  analysis.  But my understanding is, he uses one of the
15  tables, and I would have to pull up exactly which one
16  it was, but it's a general number for, I think,
17  management, and he uses that number for all eight
18  plaintiffs.
19        And he uses two different numbers, one
20  which is the average salary, which I guess all
21  workers, and then he has the average total cost of
22  benefits for all those workers.  And basically he
23  divides the average cost of total benefits by the
24  average wage of all of those workers in that class and
25  comes up with a benefit multiplier of 44.38 percent.

19

1    Q.  So is it your understanding that what
2  Mr. Rambin did with the fringe benefits calculation
3  is, he converted the fringe benefit percentage of the
4  total to a fringe benefit percentage of the wages?
5        MR. SMITH:  Objection.  Form.
6    A.  I don't understand your question, sir.
7    Q.  (BY MR. PRINGLE)  You don't understand that?
8    A.  No, sir, I don't.
9    Q.  Okay.  How are the fringe benefits listed in
10  the table that you referenced?
11    A.  Well, in the table, it's actually multiple
12  tables.  If you're talking about the ones he actually
13  used --
14    Q.  Yes.
15    A.  How were they listed?  Well, they're listed
16  in terms of -- it goes across, it shows an average
17  salary.  So what it is, it's based off of a survey,
18  and so you -- what he's done is they calculate the
19  average wage for all those employees in that
20  particular category of employment or that occupation.
21  So that's one of the columns.
22        And then as you go further over, it has
23  another column that says, Total Benefits.  And total
24  benefits is equal to a whole range of other
25  subcategories.  So, for example, it has supplemental

20

1  pay, it has vacation pay, it has insurance, it has
2  legally required benefits.  And so there's a dollar
3  amount that's attachment to each of those.
4        And so what he does is, he looks at the
5  total amount of those benefits, the sum total of all
6  of those benefits, and divides that by the average
7  wage for the people in that category.  And so those
8  are the average costs of those benefits, he divides it
9  by the average cost of those -- by the average wage
10  for those employees.
11    Q.  In the table that Mr. Rambin reviewed --
12  referenced and that you reviewed yesterday, are the
13  percentage of benefits expressed as a percentage of
14  the total compensation?
15    A.  I can pull that table up.  But the table
16  that -- that he used shows dollars, and I believe
17  there is percentage, but there's a dollar -- there's a
18  dollar amount and there's a percentage amount.
19    Q.  Right.  And are the percentage amounts of
20  the fringe benefits expressed as a percentage of the
21  entire compensation, including the fringe benefits?
22    A.  I would have to look.  It may be.  I don't
23  recall.
24    Q.  Please do look and verify that if you would.
25    A.  Sure.

Dwight Steward, Ph.D.  - 5/13/2022

41

1    Q.  All right.  Would you be able to express an
2    opinion as to the financial detriment that each
3    plaintiff suffered in terms of a dollar amount as a
4    result of their termination from IBM?
5    A.  I don't know.  I would have to -- I have not
6    been asked to do that.  I have a -- obviously, I would
7    know how to go about that.  But some of the
8    individuals, I don't know if the data would be
9    completely there, because I know some individuals the
10   data is not there all the way.  So the short answer is
11   I don't know completely what that would look like.
12   Q.  You don't know whether you would be able to
13   calculate damages for these eight plaintiffs.  Is that
14   right?
15   A.  Yeah, that's what it said because, like I
16   said, some of these individual I know that the data is
17   not complete yet, but I know the methodology that I
18   would use.  But that's, again, not something I've been
19   asked to do.
20   Q.  All right.  Let's -- are you critical of
21   Mr. Rambin's methodology?
22   A.  Yes.
23   Q.  Can you list your criticisms of his
24   methodology?
25   A.  We would really have to go person by person.

42

1    But I'm somewhat -- I could give you some general
2    impressions, but I really -- it's important to realize
3    that each case is different, every individual here in
4    terms of all eight, they're all different in terms of
5    what the issue is.  But generally, in terms of what he
6    does -- and, again, it just really depends on the
7    person, but a lot of it is -- you've got two things.
8    One, on the left-hand side there's an issue in terms
9    of how he calculates what the IBM wages would be going
10   into the future.
11          There is the really big disconnect in
12   terms of how that should be calculated in terms of how
13   far that would go.  It's very clear, in terms of
14   employment, that you have to consider -- it's not work
15   life that's relevant in an employment case when you're
16   doing the damages, it's how long they would have
17   worked at that employer.  And those are completely
18   separate issues.
19          And so Mr. Rambin's approach of using
20   this Markov model is completely incorrect and that
21   permeates through all of his analyses.  That's one
22   that goes across.
23          The other thing that goes across, is
24   you have to look at the mitigation attempts of the
25   individuals in an employment case, you have to see

43

1    what did they try to do when they -- when they were
2    terminated.  That's a big part.  That's what makes it
3    different from an injury case, because there, you
4    know, that's when you use a vocational person.
5          Here you want to know, what did they do
6    in terms of, you know, to get a job.  Did they go --
7    how did they serve.  So that's a big part that he
8    doesn't do.
9          And then there's just a huge
10   overstatement in those fringe benefits.  There's a
11   complete double counting of a number of things.  And
12   his fringe benefit multiplier includes things that
13   none of these individuals actually had in terms of
14   benefits, and so that results in a really -- when it
15   should be applied or potentially applied, it's
16   ridiculously overstated.  In a number of situations,
17   it really should be no damage whatsoever in terms of
18   fringe benefits.  So that's the overarching kind of
19   theme, but there are a lot of things that, you know,
20   go into that.
21   Q.  And you also criticize his assumption
22   regarding retirement age?
23   A.  Well, that actually was my very first thing.
24   It isn't -- that's my point.  This isn't a retirement
25   issue.  It's how long would you be with that employer.

44

1    But for these individuals, you definitely want to look
2    at -- because he talks about retirement.  Yeah, so
3    that's one of the things that you -- that I take issue
4    with in terms of how long they would be employed.
5    Sometimes he just uses arbitrary 70, because I guess
6    they report it to him.  Other times he uses an
7    academic study which, again, is not used in an
8    employment setting.  That's for injury cases, that's
9    not relevant to these individuals.
10   Q.  Is retirement age at all relevant in any of
11   these analyses?
12   A.  Yes.
13   Q.  How is it relevant?
14   A.  Well, there's a couple of people that
15   clearly are, at the time of what he says is the
16   injury, were past the retirement age.  And, in fact, I
17   believe there was one individual who reports actually
18   being retired.  So, yes, retirement age, I can think
19   of two individuals where retirement age would be
20   something that Mr. Rambin should consider.
21   Q.  Is it your opinion that the plaintiff or
22   plaintiffs who were past retirement age at the time of
23   discharge suffered no damages?
24   A.  Again, we would have to talk about each one
25   separately.  I'm not going to -- I can't give you

Dwight Steward, Ph.D.  - 5/13/2022

81

1 asking them for retirement data.
2     Q.  Would it be fair to say that you haven't
3 asked for that because you haven't been asked to opine
4 about the average retirement age?
5         MR. SMITH:  Objection.  Form.
6     Q.  (BY MR. PRINGLE)  Or ages?
7     A.  I really wouldn't say that's fair, because I
8 really have described why I did not ask for that.  And
9 again, it's -- I've already described it.  What is
10 fair is kind of how I've described it in the last
11 couple of questions.  That's not necessarily -- that's
12 not necessary for what I'm doing.  And that's why I
13 did not ask for it.  Because again, those are the
14 things that Mr. Rambin would need to do to make his
15 analysis accurate and scientifically sound.
16     Q.  And it's not necessary because it -- you
17 haven't been asked to opine about the specific
18 retirement age for these plaintiffs, specific
19 retirement age?
20     A.  No.  It's not necessary for the reasons that
21 I just mentioned.  Because again, it's not necessary
22 because that's -- because those are the things that
23 Mr. Rambin does.  And again, it doesn't have anything
24 to do with the second part.  It just has to do with
25 Mr. Rambin.  That's it.

82

1     Q.  And because you haven't been asked to do
2 that, you don't feel a need to request that
3 information.  Correct?
4         MR. SMITH:  Objection.  Form.  It's
5 been asked and answered about eight times.
6         MR. PRINGLE:  Yeah.  And I'm not really
7 understanding the answer.  I don't understand the
8 answer at all.
9     Q.  (BY MR. PRINGLE)  What is the answer?
10     A.  Again --
11         MR. SMITH:  Objection.  Form.
12     A.  -- it has absolutely nothing to do with the
13 fact that I wasn't asked to do this.  Again, it has to
14 do with Mr. Rambin.  And so what I'm saying is, again,
15 so that -- he needs to get that type of information.
16 And I've laid that out.  There's no reason for me to
17 ask for the information that Mr. Rambin needs in
18 this -- in this case.  That's it.  It had nothing with
19 what I was asked to do.
20         If I were asked to do a different
21 assignment, I'm sure I would ask for different items,
22 but it has nothing to do with the second aspect of
23 what you're saying.
24     Q.  (BY MR. PRINGLE)  And as we sit here today,
25 you don't know if IBM would have the capability to

83

1 provide the average retirement age for plaintiffs
2 similarly situated than these plaintiffs if you or
3 Mr. Rambin asked for it.  You don't know one way or
4 the other, do you?
5     A.  I don't know one way or another.
6     Q.  You criticize Mr. Rambin -- and let me see.
7 I'm looking at paragraph 24 on pages 9 and 10 of your
8 report.  And you're critical of Mr. Rambin's use of
9 the labor market data that he references because it
10 includes jobs such as store clerks, truck drivers,
11 administrative assistants, housekeepers, bartenders.
12 And those jobs are clearly different than the ones
13 held by Mr. Townsley.  Is that correct?
14     A.  You read it -- close.  I mean, it's not --
15 there's no because.  These were just examples of the
16 issues related to his -- his use of this.  These are
17 just examples.  This is not the sum total of why it's
18 wrong.
19     Q.  I know that.  I know that's your opinion.
20 My question, though, is, just is that one of your
21 criticisms?
22     A.  I'm sorry.  Was what one of my criticisms?
23     Q.  That the labor market data that Mr. Rambin
24 used included those various other job descriptions
25 unlike the job held by Mr. Townsley?

84

1     A.  My criticism is that this data -- that the
2 calculation that he's even using is based on data from
3 job titles that are not -- that are disparate from
4 what Mr. Townsley was doing, for example, and I give
5 those as examples.  That's my opinion.
6     Q.  So to meet that criticism, you would -- you
7 would be less critical if he had used the data from
8 jobs similar to Mr. Townsley.  Correct?
9     A.  Absolutely not.  And I'm very clear, this
10 whole approach is completely wrong because, like I
11 just described before, this is work life data, so it's
12 not relevant at all.  Because what this shows, this is
13 for people that go in and out of the work force, not
14 from an employer, so the whole use of it is completely
15 wrong.  This is just another example to show the other
16 level of how wrong it is.  So, no, by means is that
17 only reason why this is wrong.
18     Q.  Let's go on to paragraph 25.  That's where
19 you talk about the fringe benefits.  Mr. Rambin's
20 calculated employer provided fringe benefits of
21 44.83 percent of the salary that Mr. Townsley received
22 at IBM.  And you disagree with that.  Correct?
23     A.  I disagree -- I don't disagree that he makes
24 44.83.  That's what he uses.  I disagree -- it's
25 inappropriate in terms of the way it's calculated, and

Dwight Steward, Ph.D.  - 5/13/2022

85

1  in this particular case, it's just wrong.
2      Q.  It's wrong how?
3      A.  Okay.  There are a couple of different ways.
4  And again, this criticism, as what I've described
5  before, is different for each individual.  This one is
6  particularly, I guess, egregious -- is a big problem
7  because he has the same -- he -- the plaintiff has the
8  same benefits at Oracle that he did at -- at IBM.  So
9  essentially there's very little difference or really
10  none that should even be attributed.  So that's one
11  thing.
12         So, for example, with health care, he
13  has health care at Oracle, he had health care at IBM.
14  That should not be part of any calculation.
15  Mr. Rambin includes that.  And that's actually a large
16  part of that 44 percent.  That's just wrong, so that
17  should be out completely.
18         This other part, for example, are
19  legally required benefits like social security.
20  That's like -- that's equal to about -- what is that?
21  Like, 7 -- I think it's 6.5 percent, I think it is.
22  But the issue with that is, it's capped, and so he --
23  the way he does it is, he's assuming IBM is going to
24  contribute more of social security than Oracle is.
25  No.  Because it's a maximum of 125,000, so it's the

86

1  same.  Again, that should be out.
2         The other things are going with this
3  calculation -- like I would just go through and just
4  show you, he includes things in that 44 percent that
5  Mr. -- that Mr. Townsley doesn't even have.  And if
6  you go to the actual ECEC document, you're going to
7  see that.  So, for example, he includes things like
8  supplemental pay, overtime premiums, shift
9  differentials.  Clearly he didn't have any of those,
10  but that's what's included in that 44.8 percent.
11         He assumes, for example, that there's a
12  vacation like -- salary, he's going to get an extra
13  amount for that.  That's included in this.  And that's
14  why you can't do it this way in the way that he's done
15  it.  At the end of the day, that's -- that's the big
16  issue.  And so for this particular case, those numbers
17  would be -- if anything, the only possible difference
18  could be in any retirement that you're looking at.  So
19  that's my criticism for this one.
20      Q.  As you sit here today, you don't have an
21  opinion as to what the percentage of fringe benefits
22  are with respect to Mr. Townsley's wage salary.
23  What -- I guess, his earned salary and commissions?
24      A.  I'm sorry.  I don't understand that at all,
25  sir.

