IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHARLES TOWNSLEY, MICHAEL SAURO, WALTER NOFFSINGER, ROSA DAVIDSON, MICHAEL KELLY, TITON HOQUE, JANET GELPHMAN, THANH DO | § § § § § § | |
| *Plaintiffs,* | § § | |
| vs. | § § | Civil Action No.: 1:20-cv-00969-DAE |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § § § | |
| *Defendant.* | § § | |

**PLAINTIFFS' RESPONSE TO IBM'S MOTION TO EXCLUDE
EXPERT REPORT AND TESTIMONY OF MARK RAMBIN**

TO THE HONORABLE UNITED STATES DISCTRICT JUDGE:

Plaintiffs Charles Townsley, Michael Sauro, Walter Noffsinger, Rosa Davidson, Michael Kelly, Titon Hoque, Janet Gelphman and Thanh Do ("Plaintiffs") file this Response to Defendant IBM's Motion to Exclude the Expert Testimony of Mark Rambin and in support thereof, would show the Court as follows:

## I. <u>BACKGROUND</u>

1.      This is a multi-party lawsuit wherein Plaintiffs have each alleged that IBM engaged in illicit age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). The age discrimination occurred as part of company-wide rolling layoffs that were designed to target older veteran employees while explicitly shielding categories of younger workers from those layoffs altogether.

2.      Plaintiffs retained and timely designated Mark Rambin, CPA, CFF as an expert witness to help the finder of fact understand and compute the economic damages for each Plaintiff. The damage calculations at issue included past and future salaries, fringe benefits, bonuses, retirement benefits, likely years of employment, and more. After Rambin was presented for his deposition, IBM filed a motion to strike his testimony.[1]

3.      Rambin is a forensic accountant with 35 years of experience providing expert testimony to assist finders of fact in better understanding economic damage calculations.[2] His experiences include—but are not limited to—testifying and providing consultation in the context of commercial litigation, bankruptcy actions, receiverships, criminal prosecutions, lost profit claims, business interruption claims, professional liability claims, complex property loss claims, personal injury claims, employment law claims, and intellectual property disputes.[3] He has been retained by governmental agencies such as the United States Department of Justice, the Texas Office of the Attorney General, the Federal Deposit Insurance Corporation, and others.[4]

4.      Rambin has testified in multiple federal and state district courts in and outside of Texas. Rambin is clearly qualified to testify regarding the calculation of economic damages, and IBM has

---

[1] *See generally* IBM Mot. to Exclude Rambin, pg. 6, Dkt. # 98.
[2] *See* **Ex. 1,** *Rambin Original Report*, **pgs. 8 – 14**.
[3] *Id*. at 8 – 9.
[4] *Id.* at 8.

consequently refrained from challenging his qualifications to testify as an expert in its motion to exclude. Instead, IBM challenges his methodologies, data, and conclusions. Plaintiffs file this response brief to assure the Court that any questions about his methodologies, data, or conclusions would go only to the weight of his testimony and *not* admissibility.

## II.   LEGAL STANDARD

5.      When attacking the admissibility of a retained expert witness's testimony, the movant must argue that the proposed testimony in some way fails to meet the standards of Federal Rule of Evidence 702.[5] The advisory comments to Rule 702 counsel that "the rejection of expert testimony is the exception rather than the rule."[6] In gatekeeping expert testimony, Courts are instructed by *Daubert* that the testimony is admissible if (1) the witness is qualified, (2) the testimony is based on sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the witness has applied their principles and methods reliably.[7] *Kumho Tire Co*. further instructs that Courts have "considerable leeway in deciding…whether particular [non-scientific] expert testimony is reliable."[8] Rule 704 advises that an expert may offer an opinion that "embraces an ultimate issue," though *legal* conclusions are not permitted.[9] So long as the non-movant can show by a preponderance of the evidence that the offered testimony satisfies these requirements, *Daubert* instructs that the testimony is admissible, and the movant's proper recourse is "vigorous cross-examination" at trial rather than exclusion from trial altogether.[10]

---

[5] FED. R. EVID. 702.

[6] FED. R. EVID. 702, Adv. Comm. Notes (2000).

[7] *See Pipitone v. Biomatrix Inc.*, 288 F.3d 239, 243 – 44 (5th Cir. 2002) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)).

[8] *Kumho Tire. Company, LTD v. Carmichael*, 526 U.S. 137, 150 (1990).

[9] FED R. EVID. 704(a); *see also Owen v. Kerr-McGee Corp.,* 698 F.2d 236, 240 (5th Cir. 1983) (holding "the rule is [not] intended to allow a witness to give *legal* conclusions (emphasis original)); *see also United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999).

[10] *See Daubert*, 509 U.S. 579 at 596; *see also Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002) (preponderance burden).

---

### III.   ARGUMENTS & AUTHORITIES

**A. IBM dedicates the gravamen of its motion attacking Rambin's methodology for calculating Plaintiffs' front pay damage model rather than back pay. *This Court* will ultimately decide any front pay award—and the *admissibility* standard is relaxed accordingly.**

6.     Back pay and front pay are two cornerstones of a plaintiffs' damage model in an ADEA discrimination lawsuit. Damages experts in employment cases are not required, but in many cases the expert's role is to simply "add up the numbers provided."[11] Courts have rejected arguments that "such testimony [is] inadmissible purely because it is a simple calculation."[12] Here, there are numerous Plaintiffs in the case at hand, and Rambin was hired to analyze and tabulate their multiple damage models—nothing more. While *some* jurors no doubt possess the knowledge to perform the calculations Rabin preformed here, the "mere fact" that his expert contribution is to organize and "add up the numbers" does not require the exclusion of his opinions on his proposed back pay and front pay damage models for these Plaintiffs.[13]

7.     "Back pay encompasses what the plaintiff would have received in compensation but for the employer's violation of the ADEA."[14] Back pay damages begin from the time of the discriminatory conduct—in this case Plaintiffs' termination—and the date these damages are "settled."[15] The Fifth Circuit has interpreted "settled" to mean the date of a judgment, or when a plaintiff obtains a higher-paying new position.[16]  Back pay awards are accordingly frequently decided by the jury sitting as fact finder.

---

[11] *McCorquodale v. DG Retail, LLC,* No-CV-518, 2022 WL 748642, at *15 (D. Minn. Mar. 11, 2022).

[12] *Id*.

[13] *Id*.

[14] *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 82—83 (5th Cir. 2007), clarified (Sept. 27, 2007).

[15] *Id*.

