IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHARLES TOWNSLEY, MICHAEL SAURO, WALTER NOFFSINGER, ROSA DAVIDSON, MICHAEL KELLY, TITON HOQUE, JANET GELPHMAN, THANH DO | § § § § § § | |
| *Plaintiffs,* | § § | |
| vs. | § § | Civil Action No.: 1:20-cv-00969-LY |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § § § | |
| *Defendant.* | § § | |

**PLAINTIFFS' RESPONSE TO IBM'S MOTION FOR PROTECTIVE ORDER TO LIMIT SCOPE OF 30(B)(6) DEPOSITION**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiffs Charles Townsley, Michael Sauro, Walter Noffsinger, Rosa Davidson, Michael Kelly, Titon Hoque, Janet Gelphman and Thanh Do ("Plaintiffs") file this Response to IBM's Motion for Protective Order to Limit Scope of 30(B)(6) Deposition pursuant to Federal Rules of Civil Procedure § 26, 34, & 37(a), and would show the Court as follows.

1

## FACTUAL AND PROCEDURAL HISTORY

I.       **As one of several discovery concessions, Plaintiffs agreed to forswear numerous requested executive depositions in reliance on conducting a meaningful 30(b)(6) deposition. Now, after the close of discovery, IBM seeks to narrow the topics of discussion so significantly it will render the testimony inapplicable to much of the probative evidence in this case.**

In an effort to limit the discovery disputes before this Court, Plaintiffs made significant discovery concessions. These concessions included reaching an agreement to significantly pare down the number of fact witness depositions sought and to withdraw Plaintiffs' request for an apex deposition. Ultimately, the parties agreed that Plaintiffs would take seven fact-witness depositions and the deposition of IBM's Corporate Representative(s). The assumed understanding of this agreement was that IBM's Corporate Representative(s) would testify on the topics that would have been addressed through the fact-witness depositions Plaintiffs agreed to forego, and information sought by written discovery.

IBM now seeks a Protective Order to shield the company from addressing four topics of inquiry that relate to IBM's workforce "transformation." Specifically, IBM seeks to shield its Corporate Representative from testifying about changes to its workforce that IBM executives **publicly touted**[1] and are at the heart of Plaintiffs' age discrimination case.

Plaintiffs seek IBM Corporate testimony to establish i) the baseline workforce IBM had before it commenced its "transformation;"[2] ii) the total number of employees laid off during the various phases of the "transformation," and the average age of the workforce immediately before

---

[1] *See* discussion *infra*.
[2] Ex. 1, Plaintiffs' 30(b)(6) deposition notice ("Request 1" (a) "IBM's headcount composition since 2014, including but not limited to, total headcount by year for All Business Segments and All Geographic Regions.").

and after each phase;[3] iii) general information about the company's simultaneous hiring of employees;[4] and iv) hiring of young workers known as EPH (Early Professional Hires).[5] This information has been sought in numerous ways throughout discovery and IBM has repeatedly refused to meaningfully respond. This information is tantamount to Plaintiffs' case theory regarding IBM's *company-wide* discriminatory layoffs. IBM's efforts to limit the 30(b)(6) topics is yet another attempt to improperly limit the scope of discovery using the same strategy it has employed throughout this case. IBM restricts discovery to arbitrary sub-divisions of its corporate structure, thereby disaggregating relevant employee data to conceal the true scope of its wrongdoings.

## II. Plaintiffs have noticed IBM for a corporate representative deposition with topics consistent to its case theory—and narrowly tailored to obtain evidence of the same.

Plaintiffs have always and consistently pled and argued that IBM's discriminatory scheme came from the "highest executives" with the goal of "reinventing" and "transforming" IBM as an entire company.[6] Documents produced make it clear that the plan to "transform" IBM was a global one, carried out over the better part of a decade. This plan was often referred to by IBM as its "transformation." Over the course of the "transformation," IBM laid off tens of thousands of

---

[3] Id. ("Request 2" (b) "For All Business Segments and All Geographic Regions: i) the date of notification for each wave; ii) the date of separation for each wave; iii) the number of employees separated; iv) the average age of all employees immediately prior to commencement of the RA; and v) the average age of all employees immediately after completion of all waves of the following resource actions: a) Apollo, b) Chrome, c) Saturn, d) Solitaire, e) Baccarat, f) Concord, g) Maple, h) Palm, i) Sycamore.")

[4] Id. ("Request 11" mislabeled (d) "The total number of employees hired by IBM since 2014, by year, for All Business Segments and All Geographic Regions.").

[5] Id. ("Request 12" mislabeled (e) "The total number of Early Professional Hires hired since 2014, by year, for All Business Segments and All Geographic Regions.").

[6] See Pls.' First Am. Compl., Dkt. 5 at 1-2, 26-33; Pls.' Resp. in Opp'n to Def's Mot. to Maintain Confidentiality Designations, Dkt. 64 at 3; Pls.' Mot. to Compel Disc., Dkt. 75 at 1, 5-6, 13-15; Pls.' Reply in Support of Mot. to Compel, Dkt. 89.

employees and replaced them with younger workers (Early Professional Hires), often located overseas. Plaintiffs seek to depose IBM's Corporate Representative(s) regarding the plan as it was created and carried out—i.e. company-wide and on a global scale. Namely, Plaintiffs' 30(b)(6) Topic Nos. 1 (total company headcount data since 2014); 2 (data from a narrow selection of company layoff initiatives); 11 (select hiring data since 2014); and 12 (select EPH hiring data since 2014) are narrowly tailored to gather specific information about the global plan and execution of the fire-and-hire scheme Plaintiffs have alleged since day one.