87

1      Q.  All right.  Mr. Rambin opines it's 44.83
2  percent.  Do you have an alternative percentage to
3  offer the jury?
4      A.  I -- I could provide an alternative.  And
5  that's not even the issue here in terms of how this
6  would be done.  So, yes, I have an alternative in
7  terms of how to calculate that.  But I just described
8  to you what that -- how you get there.  So, yes, I
9  have an alternative.  But as I sit here, I don't have
10  a number for you.  I've described to you how you would
11  get to it.
12      Q.  And as we sit here on the day of your
13  deposition, you have not performed those calculations,
14  you don't have any opinions -- specific opinions to
15  offer the jury, do you?
16      A.  That's completely untrue.  I just described
17  to you everything.  So in Townsley's case, the only
18  possible -- the only possible fringe benefit --
19  employer-provided fringe benefit that I would consider
20  would be retirement, and that would be equal to
21  potentially 3 percent of the difference between the --
22  the base salaries.  That's it.  And so I am telling
23  you that as we sit here.  All the other stuff would be
24  completely out.  So that's what I would do here.
25      Q.  Do you say anywhere in your report that

88

1  Mr. Townsley's fringe benefits from IBM are only
2  3 percent?
3      A.  No, I didn't say that here.  I'm saying that
4  I would look -- no.  And I did not say that here.
5  I've described to you -- you asked me if I have
6  something to tell the jury and I just described that
7  to you.
8      Q.  And do you -- have you offered your
9  calculations in your report on how to do that?
10      A.  I have offered how you get to that, yes.  I
11  just completely explained to you the problems with
12  that.  So you take the problems, you fix the problems,
13  you do it in the way that it's done in my field, and
14  that's how you would come up with the number.  And
15  that's what I have laid out here and that's what I
16  have laid out in other things that I have written, so
17  it's here.
18      Q.  Can you direct me to those calculations in
19  your report?
20      A.  I can direct you to the description of
21  what's wrong with Mr. Rambin's report.  And again, you
22  take those out, then you get to what you would want to
23  get to in terms of the number -- if you believe there
24  was a number.
25      Q.  I'm familiar with your criticisms of him,

Dwight Steward, Ph.D.  - 5/13/2022



249

1        SIGNATURE
2
3        I, DWIGHT STEWARD, Ph.D., have read the
4  foregoing deposition and hereby affix my signature
5  that same is true and correct, except as noted above.
6
7
8        _____
        DWIGHT STEWARD, Ph.D.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

251

1  the oral deposition is a true record of the testimony
2  given by the witness;
3        I further certify that pursuant to Federal
4  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as
5  well as Rule 30(e)(2) that the signature of the
6  deponent:
7        __X__ was requested by the deponent and/or a
8  party before completion of the deposition and is to be
9  returned within 30 days from date of receipt of the
10  transcript.  If returned, the attached Changes and
11  Corrections and Signature pages contain any changes
12  and the reasons therefor;
13        ____ was not requested by the deponent and/or a
14  party before the completion of the deposition.
15        That $_____ is the deposition
16  officer's charges for preparing the original
17  deposition transcript and any copies of exhibits,
18  charged to PLAINTIFFS;
19        That pursuant to information given to the
20  deposition officer at the time said testimony as
21  taken, the following includes all parties of record:
22
23
24
25

250

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TEXAS
2                AUSTIN DIVISION
3  CHARLES TOWNSLEY,        §
4  MICHAEL SAURO, WALTER    §
   NOFFSINGER, ROSA         §
5  DAVIDSON, MICHAEL KELLY, §
   TITON HOQUE, JANET       §
6  GELPHMAN, THANH DO,      §
                            § CASE NO.
7        Plaintiffs,        § 1:20-CV-00969-LY
8                           §
9                           §
10 VS.                      §
11                          §
12                          §
   INTERNATIONAL BUSINESS   §
13 MACHINES CORPORATION,    §
                            §
14                          §
        Defendant.          §
15
16
17 * * * * * * * * * * * * * * * * *
        REPORTER'S CERTIFICATION
18  ORAL AND VIDEOTAPED DEPOSITION OF
        DWIGHT STEWARD, Ph.D.
19            VOLUME 1
            May 13, 2022
20 * * * * * * * * * * * * * * * * *
21      I, BRENDA J. WRIGHT, Certified Shorthand
22 Reporter in and for the State of Texas, hereby certify
23 to the following:
24      That the witness, DWIGHT STEWARD, Ph.D., was
25 duly sworn by the officer and that the transcript of

252

1  For the Plaintiffs:
   Mr. Ross Pringle
2  WRIGHT & GREENHILL, P.C.
   900 Congress Avenue
3  Suite 500
   Austin, Texas  78701-2496
4  512-476-4600/512-476-5382 (fax)
   hcoughlin@w-g.com
5  scooke@w-g.com
   cpierce@w-g.com
6  rpringle@w-g.com
   lgobellan@w-g.com
7
   For the Defendant:
8  Mr. Edward M. "Ted" Smith
   CORNELL SMITH MIERL BRUTOCAO BURTON, LLP
9  1607 West Avenue
   Austin, Texas 78701
10 512-328-1540
   tsmith@cornellsmith.com
11 alin@cornellsmith.com
   abroadaway@cornellsmith.com
12
13      I further certify that I am neither attorney
14 nor counsel for nor related to nor employed by any of
15 the parties to the action in which this deposition is
16 taken;
17      Further, I am not a relative nor an employee of
18 any attorney of record in this cause, nor am I
19 financially or otherwise interested in the outcome of
20 the action.
21
22
23
24
25

Dwight Steward, Ph.D.  - 5/13/2022

253

1    Certified to by me this 20TH day of MAY, 2022.
2
3
4    _____
     BRENDA J. WRIGHT, Texas CSR No. 1780
5    Expiration Date:  08-31-22
     WRIGHT WATSON & ASSOCIATES
6    Firm Registration No. 225
     Expiration Date:  12-31-23
7    1250 S. Capital of Texas Highway
     Building 3, Suite 400
8    Austin, Texas 78746
     512-474-4363
9    www.wrightwatson.com
10   JOB NO. DSTEWARD05132022
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| CHARLES TOWNSLEY, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-00969-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S**
**MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

# EXHIBIT D to Exhibit 1

Titon Hoque - 1/27/2022



1

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
2                        AUSTIN DIVISION

3  CHARLES TOWNSLEY, MICHAEL  )
   SAURO, WALTER NOFFSINGER,  )
4  ROSA DAVIDSON, MICHAEL     )
   KELLY, TITON HOQUE, JANET  )
5  GELPHMAN, THANH DO,        )
                              )
6                             )
        Plaintiffs,           )
7                             )
                              )
8                             )
                              )
9                             )
10 vs.                        )   CIVIL ACTION
                              )   NO. 1:20-CV-00969-LY
11                            )
                              )
12                            )
                              )
13                            )
                              )
14 INTERNATIONAL BUSINESS     )
   MACHINES CORPORATION,      )
15                            )
                              )
16      Defendant.            )
17
18  ***********************************************
19       ORAL AND VIDEOTAPED DEPOSITION OF
20                   TITON HOQUE
21                    VOLUME 1
22               JANUARY 27, 2022
23              (Reported Remotely)
24  ***********************************************
25
```

2

```
1       ORAL AND VIDEOTAPED DEPOSITION OF TITON HOQUE,
2  produced as a witness at the instance of the
3  DEFENDANT, and duly sworn, was taken in the
4  above-styled and numbered cause on January 27, 2022,
5  from 9:35 a.m. to 6:25 p.m., before Jodi Cardenas,
6  CSR, RPR, in and for the State of Texas, reported by
7  computerized stenotype machine at the residence of
8  TITON HOQUE, ████████████████████████ Elgin,
9  Texas, pursuant to the Federal Rules of Civil
10 Procedure, the current Emergency Order regarding the
11 COVID-19 State of Disaster, and the provisions stated
12 on the record or attached hereto.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
1                    APPEARANCES
2
3  FOR THE PLAINTIFFS:
4      Ms. Heidi A. Coughlin
           WRIGHT & GREENHILL, PC
5      900 Congress Avenue, Suite 500
           Austin, Texas 78701
6      (512) 476-4600
           hcoughlin@w-g.com
7
       -and-
8
9      Mr. Austin Harris Kaplan
           KAPLAN LAW FIRM, PLLC
10     2525 Wallingwood Drive, Building 14
           Austin, Texas 78746
11     (512) 553-9390
           akaplan@kaplanlawatx.com
12
13 FOR THE DEFENDANT:
14     Mr. Andrew Broadaway
           CORNELL, SMITH, MIERL, BRUTOCAO & BURTON, LLP
15     1607 West Avenue
           Austin, Texas 78701
16     (512) 328-1540
           abroadaway@cornellsmith.com
17
18 ALSO PRESENT:
19     Ms. Meghan Encinias, Videographer
20
21
22
23
24
25
```

4

```
1                    STIPULATIONS
2
3           The attorneys for all parties present
4  stipulate and agree to the following items:
5
6           That the deposition of TITON HOQUE is
7  being taken pursuant to Notice;
8
9           That the deposition is being taken
10 pursuant to the Federal Rules of Civil Procedure;
11
12          That the original transcript will be
13 submitted to the witness' attorney, MS. HEIDI A.
14 COUGHLIN;
15
16          That the witness or the witness' attorney
17 will return the signed transcript to the court
18 reporter within 30 days of the date the transcript is
19 provided to the witness' attorney.  If not returned,
20 the witness may be deemed to have waived the right to
21 make the changes, and an unsigned copy may be used as
22 though signed.
23
24
25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

e47aab5e-2056-4837-808b-1d811864a447

Titon Hoque - 1/27/2022



**Page 5**

INDEX
                                            PAGE

Appearances....................................   3
Stipulations..................................   4
TITON HOQUE
     Examination by Mr. Broadway..............   9

Changes and Corrections......................  290

Signature Page...............................  291

Reporter's Certificate.......................  292


          EXHIBITS

NO.  DESCRIPTION                          PAGE

1..........................................  32
     E-mail Correspondence,
     "Confidential: Workday Separation"

2..........................................  35
     Separation Agreement
3..........................................  38
     Proof of Separation Pay

4..........................................  41
     Resource Action Notification to
     Mr. Hoque

5..........................................  53
     Plaintiff Titon Hoque's Responses to
     Defendant's Request for Production of
     Documents
6..........................................  58
     Mr. Hoque's Job Application List

7..........................................  70
     First Amended Complaint

**Page 6**

          EXHIBITS (CONT'D)
NO.  DESCRIPTION                          PAGE
8..........................................  70
     IBM Offer Letter

9..........................................  76
     Mr. Hoque's Resumé
10.........................................  78
     ACC Payroll Printout

11.........................................  82
     ACC New Position Offer Letter
12.........................................  107
     Organizational Structure and
     Mr. Hoque's Direct Reports
13.........................................  132
     E-mail Correspondence,
     "Subject: AECOM - Updated List"
14.........................................  152
     E-mail Correspondence,
     "Subject: S4V Status"
15.........................................  153
     E-mail - Concord Training Meeting
     Slide
16.........................................  155
     Concord Training Slide Deck

17.........................................  171
     E-mail Correspondence,
     "Subject: Identification Worksheet"

18.........................................  172
     Tse Selection Worksheet
22.........................................  179
     Paiz Selection Worksheet

21.........................................  183
     E-mail Correspondence,
     "Subject: AECOM S4V"

**Page 7**

          EXHIBITS (CONT'D)
NO.  DESCRIPTION                          PAGE
22.........................................  196
     E-mail Correspondence,
     "Subject: The Process for RA"
23.........................................  208
     Manager Training Slides for
     RA Selection
24.........................................  221
     E-mail Correspondence,
     "Subject: Updated SQL Inventory"
25.........................................  234
     Selection Worksheet

26.........................................  248
     Application for IBM Job After
     Separation

29.........................................  278
     Mr. Hoque's EEOC Charge

**Page 8**

1       (REPORTER'S NOTE:  Please note this
2   deposition was taken remotely via Zoom;
3   therefore, due to the quality of
4   transmission of data via Zoom
5   videoconference, audio distortions,
6   internet connections freezing,
7   overspeaking, extraneous room noise,
8   et cetera, unintelligibles or
9   inaudibles may have created
10   inaccuracies in the transcription.)
11       (Federal Rules 30(b)(5)(A) and (C) were
12   waived by all counsel present)
13       THE VIDEOGRAPHER:  We are on the record
14   January 27th, 2022.  And the time is 9:35 a.m.  Here
15   begins Tape 1 of the video deposition of Titon Hoque.
16   This video deposition is being held via Zoom video
17   conferencing.
18       Will counsel please identify yourselves
19   for the record?
20       MS. COUGHLIN:  Heidi Coughlin with
21   Wright & Greenhill on behalf of the plaintiff.  Also
22   with me is Austin Kaplan.  He is also here on behalf
23   of the plaintiff.
24       MR. BROADWAY:  And I'm Andrew
25   Broadway with Cornell Smith, and I am here on behalf

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

e47aab5e-2056-4837-808b-1d811864a447

Titon Hoque - 1/27/2022

9

1  of Defendant IBM.
2         THE VIDEOGRAPHER:  Okay.  Will the
3  court reporter please swear in the witness?
4         THE REPORTER:  And real quick, I would
5  just like to note that I am administering the oath
6  and reporting the deposition remotely by stenographic
7  means from my residence within the state of Texas,
8  and the witness has been identified to me through
9  attestation of counsel.  And the witness is located
10  as his residence at 366 North County Line Road in
11  Elgin, Texas.
12         Mr. Hoque, will you raise your right
13  hand, please?
14              TITON HOQUE,
15  having been first duly sworn, testified as follows:
16              EXAMINATION
17  BY MR. BROADAWAY:
18    Q.  Good morning, Mr. Hoque.  For -- for the
19  record, would you please state and spell your full
20  name?
21    A.  Yeah.  It's Titon Hoque, T-I-T-O-N
22  H-O-Q-U-E.
23    Q.  Have you ever gone by another name?
24    A.  I have.  By Rashed.
25    Q.  Would you spell that, please?