[16] *Id*. at fn. 5 (citing favorably *Kolb v. Goldring, Inc.*, 694 F.2d 869, 874 & n. 4 (1st Cir. 1982).

8.    Conversely, front pay is an equitable remedy. **Only this Court** is vested with the power to award these Plaintiffs front pay if the jury finds IBM discriminated against them in this matter.[17] As an equitable award, the ward of front pay is determined by the judge after tial, in what amounts to a post-trial hearing. The Fifth Circuit gives district courts wide latitude on such equitable awards.[18]   In its Motion to Exclude, IBM dedicates the gravamen of its *Daubert* challenge to attacking Rambin's calculations on plaintiffs' post-trial lost income damage models (front pay). In *McCorquodale*, a district court—presented with a nearly identical *Daubert* challenge as IBM has filed here dismissed an almost identical front pay *Daubert* challenge out of hand, noting that "*Daubert's* application is 'relaxed' in court trials."[19]

9.    The Fifth Circuit agrees with the relaxed standard, having held that "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."[20] In contrast, IBM neglects to bring up the lessened standard for front pay damage testimony, and instead incorrectly applies *Daubert* in its motion to exclude as if the challenged front pay expert testimony will be heard by a jury.

10.    This Court, however, may determine its award of front pay with the assistance of the jury by submitting a front pay question to the jury on an advisory basis.[21] Accordingly, even though

---

[17] *Id*. at 488 ("The ADEA vests the court with discretion to grant such legal or equitable relief as may be appropriate to effect the purposes of [the ADEA]").

[18] *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822 (5th Cir. 1990).

[19] *McCorquodale*, 2022 WL 748642 at * 15; *see also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) (noting "Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury").

[20] *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) (noting "Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury"); *see also see also Whitehouse Hotel L.P. v. IRS Commissioner,* 615 F.3d 321, 330 (5th Cir.2010)("there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence.")

[21] *See Julian v. City of Houston*, *Tex.*, 314 F.3d 721 at fn. 25.

---

the *Daubert* standard for front pay is relaxed, the undersigned will rebut IBM's quibbles with Rambin's front pay calculations in the order which they were raised.

**B. IBM makes the following meritless complaints with regard to retirement age: (a) work-life statistics are not permitted in employment lawsuits; (b) Rambin used an outdated Bureau of Labor Statistics Report and was not familiar with a cherry picked 2015 article; (c) his use of statistical averages was insufficiently particularized; and (d) he impermissibly accepted Plaintiff statements that they would work until 70.**

> **a. IBM's argument that Dr. Steward—IBM's hired rebuttal expert—believes Rambin's use of work-life statistics to be "completely incorrect" lacks any legal support whatsoever.**

11.     IBM's leads its motion by claiming that Rambin's use of worklife statistic tables and studies—to identify the temporal scope of a Plaintiffs' front pay damage model—is entirely inappropriate.[22] In support, IBM merely cites to the deposition testimony of its hired rebuttal expert Dr. Dwight Steward. In deposition, Steward testified that Rambin's decision to calculate the scope of Plaintiffs' expected front pay damages using a work life statistics table was "completely incorrect."[23]  Steward conjectures that these work-life tables are inappropriate because they only project an average retirement date, and do not consider an average how long an individual employee would have worked at an individual employer.[24]

12.     IBM utterly fails to support the otherwise conclusory *ipse disxit* of its expert—who claims to disagree about the propriety of work-life tables in employment discrimination cases. "Experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder."[25]  In his Report and Amended Report—Rambin articulates in paragraph thirteen that his calculations anticipated that Plaintiffs—absent their discriminatory termination—

---

[22] IBM Mot. to Exclude Rambin, pg. 6, Dkt. # 98.
[23] IBM Mot. to Exclude Rambin, Exhibit C, pg. 42, ¶¶ 14 – 22, Dkt. # 98.1.
[24] *Id*. at ¶¶ 14 – 18.
[25] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 2007).

would have remained at IBM for the remainder of their careers—i.e. their projected work life.[26] In paragraph fifteen, Rambin explains that he ascertained the expected worklife of these individual by using well respected academic studies that tabulated a statistical average, which he cites to in his report.[27]

13.     Rambin's decision to use worklife statistics is well-reasoned based on his assumption that Plaintiffs would have remained at IBM until they retired. This assumption assuredly engages in some speculation, but "tentative or speculative opinions should not be excluded for those reasons alone."[28] "Indeed, the Fifth Circuit has recognized that the calculation of front pay is ***inherently speculative in nature***"[29] and "can only be calculated through intelligent guesswork."[30] As articulated by the Southern District in *Meinelt **on this identical complaint***, the fact that IBM's hired expert disagrees with Rambin's assumption merely goes to the weight of Rambin's testimony, not admissibility. IBM's remedy will be to cross Rambin at trial.[31]

> **b. Courts *routinely* reject arguments that an expert's failure to account for an opposing parties preferred data provides cause to strike under *Daubert*.**

14.     IBM further quibbles that Rambin failed to use a more recently updated worklife table.[32] As cited in his Report, Rambin used the Markov Model of Labor Force Activity published in

---

[26] **Ex. 1,** *Rambin Original Report*, **pg. 4, ¶ 15**; *see also* **Ex. 2**, *Rambin Supplemental Report*, **pg. 5.**

[27] **Ex. 1,** *Rambin Original Report*, **pg. 3, ¶ 15**; *see also* **Ex. 2**, *Rambin Supplemental Report*, **pg. 6.**

[28] *Viterbo*, 826 F.2d at 422.

[29] *Blottin v. Mary Kay Inc.*, No. 3-10-CV-1905-M-BD, 2012 WL 13026814, at *3 (N.D. Tex. Aug. 22, 2012) (emphasis added).

[30] *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007)

[31] *Meinelt v. P.F. Chang's China Bistro, Inc.*, 787 F. Supp. 2d 643, 656—57 (S.D. Tex. 2011) ("[Defendant] argues that [plaintiff's expert's] opinion as to the length of time that [plaintiff] would remain at P.F. Chang's is unreasonable in light of [plaintiff's] job history and modern trends of job mobility. The factfinder—in this case, this court—can assess the credibility of that opinion when counsel for [Defendant] cross-examines [plaintiff's expert] …").

[32] IBM Mot. to Exclude Rambin, pg. 6, Dkt. # 98.