### III.   IBM is a global corporation, no IBM "group" is limited to the United States, and no major part of IBM's "transformation" was limited by U.S. borders.

IBM is a global corporation operating in 175 countries, and its most senior executives leading the company have global responsibilities. As a result, it would be factually and functionally impossible to question a 30(b)(6) deponent about topics—such as emails reflecting executive monitoring of millennial percentages, as well as the percentages themselves—without straying into information IBM now seeks to make off limits. IBM has acknowledged the *company-wide* nature of its "transformation" in public statements[7], SEC filings[8], depositions[9] and in the documents produced.[10] No IBM group employs *only* U.S. employees, nor was IBM's "transformation" planning in any way limited to the borders of the United States. That factual reality is crucial to understanding why IBM's proposed restrictions would not just be difficult—

---

[7] Ex. 2, Tim Hesler, TRANSFORMATION IN A COGNITIVE ERA: GINNI ROMETTY DIALOGUE, July 13, 2020, available at http://gmba.sem.tsinghua.edu.cn/info/1080/1987.htm.
[8] Ex. 3, IBM's Annual 10Ks (i.e. Annual Report).
[9] Ex. 4, Deborah Butters Dep. Tr. at 53:18-54:2, 167:11-15; Ex. 5, Sam Ladah Dep. Tr. at 37:411; 210:19-25; Ex. 6, Nickel LaMoreaux Dep. Tr. at 77:1-78:4.
[10] Ex. 7, at IBMK-000152278 (A presentation given to the company executives by Diane Gherson, CHRO, reporting on the progress of IBM's company-wide Transformation.).

but nigh *impossible* to both abide *and* effectively question the deponent about much of the probative evidence in this case.

Take for example Niamh Long. Her affidavit is the only evidence IBM relies on to support its contention that Plaintiffs' 30(b)(6) topics are too broad and should be limited to the United States. In IBM's self-serving affidavit, Long states that she is the Director of HR Workforce Management.[11] She also states she has been in charge of "overseeing the restructuring activities, including resource actions, in countries outside the United States."[12] What Long fails to acknowledge is, at the time of her sworn affidavit, IBM had suspended doing layoffs,[13] but during the relevant time period Long was actually the person in charge of the U.S. restructuring and ***carried out her duties from Madrid, Spain***.[14] An executive based in Spain overseeing the American layoffs of a Fortune 50 company is a perfect example of evidence showing that—*truly*—IBM's layoffs planning and execution constituted an interconnected, border-spanning feat of global synergy brought into existence at the hands of its corporate executives.

## IV. IBM executives have boasted about its company-wide demographic transformation and yet IBM seek protection from providing testimony regarding the underlying data.

As an example, IBM's then-CEO Ginni Rometty delivered a presentation on IBM's "Transformation" at a Chinese university in 2016. During the presentation, ***Rometty boasted that out of IBM's 400,000 employees 50% were "millennials."***[15] As another example, in 2018, Senior

---

[11] Def's Mot. for Protective Order, Ex. 1,  Dkt. 103-1 at 2.
[12] *Id.*
[13] Ex. 6, Nickel LaMoreaux Dep. Tr. at 177:9-13.
[14] Ex. 8, Alan Wild Dep. Tr. at 41:6-13.
[15] Ex. 2, Tim Hesler, Transformation in a Cognitive Era: Ginni Rometty Dialogue, http://gmba.sem.tsinghua.edu.cn/info/1080/1987.htm (July 13, 2020), at 2.

Vice President and Chief Financial Officer, James Kavanaugh, touted to its shareholders "**~50% of [IBM's] employees are new in the last 5 years**."[16]

Plaintiffs intend to question IBM's corporate representative about such statements—including about the underlying data IBM's executives were relying upon. However, IBM now seeks to exclude data related to (i) IBM's overseas employees, (ii) IBM employees outside Plaintiffs' groups, and (iii) IBM employees not included in Palm, Maple, or Concord.[17] It is inconceivable, for example, that the "200,000 millennial employees"[18] cited by IBM's CEO do not also include categories of employees IBM seeks to exclude here. Thus, the underlying data behind executive statements at the heart of this case would be excluded from IBM's corporate representatives' obligation to prepare and testify vicariously about the same.

## V.   Many of IBM's most damning internal planning documents stray beyond IBM's 30(b)(6) proposed topic scope.

There is a plethora of internal executive planning documents suddenly at jeopardy of being functionally excluded from vicarious trial testimony if IBM prevails on its motion. One example—which also serves as lock tight support for Plaintiffs' decision to date the 30(b)(6) topics as starting from 2014-onward—is a document that states plainly that ████████████████████ ████████████████████████████████ which is a dead ringer for the "fire and hire" scheme Plaintiffs have long alleged.[19] The same document provides data

---

[16] Ex. 9 at IBMK-000186353.
[17] Def's Mot. for Protective Order, Dkt. 103 at 6-7.
[18] Ex. 2, Tim Hesler, TRANSFORMATION IN A COGNITIVE ERA: GINNI ROMETTY DIALOGUE, http://gmba.sem.tsinghua.edu.cn/info/1080/1987.htm (July 13, 2020), at 2.
[19] See Ex. 7, at IBMK-000152278.

about the company's "transformation" during that time period, including referencing ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ [20]





Other internal documents reflect that *company-wide* progress on the "transformation" included increasing the total percentage of millennials and lowering the average age of the IBM workforce—point blank. This progress was monitored and tracked by top executives.[21]

---

[20] *See id.* (noting that IBM's overall company workforce transformation includes ~120,000 laid off [40% of "300k losses"], while hiring ~115k Early Professional Hires [half of "230K hired"]).
[21] Ex. 10 at IBMK-000041491.