10

1    A.  R-A-S-H-E-D.
2    Q.  So as -- as I just told you before we got on
3  the record, I -- my name is Andrew Broadaway.  I am
4  one of the lawyers representing IBM in this matter.
5  And I just want to start off with a couple of the
6  ground rules about this deposition and -- and a
7  little bit of background.  So my -- my purpose for
8  being here today is to ask you a series of questions
9  regarding your claims in the lawsuit you brought
10  against IBM and your reasons for bringing the
11  lawsuit.  Do you understand that?
12    A.  Yes, I do.
13    Q.  And do you understand that the oath that you
14  just took at the beginning is the same -- same oath
15  that you would take if you were testifying in front
16  of a judge or a jury?
17    A.  Yes.
18    Q.  And do you understand that this -- the
19  testimony that you give today may be used in the
20  eventual trial in this matter or for other purposes
21  in -- in this case?
22    A.  Yes.
23    Q.  So do you understand that it's important to
24  give the most complete and truthful testimony that
25  you can here today?

11

1    A.  Yes.
2    Q.  Especially because -- well, scratch that.
3         You're aware that there's going to be a
4  court reporter taking down everything that you and I
5  and your counsel say.  Is that right?
6    A.  (Witness nods head).
7    Q.  And it's also being videotaped?
8    A.  (Witness nods head).
9    Q.  It's -- it's especially important because
10  we're -- we're here today by Zoom remote -- remotely,
11  that you give audible responses.  So sometimes in the
12  question-and-answer format, it's really easy to give
13  "uh-huh" or nod or kind of give nonverbal responses.
14  It's hard -- it's hard for the court reporter to take
15  all that down.  I'll probably do it; you'll probably
16  do it.  If -- if I remind you to try to make an
17  audible response, it's -- it's only for that reason,
18  so bear with -- bear with us on that, but --
19    A.  Okay.
20    Q.  -- please try to -- please try to make your
21  responses audible.
22         Another important facet of the -- the
23  video deposition is, because of the slight lag time
24  involved, you know, would you please try to let --
25  wait and let me finish the question I'm answering

12

1  {sic], and I'll try to allow you to finish your
2  answer.  There -- there may be times if I feel like
3  you're not answering my question fully.  I may ask
4  you to focus your attention on the question that I
5  asked, but I'll try to -- I'll try to let you finish
6  your answer.  Same goes for your counsel -- after I
7  ask a question, your counsel may at various times
8  object and lodge various objections on the record.
9  But you understand that you're still required to
10  answer the question, unless your counsel specifically
11  instructs you not to answer.
12    A.  Yes.
13    Q.  Throughout the course of today, there may be
14  questions that I ask poorly that you don't understand
15  that are unclear.  If there's anything that I ask
16  that is unclear or you don't -- don't understand,
17  would you please ask me to clarify the question?
18    A.  Yes, I will do that.
19    Q.  Okay.  And if you -- if you don't, I'm going
20  to assume that you understand -- that you understand
21  the question.  Okay?
22    A.  Understood.
23    Q.  So a final -- final point today -- I'm --
24  I'm going to try to move through the questions I have
25  as quickly as I can, but we're probably going to go

Titon Hoque - 1/27/2022

77

1  on the section about IBM?
2  Q.  (BY MR. BROADAWAY)  This states that you
3  were employed with IBM from February 2017 to August
4  of 2017.  That's what it says.  Right?
5  A.  Yeah.
6  Q.  But that's not accurate, is it?
7  A.  Well, it probably would have been
8  technically the end of July.
9  Q.  Wasn't your last day with IBM in July of
10 2018?
11 A.  Oh, I have the year incorrect and the month.
12 Q.  Okay.  I -- I was just -- I wanted to ask
13 why -- why that was incorrect, why -- why that date
14 was --
15 A.  Oh, that was just oversight on my part.
16 Q.  If you scroll up a little bit, and it
17 says -- it shows that you have worked -- you started
18 working with --
19 A.  Oh, and --
20 Q.  -- Austin Community College in August of
21 2017 to present?
22 A.  No.  or I started working there in December of
23 2018 -- or I think January of 2019 -- no, it was
24 December of 2018 to present.
25 Q.  So was -- was that just another typo?

78

1  A.  It was a typo, complete typo.  I think when
2  I was joining ACC, they were requiring me to update
3  my resumé.  I did it while I was in another meeting,
4  did it very quickly, and wasn't paying attention to
5  the details.
6  Q.  So you -- you said you think you started in
7  December of 2017 -- or excuse me.  December of 2018
8  or January 2019 with -- with Austin Community
9  College?
10 A.  Correct.
11     MR. BROADAWAY:  Okay.  Can we just look
12 at Exhibit No. 10 for a second?
13     (Exhibit No. 10 marked)
14 Q.  (BY MR. BROADAWAY)  Okay.  And do -- do you
15 see there's -- there's a Bates number -- there's
16 actually two numbers in the lower right-hand corner
17 of this.  And I'll -- I'll proffer to you that this
18 was produced by Austin Community College as part of a
19 subpoena in this litigation.  So I -- I just -- just
20 want to ask you about something that is in the upper
21 right-hand corner where it says, "Hire date."  Do you
22 see where it says "hire date" in the upper right-hand
23 corner underneath the Social Security number?
24 A.  Yes.
25 Q.  So it says, "Hire date, 5/1/2019."  Do you

79

1  have any idea why ACC would reflect that you were
2  hired in -- in May of 2019?
3  A.  So this -- what I would say is that the way
4  that ACC handles consultants versus full-time
5  employees is not accurately reflected in their ERP
6  systems.
7  Q.  I see.  Did you --
8  A.  And this -- even today --
9  Q.  Did you have a -- a consulting agreement
10 with Austin Community College?
11 A.  Not with Austin Community College.
12 Q.  Who did you have -- did you have a
13 consulting agreement in place with anyone while you
14 were working at Austin Community College?
15 A.  Yes.
16 Q.  And what entity was that?
17 A.  That was Beacon Hills Staffing.
18 Q.  Is that a staffing agency?
19 A.  Yes.
20 Q.  So you -- did you have an agreement -- were
21 you an employee of Beacon Hill?
22 A.  No.
23 Q.  They -- they placed you at Austin Community
24 College?
25 A.  Yes.

80

1  Q.  Did you have an -- any sort of written
2  agreement with Beacon Hill?
3  A.  Yes.
4  Q.  And when did that agreement start?
5  A.  In December of 2018.
6  Q.  Did you -- did you provide a copy of that
7  agreement to your attorneys?
8  A.  No.
9  Q.  And how -- how did Beacon Hill come to place
10 you at Austin Community College?
11     MS. COUGHLIN:  Objection; calls for
12 speculation, but go ahead.
13     THE WITNESS:  I believe it was -- I
14 don't remember if it was a posting on LinkedIn that I
15 had applied to or if a recruiter from Beacon Hill
16 reached out to me.
17 Q.  (BY MR. BROADAWAY)  Okay.  So would --
18 would -- did Beacon Hill accept jobs that you had
19 identified and tried to place you in jobs that you
20 had identified?
21 A.  I don't understand the question.
22 Q.  I'm just trying to -- to figure out how you
23 found the job at Austin Community College.
24 A.  So either they had posted the job and I
25 applied for it or one of their recruiters told me

Titon Hoque - 1/27/2022

81

1  about a job at Austin Community College.  I don't
2  remember which one it was.
3      Q.  Okay.  Do you know how much money you were
4  making when you first started with Austin Community
5  College?
6      A.  Through Beacon Hill?
7      Q.  Yes.  Well, I -- I -- how much were you
8  getting paid for your work when you were working for
9  Austin Community College?
10     A.  I think originally I was being paid by
11  Beacon Hill $90 per hour.
12     Q.  Okay.  So -- and -- and to be clear, your
13  resumé only reflects Austin Community College.
14  Right?
15     A.  Correct.
16     Q.  It -- it does not reflect Beacon Hill?
17     A.  Correct.
18     Q.  So did you get tax documents from Beacon
19  Hill?
20     A.  I did.
21     Q.  Were they W-2s?
22     A.  No.
23     Q.  Were they 1099s?
24     A.  Yes.
25     Q.  Okay.  Did you submit invoices to Beacon

82

1  Hill?
2      A.  Yes, I did.
3      Q.  Do you have copies of those invoices?
4      A.  I believe I can still get to them because I
5  use an online service to generate invoices that I no
6  longer use.
7      Q.  Okay.  So from January 2019, how long did
8  you remain a consultant for IBM -- excuse me, for
9  ACC?
10     A.  From that time until February of 2020.
11     Q.  And what happened in February of 2020?
12     A.  In February of -- just a moment.  Let me
13  think.  Am I getting my years straight?
14     Q.  You know, I think I may have something
15  that -- that may refresh your recollection.
16         MR. BROADWAY:  Can we look at Exhibit
17  No. 11?
18         (Exhibit No. 11 marked)
19         MR. BROADWAY:  Can -- can we just kind
20  of blow up the first half of that page?
21         THE WITNESS:  Oh, yeah.  I was getting
22  my year incorrect, so it was February 1st of 2021.
23     Q.  (BY MR. BROADWAY)  Okay.  So between
24  January 2019 about February 2021, you were a
25  consultant for ACC through Beacon Hill?

83

1      A.  Correct.
2      Q.  Okay.  And -- and what was the job that you
3  were doing during that period?
4      A.  During the consulting period?
5      Q.  Yes.
6      A.  I was in multiple roles or held multiple
7  titles during that time.
8      Q.  Okay.  Can you tell me about them?
9      A.  The -- what would you like me to tell you
10  about them?
11     Q.  Well, let's -- I mean, let's start with one
12  of the titles.
13     A.  The titles?
14     Q.  Let's start with one of the titles.
15     A.  Okay.  The first one was a manager for
16  business intelligence.
17     Q.  And what did you do for that role?
18     A.  I was to assemble the business intelligence
19  strategy for Austin Community College.
20     Q.  Okay.  And how long did that last?
21     A.  About the first six months.
22     Q.  And while you were doing that, did -- did
23  you hold another title?
24     A.  So I did not while I held that title.
25     Q.  Okay.

84

1      A.  But I transitioned into another role.
2      Q.  And what was that?
3      A.  The director of development and data.
4      Q.  Okay.  And what -- and when you held that --
5  when you held that title, approximately when was
6  that?
7      A.  I think that was in July of 2019.
8      Q.  And did you have employees reporting to you
9  as -- in that director title?
10     A.  Yes.
11     Q.  And did you have any other titles at that
12  time when you held that title?
13     A.  Not during.
14     Q.  Okay.  So after that, did you transition in
15  to another role?
16     A.  Yes.  And that's the one that is listed on
17  my resumé, as well.
18     Q.  Okay.  And what -- what is that?
19     A.  The associate vice president --
20     Q.  Okay.
21     A.  -- of solutions delivery and business
22  intelligence.
23     Q.  So you were an associate vice president
24  while a consultant for an outside company?
25     A.  Correct.

Titon Hoque - 1/27/2022

269

1  record at 5:44 p.m.
2          (Off the record)
3          THE VIDEOGRAPHER: Okay. We are back
4  on the record at 5:56 p.m. This begins Tape 7.
5      Q. (BY MR. BROADAWAY) Okay. Were you able to
6  take one last break, Mr. Hoque?
7      A. Yes, I was.
8      Q. It's been a long day, but you remember
9  you're still under oath?
10     A. Yes.
11     Q. Thank you so much. Just -- just a few
12  couple last -- last things.
13         MR. BROADAWAY: Can we look at
14  Exhibit 7, which is the first amended complaint? And
15  when you pull it up, Meghan, I would like to go to
16  Page -- Page 36, which is one of the last pages --
17  second to last page.
18     Q. (BY MR. BROADAWAY) So, Mr. Hoque, have
19  you -- have you reviewed this page of the complaint?
20  Do you remember ever looking at this closely?
21     A. Yeah. I did read this over.
22     Q. Okay. Are you -- so it's referring to
23  plaintiffs, plural, so -- so all the other plaintiffs
24  are -- are lumped in with you. But are you asking
25  that IBM be ordered to reinstate your employment with

270

1  IBM?
2          MS. COUGHLIN: Objection to the extent
3  it calls for legal analysis or conclusion.
4      Q. (BY MR. BROADAWAY) Do you know what
5  "reinstate" means, Mr. Hoque?
6      A. To put me back into my same position.
7      Q. Uh-huh. Do you -- and do you see -- do you
8  see Paragraph 3 that -- that we're looking at?
9      A. Yes, I do.
10     Q. So that -- that -- it says all --
11  plaintiffs, plural, but I'm asking you if you want to
12  be reinstated to your former position at IBM?
13     A. I do not wish to be.
14     Q. Okay. And then I want -- I want to focus
15  on -- on Section 5, Paragraph 5 now. This is kind of
16  in the middle of the screen. Are you seeking
17  compensatory damages for grief?
18     A. Yes.
19     Q. Have you ever talked to anybody about your
20  grief other than the doctor you previously discussed?
21     A. Family.
22     Q. Which members of your family?
23     A. My wife.
24     Q. Who else?
25     A. My brother.