2011.[33] IBM asserts that Rambin's failure to use the study published in 2019 renders his methodology so unreliable that his front pay testimony should be struck. IBM compounds this pettifogging by declaring Rambin's failure to review a 2015 article from Boston College further renders his calculated retirement ages unreliable for the purposes of his front pay analysis.[34]

15.     IBM's counsel sprung this article on Rambin in the middle of his deposition.[35] Rambin readily admitted he had never read this article.[36] Counsel crossed Rambin on the contents of this article and noted that it articulated that the average retirement age for men is 64 and the average for women was 62. IBM is more than welcome to cross Rambin on this article again at trial—because it demonstrably only goes to the weight of Rambin's testimony. "Court's routinely reject challenges to admissibility of expert testimony based on arguments that the expert failed to consider certain data in forming his or her opinions."[37] This Court, in *Browning*, considered an identical attempt to strike a damages expert in an employment discrimination case. The *Browning* Court noted that "courts have found no basis for exclusion when experts were challenged for failing to take into account certain data."[38] There is similarly no basis here.

### c.   IBM's desire for more personalized detail for retirement age variables is not a basis to strike Rambin's testimony.

16.     IBM also complains that Rambin failed to use certain detailed metrics in forming his opinion on the retirement ages of Plaintiffs Do, Gelphan, Kelly and Townsley. Specifically, IBM claims that Rambin's use of worklife statistics were not specific enough, and that Rambin should

---

[33] **Ex. 1,** *Rambin Original Report*, **pgs. 27, 30, 36, 44.**
[34] *Id*. (Quibbling "[i]ndeed, Rambin failed to familiarize himself with a 2015 article…").
[35] **Ex. 3,** *Rambin Dep*., **pg. 31 ¶¶ 10 – 20.**
[36] *Id*. at **pg. 33,** ¶¶ 6 – 14.
[37] *Blottin*, 2012 WL 13026814, at *3.
[38] *Browning v. Sw. Research Inst.*, No. CIVSA-05-CA-0245FB, 2006 WL 6549921, at *2 (W.D. Tex. Aug. 17, 2006).

---

have also specifically utilized a study specific to the technology industry, the "lifestyle" of each of these Plaintiffs, and the average retirement age of IBM specifically.[39]

17.     Opposing counsel always demand during cross examination that his or her opponent expert utilize as much detail and data as possible—but a failure to reach such an impossible standard in no way subjects an opposing expert to exclusion under *Daubert*. In *Garcia*, the defendant City of Amarillo challenged a plaintiff's damages expert who calculated the plaintiff's back pay and front pay—claiming that the expert's calculations did not rely on sufficiently personalized or detailed facts.[40] The *Garcia* court noted that, "the grounds for the expert's opinion merely have to be good, they do not have to be perfect."…[b]ecause expert testimony can vary widely according to the subject matter of the litigation, the issues in a case, and the nature of the opinions themselves, it is difficult to generalize about how detailed an expert's report should be."[41]

18.     The *Garcia* court then analyzed the defendant's complaint that the life expectancy data relied upon in plaintiff's expert report was unreliable because "the [plaintiff's expert] report utilize[d] life expectancy assumptions based on government statistics but fail[ed] to consider Plaintiff's actual age, health lifestyle, and other individual factors…."[42] The court denied defendant's motion to strike on these grounds, holding that the standard in this context is merely if the expert's opinions "are not so speculative as to be totally incredible or inconsistent with common sense."[43] Here, IBM makes the same complaints of Rambin, and they should similarly be denied.

---

[39] IBM Mot. to Exclude Rambin, pg. 7, Dkt. # 98.
[40] *Garcia v. City of Amarillo, Texas*, No. 2:18-CV-95-Z-BR, 2020 WL 5642763, at *1 (N.D. Tex. Feb. 26, 2020).
[41] *Id*. at *5.
[42] *Id*. at *7.
[43] *Id*.

> **d. Courts allow interviews of plaintiffs to be used as data for retirement age variables for front pay calculation. IBM's reliance on a line of personal injury cases is unavailing.**

19.     Finally, IBM declares that Rambin's acceptance of Plaintiffs Davidson, Hoque, Noffsinger and Sauro's statements—that they would have worked at IBM until they retired at 70 years old—amounted to impermissibly relying upon an unscientific and self-serving statement by the Plaintiffs.[44] Then, IBM proceeds to cite a litany of ***personal injury*** cases, which IBM craftily claims are suddenly relevant for this Court's analysis here because worklife statistics are frequently utilized by damages experts in personal injury trial. In this instance, the standards are not the same, and the cases cannot be compared analogously.

20.     In personal injury cases in the Fifth Circuit, in a line of caselaw generally extending from *Madore*, a personal injury plaintiff suing for lost future earnings into the far-flung future cannot recover for this lost income based on a speculative number of years unsupported generally by worklife statistics absent "evidence that a particular person, by virtue of his health" would likely live and work longer."[45] The reasoning for this rule makes sense ***in the personal injury context***, as young and injured twenty-something employees suing for lost wages—that they will never be able to obtain through working due to their injury—is an area ripe for regular exaggeration. Such claims are frequently untethered from a particular employer, a particular time, or a particular scope of employment. IBM's cited case law is ***only*** personal injury cases—making its arguments eminently distinguishable.[46]

---

[44] IBM Mot. to Exclude Rambin, pg. 7 – 8, Dkt. # 98.
[45] *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984).
[46] *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 469 (5th Cir. 2015) (plaintiff hurt when he fell on a barge); *Mays v. Chevron Pipe Line Co.*, No. CV 14-03098-BAJ-CBW, 2019 WL 244658, at * (W.D. La. Jan 16, 2019) (killed by a pressure valve); *Crompton v. Graphic Packaging Int'l*, No.20-CV-00095-RWS, 2021 WL 7308034, at *1 (E.D. Tex. Nov. 22, 2021) (sustained severe burn injury).

21.     In the employment law, a the front pay damage model is subject to an entirely different standard from the lost wages' standard. As referenced *supra*, "the Fifth Circuit has recognized that "[f]ront pay can only be calculated by intelligent guesswork. Because of the remedy's speculative character the Fifth Circuit gives wide latitude to district courts making this determination."[47] To wit, damages experts in this context are frequently given generous leave by district courts in Texas to make assumptions, such as assuming that a plaintiff would work "thirty more years in [their] position" despite "modern trends of job mobility."[48]

22.     However, this ***exact*** issues has previously been litigated in the Northern District of Texas.[49] In *Owens*, the plaintiff sued under the ADEA and other statutes for a discriminatory termination. Defendant Excel Management moved to strike the plaintiff's damages expert who calculated her back pay and front pay damages.[50] The defendant moved to strike the plaintiff's damages expert on the grounds that the expert "based his estimate of front pay damages on plaintiff's stated desire to work until age 70, if possible."[51] The *Owens* Court refused to strike the plaintiff's damages expert on these grounds, holding:

> "Although ***worklife expectancy tables*** estimate that a 54-year old college-educated woman will likely retire in her mid-sixties, nothing in *Daubert* or its progeny requires an expert's testimony to be circumscribed by statistical averages when evidence in a particular case supports a different conclusion."[52]

---

[47] *Meinelt*, 787 F. Supp. 2d 643, 656 (S.D. Tex. 2011).