**VI.   IBM provided inculpatory reports to its Board of Directors about its efforts to lower the aggregate age of its workforce, but IBM's now-proposed 30(b)(6) topic restrictions would cause data underlying the reports to be off limits.**

IBM executives prepared presentations for IBM's Board of Directors which explicitly referenced the plan to "rebalance" the age of IBM's workforce by 2020.[22] Other Board presentation preparation materials analyzed and broke down the entire IBM workforce *by generation*, e.g. Baby Boomer, Millennial, etc.[23]



---

[22] Ex. 11 at IBMK-000056611.
[23] Ex. 12 at IBMK-000071710_A.

8



Additionally, IBM's senior leadership tracked the progression of the *company-wide* "transformation," and "replacement" of its workforce, and reported the progress to the Board of Directors.[24]



---

[24] Ex. 13 at IBMK-000065442.



Internal targets for EPH hiring were _not_ limited by geographic boundaries and were often set forth in 3-year periods—not on a short-term, local basis as IBM has alleged would be the case.[25] When IBM tracked the progress on increasing its "***EPH mix***" it was done on a *company-wide* and thus *global* scale.[26]

---

[25] Ex. 14 at IBMK-00188953.
[26] Ex. 15 at IBMK-000088245.





The unique treatment IBM applied to EPH hires was similarly applied company-wide.

Concerned IBM was losing some of the transformation "progress" by laying off the young people

IBM's executives so explicitly wanted to retain, the Chief Human Resource Officer issued an edict

"across the board" making Early Professional Hires completely immune from all Resource Action layoffs.[27]



### VII.    IBM's proposed 30(b)(6) restrictions would all but exclude data reflecting IBM's practice of firing ADEA-protected American employees and replacing them with younger overseas hires.

Based on information and belief, IBM wants to limit its production of information to the US workforce because doing so would mean IBM can hide the reality that the global workforce remained roughly the same size, while the average age of its employees was significantly reduced. Perhaps more concerningly, IBM will be permitted to conceal the fact that young, overseas employees replaced *ADEA-protected Americans*.

### VIII.   Even Maple, Palm, and Concord planning documents inextricably include data that would violate IBM's proposed (30)(b)(6) restrictions.

IBM asks this Court to restrict the 30(b)(6) topics at issue to Maple, Concord, and Palm. Maple,[28] Palm,[29] and Concord[30] were company-wide global layoffs affecting all IBM geographies.

---

[27] Ex. 16 at IBMK-000057028.
[28] Ex. 17 at IBMK-DAV-0000883.
[29] Ex. 18 at IBMK-000172334.
[30] Ex. 19 at IBMK-000187506.

Maple, Palm, and Concord likewise spanned across all IBM groups, *not* just the groups Plaintiffs herein worked within.[31]



Thus, even within Maple, Palm, and Concord, vast portions of the underlying data contained within the planning documents would spill over into IBM's proposed 30(b)(6) restrictions.

## IX. Under the federal rules, IBM's 30(b)(6) objections would consequently exclude *from trial* any and all vicarious corporate testimony about data underlying executive age statements, damning internal documents, and more.

IBM's proposed restrictions would effectively strip Plaintiffs of their *one and only* opportunity to obtain "vicarious" trial testimony (i.e. testimony from a corporate representative as if the company itself was testifying). This would exclude vicarious trial testimony regarding the data underlying executive boasts, inculpatory board of director reports, damning internal planning documents, the usage of offshoring to reduce age, and more.

### A. IBM corporate representative(s) will have a duty to learn about and prepare to be able to fully answer questions regarding the 30(b)(6) topics.

After 30(b)(6) topics are designated, "the deponent 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing

---

[31] Ex. 20 at IBMK- 46173, 182957, 163290, 163292.

the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed ... as to the relevant subject matters.'"[32] If IBM's proposed restrictions are imposed, IBM would have **_no_** duty to prepare its corporate representative to be able to answer questions about data that touches on anything beyond (1) U.S. employees; (2) the IBM groups Plaintiffs worked within; and (3) Palm, Maple, and Concord.

### B. Corporate representative testimony is "vicarious," and is considered to be testimony from the company itself.

"'Obviously it is not literally possible to take the deposition of a corporation.'"[33] By invoking Rule 30(b)(6), however, the designated corporate representative(s) "presents the corporation's 'position' on the topic[s]" of information specified in the deposition notice, and the company formally concedes that "the employee has the authority to speak on behalf of the corporation" regarding such topics.[34] "This extends not only to facts, but also to [the company's] subjective beliefs and opinions."[35] This process is often referred to as testimony provided "vicariously" for the company.[36]

### C. The lone guaranteed opportunity for a plaintiff to obtain "vicarious" company testimony is during a 30(b)(6) deposition.

"[T]here is no rule requiring that the corporate designee testify 'vicariously' at trial." [37] This means IBM will be under no absolute obligation to designate or allow any of its witnesses to

---

[32] *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (internal citations omitted).

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.* at 434.