271

1      Q. Okay.
2      A. My brother's wife.
3      Q. Okay.
4      A. And my mother.
5      Q. Okay. And -- and what -- and what did you
6  tell them about your level of grief?
7      A. And my inlaws.
8      Q. And your inlaws. Okay. And what did you --
9  what did you tell them -- did you tell all those
10  people the same thing?
11     A. Mostly.
12     Q. And -- and what did you tell them?
13     A. That what I went through was a very
14  difficult time for me. It was very stressful. It
15  was one of the most stressful events that I've gone
16  through, that it really shook my confidence --
17     Q. Uh-huh.
18     A. -- and really hurt me personally.
19     Q. How did it hurt you personally?
20     A. That what was done to me was wrong and that
21  I didn't really deserve what was done to me.
22     Q. And when you say what was done to you, you
23  mean being laid off from your job at IBM?
24     A. Yes.
25     Q. Okay. Is there anything else that you told

272

1  them?
2      A. That I was having difficulty with it, with
3  trying to move forward.
4      Q. How did that manifest itself?
5      A. Just trying to stay positive --
6      Q. Uh-huh.
7      A. -- and have a positive outlook, trying to be
8  positive in my manners, the way I go about
9  interviewing with other companies in speaking with
10  other professionals and so forth.
11     Q. Uh-huh. And would you -- so in looking at
12  the list that we're looking at of the next several
13  damages, inconvenience, is -- is that similar to the
14  grief? What -- what's inconvenienced? What do you
15  mean by that? Are you -- are you seeking damages for
16  inconvenience?
17     A. Yes.
18     Q. And what -- and what does that mean?
19     A. Several inconveniences financially just to
20  be able to have the convenience of paying for things.
21     Q. Okay.
22     A. Like mortgage, car payments, insurance.
23     Q. Did you miss any mortgage payments?
24     A. I don't remember exactly -- I know I was
25  late. I don't remember if I actually missed.

Titon Hoque - 1/27/2022

289

1  five minutes.
2           MS. COUGHLIN:  Yeah.  And I'm going to
3  go on the record and object to this because I'm
4  pretty sure you marked all the Ed Fung documents
5  attorneys' eyes only.
6           MR. BROADAWAY:  I -- I have no idea,
7  but I will give you back these five minutes.
8           I will pass the witness.
9           MS. COUGHLIN:  And I'll reserve for the
10 time of trial.
11          THE VIDEOGRAPHER:  Okay.  We're off the
12 record at 6:25 p.m.  This concludes the deposition.
13          (Deposition concluded at 6:25 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

290

1          CHANGES AND CORRECTIONS
2          WITNESS NAME:  TITON HOQUE
3          DATE:  JANUARY 27, 2022
4  Reason Codes:  (1) to clarify the record; (2) to
5  conform to the facts; (3) to correct a transcription
6  error; (4) (please explain).
7  PAGE/LINE      CHANGE      REASON CODE
8  _____
   ___
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

291

1          I, TITON HOQUE, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
   _____
5          TITON HOQUE
6
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10         Before me, _____, on this
11 day personally appeared TITON HOQUE, known to me or
12 proved to me on the oath of _____ or through
13 _____ (description of identity card or
14 other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that he/she executed the same for the purpose and
17 consideration therein expressed.
18         Given under my hand and seal of office on this
19 _____ day of _____, _____.
20
21         _____
22         NOTARY PUBLIC IN AND FOR
23         THE STATE OF _____
24
25 My Commission Expires: _____

292

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE WESTERN DISTRICT OF TEXAS
                 AUSTIN DIVISION
3  CHARLES TOWNSLEY, MICHAEL  )
   SAURO, WALTER NOFFSINGER,  )
4  ROSA DAVIDSON, MICHAEL     )
   KELLY, TITON HOQUE, JANET  )
5  GELPHMAN, THANH DO,        )
6                             )
                              )
7     Plaintiffs,             )
                              )
8                             )
                              )
9                             )
                              )
10 vs.                        )  CIVIL ACTION
                              )  NO. 1:20-CV-00969-LY
11                            )
                              )
12                            )
                              )
13                            )
                              )
14 INTERNATIONAL BUSINESS     )
   MACHINES CORPORATION,      )
15                            )
                              )
16    Defendant.              )
17 ...........................
18
19         REPORTER'S CERTIFICATION
20 ORAL AND VIDEOTAPED DEPOSITION OF
21         TITON HOQUE
              VOLUME 1
22       JANUARY 27, 2022
23        (Reported Remotely)
24 ...........................
25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

Titon Hoque - 1/27/2022

293

1        I, Jodi Cardenas, Certified Shorthand
2   Reporter in and for the State of Texas, hereby
3   certify to the following:
4        That the witness, TITON HOQUE, was duly
5   sworn by the officer and that the transcript of the
6   oral deposition was transcribed to the best of my
7   ability and is a true record of the testimony given
8   by the witness;
9        I further certify that pursuant to the
10  Federal Rules of Civil Procedure, Rule 30(e)(1) (A)
11  and (B) as well as Rule 30(e)(2) that the signature
12  of the deponent:
13       __X__ was requested by the deponent and/or
14  a party before the completion of the deposition and
15  is to be returned within 30 days from date of receipt
16  of the transcript.  If returned, the attached Changes
17  and Corrections and Signature Pages contains any
18  changes and the reasons therefor;
19
20       _____ was not requested by the deponent or
21  a party before the completion of the deposition.
22       That $_____ is the deposition
23  officer's charges for preparing the original
24  deposition transcript and any copies of exhibits
25  charged to DEFENDANT;

294

1        That pursuant to information given to the
2   deposition officer at the time said testimony was
3   taken, the following includes all parties of record:
4   FOR THE PLAINTIFFS:
5     Ms. Heidi A. Coughlin
      WRIGHT & GREENHILL, PC
6     900 Congress Avenue, Suite 500
      Austin, Texas 78701
7     (512) 476-4600
      hcoughlin@w-g.com
8
      -and-
9
      Mr. Austin Harris Kaplan
10    KAPLAN LAW FIRM, PLLC
      2525 Wallingwood Drive, Building 14
11    Austin, Texas 78746
      (512) 553-9390
12    akaplan@kaplanlawatx.com
13  FOR THE DEFENDANT:
14    Mr. Andrew Broadaway
      CORNELL, SMITH, MIERL, BRUTOCAO & BURTON, LLP
15    1607 West Avenue
      Austin, Texas 78701
16    (512) 328-1540
      abroadaway@cornellsmith.com
17
18       I further certify that I am neither counsel
19  for, related to, nor employed by any of the parties
20  or attorneys in the action in which this proceeding
21  was taken;
22       Further, I am not a relative nor an
23  employee of any attorney of record in this cause, nor
24  am I financially or otherwise interested in the
25  outcome of the action.

295

1        Certified to by me this 13th day of
2   February, 2022.
3
4
5
      _____
      JODI CARDENAS, RPR, Texas CSR 7594
6     CSR Expiration: 10-31-23
      WRIGHT WATSON & ASSOCIATES
7     Firm Registration No. 225
      Firm Expiration: 12-31-21
8     1250 South Capital of Texas Highway
      Building 3, Suite 400
9     Austin, Texas 78746
      512-474-4363
10    www.wrightwatson.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| CHARLES TOWNSLEY, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-00969-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

# EXHIBIT E to Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CHARLES TOWNSLEY, MICHAEL      §
SAURO, WALTER NOFFSINGER,      §
ROSA DAVIDSON, MICHAEL         §
KELLY, TITON HOQUE, JANET      §
GELPHMAN, THANH DO,            §
                               §
        Plaintiffs,            §     CASE NUMBER
                               §  1:20-CV-00969-LY
v.                             §
                               §
INTERNATIONAL BUSINESS         §
MACHINES CORPORATION,          §
                               §
        Defendants.            §

* * * * * * * * * * * * * * * * * * *

THE VIDEOTAPED ORAL DEPOSITION OF
JANET GELPHMAN
January 21, 2022
(Reported Remotely)

* * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF JANET GELPHMAN produced as
a witness at the instance of the Defendant and duly
sworn, was taken in the above styled and numbered cause
on the 21st day of January 2022, from 9:29 a.m. to
11:56 a.m. and from 12:47 p.m. to 4:21 p.m.,
respectively, before Sandra S. Givens, CSR, in and for
the State of Texas, reported by machine shorthand

Page 1

---

1  method pursuant to the Federal Rules of Civil
2  Procedure, with the witness testifying from her
3  residence in Dallas, Texas.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

---

```
1              A P P E A R A N C E S
2
    FOR THE PLAINTIFFS:
3
            Ms. Heidi A. Coughlin
4           WRIGHT & GREENHILL, PC
            900 Congress Avenue
5           Suite, 500
            Austin, Texas 78701
6           (512) 476-4600
            hcoughlin@w-g.com
7
            Mr. Austin Harris Kaplan
8           KAPLAN LAW FIRM, PLLC
            2525 Wallingwood Drive
9           Building 14
            Austin, Texas 78746
10          (512) 553-9390
            akaplan@kaplanlawatx.com
11
12  FOR THE DEFENDANT:
13          Mr. Edward M. "Ted" Smith
            Mr. Andrew Broadaway
14          CORNELL SMITH MIERL BRUTOCAO BURTON, LLP
            1607 West Avenue
15          Austin, Texas 78701
            (512) 328-1540
16          tsmith@cornellsmith.com
            abroadaway@cornellsmith.com
17
18  VIDEOGRAPHER:
19          Mr. Hank Widrodt
            3stix Productions
20
21
22
23
24
25
```

Page 3

---

```
1                I N D E X
2
   Appearances - - - - - - - - - - - - - - - - - - - 3
3
   Exhibits - - - - - - - - - - - - - - - - - - - - - 4
4
   JANET GELPHMAN
5
      Examination by Mr. Smith - - - - - - - - - - - - 7
6
   Changes and Signature - - - - - - - - - - - - - 226
7
   Reporter's Certification - - - - - - - - - - - - 228
8
9
10              E X H I B I T S
11
12  NO.  DESCRIPTION                            PAGE
    Exhibit 1 - - - - - - - - - - - - - - - - - - - 46
13      IBM Corporate Policy 117, Workforce Diversity

    Exhibit 2 - - - - - - - - - - - - - - - - - - - 53
14      Janet Gelphman Resume
15  Exhibit 3 - - - - - - - - - - - - - - - - - - - 69
16      11/26/18 Hourly Employment Agreement Between
        Janet Gelphman and Robert Half International
17  Exhibit 4 - - - - - - - - - - - - - - - - - - - 78
        8/1/19 Employment Agreement Between Janet
18      Gelphman and GTN Technical Staffing
19  Exhibit 5 - - - - - - - - - - - - - - - - - - - 80
        2019 Gelphman W-2 from GoTechNow, LLC
20
    Exhibit 6 - - - - - - - - - - - - - - - - - - - 82
21      2/26/20 Offer of Employment to Gelphman from
        JDA Software, Inc. (Blue Yonder)
22
    Exhibit 7 - - - - - - - - - - - - - - - - - - - 84
23      3/10/20, 3/11/20 Email Exchange Between Maui
        Francis and Gelphman re: Job Referral Thank You
24
    Exhibit 8 - - - - - - - - - - - - - - - - - - - 87
25      2020 Gelphman W-2 from Blue Yonder, Inc.
```

Page 4

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

## Page 5

```
1   Exhibit 9 - - - - - - - - - - - - - - - - - - - 95
2       1/9/20 - 1/14/20 Email Exchange Between
        Gelphman and Rupert Douglas of GitLab re:
3       "Thanks for Your Interest in GitLab"
4   Exhibit 10 - - - - - - - - - - - - - - - - - - 106
        5/18/18 IBM Global Performance Improvement
5       Plan for Gelphman by Ty Tyner
6   Exhibit 11 - - - - - - - - - - - - - - - - - - 109
        2/29/18 Email from Gelphman to Ty Tyner re:
7       Follow-up From Friday
8   Exhibit 12 - - - - - - - - - - - - - - - - - - 118
        IBM 2017 Performance Assessment for Gelphman
9       by Teerasit Tinnakul
10  Exhibit 13 - - - - - - - - - - - - - - - - - - 128
        2/2/18 Email from Ty Tyner to Amy Blea
11      re: Designer for Block & File
12  Exhibit 14 - - - - - - - - - - - - - - - - - - 151
        1/19/16 Email from Darin Duvall to Team
13      re: CFS Design Team Alignment
14  Exhibit 15 - - - - - - - - - - - - - - - - - - 159
        Plaintiffs' First Amended Complaint
15
16  Exhibit 16 - - - - - - - - - - - - - - - - - - 163
        7/24/18 Email from Darin Duvall/Austin/IBM
17      to Team re: Please Welcome Ty Tyner as the New
        Head of Design for Infrastructure Services/
18      Cloud Foundation Services

19  Exhibit 17 - - - - - - - - - - - - - - - - - - 174
        Excel Spreadsheet: Notes on Gelphman
20  Exhibit 18 - - - - - - - - - - - - - - - - - - 187
        IBM Identification Worksheet Prepared/Approved
21      by Ty Tyner, Reviewed/Approved by Jojari Cannon
22  Exhibit 19 - - - - - - - - - - - - - - - - - - 192
        Resource Action Information Package for
23      Employees
24  Exhibit 20 - - - - - - - - - - - - - - - - - - 193
        Screenshots of March 2018 - May 2018 Text
25      Message Exchanges Between Gelphman and Diana
```