[48] *Id*. at 657, 658.

[49] *Owens v. Excel Mgmt. Services, Inc.* No.3-02-CV-0835-L, 2003 WL 22718002, at *1 (N.D. Tex. Nov. 10, 2003).

[50] *Id*. at *3 (noting "[p]laintiff has designated [an expert], an economist, to testify regarding her back pay and front pay damages)."

[51] *Id*.

[52] *Id*. (emphasis added).

---

Accordingly, in an ADEA employment case, Texas District Courts have already heard and rejected IBM's argument that an expert must be struck for accepting a plaintiff's stated desired retirement age in lieu of using a worklife expectancy table.

23.     Here, Rambin testified in his deposition that—during his investigatory interviews—he would present each plaintiff with their statistical worklife expectancy.[53] Half of the plaintiffs affirmed to Rambin that they would be ready to retire "at a normal time."[54] However, Plaintiffs Davidson, Hoque, Noffsinger and Sauro represented to Rambin that they planned to work at IBM until they at least 70 years old. Accordingly, Rambin accepted their statements for the purposes of his front pay calculations, while also acknowledging that "they will need to be able to explain to the, to the finder of facts their intentions," presumably during testimony live at trial.[55] This is the exact same scenario analyzed by *Owens*. IBM's motion to exclude on these grounds should accordingly be denied—as all of IBM's arguments on the matter rely on inapplicable case law.

**C.  IBM's also moves to strike Rambin's front pay analysis because he did not consider each Plaintiffs' mitigation efforts is fundamentally flawed because it is IBM's legal burden to plead and prove mitigation. It is not the job of the opposing expert to so on its behalf.**

24.     IBM also takes issue with Rambin's failure to investigate Plaintiffs' mitigation efforts in calculating his front pay damages, and Rambin's failure to remove certain plaintiffs from front pay damage calculations because certain Plaintiffs' testified in their depositions that they were not seeking reinstatement with IBM at this time.[56] In support, IBM created a misleading footnote,

---

[53] **Ex. 3**, *Rambin Dep.*, **pgs. 25 – 26**
[54] **Ex. 3**, *Rambin Dep.*, **pg. 26.**
[55] **Ex. 3**, *Rambin Dep.*, **pg. 34.**
[56] IBM Mot. to Exclude Rambin, pg. 8 – 9, fn. 4, Dkt. # 98.

claiming that not wanting reinstatement immediately negates any potential recovery for front pay.[57]

25.    Rambin is a damages expert, not a vocational expert or a job recruiting expert. Rambin was not designated to rebut any affirmative defense IBM might put on at trial regarding mitigation. Rambin candidly admitted in his deposition that his expertise in this case did not extend to corroborating if Plaintiffs—such as Plaintiff Do—properly attempted mitigation—which would arguably call for an impermissible legal conclusion.[58] "The burden is on [IBM] to prove failure to mitigate."[59] IBM has *no basis at all* to complain that Rambin—who was not designated to pine on mitigation—did not undertake to carry IBM's water to prove up its mitigation defense on its behalf.

26.    District courts in Texas hold that damages experts for plaintiffs in employment disputes are not required to do vocational investigations before tabulating a plaintiff's proposed damage model. In *Blottin*, the defendant argued that a damages expert's tabulation should be struck because it failed to investigate if the plaintiff failed to mitigate damages by going back to school rather than seeking new employment.[60] The *Blottin* court disagreed, holding:

> [I]t is up to the jury to decide whether plaintiff's decision to return to school was a reasonable form of mitigation. Here [plaintiff's] expert assumes that plaintiff's decision to return to school constituted reasonable mitigation. That [plaintiff's expert] *relied on*

---

[57] IBM's assertion in footnote 4 is simply not correct. In *Weaver I* the Fifth Circuit noted that the only evidence in the record was "evidence presented by [plaintiff]" that "he did not desire reinstatement." The Fifth Circuit noted that reinstatement was the preferred equitable remedy but recognized that reinstatement was often not feasible due to animosity between the parties, and remanded to the District Court for further analysis. *Weaver v. Amoco Prod. Co.*, 66 F.3d 85, 88 (5th Cir. 1995). In *Weaver II*, the case returned to the Fifth Circuit after the trial court awarded front pay upon finding that animosity made reinstatement impossible, and a further finding that the defendant only offered to reinstate plaintiff after losing at trial. IBM has made no offer to reinstate these plaintiffs, and it will be up to the fact finder to determine if animosity makes reinstatement impossible. *Weaver v. Amoco Prod. Co.*, 95 F.3d 52 (5th Cir. 1996).
[58] **Ex. 3**, Rambin Dep., pg. 88 (testifying "[a]gain, that's, that is, that is my – that is not my job to, to do the vocational stuff").
[59] *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003).
[60] *Blottin*, 2012 WL 13026814, at *2.

---

***plaintiff's interpretation of a disputed fact does not render his opinion*** [on proposed damages calculation] ***irrelevant***.[61]

*Blottin* is not an outlier opinion. In *Garcia*, the Northern District of Texas again noted in 2020 that a plaintiff's damages expert in an employment case is not required to include mitigation information, holding "[d]efendant's challenges regarding a failure to include mitigating earnings" is a challenge "more appropriate for cross examination than as challenges under Rule 702 or the *Daubert* standard."[62] Accordingly, IBM's assertion that Rambin must be struck—because he "relied on" Plaintiff Do's statement that she had been unable to find work—is untethered from the case law and the applicable standards.