[37] *Id.* (as a point of clarification, the Fifth Circuits notes, however, that courts may rule that such a deposition not be allowed to be read into the record if the witness is available to testify at trial. Here, IBM's executives who would be designated as corporate representatives likely will be beyond subpoena range, and thus this scenario will almost assuredly not be present as it applies to this lawsuit—assuming IBM does not voluntarily designate a vicarious witness for trial.).

testify vicariously on behalf of the company at trial. The remedy if a company decides *not* to designate a "vicarious" witness for trial is to allow the plaintiff to read the previously-taken 30(b)(6) deposition into the record as vicarious trial testimony of a party opponent.[38] Applied here, the only guaranteed opportunity for Plaintiffs to obtain vicarious IBM testimony about the designated data underlying many executive statements and other damning internal documents is *now* at the noticed 30(b)(6) deposition. Absent a tactical surprise by IBM, ***there will be no second chance for Plaintiffs herein***.  Thus, this Court's ultimate ruling on the motion at bar carries huge significance in terms of affecting Plaintiffs' ability to portray the entire picture of IBM's age animus and discrimination to the jurors who must make final decisions regarding the same.

## <u>ARGUMENTS & AUTHORITIES</u>

X.  ***Hageman* is an on-point ADEA decision demonstrating that overseas employees fall within the scope of ADEA discovery in RIF layoff cases.**

The *Hageman* decision is the most on-point discovery precedent presented to this Court to date by any party, and it demonstrates that information about foreign employees falls within the proper scope of discovery for ADEA claims. Employees fired within the United States were often slated by IBM corporate to be replaced by offshore employees—replacement employees who Plaintiffs contend were *younger* on average than the laid-off domestic employees they replaced. The symbiotic relationship between firing in one country and hiring replacements in another means that any suppression of Plaintiffs' ability to discover the offshore hiring half of the scheme would render it *impossible* to portray the scheme as a whole to a jury—at least as it pertains to the offshoring cog of the discriminatory machine. Offshoring notwithstanding, IBM's scheme was *not* limited to reducing the age of its U.S. workforce. IBM's scheme sought to reduce the age of its

---

[38] *Id.*

workforce *globally* through the firing of older workers, hiring of EPH, and other approaches. The global nature of IBM's scheme rendered it a company-wide practice of discrimination, and this evidence will be admissible at trial—*and thus at the very least should be discoverable*. IBM cannot be allowed to hide behind nation-state borders through the granting of its request to be excused from providing vicarious, company-binding testimony about its discriminatory practices just because it perpetrated them in part overseas.

In *Hageman*—just like in the case at bar—the plaintiffs were terminated via RIFs in a manner that targeted older employees at a higher rate than younger employees.[39] The *Hageman* plaintiffs challenged one of six topics the employer had refused to respond to during discovery, including **"[a]ge information about replacement employees, including Accenture's overseas employees."**[40]  Point-by-point, the court rejected each of the employer's arguments in defense of its refusals, including that producing overseas employee data was "irrelevant" to ADEA claims; would be "overly burdensome;" was "overbroad" because: the overseas employees allegedly performed different work than the plaintiffs; Plaintiff had "not offered sufficient evidence in support of their claims regarding overseas employees;" the plaintiffs "had presented no evidence that overseas employees were consider as part of the reduction in force;" and, the overseas employees were allegedly "not similarly situated because their respective hiring and termination was governed by different decision-makers."[41] As part of its rejection of the defendant-employer's argument that the plaintiffs had not proved a connection to overseas employees, the *Hageman*

---

[39] *Hageman v. Accenture LLP*, No. CIV. 10-1759 RHKFLN, 2010 WL 3749246, at *1 (D. Minn. Sept. 21, 2010) (dismissing the employer's motion to dismiss where the plaintiffs alleged that 70% of the employees terminated in certain RIFs were over the age of 40, and that the termination rate of that group was more than double the rate for employees under 40.).
[40] *Id.* at *2.
[41] *Id.* at *2–3.

court noted that "Rule 26(b)(1) does not require a party to satisfy a burden of proof in order to seek discovery," but the plaintiffs had provided sufficient evidence to "overcome any contention that discovery is sought solely to annoy, oppress, or unduly burden [the employer]."[42] Here, Plaintiffs have provided proof that IBM created and carried out plans to replace laid off workers with new employees—many of whom were overseas hires, and many of whom were "Early Professional Hires."[43] Just as in *Hageman,* Plaintiffs have likewise provided enough proof that their desire to examine overseas employment data is genuine and not meant to merely impose a burden or annoyance upon IBM.

As part of its rejection of the defendant-employer's argument that hiring and firing of overseas employees was governed by different decision-makers, the *Hageman* court noted that the plaintiffs had offered evidence that "the decision, to terminate 'Service' employees and replace them with overseas employees, ***was made at the corporate level***," therefore discovery into overseas employee data was merited.[44] Other courts have likewise held that proof of decision-making at a global level merits *discovery* on a global level.[45] The Court here does not need to be

---

[42] *Id.*

[43] ████████████████████████████████████████████████████

[44] *Hageman*, 2011 WL 13136510 at *3.

[45] *See e.g. Zhao v. Deutsche Bank AG*, No. 13CV02116 (GBD) (DF), 2014 WL 12526256, at *1 (S.D.N.Y. June 24, 2014) ("In support of [the ultimately rejected U.S.-only] geographic limitation, Defendant argues that Plaintiff was employed by GIS in the U.S., and that decision-making for the RIF occurred at a regional level. Documents already produced in discovery, however, provide a colorable basis for Plaintiff's belief that such decision-making actually occurred on a global level, rendering the requested [global employee] discovery relevant and appropriate.") (emphasis added) (internal citations omitted).

reminded that Plaintiffs have likewise long alleged that layoff strategies, planning, and decisions were made at the IBM corporate level, and that evidence to support those contentions has already been provided and briefed in detail.[46] IBM's arguments that allegedly different (nominal) decisionmakers should similarly be rejected.