Page 5

## Page 6

```
1   Exhibit 21 - - - - - - - - - - - - - - - - - - 198
        Screenshots of 8/1/19 Text Message Exchanges
2       Between Gelphman and Ceci Morales
3   Exhibit 22 - - - - - - - - - - - - - - - - - - 201
        5/7/20 Letter to Debra Richards of EEOC from
4       Janet Gelphman
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

## Page 7

```
1              VIDEOGRAPHER:  Here begins tape 1
2   of the video deposition of Janet Gelphman.  Today's
3   date is January 21st, 2022, and the time is 9:29 a.m.
4   This video deposition is being held via Zoom
5   video-conferencing.  Will counsel please identify
6   themselves for the record?
7              MS. COUGHLIN:  Heidi Coughlin with
8   the law firm of Wright & Greenhill on behalf of
9   plaintiff Janet Gelphman, and with me is Austin Kaplan
10  also on behalf of the plaintiff.
11             MR. SMITH:  And Ted Smith on behalf
12  of IBM, and I'm with the law firm of Cornell Smith
13  Mierl Brutocao Burton.
14             JANET GELPHMAN,
15  having been first duly sworn, testified as follows:
16             EXAMINATION
17  BY MR. SMITH:
18      Q   Good morning, Ms. Gelphman.  As I have just
19  mentioned a moment ago, I'm an attorney representing
20  IBM in a lawsuit that has been brought by some former
21  employees including yourself.  Are you aware that you
22  filed a lawsuit against IBM?
23      A   Yes.  I'm aware of that.
24      Q   Okay.  Have you ever had your deposition
25  taken before?
```

Page 7

## Page 8

```
1       A   No.
2       Q   So because of that and because we're remote
3   it makes it a little bit more challenging, so I'd just
4   kind of like to talk a little bit about how the process
5   works and see if we can kind of get some ground rules
6   that we can both agree on.  Is that all right?
7       A   Yes.
8       Q   So we have a court reporter, Sandy Givens who
9   you can see on your screen, who is taking down your
10  testimony and all of our questions and objections.  Do
11  you understand that your testimony here is the same as
12  if we were in a court of law?
13      A   Yes.
14      Q   And do you understand that you're under oath?
15      A   Yes.
16      Q   It's important to make sure that we don't
17  talk over each other so that the court reporter,
18  Ms. Givens, can take down each other's -- the testimony
19  clearly.  So I will do my best not to talk over you,
20  and I'd just ask the same for you, if that's okay.
21      A   That's absolutely okay.
22      Q   And you're doing a good job so far, but it's
23  important that you provide verbal responses to my
24  questions.  It's difficult for Ms. Givens to take down
25  responses such as a nod of the head or comments like
```

Page 8

2 (Pages 5 to 8)

Page 85

```
1       Q    Okay.  Do you see your gelphman@topocam.com
2  up there?
3       A    Yes.
4       Q    Is that your email address?
5       A    That's correct.
6       Q    Okay.  And Mr. Francis appears to be -- had
7  been working at IBM at the time you sent this to him on
8  March 11, 2020, right?
9       A    That's correct.
10      Q    And again, you say that you were referring to
11 starting your job at Blue Yonder; is that right?
12      A    Correct.
13      Q    And so here -- and did Maui provide a
14 referral to you for Blue Yonder?
15      A    Yes, he did.
16      Q    And so in here you say, "Hi Maui, thank you
17 so much for your referral for my dream job.  I'm
18 starting on Monday."
19           The dream job you're referring to, is
20 that Blue Yonder?
21      A    Yes.
22      Q    And why did you believe -- why did you feel
23 that Blue Yonder is your dream job?
24      A    Because they -- because of my interviews with
25 my boss and, and what kinds of work he was going to
```

Page 86

```
1  assign me to, because he was -- had had a lot of
2  experience with heading innovation teams, and so I was
3  excited to work with him and work on innovation with
4  him.
5       Q    And are you able to work on things at Blue
6  Yonder that you weren't able to work on in your
7  position at IBM?
8       A    Well, it's a completely different --
9            MS. COUGHLIN:  Calls for
10 speculation.  You can go ahead.
11      A    So I, I really don't know how to answer that
12 question.  They're two --
13      Q    (By Mr. Smith)  Well, you knew the -- you
14 know the kind of work that you were doing at IBM,
15 right?
16      A    Yes.  It involved Clou- Cloud.  This is not a
17 Cloud company.
18      Q    Right.  What kind of company is this?
19      A    This is a company that creates applications
20 for the supply chain.
21      Q    Okay.  So that's my question is, the kind of
22 work you're doing at Blue Yonder now, which is what
23 you've called your dream job, are things that you could
24 not have been working on in your position that you had
25 at IBM; is that right?
```

Page 87

```
1       A    I think it's more about the opportunity
2  versus what the actual work was.  I -- and I think that
3  there was more opportunity to do innovation.  I saw
4  that there was -- this is why I say it's my dream.
5  There was opportunity to do innovation there versus --
6  the work at IBM versus the work at, at Blue Yonder.
7       Q    But you're doing different kind of work,
8  aren't you, at Blue Yonder than you were doing at IBM?
9       A    Yes.
10      Q    And how is it different?
11      A    I'm working business to business versus at
12 IBM I was -- it's -- it wasn't really business to
13 business.  It was creating interfaces for developers.
14           MR. SMITH:  Okay.  And if we could
15 go to Exhibit 17A as the next exhibit.
16           THE REPORTER:  And that'll be
17 Exhibit, that'll be Exhibit 8, Ted.
18           MR. SMITH:  Exhibit No. 8?  Okay.
19      Q    Have you seen this document before,
20 Ms. Gelphman?
21      A    Yes.
22      Q    And what is this document?
23      A    It looks like my W-2.
24      Q    For 2020?
25      A    Correct.
```

Page 88

```
1       Q    And it's from Blue Yonder; is that right?
2       A    Correct.
3       Q    And it shows for 2020 your gross pay being
4  $119,283.50; is that right?
5       A    Correct.
6       Q    Actually it looks like your Social Security
7  wages are 120,409.56?
8       A    That doesn't make sense.  Wait.  Oh, with,
9  with the W -- with the Social Security.  Are you
10 looking at the bottom-line reported W-2 wages?
11      Q    Yeah.  In 3 and 5.
12      A    Okay.  Box 3 and box 5?
13      Q    Yes.
14      A    So, I mean, you might be better at
15 interpreting this than I am.  So whatever figure
16 includes the 401(k); Medicare -- Medi- Medicare wages?
17 Yeah.  Medicare wages; Social Security wages.  All of
18 that, if that $120,409 includes both of those, then
19 that would be correct.
20      Q    And do you get a -- so do you think you made
21 about $120,409 in 2020 from Blue Yonder?
22      A    It appears that that is what they are saying
23 I made, so I agree with that.
24      Q    And were you also able to participate in
25 their 401(k) plan?
```

22 (Pages 85 to 88)

**Page 89**

```
1       A    Correct.
2       Q    And do you get health insurance benefits
3   through Blue Yonder?
4       A    Correct.
5       Q    And did you get health insurance benefits
6   through Blue Yonder at the start of your employment
7   there?
8       A    Correct.
9       Q    What other benefits do you know that you get
10   through Blue Yonder?
11       A    Well, I think it says on here that they do a
12   match for your 401(k).
13       Q    Okay.  And then do you get any kind of life
14   insurance benefits?
15       A    Yes.  Yes, I do.
16       Q    How about disability insurance?
17       A    Yes.  I think it's on there too, by the way.
18       Q    And --
19       A    It should be on that receipt.
20       Q    So how do you feel like your -- the benefits
21   that you receive at Blue Yonder match up to the
22   benefits that you received when you left IBM?
23            MS. COUGHLIN:  Objection to the
24   extent that it calls for a legal conclusion.
25       A    So, sorry.  I, you know, I don't know how to
```

**Page 90**

```
1   answer that.  I think they -- when I left IBM I was
2   making -- I had health insurance, I had disability.  I
3   don't remember if life insurance if it was free I took
4   it.  So in that respect they didn't do a match, so that
5   part was not the same.
6       Q    (By Mr. Smith)  IBM did not do a match or
7   Blue Yonder?
8       A    IBM did not do a match.
9       Q    Okay.  So you actually get -- that's a
10   benefit that you're getting at Blue Yonder that you did
11   not get at IBM, right?
12       A    Yeah.  I think you have to work at IBM for a
13   certain amount before they'll agree to match, and so
14   I'm not sure if the last year I qualified for it or
15   not.
16       Q    Okay.  And then you also were -- back when
17   you were hired you were eligible for a potential
18   performance incentive bonus, right?
19       A    Which company are you referring to?
20       Q    Blue Yonder.
21       A    I, I, I don't know at the time that I knew
22   that that was possible.
23       Q    Let's go back to, it should be I believe
24   Exhibit 6.  This is your offer letter again from Blue
25   Yonder, correct, February 26, 2020?
```

**Page 91**

```
1       A    Okay.
2       Q    And do you see where it says in the third
3   paragraph, "As an associate working at least 30 hours
4   per week, you will be able to participate in the
5   Company's annual performance incentive program at 18
6   percent of your annual salary per year beginning on
7   your date of hire"; is that correct?
8       A    That's correct.
9       Q    So does that refresh your recollection as to
10   whether you were eligible for an annual performance
11   incentive bonus as well?
12       A    Yes.  That refreshes my recollection.
13       Q    Do you know if you received a bonus in 2020?
14       A    They were giving bonus -- they weren't
15   giving -- now, for 2020 or in 2020?
16       Q    For -- well, for -- how about for 2020?
17       A    Yes.  For 2020 I received a bonus.
18       Q    Do you know what your bonus was?
19       A    I think there's a document that I provided
20   for you that said the amount exactly.
21       Q    Okay.  But do you recall approximately what
22   it was?
23       A    Approximately $19,000.
24       Q    Over and above your regular salary for 2020?
25       A    Correct.
```

**Page 92**

```
1       Q    So that would have made your annualized --
2   okay.  That's fine.  $19,000 over and above what your
3   regular salary of 150,000 per year would have been for
4   2020.
5       A    Correct.
6       Q    And then did you receive a raise -- have you
7   received any raises during the time you've been at Blue
8   Yonder?
9       A    I didn't realize it until I looked at my
10   paycheck, and I guess they raised it by $3,000 starting
11   in 2021.
12       Q    So would that make your current -- is your
13   salary 153,000?
14       A    Yes.
15       Q    And are you still eligible for the annual
16   bonus?
17       A    I'm still eligible.
18       Q    I think you testified earlier that you said
19   that your current position is principal; is that right?
20       A    Yes.  That's actually sort of equivalent to
21   architect, but they moved architect over into the
22   principal area.
23       Q    Other than getting the $3,000 raise, is there
24   any other increase in income or benefits or equity in
25   the company that you get as a principal?
```

```
 1   jobs after you were made aware of your selection in the
 2   RA process?
 3       A    No.  Because Ty told me it was fruitless.
 4       Q    So you didn't, you didn't make any attempt to
 5   apply for any internal IBM jobs?
 6       A    No.  Because --
 7            MS. COUGHLIN:  Asked and answered.
 8       A    Yeah.  The answer doesn't change.
 9            MR. SMITH:  I don't think I have
10   any further questions, and I'll pass the witness.
11            MS. COUGHLIN:  We'll reserve for
12   the time of trial.
13            VIDEOGRAPHER:  Off the record at
14   4:21.
15            (4:21 p.m. the proceedings
16   adjourned.)
17
18
19
20
21
22
23
24
25
```

Page 225

```
 1                  ACKNOWLEDGMENT OF DEPONENT
 2
 3       I, JANET GELPHMAN, do hereby certify that I have
 4   read the foregoing pages and that the same is a correct
 5   transcription of the answers given by me to the
 6   questions therein propounded, except for the
 7   corrections or changes in form or substance, if any,
 8   noted in the attached Changes and Insertions page
 9   (Errata).
10
11
12
13                  JANET GELPHMAN
14
15                  DATE
16
17
18
19
20
21
22
23
24
25
```

Page 227

```
 1              CHANGES AND INSERTIONS
 2                  JANET GELPHMAN
 3                January 21, 2022
 4
 5   PAGE  LINE  CHANGE                        REASON
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