**D. Rambin's proposed Amended Report updates the discount rate from his original February numbers. Even without such an amendment, a slightly outdated discount rate is not sufficient cause to exclude Rambin's proposed testimony.**

27.     IBM spends a paragraph of its motion to strike arguing Rambin should be struck for utilizing an outdated discount rate.[63] Rambin produced his Report in February of 2022. Within, he utilized a 2.5% discount rate based on the Federal Open Market Committee's projections as of December 15th, 2021.[64] Inflation has reared its ugly head since then. Accordingly, Rambin admitted in his deposition that the interest rate has consequently risen.[65] Nevertheless, Rambin used a newer discount rate of 3% in his proposed Amended Report.[66]

28.     Even if Rambin had not updated his discount rate—from February of this same year to now—courts have held that a defendant's complaint of a plaintiff's expert using an inappropriate

---

[61] *Id*. (emphasis added) (cleaned up).
[62] *Garcia*, 2020 WL 5642763, at *6.
[63] IBM Mot. to Exclude Rambin, pg. 8 – 9, fn. 4, Dkt. # 98.
[64] **Ex. 1**, *Rambin Original Report*, **pg. 24**.
[65] **Ex. 3**, *Rambin Dep.*, **pg. 115**
[66] ***See* Ex. 2**, *Rambin Supplemental Report*, **pgs. 25, 27, 30, 35, 38, 41, 43**; *see also Browning* 2006 6549921, at *3 (noting that substantive errors, rather than methodological flaws, can easily be cured with an amended report).

discount rate is not sufficient cause to exclude the expert's testimony. In *Garcia*, the court held

that a disagreement between the parties as to what discount rate should apply merely goes to the

weight of the expert's testimony, not admissibility. In so holding, the *Garcia* court reminded that

" [the expert's] front-pay calculation" should only be struck if it is "so fundamentally unsupported

that it cannot possibly help the factfinder and should be excluded."[67]  Rambin's use of a December

2021 discount rate is not so fundamentally unsupported that it renders his testimony unreliably

inadmissible.

   **E.  Rambin's methodology for calculating Plaintiffs' Fringe Benefits is well supported in his Report. IBM's laundry list of quibbles with his calculations merely go to the weight of Rambin's testimony.**

      **a.  IBM complains Rambin did not completely cease tabulating fringe benefit damages after Plaintiffs found subsequent employment. IBM is only entitled to an offset under the case law, which Rambin has *demonstrably* always calculated in his methodology.**

29.    As a matter of housekeeping, IBM's attempts to strike Mr. Rambin's testimony regarding

fringe benefits now encompasses his anticipated testimony regarding both front pay and back pay.

30.    IBM—without citation to any authority except its own expert—calls for this Court to

exclude Rambin's testimony because he did not ***completely cease*** tabulating fringe benefit

damages after some of the Plaintiffs in this case found subsequent employment.[68] IBM's position

is untethered from the case law. A complete cessation should only occur if a latter employment is

completely higher paying.

31.    In employment cases, courts only "offset interim earnings" from back pay awards in order

to make plaintiff's whole, but to avoid windfall awards."[69] Jurys are tasked to offset interim

---

[67] *Garcia*, 2020 WL 5642763, at *6.
[68] IBM Mot. to Exclude Rambin, pg. 11, Dkt. # 98.
[69] *Stephens v. C.I.T. Group/Equip. Fin., Inc.*, 955 F.2d 1023, 1028 (5th Cir. 1992).

earnings from their backpay awards.[70] "This includes not only salary, but also employment [fringe] benefits such as vacation and sick pay, insurance benefits, retirement benefits, profit sharing, and in-kind payments."[71] Courts apply the same standard—for the same reasons—to the equitable award of front pay.[72]Rambin ___**did**___ calculate interim offsets in his Original Report, and this remains unchanged in his Amended Report.

32.      In his Amended Report, **Rambin removes much of Plaintiff Hoques' damage model**[73] because subsequent discovery revealed to Rambin that Hoques' new job at Austin Community college is **a completely higher paying new position**—meaning his damages have "settled".[74] However, the undersigned will use Rambin's old original calculations for Plaintiff Hoque as a demonstrative to show Rambin has **always** calculated the offsets that IBM is entitled to under the case law.[75]

33.      In the original report, under "Actual and Projected Employment with Damages," Rambin has three entrees for Hoque. In the Period 3, Hoque was unemployed—so received $8,398.00 from the Texas Workforce commission and no benefits.

34.      Rambin records this as an interim pay "offset" in his calculations of Hoque's damages. The calculation of this offset is reflected in Rambin's backpay calculations under "Pre-Trial Lost Income". Within, Rambin calculates that Hoque would have received $72,726.00 in income and

---

[70] *Id*.

[71] *Thomas v. Deloitte Consulting L.P.*, No. 3-02-CV-0343-M, 2004 WL 1372954, at *3 (N.D. Tex. June 14, 2004).

[72] *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 490 (5th Cir. 2007) (Noting "[a]gain, an award of front pay is meant to compensate the plaintiff for wages and benefits he would have received from the defendant employer in the future if not for the discrimination.").

[73] **Ex. 2,** *Rambin Amended Report*, **pg. 34.** (Discovery revealed Hoques' salary at ACC was actually $178,000.00, not $154,32400, which eclipses his previous salary at IBM of $158,952.00).

[74] *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 82—83 (5th Cir. 2007)

[75] **Ex. 1**, *Rambin Original Report*, **pg. 34**. (highlighted).

$32,276 in benefits for a total of **$105,002.00** that Hoque would have received had he not been fired due to IBM's age discrimination.[76] Then, Rambin next tabulated Hoque's actual interim income—$8,398.00—and added it to his actual benefits—nothing. Rambin then subtracts that $8,398.00 from $105,002.00—and arrives at net loss of $96,604.00 to Plaintiff Hoque due to IBM's discriminatory firing.[77] Accordingly, Rambin was and still ***is calculating the interim offsets*** that IBM is entitled to under the case law.

35.     Rambin's old back pay offset calculations continued. Period 3 reflected income that Hoque received from his sole proprietorship—$155,384.00. As a sole proprietor, Hoque had no additional benefits, so Rambin subtracted this income from the $243,471.00 he calculated Hoque would have received from IBM as income and fringe benefits. Accordingly, even for Rambin's old Period 3 calculations—Rambin calculated that Hoques' loss due to IBM's discrimination was a reduced $88,087.00.

36.     Crucially, Rambin also calculates interim offsets to damages based on new fringe benefits Plaintiffs receive at their new jobs. In January of 2021, Hoque was hired by Austin Community College. As tabulated in Period 4 of the "Actual Projected Employment With Damages" table, Rambin previously thought Hoque received $154,324.00 in income at this new job, and benefits valued at $68,489.00—making Hoque's old total interim earnings in $222,813.00.[78] This was then subtracted from the "total uninjured" number to account for an offset. Accordingly, after this offset that included Hoque's' new fringe benefits—Rambin calculated that Plaintiff Hoque's old loss for that time had been reduced down to $27,962.00.