As a demonstrative parallel, it would be unconscionable for a race discrimination employer-defendant to be shielded from providing information reflecting that it had fired predominantly black workers in America and replaced them with predominantly white workers in Great Britain—especially where, as here, executive comments reflecting discriminatory animus were found.[47] It would be just as unconscionable for a race discrimination employer-defendant to be shielded from providing discovery about such a practice. The Plaintiffs in this discrimination suit are likewise entitled to (1) establish whether IBM's overseas replacement employees were younger than employees being laid off, and (2) establish whether IBM really did have a *company-wide* pattern or practice of discrimination *globally* by being allowed to discover **admissible evidence** proving the same.[48]

---

[46] *See generally* Pls.' First Am. Compl., Dkt. 5; Pls.' Mot. to Compel Disc., Dkt. 75, and all exhibits filed in support therein.

[47] *See, e.g.*, Ex. 25 at IBMK-000093664 (executive comments about IBM millennial percentage of workforce is too low); Ex. 26 at IBMK-000065323 (executive comments that IBM millennial percentage of workforce trails competitors and suggests plans for that to be remedied); Ex. 27 at IBMK-000073352 (IBM CEO praising disparagement of IBM old workers, as well as plans to exit them from the company); Ex. 28 at IBMK-000056483 (additional executive comments that IBM millennial percentage of workforce is too low).

[48] *See e.g. McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 754 (5th Cir. 1980) (holding that that "evidence of a pattern of terminating older workers when a reduction in force occurred [allows] the reasonable inference that age had played a role in [a plaintiff's] discharge.") (emphasis added).

**XI.    IBM conflates two unrelated concepts, (i) overseas foreign employees' lack of standing to sue under the ADEA with (ii) discoverability of data regarding foreign employees working overseas. If anything, the ADEA was drafted with an intent to hold domestic companies accountable for their actions overseas.**

IBM misleads the Court by vaguely suggesting that foreign employees simply have no relevance to ADEA suits—even in discovery and pre-trial phases. For example, IBM makes the laconically misleading statement that "[c]ourts have repeatedly held that the ADEA does not apply to foreign employees outside of the United States," citing *Reyes-Gaona* and *O'loughlin* as examples.[49] *Reyes-Gaona* and *O'loughlin* have **nothing to do whatsoever with discoverability**, and are instead threshold jurisdictional cases regarding whether a "foreign national" may invoke the ADEA to sue for conduct occurring overseas.[50] In other words, IBM's cited cases pertain to *legal standing* for foreign nationals working overseas, *not* whether data about foreign nationals working overseas is *discoverable* as part of a domestic lawsuit. No Plaintiff herein is an overseas foreign national attempting to sue, and precedents prohibiting a fact situation not present here should not be extrapolated to constrict these Plaintiffs' ability to conduct discovery and work up their case.

IBM similarly misleads that "[a]s a matter of common sense, decisions made by managers in foreign countries regarding employees in those countries who were not subject to the ADEA do not shed any light on whether managers in the United States discriminated against Plaintiffs on the basis of their age."[51] Such argument is blatantly false based on a basic reading of the ADEA as amended in 1984, as well as the congressional intent that was specifically aimed at holding American companies accountable for their actions overseas. IBM's argument also ignores the fact

---

[49] Def's Mot. for Protective Order, Dkt. 103 at 11-12.
[50] *See Reyes-Gaona v. N. Carolina Growers Ass'n*, 250 F.3d 861, 863 (4th Cir. 2001); *see also O'Loughlin v. The Pritchard Corp.*, 972 F. Supp. 1352, 1364 (D. Kan. 1997).
[51] Def's Mot. for Protective Order, Dkt. 103 at 12.

that Plaintiffs have alleged—and offered evidence to support—IBM's corporate age animus. This animus resulted in aligned and consistent strategies to reduce the age of IBM's workforce *globally*. Thus, "decisions made by" IBM's CEO regarding global layoff strategies would naturally have affected IBM employees regardless of respective geography, and the discriminatory results elsewhere would certainly "shed light" on domestic discrimination by corroborating the existence of the same.

Section 623(h)(1) of the ADEA states that "[i]f [a domestic] employer controls a corporation whose place of incorporation is in a foreign country, ***any*** practice by such corporation prohibited under this section shall be presumed to be such practice by such [domestic] employer."[52] The fact that Congress intended to hold domestic corporations accountable for ***any*** discriminatory practice overseas is confirmed by the testimony that led up to the passage of the amendment. As amended, the ADEA reaches employers that are controlled by American firms, through ***a presumption that the subordinate business's discriminatory actions, are in fact, the actions of the American firm***.[53]

In other words, ***any*** discriminatory practices of IBM overseas—***or even a subsidiary of IBM overseas***—are presumed to be the discriminatory practices of IBM as a company pursuant to the plain language of the ADEA.  Evidence of a pattern or practice of age discrimination can be

---

[52] *See* 29 U.S.C.A. § 623(h)(1) (West) (as provided in a subtitle which reads in part, "Practices of foreign corporations controlled by American employers."); *but see* 29 U.S.C.A. § 623(f) (the "foreign law exception" excusing violations of the ADEA where compliance with the ADEA overseas "would cause [the] employer, or a corporation controlled by such employer, to violate the laws of the country in which such workplace is located.").