Page 226

```
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                   AUSTIN DIVISION
 3
     CHARLES TOWNSLEY, MICHAEL       $
 4   SAURO, WALTER NOFFSINGER,       $
     ROSA DAVIDSON, MICHAEL          $
 5   KELLY, TITON HOQUE, JANET       $
     GELPHMAN, THANH DO,             $
 6                                   $
         Plaintiffs,                 $      CASE NUMBER
 7                                   $  1:20-CV-00969-LY
     v.                              $
 8                                   $
     INTERNATIONAL BUSINESS          $
 9   MACHINES CORPORATION,           $
                                     $
10       Defendants.                 $
11          REPORTER'S CERTIFICATION OF THE
12      VIDEOTAPED ORAL DEPOSITION OF JANET GELPHMAN
13               January 21, 2021
14               (Reported Remotely)
15       I, Sandra S. Givens, Certified Shorthand Reporter
16   in and for the State of Texas, hereby certify to the
17   following:
18       That the witness, JANET GELPHMAN, was duly sworn
19   by the officer and that the transcript of the oral
20   deposition is a true record of the testimony given by
21   the witness;
22       That the original deposition transcript was
23   submitted to: JANET GELPHMAN in care of her attorney,
24   Heidi A. Coughlin;
25       That a copy of this certificate was served on all
```

Page 228

57  (Pages 225 to 228)

```
1   parties and/or the witness shown herein on  January 31,
2   2022.
3        I further certify that pursuant to FRCP Rule
4   30(f)(1) that the signature of the deponent was
5   requested by the deponent's attorney before the
6   completion of the deposition and that the transcript be
7   returned within 30 days from the date of receipt.  If
8   returned, the attached Changes and Signature page
9   contains any changes and the reasons therefor:
10       That $         is the deposition officer's
11  charges to the Defendant for preparing the original
12  deposition transcript and any copies of exhibits;
13       That the amount of time used by each party at the
14  deposition is as follows:
15       Edward M. (Ted) Smith - 4 hours, 52 minutes
         Heidi A. Coughlin - 0 minutes
16       Austin Harris Kaplan - 0 minutes
17       That pursuant to information given to the
18  deposition officer at the time said testimony was
19  taken, the following includes counsel for all parties
20  of record:
21       Edward M. (Ted) Smith - Attorney for Defendant
         Heidi A. Coughlin - Attorney for Plaintiffs
22       Austin Harris Kaplan - Attorney for Plaintiffs
23       I further certify that I am neither counsel for,
24  related to, nor employed by any of the parties or
25  attorneys in the action in which this proceeding was
```

Page 229

```
1   taken, and further, that I am not financially or
2   otherwise interested in the outcome of the action.
3        Certified to by me this 31st day of January 2022.
4
                    GIVENS COURT REPORTING
5                   6549 Fair Valley Trail
                    Austin, Texas 78749
6                   (512) 301-7088
7
8
9                   SANDRA S. GIVENS, CSR
                    Certification No. 5000
10  # sg-1923       Certificate Expires 1/31/24
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 230

58  (Pages 229 to 230)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| CHARLES TOWNSLEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-00969-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S**
**MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

# EXHIBIT F to Exhibit 1

## Page 1

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

CHARLES TOWNSLEY, MICHAEL      $
SAURO, WALTER NOFFSINGER,      $
ROSA DAVIDSON, MICHAEL         $
KELLY, TITON HOQUE, JANET      $
GELPHMAN, THANH DO,            $
                               $
        Plaintiffs,            $    CASE NUMBER
                               $ 1:20-CV-00969-LY
v.                             $
                               $
INTERNATIONAL BUSINESS         $
MACHINES CORPORATION,          $
                               $
        Defendants.            $

* * * * * * * * * * * * * * * * * * *

          THE VIDEOTAPED ORAL DEPOSITION OF
                   CHARLES TOWNSLEY
                   December 9, 2021

* * * * * * * * * * * * * * * * * * *

          THE VIDEOTAPED ORAL DEPOSITION OF CHARLES
TOWNSLEY, produced as a witness at the instance of the
Defendant and duly sworn, was taken in the above styled
and numbered cause on the 9th day of December 2021,
from 9:27 a.m. to 12:11 p.m. and from 1:06 p.m. to 2:40
p.m., respectively, before Sandra S. Givens, CSR, in
and for the State of Texas, reported by machine
shorthand method at the law offices of Wright &
```

## Page 2

```
 1  Greenhill, 900 Congress Avenue, Suite 500, Austin,
 2  Texas 78701,  pursuant to the Federal Rules of Civil
 3  Procedure.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1               A P P E A R A N C E S
 2
     FOR THE PLAINTIFFS:
 3
         Ms. Heidi A. Coughlin
 4       WRIGHT & GREENHILL, PC
         900 Congress Avenue
 5       Suite, 500
         Austin, Texas 78701
 6       (512) 476-4600
         hcoughlin@w-g.com
 7
         Mr. Austin Harris Kaplan
 8       KAPLAN LAW FIRM, PLLC
         2525 Wallingwood Drive
 9       Building 14
         Austin, Texas 78746
10       (512) 553-9390
         akaplan@kaplanlawatx.com
11       (Via Speakerphone)
12
     FOR THE DEFENDANT:
13
         Mr. Edward M. "Ted" Smith
14       CORNELL SMITH MIERL BRUTOCAO BURTON, LLP
         1607 West Avenue
15       Austin, Texas 78701
         (512) 328-1540
16       tsmith@cornellsmith.com
17
     VIDEOGRAPHER:
18
         Mr. Brad Rosauer
19
20
21
22
23
24
25
```

## Page 4

```
 1                   I N D E X
 2
     Appearances - - - - - - - - - - - - - - - - - - - 3
 3
     Exhibits - - - - - - - - - - - - - - - - - - - - - 4
 4
     CHARLES TOWNSLEY
 5
        Examination by Mr. Smith - - - - - - - - - - - 7
 6
     Changes and Signature - - - - - - - - - - - - - 174
 7
     Reporter's Certification - - - - - - - - - - - 176
 8
 9
10                E X H I B I T S
11   NO.  DESCRIPTION                            PAGE
12   Exhibit 1 - - - - - - - - - - - - - - - - - - 15
        Chuck Townsley Resume
13
     Exhibit 2 - - - - - - - - - - - - - - - - - - 25
14      2020 Tax Return History Report, Form 1040
15   Exhibit 3 - - - - - - - - - - - - - - - - - - 31
        5/14/19 Offer Letter from Oracle
16
     Exhibit 4 - - - - - - - - - - - - - - - - - - 38
17      Plaintiffs' First Amended Complaint
18   Exhibit 5 - - - - - - - - - - - - - - - - - - 98
        Total Pipeline Summary under Manager Tushar
19      Bajaj for: Chuck Townsley, Greyson Kountz
        Hailey Williams, Jaclyn Poe, Justin Crohn,
20      Michelle Miller [CONFIDENTIAL]
21   Exhibit 6 - - - - - - - - - - - - - - - - - 106
        Listing of Quotas for Various Employees
22      [CONFIDENTIAL]
23   Exhibit 7 - - - - - - - - - - - - - - - - - 112
        IBM CONFIDENTIAL - Guidelines for Completing
24      U.S. Identification Worksheet - January 2018.
        Worksheet re: Charles Townsend
25      Prepared/Approved by Tushar Bajaj; Reviewed/
```

1 (Pages 1 to 4)

```
 1
 2       Exhibit 8 - - - - - - - - - - - - - - - - - - - 114
 3          Hundred Percent Club 2017 - North America
         Exhibit 9 - - - - - - - - - - - - - - - - - - - 168
            EEOC Charge of Discrimination
 4
 5       Exhibit 10 - - - - - - - - - - - - - - - - - - 123
            Job Posting Interview - Offering Manager,
            Automotive [CONFIDENTIAL]
 6
 7       Exhibit 11 - - - - - - - - - - - - - - - - - - 129
            IBM Confidential: 2017 Performance Assessment
            for Chuck Townsley
 8
 9       Exhibit 12 - - - - - - - - - - - - - - - - - - 138
            Plaintiff Charles Townsley's Answers to
            Defendant's First Set of Interrogatories
10
11       Exhibit 13 - - - - - - - - - - - - - - - - - - 143
            3/29/18 Confidential Package Info from
12          Tushar Bajaj to Chuck Townsley: Bootcamp SPD
            Addendums - March 2018; IRA Employee Package -
13          March 2018; Cover Letters - Chuck Townsley

14       Exhibit 14 - - - - - - - - - - - - - - - - - - 147
            2018 W-2 from Workforce Logic, LLC
15       Exhibit 15 - - - - - - - - - - - - - - - - - - 149
            Oracle Salary Administration Document
16          Reflecting Increase in Salary
17       Exhibit 16 - - - - - - - - - - - - - - - - - - 150
            2019 W-2 from Oracle
18
19       Exhibit 17 - - - - - - - - - - - - - - - - - - 150
            2020 W-2 from Oracle
20       Exhibit 18 - - - - - - - - - - - - - - - - - - 152
            Oracle Benefits for 2019
21
22       Exhibit 19 - - - - - - - - - - - - - - - - - - 155
            Oracle Benefits for 2020
23       Exhibit 20 - - - - - - - - - - - - - - - - - - 156
            Oracle Benefits for 2021
24
25       Exhibit 21 - - - - - - - - - - - - - - - - - - 156
            2018 Schedule 1: Additional Income and
```

Page 5

```
 1
         Exhibit 22 - - - - - - - - - - - - - - - - - - 157
 2          2019 Schedule 1: Additional Income and
            Adjustments to Income
 3
         Exhibit 23 - - - - - - - - - - - - - - - - - - 157
 4          9/20/18 Email Exchange Between Chuck Townsley
            and Tushar Bajaj re: Overpayment of Payroll
 5
         Exhibit 24 - - - - - - - - - - - - - - - - - - 161
 6          IBM Corporate Policy 117, Workplace Diversity
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1                    VIDEOGRAPHER:  We are on the record
 2       on Thursday, December 9th, 2021, at 9:27 a.m.,
 3       beginning the video deposition of Charles Townsley.
 4       Will counsel please identify themselves for the record?
 5       After which the court reporter will swear in the
 6       witness.
 7                    MS. COUGHLIN:  Heidi Coughlin with
 8       Wright & Greenhill on behalf of the plaintiff, and
 9       Austin Kaplan is also attending via phone on behalf of
10       the plaintiff.
11                    MR. SMITH:  And Ted Smith on behalf
12       of IBM.
13                    CHARLES TOWNSLEY,
14       having been first duly sworn, testified as follows:
15                    EXAMINATION
16       BY MR. SMITH:
17          Q   Good morning, Mr. Townsley.
18          A   Good morning, Mr. Smith.
19          Q   As I mentioned just a moment ago, my name is
20       Ted Smith, and I'm representing IBM in a lawsuit that
21       has been filed against them and in which you are one of
22       the plaintiffs.
23          A   Mm-hm.
24          Q   Do you understand that that's the purpose
25       here today, is to discuss that lawsuit?
```

Page 7

```
 1          A   Yes.
 2          Q   Have you ever had your deposition taken
 3       before?
 4          A   No.
 5          Q   So let me just kind of talk through a little
 6       bit kind of how this'll -- how it works, and, and
 7       hopefully if we can agree to some ground rules, it just
 8       makes it go smoothly.
 9          A   Sure.
10          Q   So although we're sitting in your counsel's
11       conference room, do you understand that, one, that
12       you're under oath?  Do you --
13          A   Yes.
14          Q   -- understand that?
15          A   I do understand that.
16          Q   And two, do you understand that your
17       testimony here today is the same and carries the same
18       weight as if we were sitting in a courtroom?
19          A   Yes.  I consider this a courtroom.
20          Q   And we have a court reporter who is here
21       taking down all of the testimony, so it's important,
22       number one, that you answer verbally whenever possible.
23          A   Okay.
24          Q   It's difficult for her to take down things
25       like nods of the head and things like uh-huh or
```

Page 8

GIVENS COURT REPORTING

6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1  go about closing that -- some of that pipeline in order
2  to be able to make my TI.
3      Q    And what's TI?
4      A    Target incentive.  It's a number that
5  basically is your quota plus some other little factors
6  within it.
7      Q    And if you reach that number then you are
8  entitled to addi- you're eligible for additional
9  compensation; is that...
10     A    Well, actually, any sale you do you're
11 entitled, but as you sell, the higher you -- the more
12 sales you get, there, there's target incentives:  When
13 you hit this it says you're going to make this much.
14 Things above that have multipliers on top of that.  So
15 if you're twice, you may get two times the amount that
16 you would have gotten if you just made it.  Not twice
17 like as in -- it would end up being, like, three times
18 in some circumstances.  So the more you sold above your
19 target incentive, the greater the rewards were coming
20 back.
21     Q    And was it an important part of your job to
22 have a strong pipeline?
23     A    It was important to have pipeline.  Pipeline
24 is what enabled me to be able to sell.
25     Q    And was that an important factor in your job?

Page 69

1      MS. COUGHLIN:  Objection, vague.
2      A    What does that mean?  I thought you just
3  asked me that question.  I thought I just answered it.
4      Q    (By Mr. Smith)  Were, were you -- was your
5  performance rated in part on what your pipeline was?
6      MS. COUGHLIN:  Objection vague,
7  calls for speculation.
8      A    I don't know what his -- what he used as his
9  construct as to what my --
10     Q    (By Mr. Smith)  Did --
11     A    The way I was rated.
12     Q    So you, you don't know what -- whether your
13 pipeline was included in your performance review by
14 your supervisors?
15     A    I don't remember it being in there.  It may
16 have been.  Bottom line is, is I needed to build
17 pipeline.  I needed to build pipeline so I could make
18 money.
19     Q    Okay.
20     A    Unfortunately, I was constantly getting new
21 accounts.  Okay?  When I -- over the past few years I
22 went from one account to 14, or somewhere around
23 there, and there was, like, 70 when, when Raj became
24 my manager, and they didn't come with very much pipe
25 at all.  These were accounts that didn't have

Page 70

1  much -- didn't do much business with IBM.
2      Q    Okay.  So you -- if I understand your
3  testimony correctly, for awhile that you were working
4  at IBM you only had one account?
5      A    I had AT&T.  Inside there, there was many
6  different business opportunities.
7      Q    But your one account was AT&T.
8      A    Mm-hm.
9      Q    And how long did you only have one account?
10     A    Can I -- yeah.  So that would have been from
11 2013 I think through '16.
12     Q    Okay.  And in two thousand and --
13     A    Up to, I think it was, January of '16 --
14     Q    Okay.
15     A    -- February, something like that.
16     Q    And then in 2016 your job role changed such
17 that you no longer just had one account, correct?
18     A    Yeah.  I moved off of that account.  They
19 asked me to move over -- they didn't ask me.  They told
20 me to move over to work for George -- daggone,
21 George -- I lost his last name.  Anyway, my manager
22 George, which was the manager before Tushar, and they
23 wanted me to foc- the company wanted me to focus on
24 accounts that they really struggled with getting IBM to
25 buy, because of my success at AT&T.