---

[76] *Id*. (highlighted yellow) (referred to as "total uninjured").
[77] *Id.* (highlighted blue).
[78] Later Amended to $178,000.00.

37.     This trend demonstrably continued for the rest of Rambin's old calculations of Plaintiff Hoque's previously anticipated front pay damages—as articulated by the "Post-Trial Lost Income" table.[79]

38.     Regardless, Rambin's report and anticipated testimony utilized methodology that employed these offsets for IBM for every Plaintiff. Further, Rambin's Amended Report reveals that his methodology can account for later discovered facts that might reduce or enlarge a plaintiff's damage model.

39.     Regardless, IBM's complaint that Rambin did not stop calculating fringe benefit damages completely after every Plaintiffs found new employment is utterly unsupported by any case law. If a Plaintiffs' new work overshoots their old IBM salary and benefits, then a Plaintiffs damage model stops. Otherwise, IBM gets an offset, nothing more.

      **b.  Rambin clearly and concisely articulated how he arrived at his conclusion that Plaintiffs' fringe benefits could be valued at 44.38% of their base salary, and it is factually supported.**

            **i.  Rambin's use of the Bureau of Labor Statistics to generate the Plaintiffs fringe benefit multiplier of 44.38% is appropriate in the Fifth Circuit. The math itself is supported by IBM's expert's own book.**

40.     IBM claims that Rambin should be struck because he relied "on national averages" instead of ascertaining Plaintiffs' actual fringe benefits to the penny at both IBM and their new places of employment, if any.[80] In support—IBM cites this Court to one case—a Southern District of New York case called *Joffe*. Generally, in *Joffe*, the Southern District of New York held that an ex-associate attorney at King and Spalding's damage expert did not properly articulate why a 4.8%

---

[79] **Ex. 1**, *Rambin Original Report*, pg. 34. (highlighted purple).
[80] IBM Mot. to Exclude Rambin, pg. 11, Dkt. # 98.

figure found the Bureau of Labor statistics was an appropriate measure for fringe benefits earned by King and Spalding law-firm partners.[81]

41.     Conversely—***down here in the Fifth Circuit***—district courts have frequently affirmed that a damages expert may testify to fringe benefit calculations that were tabulated using national averages or labor statistics. This exact issue was litigated in *Ashford*, where, the Southern District of Mississippi was presented with Defendant Wal-Mart's motion to strike a plaintiff's damages expert who calculated a plaintiff's loss of fringe benefits. The *Ashford* court noted "that United States labor statistics compiled by the U.S. Census Bureau were utilized in forming [the expert's] opinion [on fringe damages]."[82]

42.     Wal-Mart argued that plaintiff's expert's testimony on fringe benefits was unreliable because "there [was] no evidence plaintiff received *any* fringe benefits" as outlined in the labor statistics, and that the expert cited to no factual specifics "supporting the type or amount of fringe benefits [plaintiff] received" at her employer[83] The *Ashford* court held that the plaintiff's expert sufficiently "disclose[d] the factual predicate for his opinion regarding the loss of fringe benefits, namely the fact that her employer ***provided benefits*** and United States labor statistics evaluating typical employer provided fringe benefits."[84] The *Ashford* court went on:

> "Whether [plaintiff] participated in her employer's elective benefit programs and whether her level of participation should have affected [plaintiff's expert's] conclusion, goes to the weight of [plaintiff's expert's] opinion and not its admissibility. [Plaintiff's expert] should be allowed to testify as to [plaintiff's] alleged loss of fringe benefits."

---

[81] *Joffe v. King & Spalding LLP*, No. 17-CV-3392, 2019 WL 4673554, at *8 (S.D.N.Y. Sept. 24, 2019).
[82] *Ashford v. Wal-Mart Stores, LP*, No. 1:11-CV-57-HSO-JMR, 2013 WL 152853, at *4 (S.D. Miss. Jan 15, 2013).
[83] *Id*.
[84] *Id*.

In *Sanders*, another district court in the Fifth Circuit analyzed a defendant's motion to exclude a plaintiff's damages expert's testimony that calculated a plaintiff's fringe benefits as equal to 17.5% of the plaintiff's wages.[85] The defendant complained that this assertion was unreliable because it was unsupported by specific facts. The *Sanders* plaintiff countered that the "[expert's] opinions are grounded in commonly accepted methodology, sufficient facts and data, and reasonable assumption."[86] The *Sanders* Court found that basis sufficient, holding that defendant's objection that the testimony was based on "unsupported assumptions" went to "the weight of the [expert's] testimony rather than the admissibility."[87]

43.     This Court heard a substantially similar argument in 2019.  In *Alpizar*, the defendant argued that a plaintiff's damages expert utilized flawed methodology in calculating the plaintiff's lost fringe benefits.[88] The Court noted that the plaintiff's expert's "report [] includes an opinion as to the value of Plaintiff's lost fringe benefits *at the private industry average*…".[89] The defendant argued "that there [was] no evidence that plaintiff ever received fringe benefits such that this testimony would assist the jury."[90] The denied the defendants arguments, and  declined to strike the expert's fringe benefit calculations based on industry averages, holding "[t]his challenge is also better addressed through a motion in limine or a contemporaneous objection for lack of foundation if the evidence presented a trial does not establish the existence of such benefits."[91]

---

[85] *Sanders v. Marquette Transp. Co. Gulf Inland, L.L.C.*, No CV 19-12046, 2020 WL 6287469, at *1 (E.D. La. Oct. 27, 2020).
[86] *Id*.
[87] *Id*. at *2.
[88] *Alpizar v. John Christner Trucking, LLC*, No. SA-17-CV-00712-FB, 2019 WL 1643743, at *8 (W.D. Tex. Apr. 16, 2019, report and recommendation adopted, No. CV SA-17-CA-712-FB, 2019 WL 4087445 (W.D. Tex. May 17, 2019).
[89] *Id*.
[90] *Id*.
[91] *Id*.

44.     Finally, in *Shoemake*, another Fifth Circuit district court declined nearly identical argument's to IBM. The *Shoemake* defendant also objected to an expert's use of a statistical abstract to calculate lost fringe benefits.[92] The Court—taking non-binding guidance from the Mississippi Supreme Court due to the issues close relationship to state law damages—held that it would accept "the inclusion of fringe benefits calculated from statistical abstracts [as] proper in assessing economic loss."[93] Thus—in the Fifth Circuit—Rambin's use of statistical averages from the Bureau of Labor Statics to calculate Plaintiffs lost fringe benefits is a demonstrably permissible methodology. IBM is free to argue more precise data could have been used during cross examination.