[53] *See* 129 Cong. Rec. S. 17,018 (daily ed. Nov. 18, 1983) (statement by Senator Grassley).

admissible in ADEA lawsuits, so at the very least Plaintiffs should be entitled to explore the same *during discovery*—regardless of *where* IBM perpetrated its discrimination.[54]

### XII. Federal courts have long held that overseas foreign employees—as well as even domestic employees without standing to sue under the ADEA—are still relevant to ADEA lawsuits.

As established *supra* in *Hageman,* foreign employee RIF data is discoverable in ADEA cases whenever a colorable basis for relevance is shown, as is the case here.[55] Taking a step back from that on-point holding, other courts have likewise recognized the relevance of overseas employee information to ADEA and other discrimination suits.[56] In the Second Circuit's *Morelli* decision, the defendant-employer was a Luxembourg bank and the district court had granted the defendant-employer's motion to dismiss because the bank employed fewer than 20 employees in its sole U.S. branch (on the basis that ADEA protections are not triggered for employers with fewer than 20 employees).[57]   However, the Luxembourg bank employed more than 20 total employees worldwide, and the issue was raised of whether those foreign national employees overseas could count toward the 20-employee threshold requirement. The *Morelli* Court provided considerable

---

[54] *See e.g. McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 754 (5th Cir. 1980) (holding that that "evidence of a pattern of terminating older workers when a reduction in force occurred [allows] the reasonable inference that age had played a role in [a plaintiff's] discharge.") (emphasis added); *see also e.g. Norris v. Acadiana Concern for Aids Relief Educ. & Support*, 421 F. Supp. 3d 399, 409 (W.D. La. 2019) (holding that "allegations of a pattern of age-based comments and conduct is sufficient to survive a Motion to Dismiss.") (emphasis added); *see also generally Williams v. United States Env't Servs., LLC*, No. CV 15-168-RLB, 2016 WL 617447, at *8 (M.D. La. Feb. 16, 2016).

[55] *See e.g. Hageman v. Accenture, LLP*, No. CV 10-1759 (RHK/TNL), 2011 WL 13136510, at *2 – 3 (D. Minn. June 7, 2011) (emphasis added).

[56] *See e.g. Wildridge v. IER, Inc*., 65 F. Supp. 2d 429, 431 (N.D. Tex. 1999) (allowing overseas employees to count toward the jurisdictional requirements of Title VII); *see also generally Bass v. Technip USA Corp.*, No. CIV.A. H-05-0652, 2005 WL 1185626 (S.D. Tex. May 6, 2005).

[57] *Morelli v. Cedel*, 141 F.3d 39, 41, 44 (2d Cir. 1998).

discussion of the 1984 amendment to the ADEA, and stated that, as it pertains to foreign national employees working overseas:

> The district court reasoned that the overseas employees of foreign employers should not be counted because they are not protected by the ADEA. But ***there is no requirement that an employee be protected by the ADEA to be counted***; an enumeration, for the purpose of ADEA coverage of an employer, ***includes employees under age 40, who are also unprotected***…Accordingly, in determining whether [the employer] satisfies the ADEA's 20–employee threshold, ***employees cannot be ignored merely because they work overseas***. We therefore vacate the judgment on the plaintiff's ADEA count.[58]

As the *Morelli* court noted, the word "employee" does not even appear in § 623(4)(h)—the section that holds domestic corporations accountable for discriminatory practices perpetrated overseas.[59] "[I]f Congress had wished to restrict the definition of 'employee' to exclude a foreign employer's foreign workers, it certainly could have done so directly when it amended § 11(f) in 1984."[60] It did not. Applied to the dispute at bar, Congress did not use the term "employee" in the section holding domestic companies accountable for overseas discrimination, and thus we can surely assume that Congress never meant to exclude or suppress *discovery* about such overseas discrimination in domestic lawsuits such as this one.

Just as "there is no requirement that an employee be protected by the ADEA to be counted [for jurisdictional thresholds]," there is likewise no requirement that an employee be protected by the ADEA for information about that employee to be *discoverable* in a domestic lawsuit brought by someone else entirely.[61] If "***a foreign business may not deliberately undertake to reduce the age of its workforce by replacing older Americans with younger foreign nationals***," then certainly a *domestic* business may not legally do so either, which is exactly what Plaintiffs allege

---

[58] *Id.* at 44-45.
[59] *Id.*
[60] *Id.*
[61] *Id.* at 39, 45.

occurred here.[62] IBM's motion seeking to suppress discovery regarding evidence of its discriminatory practices overseas should thus be denied.

### XIII.   IBM insistence that topics should be restricted to arbitrary subdivisions within its U.S., and workforce is an attempt to "disaggregate" the relevant data and thereby skew the population of relevant comparators.

In *Capaci v. Katz & Besthoff, Inc.*, the Fifth Circuit squarely rejected the strategy of "disaggregation" that IBM now advocates.[63] IBM asks this Court protect it from providing testimony concerning its *aggregate workforce composition* through the imposition of geographic and organizational restraints on the noticed 30(b)(6) topics.[64]  In *Capaci*, the court found that the defendant-employer's attempt to "demonstrate that there was no statistically significant evidence of discrimination when the [workforce] data was broken down" by geography or year, "was an unfair and obvious attempt to *disaggregate* that data to the point where it was difficult to demonstrate statistical significance."[65] The *Capaci* court stated "there was no reason to fragment [workforce] data geographically"—as IBM seeks to do here—since disparate treatment "liability is premised on across-the-board practices… occurring at all locations."[66] As with the *Capaci* plaintiffs, these Plaintiffs have pled that the unlawful discrimination which they suffered was the result of "across-the-board practices"  affecting the whole of IBM.[67]

---

[62] *See MacNamara v. Korean Air Lines*, 863 F.2d 1135, 1141 (3d Cir. 1988) (emphasis added).
[63] *See Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 654 – 55 (5th Cir. 1983).
[64] *Id.*
[65] *Id.* at 654(emphasis added).
[66] *Id.* at 654–55.
[67] *Id.* at 655.