Page 71

1      Q    And how many accounts did you receive as a
2  result of that change?
3      A    I think I went to around 14, as I remember.
4  I don't know the exact number, but it was somewhere
5  near there.
6      Q    Okay.
7      A    It did not come with pipe, to speak of.
8      Q    So --
9      A    I had to build pipe.
10     Q    -- in that change you were -- is it fair to
11 say that you were then required to develop a new
12 pipeline?
13     A    Absolutely.
14     Q    And were you, were you the only employee that
15 you know of who was changed from having one account to
16 multiple accounts during that same timeframe?
17     A    I'm not aware of any others that that
18 happened to.  It probably did, but I wasn't aware of
19 any.
20     Q    Okay.  And then did you say you moved from
21 even 14 to more clients?
22     A    Yeah.  The year I worked for George I built
23 pipe there, closed some pretty nice-size deals in the
24 fourth quarter, and then was moved to Tushar, was
25 handed a whole new set of accounts.  And there may have

Page 72

18 (Pages 69 to 72)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

```
 1      A    Yes.
 2                    THE REPORTER:  Ted, can we take a
 3  short break?
 4                    MR. SMITH:  Yeah.  Sure.
 5                    VIDEOGRAPHER:  We are off the
 6  record, the time is 1:44 p.m.
 7                    (At 1:44 p.m. the proceedings
 8  recessed, continuing at 1:52 p.m.)
 9                    VIDEOGRAPHER:  We are back on the
10  record, the time is 1:52 p.m.
11      Q    (By Mr. Smith)  Mr. Townsley, I hand you
12  what's been marked as Exhibit No. 15.
13      A    Yeah.
14      Q    I'll, I'll proffer to you that these are
15  documents that we received from Oracle.  Does it seem
16  to show that you received a raise July 1st, 2021 to
17  $157,000 per year?
18      A    Yes.  It shows that.
19      Q    And is that accurate?
20      A    Yes.  That is accurate.
21      Q    So is your current salary at Oracle $157,000
22  per year?
23      A    That is correct.
24      Q    And then you're also entitled -- you're
25  eligible for additional bonuses; is that right?
```

Page 149

```
 1      A    A bonus on top of that.  Yeah.
 2      Q    Okay.
 3                    (Exhibit No. 16 marked.)
 4      Q    Mr. Townsley, have you seen Exhibit No. 16
 5  before?
 6      A    Yes.  What year is this for?
 7      Q    This is for, should be, two thousand and
 8  nine -- 2019.  It shows that you earned $91,741.44; is
 9  that right?
10      A    That is what it shows.  Yes.
11      Q    And in 2019 you only worked for part of the
12  year for Oracle, right?
13      A    That is correct.
14      Q    Okay.  And does that -- does this appear to
15  be accurate as to what you earned at --
16      A    Yes.
17      Q    -- Oracle for 2019?
18      A    Yes.
19                    (Exhibit No. 17 marked.)
20      Q    Mr. Townsley, have you seen what's been
21  marked as Exhibit No. 17 before?
22      A    Yes.
23      Q    Is this your W-2 form for 2020 from Oracle?
24      A    Yes.
25      Q    And does it show that you earned $180,514.88
```

Page 150

```
 1  in 2020?
 2      A    Yes.
 3      Q    And does that appear to be accurate as to
 4  your earnings from Oracle in 2020?
 5      A    I believe so.  Can I ask a question?
 6      Q    Sure.
 7      A    On the bottom of that W-2 form it has my
 8  Social Security there but only -- normally it would
 9  only be four digits left remaining.  They didn't redact
10  enough of it.  Do you see --
11      Q    Okay.
12      A    -- what I'm talking -- is there a way -- I, I
13  suspect these are secure documents and whatnot, right?
14                    MS. COUGHLIN:  (Nodding head)
15      Q    (By Mr. Smith)  Yes.
16      A    Okay.  Then I'm not worried.  Thank you.
17      Q    Yeah.  We won't --
18                    MS. COUGHLIN:  I'll let you in on a
19  little secret:  IBM already knows your Social Security
20  Number.
21                    MR. SMITH:  Yeah.
22                    THE WITNESS:  No.  I wasn't worried
23  about that.  I mean, you know, I just didn't know what
24  happens to these documents --
25                    MS. COUGHLIN:  Yeah.
```

Page 151

```
 1                    THE WITNESS:  -- and if they
 2  weren't being shredded or whatever, I'd just want to
 3  know.
 4      Q    (By Mr. Smith)  Yeah.  And I mean --
 5      A    Not that one digit's going to tell them
 6  anything, but...
 7                    MS. COUGHLIN:  No.
 8      Q    (By Mr. Smith)  Well, and if at any time any
 9  of these ever need to be filed or anything, we always,
10  we make sure to redact out those kind of --
11      A    Thank you.
12      Q    -- things.  Can't really imagine why this
13  document would be filed, but...
14                    (Exhibit No. 18 marked.)
15                    THE WITNESS:  Thank you.
16                    THE REPORTER:  You're welcome.
17      Q    (By Mr. Smith)  Mr. Townsley, I hand you
18  what's been marked as Exhibit No. 18, and I would also
19  proffer to you that we received these documents from
20  Oracle.
21      A    I'm sorry.  What was the question?
22      Q    So actually no question yet.
23      A    Okay.  Okay.  I'm sorry.
24      Q    So these are documents that I would proffer
25  to you we've received from Oracle.
```

Page 152

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

Page 173

1           MS. COUGHLIN:  Objection to the
2  extent that it mischaracterizes the witness's prior
3  testimony regarding his personal knowledge at that time
4  that he can remember at this point.
5       A   Yes.  And what I said before.
6           MR. SMITH:  I don't think I have
7  any further questions.  I'll pass the witness.
8           MS. COUGHLIN:  And we will reserve
9  our questions for the time of trial.
10          MR. SMITH:  That's all.  Thank you
11  very much.
12          THE WITNESS:  Thank you.
13          VIDEOGRAPHER:  This concludes
14  today's deposition.  We are off the record, the time is
15  2:40 p.m.  Number of medias used is two.
16                (2:40 p.m. the proceedings
17  adjourned.)
18
19
20
21
22
23
24
25

Page 175

1           ACKNOWLEDGMENT OF DEPONENT
2
3       I, CHARLES TOWNSLEY, do hereby certify that I have
4  read the foregoing pages and that the same is a correct
5  transcription of the answers given by me to the
6  questions therein propounded, except for the
7  corrections or changes in form or substance, if any,
8  noted in the attached Changes and Insertions page
9  (Errata).
10
11
12
13                CHARLES TOWNSLEY
14
15      DATE
16
17
18
19
20
21
22
23
24
25

Page 174

1           CHANGES AND INSERTIONS
2           CHARLES TOWNSLEY
3           December 9, 2021
4
5  PAGE  LINE  CHANGE                        REASON
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 176

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2               AUSTIN DIVISION
3
   CHARLES TOWNSLEY, MICHAEL       §
4  SAURO, WALTER NOFFSINGER,       §
   ROSA DAVIDSON, MICHAEL          §
5  KELLY, TITON HOQUE, JANET       §
   GELPHMAN, THANH DO,             §
6                                  §
      Plaintiffs,                  §    CASE NUMBER
7                                  §  1:20-CV-00969-LY
   v.                              §
8                                  §
   INTERNATIONAL BUSINESS          §
9  MACHINES CORPORATION,           §
                                   §
10     Defendants.                 §
11
12       REPORTER'S CERTIFICATION OF THE
13       ORAL DEPOSITION OF CHARLES TOWNSLEY
14             December 9, 2021
15      I, Sandra S. Givens, Certified Shorthand Reporter
16  in and for the State of Texas, hereby certify to the
17  following:
18      That the witness, CHARLES TOWNSLEY, was duly sworn
19  by the officer and that the transcript of the oral
20  deposition is a true record of the testimony given by
21  the witness;
22      That the original deposition transcript was
23  submitted to: CHARLES TOWNSLEY in care of his attorney,
24  Heidi A. Coughlin;
25      That a copy of this certificate was served on all

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

```
 1   parties and/or the witness shown herein on  December
 2   17, 2021.
 3       I further certify that pursuant to FRCP Rule
 4   30(f)(1) that the signature of the deponent was
 5   requested by the deponent's attorney before the
 6   completion of the deposition and that the transcript be
 7   returned within 30 days from the date of receipt.  If
 8   returned, the attached Changes and Signature page
 9   contains any changes and the reasons therefor:
10       That $            is the deposition officer's
11   charges to the Defendant for preparing the original
12   deposition transcript and any copies of exhibits;
13       That the amount of time used by each party at the
14   deposition is as follows:
15       Edward M. (Ted) Smith - 3 hours, 44 minutes
         Heidi A. Coughlin - 0 minutes
16       Austin Harris Kaplan - 0 minutes
17       That pursuant to information given to the
18   deposition officer at the time said testimony was
19   taken, the following includes counsel for all parties
20   of record:
21       Edward M. (Ted) Smith - Attorney for Defendant
         Heidi A. Coughlin - Attorney for Plaintiffs
22       Austin Harris Kaplan - Attorney for Plaintiffs
23       I further certify that I am neither counsel for,
24   related to, nor employed by any of the parties or
25   attorneys in the action in which this proceeding was
```

Page 177

```
 1   taken, and further, that I am not financially or
 2   otherwise interested in the outcome of the action.
 3
 4       Certified to by me this 17th day of December 2021.
 5
                     GIVENS COURT REPORTING
 6                   6549 Fair Valley Trail
                     Austin, Texas 78749
 7                   (512) 301-7088
 8
 9
10
                     SANDRA S. GIVENS, CSR
11                   Certification No. 5000
     # sg-1914       Certificate Expires 1/31/22
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 178

45  (Pages 177 to 178)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHARLES TOWNSLEY, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:20-cv-00969-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

# EXHIBIT G to Exhibit 1

Thanh Do - 1/11/2022



**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
                        AUSTIN DIVISION

CHARLES TOWNSLEY, MICHAEL      )
SAURO, WALTER NOFFSINGER,      )
ROSA DAVIDSON, MICHAEL         )
KELLY, TITON HOQUE, JANET      )
GELPHMAN, THANH DO,            )
                               )
     Plaintiffs,               )
                               )
                               )
                               )
                               )
vs.                            )  CIVIL ACTION
                               )  NO. 1:20-CV-00969-LY
                               )
                               )
                               )
                               )
INTERNATIONAL BUSINESS         )
MACHINES CORPORATION,          )
                               )
     Defendant.                )

*************************************************

      ORAL AND VIDEOTAPED DEPOSITION OF

                    THANH DO

                    VOLUME 1

               JANUARY 11, 2022

              (Reported Remotely)

*************************************************
```

**Page 2**

ORAL AND VIDEOTAPED DEPOSITION OF THANH DO, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on January 11, 2022, from 9:33 a.m. to 5:42 p.m., before Jodi Cardenas, CSR, RPR, in and for the State of Texas, reported by computerized stenotype machine at the residence of THANH DO, pursuant to the Federal Rules of Civil Procedure, the current Emergency Order regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto.

**Page 3**

APPEARANCES

FOR THE PLAINTIFFS:
    Ms. Heidi A. Coughlin
    WRIGHT & GREENHILL, PC
    900 Congress Avenue, Suite 500
    Austin, Texas 78701
    (512) 476-4600
    hcoughlin@w-g.com

    -and-

    Mr. Austin Harris Kaplan
    KAPLAN LAW FIRM, PLLC
    2525 Wallingwood Drive, Building 14
    Austin, Texas 78746
    (512) 553-9390
    akaplan@kaplanlawatx.com

FOR THE DEFENDANT:
    Mr. Andrew Broadaway
    CORNELL, SMITH, MIERL, BRUTOCAO & BURTON, LLP
    1607 West Avenue
    Austin, Texas 78701
    (512) 328-1540
    abroadaway@cornellsmith.com

ALSO PRESENT:

    Mr. Hank Wisrodt, Videographer

**Page 4**

STIPULATIONS

    The attorneys for all parties present stipulate and agree to the following items:

    That the deposition of THANH DO is being taken pursuant to Notice;

    That the deposition is being taken pursuant to the Federal Rules of Civil Procedure;

    That the original transcript will be submitted to the witness' attorney, MS. HEIDI A. COUGHLIN;

    That the witness or the witness' attorney will return the signed transcript to the court reporter within 30 days of the date the transcript is provided to the witness' attorney. If not returned, the witness may be deemed to have waived the right to make the changes, and an unsigned copy may be used as though signed.