45.     Tellingly, IBM's own rebuttal expert agrees with the Fifth Circuit. Steward writes in his book that computations tabulated based on government labor market data is reliable. In his book—attached as **Exhibit 5**[94] Steward writes this about calculating fringe benefits:

> A dollar value estimate can be obtained directly from the employer's records or government-collected labor market and employment data. ***More commonly***, the economist uses government labor market and employment data to construct what is called a salary fringe benefit multiplier.[95]

Accordingly, Rambin's use of these statics to calculate a fringe benefit multiplier was demonstrably permitted and reliable.

---

[92] *Shoemake v. Rental Serv. corp*., No. CIV.A.106CV426HSOJMR, 2008 WL 215819, at *3 (S.D. Miss. Jan. 22, 2008)

[93] *Id*. (citing *Flight Line v Tanksley*, 608So.2d 1165 – 66 (Miss.1992).

[94] **See Ex. 5**, ECONOMIC LOSSES AND MITIGATION AFTER AN EMPLOYMENT TERMINATION, D. Steward 2022, **pg. 12** (last accessed June 10, 2022) (via Google Books) (emphasis added). https://books.google.com/books?id=HYxaEAAAQBAJ&pg=PA1&lpg=PA1&dq=economic+losses+and+mitigation+after+an+employment+termination&source=bl&ots=k1pdhbhmlh&sig=ACfU3U0hbbLqaBWIbALvznS7c2-NrlgRDg&hl=en&sa=X&ved=2ahUKEwibqe2H4aP4AhUSATQIHf9jAy8Q6AF6BAgCEAM-v=onepage&q&f=false

[95] **Ex. 5**, ECONOMIC LOSSES AND MITIGATION AFTER AN EMPLOYMENT TERMINATION, D. Steward 2022, **pg. 12**.

---

46.     IBM can hardly equitably disclaim a methodology used and endorsed by its own expert, and Rambin's calculation of Plaintiffs' fringe benefit multiplier is demonstrably reliable and permissible. Once again, IBM's own expert's book also outlines how to calculate a fringe benefit multiplier, and it affirms the simple math Rambin utilized to arrive at his salary fringe benefit multiplier of 44.38%.

47.     First, Steward explains what a fringe benefit multiplier is. He writes:

> "A salary fringe benefit multiplier ***is a mathematical factor that shows the value of an employee's fringe benefits as a percentage of salary***. The actual multiplier is based on the average cost of providing the benefits. Commonly used salary fringe benefit multipliers are derived from the U.S. Bureau of Labor Statistics (BLS) and other employer cost surveys."[96]

On the next page, Steward provides his readers with a helpful demonstrative table to illustrate how to calculate this mathematical factor.[97]

| Income level | Management and business | Natural resources | Production and transportation | Sales |
|---|---|---|---|---|
| $50,000 | $15,823 | $16,449 | $16,930 | $11,862 |
| $75,000 | $23,734 | $24,674 | $25,395 | $17,793 |
| $100,000 | $31,645 | $32,899 | $33,860 | $23,724 |
| $150,000 | $47,468 | $49,348 | $50,790 | $35,585 |
| $200,000 | $63,290 | $65,797 | $67,720 | $47,447 |

*Source* U.S. Bureau of Labor Statistics, Employer Costs for Employee Compensation

Steward writes:

---

[96] **Ex. 5**, ECONOMIC LOSSES AND MITIGATION AFTER AN EMPLOYMENT TERMINATION, D. Steward 2022, **pg. 12**.
[97] *Id.* at **pg. 13**; *compare with* **Ex. 3**, Rambin Dep., **pg. 14** (testifying that he calculated the fringe benefit multiplier as a "factor of the wages.").

"For example, according to BLS studies and data, for a person working in a sales sector job, the value of employer-provided health insurance, and other non-wage fringe benefits is equal to approximately 23.7% of the person salary."[98]

Following Steward's teachings, dividing $11,862.00—the yearly monetary value of non-wage fringe benefits—by $50,000—the yearly salary—equals 23.7%—the fringe benefit multiplier Steward identified. Rambin calculated his fringe benefit multiplier of 44.38% the exact same way—by dividing monetary fringe benefits by salary.

48.    As outlined above, Rambin testified[99] in his deposition that he used the 2020 U.S. Bureau of Labor Statistics "Employer Costs for Employee Compensation" study to calculate the fringe benefit multiplier in the case at hand.[100] The relevant portions the study are depicted below.

| Series | Total compensation(1) | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| All workers | 42.02 | 100.0 | 28.99 | 69.0 | 13.03 | 31.0 | 3.36 | 8.0 | 1.56 | 3.7 | 3.50 | 8.3 | 1.56 | 3.7 | 3.05 | 7.3 |
| Occupational group | | | | | | | | | | | | | | | | |
| Management, professional and related | 64.20 | 100.0 | 44.36 | 69.1 | 19.84 | 30.9 | 6.11 | 9.5 | 2.44 | 3.8 | 4.73 | 7.4 | 2.45 | 3.8 | 4.12 | 6.4 |
| Management, business, and financial | 73.19 | 100.0 | 50.70 | 69.3 | 22.50 | 30.7 | 7.13 | 9.7 | 3.35 | 4.6 | 4.80 | 6.6 | 2.69 | 3.7 | 4.53 | 6.2 |

Just as Steward outlined in his book, Rambin testified that he divided $22.50 (the hourly monetary value of non-wage fringe benefits)—by $50.70—the hourly salary. The quotient equals 44.38%—the fringe benefit multiplier.

49.    IBM's claim that Rambin's calculations are "untested and unsupported" are accordingly untethered from the very expert it holds out as the standard for the industry—and has paid

---

[98] *Id.* (highlighted purple).
[99] **Ex. 3**, *Rambin Dep*. **pg. 114**.
[100] **Ex. 4**, *BLS Study*, **pg. 8**.

considerable money to testify on its behalf in this case. IBM' attempt to exclude Plaintiffs' expert for using the same methodologies its own expert endorses is unjustifiably inequitable, and this Court should discard that attempt accordingly.