IBM now asks this Court to issue a protective order that would allow it to "fragment[] [its workforce] data into small sample groups," which will effectively make, "statistical tests [] less probative."[68] Limiting the 30(b)(6) deposition to (i) IBM's domestic workforce, (ii) Plaintiffs' respective business groups, or (iii) Palm, Maple, and Concord would allow IBM to hide from the reality that during relevant timeframe, the size of its global workforce stayed relatively consistent, but the average age of its employees significantly declined.

### XIV. This Court's prior order compelled IBM to produce age data for the "group" each Plaintiff is in; IBM groups are undeniably *global*.

Plaintiffs disagree with IBM's characterization of the geographic scope of this Court's prior discovery Order. This Court expressly ordered IBM to produce responsive information at the level of "the '*group*' in which the plaintiff was employed," and provided "Systems" as an example of the type of business division contemplated.[69] In the context of IBM's organizational structure— and *demonstrably* proven by the numerous internal planning documents provided in prior motions and herein—*the term "group" is well-established as being global divisions of IBM*. As a direct example as cited by this Court, IBM "Systems" is a group that spans the globe and includes the United States, Europe, Asia, and ostensibly everywhere else IBM has a presence.[70] As described by IBM in its Response to Plaintiff's motion to compel, groups are the highest-level business unit at IBM: "each group is led by a Senior Vice President," and groups are typically divided into "sub-units," which themselves are "*sub-divided into multiple geographic regions*."[71] It is unclear how

---

[68] *Id.*
[69] *See* Order on Pls.' Mot. to Compel Disc., Dkt. 96 at 1 (emphasis added).
[70] *See* Ex. 29 at IBMK-000039618-39619 (IBM Systems planning document reflecting layoff strategies in North America, Asia, Europe, etc.).
[71] *See* Def's Resp. to Mot. to Compel Disc., Dkt. 82 at 2, 15 (emphasis added); Tr. of Hr'g on Pls.' Mot. to Compel Disc., Dkt. 112 at 34-35.

IBM could—in the context of the undeniably global span of IBM groups—contend that this Court's Order compelling discovery at the group level would only obligate it to produce data related to IBM's U.S.-based workforce.[72]

### A. IBM argued against an order setting the scope of discovery for the entire lawsuit, and this Court agreed. IBM is judicially estopped from now arguing otherwise.

Regardless of which party has correctly interpreted the April 26th Order, this Court expressly ***declined*** to issue a "global ruling" setting the scope of discovery for the entire case—not to be confused with the literal "global" issues in the instant motion that refer to the worldwide nature of IBM and its layoffs.[73] IBM argued that this Court lacked the power to set the scope of discovery for the entire case, and instead could only rule on specific objections to specific discovery requests.[74] Now, IBM argues the specific Order on Nos. 19 and 20 should be extrapolated to prevent corporate representatives questions related to its foreign employment practices.[75] IBM is judicially estopped from making any such argument, because IBM successfully took a contradictory position in a prior proceeding and was successful.

---

[72] *See* Def's Mot. for Protective Order, Dkt. 103 at 10.

[73] *See* Pls.' Mot. to Compel Disc., Dkt. 75 at 5 – 6 (requesting the Court to issue a "global ruling … that documents and data related to the Concord, Maple, and Palm IBM layoff initiatives are… within the scope of discovery."); Order on Pls.' Mot. to Compel Disc., Dkt. 96 (granting, in part, Plaintiffs' request to compel responses to Requests for Production No. 19 and 20, and denying "Plaintiff's motion in all other respects.")

[74] *See e.g.* Def. Resp. to Mtn. to Compel Disc., Dkt. 82 at 9-10; *see also* Tr. of Hr'g on Pls.' Mot. to Compel Disc., Dkt. 112 at 13 (This Court declared verbally that "this global declaration of the relevance and discoverability of Concord, Maple, and Palm [for the entire lawsuit], I think both of those are beyond the scope of what I am willing to do or able to do under federal rules in this hearing.").

[75] *See* Tr. of Hr'g on Pls.' Mot. to Compel Disc., Dkt. 112 at 5.

"Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation."[76] "The purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self-interest."[77] Success in the prior proceeding is considered necessary for the estoppel to apply,[78] and obviously IBM successfully refuted Plaintiffs' request for a global ruling on the overall scope of discovery. IBM is now legally prohibited from arguing this Court's prior Order has any effect on subsequent discovery.

### B. Plaintiffs maintain that the parameters of a prior Request for Production cannot act to restrict the scope of discovery for future discovery requests. Even if they somehow did, Plaintiffs discovery has encompassed a global scope.

IBM argues that ***completely separate discovery requests*** should now control the scope of 30(b)(6) topics. Specifically, IBM invokes the meaning of "RA" as it was defined in prior Requests for Production, to claim that testimony from its Corporate Representative(s) should be confined to its domestic workforce only. As discussed *supra,* IBM's argument assumes that a limited, definitional restriction—which was self-imposed by the party propounding discovery—*can and should* bind the scope of all subsequent discovery. IBM does not attempt to justify this position with legal authority, and the few cases in which similar situations have come before the court offer no support. As noted by this Court in *Westheimer Regency,* "***discovery requests 'should not be read or interpreted in an artificially restrictive or hyper technical manner to avoid disclosure of***

---

[76] *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334 (5th Cir. 2004) (citing *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir.1988)).
[77] *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir.1999) (citations and quotations omitted).
[78] *Gabaric v. Laurin Maritime (America) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014)(quoting *New Hampshire v. Maine*, 532, U.S. 742, 743 (2001)).