Thanh Do - 1/11/2022

---

**Page 5**

INDEX
PAGE

1  Appearances....................................... 3
2  Stipulations........................................ 4
3  THANH DO
4  Examination by Mr. Broadaway............. 8
5
6  Changes and Corrections....................... 269
7  Signature Page.................................. 270
8  Reporter's Certificate......................... 271
9
10

EXHIBITS

NO.  DESCRIPTION                        PAGE

1............................................... 44
   Defendant's Request for Production of
   Documents

2............................................... 54
   IBM Diversity Policy

3............................................... 60
   E-mail Correspondence,
   "Subject: IBM of lot of those articles"

4............................................... 119
   E-mail Correspondence,
   "Subject: Your lab installations"

5............................................... 143
   Separation Package

6............................................... 153
   Selection Worksheet

7............................................... 175
   E-mail Correspondence,
   "Subject: "Confidential personnel"

---

**Page 6**

EXHIBITS (CONT'D)

NO.  DESCRIPTION                        PAGE

8............................................... 178
   E-mail Correspondence,
   "Subject: Thanh out of office 5/28 - 6/5"

9............................................... 180
   E-mail Correspondence,
   "Subject: Updated submission"

10.............................................. 192
   E-mail with Job Opportunities

11.............................................. 202
   E-mail Correspondence,
   "Subject: Open position for IBMi Early
   Professional Hire (EPH)"

13.............................................. 229
   TWC Dashboard Printout

14.............................................. 239
   2019 TWC 1099

15.............................................. 240
   2020 TWC 1099

18.............................................. 248
   First Amended Complaint

21.............................................. 254
   EEOC Charge

22.............................................. 263
   Message from Ms. Ngo

---

**Page 7**

1          (REPORTER'S NOTE:  Please note this
2   deposition was taken remotely via Zoom;
3   therefore, due to the quality of
4   transmission of data via Zoom
5   videoconference, audio distortions,
6   internet connections freezing,
7   overspeaking, extraneous room noise,
8   et cetera, unintelligibles or
9   inaudibles may have created
10  inaccuracies in the transcription.)
11         (Federal Rules 30(b)(5)(A) and (C) were
12  waived by all counsel present)
13         THE VIDEOGRAPHER:  Here begins Tape 1
14  of the video deposition of Thanh Do.  Today's date is
15  January 11th, 2022.  And the time is 9:33 a.m.  This
16  deposition is being held via Zoom video conferencing.
17  Will counsel please identify themselves for the
18  record.
19         MR. BROADAWAY:  Yes.  I -- my
20  apologies.
21         (Overspeaking)
22         MS. COUGHLIN:  No, it's okay.  Here --
23  is that all right?  All right.  I go first.
24         MR. BROADAWAY:  Please, please.
25         MS. COUGHLIN:  Heidi Coughlin on behalf

---

**Page 8**

1   of the plaintiff with Wright & Greenhill, and Austin
2   Kaplan is also here on behalf of the plaintiff.
3          MR. BROADAWAY:  And this is Andrew
4   Broadway of Cornel, Smith, Mierl, Brutocao, & Burton
5   on behalf of defendant IBM.
6          THE VIDEOGRAPHER:  Will the court
7   reporter please swear in the witness?
8          THE REPORTER:  Ms. Do, will you raise
9   your right hand, please?
10         THANH DO,
11  having been first duly sworn, testified as follows:
12         EXAMINATION
13  BY MR. BROADAWAY:
14     Q.  Ms. Do, for the record, will you please
15  state and spell your full name?
16     A.  My name -- full name -- first name is Thanh,
17  T-H-A-N-H.  My last name, Do, D-O.
18     Q.  And have you ever gone by any other name,
19  like a maiden name or anything like that?
20     A.  No.
21     Q.  Okay.  As -- as I mentioned just a minute
22  ago, I am one of the lawyers representing IBM in
23  this -- in this matter.  My purpose for being here
24  today is to ask you a series of questions regarding
25  your claims in the lawsuit you have brought against

---

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

4eddc154-8291-4630-9ddc-fa63296d2152

Thanh Do - 1/11/2022

---

49

1    MS. COUGHLIN:  Yeah.
2    THE VIDEOGRAPHER:  Off the record at
3  10:31.  This concludes Tape 1.
4    (Off the record)
5    THE VIDEOGRAPHER:  We're back on the
6  record at 10:41.  This begins Tape 2.
7    MR. BROADAWAY:  Did you -- were you
8  able to take a break, Ms. Do?
9    THE WITNESS:  Yes.  Thank you.
10   Q.  (BY MR. BROADAWAY)  And do you understand
11 that you're still under oath even after the break
12 that we may take?
13   **A.  Yes.**
14   (Interruption)
15   MR. BROADAWAY:  Did somebody else say
16 something?  I heard -- I heard something, but I
17 couldn't identify who said it.  Okay.
18   Q.  (BY MR. BROADAWAY)  So, Ms. Do, when did you
19 first start working at IBM?
20   **A.  I start working for IBM on May 30, 1983,**
21 **right after graduation from Stevens Institute of**
22 **Technology.**
23   Q.  So it was your first job after college?
24   **A.  Yes.  It was my first job after college.**
25   Q.  What did you do when you first started

---

50

1  working for IBM?
2    **A.  I work at the IBM Poughkeepsie in New York,**
3  **and I'm responsible for performance work on the**
4  **mainframe computer and the mainframe operating --**
5  **operating system that developed in IBM Poughkeepsie.**
6    Q.  Have you done performance work your entire
7  career at IBM?
8    **A.  Yes.**
9    Q.  Have you ever been a manager?
10   **A.  No.**
11   (Zoom interruption)
12   Q.  (BY MR. BROADAWAY)  Do you have a current
13 resumé?
14   **A.  Yes.**
15   Q.  When did you last update your resumé?
16   **A.  I last update my resumé in 2019 after I left**
17 **IBM.**
18   Q.  Do you know, have you given a copy of your
19 updated resumé to your counsel?
20   **A.  No, I did not give him copy of my resumé.**
21   Q.  So I want to fast forward.  I know you were
22 there for 36 years, so I want to fast forward to the
23 last position that you held at IBM.  Can you tell me
24 about the most recent job you had at IBM?
25   **A.  The most recent job that I had at IBM is the**

---

51

1  **IBM Austin.  I'm responsible for the performance work**
2  **IBM Power System hardware and AIX operating system**
3  **that developed here in IBM -- IBM Austin.**
4    Q.  And when did --
5    THE VIDEOGRAPHER:  You guys, I think we
6  lost our court reporter.  I think she just jumped
7  off.  Let's go off the record real quick. Off the
8  record at 10:44.
9    (Off the record)
10   THE VIDEOGRAPHER:  We're back on the
11 record at 10:51.
12   Q.  (BY MR. BROADAWAY)  All right, Ms. Do,
13 before we had that technical glitch, I think I had
14 asked you, do you have a current resumé?
15   **A.  Yes.**
16   Q.  And when did you last update it?
17   **A.  I last update it around 2019.**
18   Q.  And have you given a copy of that resumé to
19 your counsel?
20   **A.  No.**
21   Q.  So can you tell me about your most recent
22 job at IBM?
23   **A.  Yes.  My most recent job with IBM is with**
24 **IBM Austin.  IBM here in Austin.  Okay?  I'm**
25 **responsible for the performance work on a**

---

52

1  **newly-powered hardware system developed here in**
2  **Austin and also the AIX operating system that**
3  **developed here in Austin.**
4    Q.  And what was your title?
5    **A.  My job title is senior software engineer.**
6    Q.  And when did you start that job?
7    **A.  When did I start that job?  I've been with**
8  **IBM in Austin around 1995.  I'm always in the same**
9  **performance area, so the -- the job that I have in**
10 **that role -- let me think.  I would say three or four**
11 **years in that job.**
12   Q.  Three to four years?
13   **A.  Three or four years, yes.**
14   Q.  And what business unit did you work under?
15   **A.  What business unit?  I work for the system**
16 technology group division in IBM.
17   Q.  And what Band were you in at the time you
18 left IBM?
19   **A.  I was at Band 9 when I left IBM.**
20   Q.  And how long had you been at Band 9?
21   **A.  I work remote through Band 9 in July of**
22 **2017, so about two years.**
23   Q.  And were you a Band 8 prior to that?
24   **A.  Yes.**
25   Q.  And how long were you a Band 8?

---

Thanh Do - 1/11/2022

269

```
 1        CHANGES AND CORRECTIONS
 2    WITNESS NAME:  THANH DO
 3    DATE:  JANUARY 11, 2022
 4  Reason Codes:  (1) to clarify the record; (2) to
 5  conform to the facts; (3) to correct a transcription
 6  error; (4) (please explain).
 7  PAGE/LINE       CHANGE        REASON CODE
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

270

```
 1    I, THANH DO, have read the foregoing deposition and
 2  hereby affix my signature that same is true and correct,
 3  except as noted above.
 4
      _____
 5    THANH DO
 6
 7  THE STATE OF _____)
 8  COUNTY OF _____)
 9
10    Before me, _____, on this
11  day personally appeared THANH DO, known to me or proved
12  to me on the oath of _____ or through
13  _____ (description of identity card or
14  other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that he/she executed the same for the purpose and
17  consideration therein expressed.
18    Given under my hand and seal of office on this
19  _____ day of _____, _____.
20
21        _____
22        NOTARY PUBLIC IN AND FOR
23        THE STATE OF _____
24
25  My Commission Expires: _____
```

271

```
 1      IN THE UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF TEXAS
            AUSTIN DIVISION
 3  CHARLES TOWNSLEY, MICHAEL, )
    SAURO, WALTER NOFFSINGER, )
 4  ROSA DAVIDSON, MICHAEL, )
    KELLY, TITON HOQUE, JANET )
 5  GELPHMAN, THANH DO,     )
                            )
 6                          )
        Plaintiffs,     )
 7                          )
 8                          )
                            )
 9                          )
                            )
10  vs.       )  CIVIL ACTION
            )  NO. 1:20-CV-00969-LY
11                          )
                            )
12                          )
                            )
13                          )
                            )
14  INTERNATIONAL BUSINESS    )
    MACHINES CORPORATION,    )
15                          )
16   Defendant.    )
17  ...........................
18
        REPORTER'S CERTIFICATION
19
    ORAL AND VIDEOTAPED DEPOSITION OF
20
            THANH DO
21
            VOLUME 1
22
        JANUARY 11, 2022
23
        (Reported Remotely)
24
25  ...........................
```

272

```
 1    I, Jodi Cardenas, Certified Shorthand
 2  Reporter in and for the State of Texas, hereby
 3  certify to the following:
 4        That the witness, THANH DO, was duly sworn
 5  by the officer and that the transcript of the oral
 6  deposition was transcribed to the best of my ability
 7  and is a true record of the testimony given by the
 8  witness;
 9        I further certify that pursuant to the
10  Federal Rules of Civil Procedure, Rule 30(e)(1) (A)
11  and (B) as well as Rule 30(e)(2) that the signature
12  of the deponent:
13        __X__ was requested by the deponent and/or
14  a party before the completion of the deposition and
15  is to be returned within 30 days from date of receipt
16  of the transcript.  If returned, the attached Changes
17  and Corrections and Signature Pages contains any
18  changes and the reasons therefor;
19
            _____ was not requested by the deponent or
20
21  a party before the completion of the deposition.
22        That $_____ is the deposition
23  officer's charges for preparing the original
24  deposition transcript and any copies of exhibits
25  charged to DEFENDANT;
```

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

4eddc154-8291-4630-9ddc-fa63296d2152

69 (Pages 273-274)

Thanh Do - 1/11/2022

273

1       That pursuant to information given to the
2   deposition officer at the time said testimony was
3   taken, the following includes all parties of record:
4   FOR THE PLAINTIFFS:
5       Ms. Heidi A. Coughlin
        WRIGHT & GREENHILL, PC
6       900 Congress Avenue, Suite 500
        Austin, Texas 78701
7       (512) 476-4600
        hcoughlin@w-g.com
8
        -and-
9
        Mr. Austin Harris Kaplan
10      KAPLAN LAW FIRM, PLLC
        2525 Wallingwood Drive, Building 14
11      Austin, Texas 78746
        (512) 553-9390
12      akaplan@kaplanlawatx.com
13  FOR THE DEFENDANT:
14      Mr. Andrew Broadaway
        CORNELL, SMITH, MIERL, BRUTOCAO & BURTON, LLP
15      1607 West Avenue
        Austin, Texas 78701
16      (512) 328-1540
        abroadaway@cornellsmith.com
17
18      I further certify that I am neither counsel
19  for, related to, nor employed by any of the parties
20  or attorneys in the action in which this proceeding
21  was taken;
22      Further, I am not a relative nor an
23  employee of any attorney of record in this cause, nor
24  am I financially or otherwise interested in the
25  outcome of the action.

274

1       Certified to by me this 8th day of
2   February, 2022.
3
4                   _Jodi Cardenas_
5       _____
6       JODI CARDENAS, RPR, Texas CSR 7594
        CSR Expiration: 10-31-23
        WRIGHT WATSON & ASSOCIATES
7       Firm Registration No. 225
        Firm Expiration: 12-31-21
8       1250 South Capital of Texas Highway
        Building 3, Suite 400
9       Austin, Texas 78746
        512-474-4363
10      www.wrightwatson.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25