> ii. **Rambin's selection of the "Management, business, and financial" row of Table 5 of the BLS study, for calculating Plaintiffs' fringe benefits was grounded in Plaintiffs' hourly income at IBM.**

50.     IBM's counsel extensively cross examined Rambin in his deposition on his decision to use the "Management, business, and financial" row in Table 5 of the BLS study.[101] Now, IBM prevaricates and claims that Rambin offered "no explanation as to why he did not utilize the classification tied to sales roles" and attempts to strike him on that basis.[102] To the contrary, Rambin testified in his deposition that he made that selection:

> "Because the compensation levels that, that we're talking about with all these people is more comparable to that that was in that table than those other, those other lower numbers. If you look what those people are being paid in that data, these, these people are more comparable with that, that level."[103]

This assumption made by Rambin is ***demonstrably*** supported factually. In Table 5, the "Management, business, and financial" row contains the highest hourly wage and salary number at $50.70. The next highest is "Professional and related" at $40.16.

51.     IBM's motion to exclude does not take issue with Rambin's calculation of Plaintiffs' Initial salaries. Of all the Plaintiffs, Janet Gelphman had the lowest Initial Salary at $99,996.00.[104] Assuming that Gelphman worked 8 hours a day—40 hours a week—for 52 weeks in a year— Gelphman made approximately $48.07 an hour.[105] Thus, even the Plaintiff with the lowest salary

---

[101] **Ex. 4,** *BLS Study*, **pg. 8** (highlighted) (Table 5 is the Employee Cost for Private Industry Workers by work status table).
[102] IBM Mot. to Exclude Rambin, pg. 12, Dkt. # 98.
[103] **Ex. 3**, Rambin Dep. **pgs. 111 – 112.**
[104] **Ex. 1**, Rambin Original Report, **pg. 32** (highlighted green).
[105] (99,996 / 52 weeks) = 1,923. (1,923 / 5 days) = 384.6. (384.6 / 8 hours) = 48.075.

in this case is closer to the "Management, business, and financial" hourly wage $50.70 than any other comparator.[106]

52.     Rambin has logically articulated that he used the management data because it was the closest hourly wage number to these Plaintiffs. Conversely, IBM claims he should have used other data. In deciding a *Daubert* motion, "contentions that [an expert's] assumption are incorrect" are "not sufficient to exclude [the expert's] opinions."[107] "Experts should be exclude only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder" and they can provide no "evidentiary support and reasoning" for their assumptions.[108] IBM is welcome to cross examine Rambin on his use of the management data versus whatever data it believes more appropriate—but it is not grounds for excluding Rambin's testimony entirely.

**F.  Finally, all of the alleged "errors" in Rambin's report that were actually errors have been corrected in Rambin's Supplemental Report. Substantive errors, rather than methodological errors, are easily corrected by amendment and do not support exclusion.**

53.     IBM ends its motion by asserting that Rambin should be excluded merely because Rambin's Original Report had errors—both real and imagined. Here, Rambin has tendered a Supplemental Report as **Exhibit 2**. As Rambin testifies in the Declaration, "[t]his amended report corrects errors that have been brought to my attention. this report does not change the methodology I used to calculate and formulate my anticipated trial testimony."[109]

54.     In Federal Court, "parties are under an ongoing duty to supplement expert reports, and when there are additions or changes to the report, they must tender them to the opposing side."[110]

---

[106] *See* Rambin Decl., pg. 4.
[107] *Browning*, 2006 WL 6549921, at *2 (W.D. Tex. Aug. 17, 2006).
[108] *Id*.
[109] Rambin Decl., pg. 1., ¶ 3.
[110] *Hawthorne v. Truck Trailer & Equip., Inc.*, No. 3:11CV518-CWR-FKB, 2013 WL 3213093, at *3 (S.D. Miss. June 26, 2013) (citing *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 F. App'x 899, 909 (5th Cir. 2010).

Supplementation may occur even when late, especially when there is no prejudice due to the opposing party.[111] Courts have found that if supplementation of an expert's report actually lowers a Defendant's liability exposure, that his factor weighs in favor of supplementation.[112]

55.     Rambin identifies all the corrections he made in his Amended Report. **First**, Rambin offset employment payments received by Plaintiff Townsley that were not discoverable on his tax return. **Second**, Rambin increased Plaintiff Hoque's' salary that he is receiving at Austin Community College based on Hoque's' later testimony at his deposition. **Finally**, Rambin updated his report to utilize more current discount rate of 3% based on an updated report from the Federal Open Market Committee.[113]

56.     In bullet point form, IBM alleges that Rambin made numerous other errors. Most, have already been addressed by the undersigned in the body of this motion—i.e. IBM's disagreement about Rambin's use of the "Manager, Business and financial" row; and disagreement about Rambin's assumptions about retirement age plaintiff's retirement age. The rest amount to IBM's pique about so called errors typically revolve around additional offsets IBM believes should have been entered for certain Plaintiffs—all of these errors are substantive—not methodological. In *Browning*, this Court rejected a defendants argument that "errors in [an expert's report] render it unreliable…".[114] Instead, the Court held that "errors in [an experts] report may also be explained during testimony" and that "[w]hile errors may exist, these errors are substantive, and therefore, do not undermine or affect the reliability of [the expert's] opinion."[115] This Court should do the

---

[111] *Id*.

[112] *Id*.

[113] Rambin Decl. pg. 2, ¶¶ 6 – 9.

[114] *Browning*, 2006 WL 6549921 at * 3.

[115] *Id*.

same. Rambin's methods are reliable. IBM can cross examine Rambin on its bullet point list at trial—as they are nothing but substantive gripes, and not methodological failings.

## IV.    **PRAYER**

57.     WHEREFORE PREMISES CONSIDERED, Plaintiffs Charles Townsley, Michael Sauro, Walter Noffsinger, Rosa Davidson, Michael Kelly, Titon Hoque, Janet Gelphman and Thanh Do respectfully request that IBM's Motion to Exclude Rambin be in all things denied, and for such other relief, general or special, legal or equitable, to which they may be justly entitled.

Respectfully submitted,

**WRIGHT & GREENHILL, P.C.**
4700 Mueller Blvd., Suite 200
Austin, Texas  78723
512/476-4600
512/476-5382 (Fax)

By:_____/s/ Stephen B. Barron_____
      Heidi A. Coughlin
      State Bar No. 24059615
      hcoughlin@w-g.com
      Archie Carl Pierce
      State Bar No. 15991500
      cpierce@w-g.com
      Blair Leake
      State Bar No. 24081630
      bleake@w-g.com
      Stephen B. Barron
      State Bar No. 24109619
      sbarron@w-g.com

      and

By:_____
      Kaplan Law Firm
      Austin Kaplan

State Bar No. 24072176
akaplan@kaplanlawatx.com

**Counsel for the Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on June 10th 2022, I electronically filed the foregoing Motion with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the Court and Defendant's counsel of record.

_____/s/_ Stephen B. Barron_____
Stephen B. Barron