*information fairly covered by the discovery request.*"[79]  In its April 26, 2022 Order, this Court compelled group-level discovery as it pertains strictly to Request Nos. 19 and 20.[80] IBM groups are undeniably international. IBM strains credulity by claiming that this Order somehow only obligated U.S. discovery. Its demand that the same erroneous interpretation should apply to 30(b)(6) topics is absurd.

Even if this Court disagrees with the international scope of Request No. 19, it is clear that other discovery has encompassed global issues and documents. Plaintiffs served their Second Requests for Production on June 11, 2021.[81] During the intervening months, mounting evidence was produced that demonstrates the discriminatory layoffs resulting in Plaintiffs' terminations were part-and-parcel of a company-wide effort to reduce the age of IBM's *global* workforce.[82] The same evidence shows that a number of the RAs identified by Request  No. 19—*as well as those specifically named in the disputed 30(b)(6) topics*—were international, and impacted IBM's U.S. workforce and foreign employees simultaneously.[83]

In February 2022, Plaintiffs propounded additional requests for production seeking information on IBM employees in "All Geographic Regions."[84] Therein, the term "All Geographic Regions," is expressly defined to include "North America, Latin America, Europe, Middle East and Africa, Asia Pacific, Japan and Greater China Group."[85] Notably, the noticed topics to which IBM now objects all explicitly state that the information sought pertains to "All Geographic

---

[79] *Westheimer Regency I, L.P. v. Great Lakes Reinsurance (UK) SE,* No. 5:18-CV-14-OLG, 2018 WL 7198643, at *2 (W.D. Tex. Aug. 20, 2018) (quoting *Beach Mart, Inc. v. L & L Wings, Inc.*, 302 F.R.D. 396, 405 (E.D.N.C. 2014)) (emphasis added).
[80] Order on Pls.' Mot. to Compel Disc., Dkt. 96.
[81] *See* Ex. 30, Pls.' Second Requests for Prod. of Docs.
[82] *See* Ex. 28 at IBMK-000056483-85.
[83] *See* Ex. 20 at IBMK-000046173, 000182957, 000163290, 000163292.
[84] *See* Ex. 31, Pls.' Third Requests for Prod. of Docs at 2.
[85] *Id.* (original parenthetical abbreviations omitted).

Regions."[86] Plaintiffs have consistently sought company-wide discovery in this lawsuit and should not now be tethered to IBM's contrived geographic limits.

### Conclusion

Plaintiffs have long alleged that IBM's scheme involved using company-wide rolling layoffs, specifically structured to target older employees, while simultaneously hiring younger employees as their replacements. The scope of the scheme at issue involved firing and hiring *thousands upon thousands* of IBM employees over the better part of a decade. Many ADEA-protected Americans who lost their jobs at IBM, were replaced by younger overseas counterparts. "[I]mposing geographic restrictions on discovery could obscure relevant information" to Plaintiff's claims.[87] "The Age Discrimination Act is remedial and humanitarian legislation," and it should be "construed liberally to achieve its purpose of protecting older employees from discrimination."[88] Allowing IBM to so-favorably sculpt its 30(b)(6) deposition to avoid offering testimony regarding the full scope of its scheme completely disregards Plaintiffs' case theory and would render an inequitable result. Further, it would excuse one of America's largest employers from testifying about the true scale of its unlawful conduct—which impacted these eight Plaintiffs and thousands of others.

### PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that this Court deny Defendant IBM's motion for protective order, compel IBM to fully engage in the corporate

---

[86] Def's Mot. for Protective Order, Ex. B, Dkt. 103-2 at 32-33, 35.
[87] *Costellow v. Becht Eng'g Co*., No. 1:20-CV-00179, 2020 WL 10317736, at *3 (E.D. Tex. Dec. 19, 2020) (declining to restrict discovery based on certain geographical boundaries).
[88] *Morelli v. Cedel*, 141 F.3d 39, 43 (2d Cir. 1998) (citing Moses v. Falstaff Brewing Corp., 525 F.2d 92, 93 (8th Cir.1975)(internal quotation marks omitted).

representative deposition noticed and all corresponding deposition topics, and all further relief, legal or equitable, general or special, to which they may be justly entitled.

Respectfully submitted,

WRIGHT & GREENHILL, P.C.
4700 Mueller Blvd., Suite 200
Austin, Texas  78701
512/476-4600
512/476-5382 (Fax)

By:_____
    Heidi A. Coughlin
    State Bar No. 24059615
    hcoughlin@w-g.com
    Archie Carl Pierce
    State Bar No. 15991500
    cpierce@w-g.com
    Blair Leake
    State Bar No. 24081630
    bleake@w-g.com

    and

By:_____
    Kaplan Law Firm
    Austin Kaplan
    State Bar No. 24072176
    akaplan@kaplanlawatx.com

**Counsel for the Plaintiffs**

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on June 24th 2022, I electronically filed the foregoing Response to IBM's Motion for Protective Order to Limit Scope of 30(B)(6) Deposition with the Clerk of the

Court using the CM/ECF system, which sent notification of such filing to the Court and

Defendant's counsel of record.

Heidi A. Coughlin